## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Restoration Forest Products Group, LLC, *et al.*,[1] | Case No. 24-10120 (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" or, the "Company") hereby move (the "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105(a), 361, 362, 363, 364, 503(b), 506(c), and 507(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the District of Delaware (the "Local Rules"): (i) authorizing the Debtors to (a) obtain postpetition financing and (b) utilize cash collateral; (ii) granting senior secured priming liens and superpriority administrative expense claims; (iii)

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Restoration Forest Products Group, LLC (8466); Just Right, LLC (3892); Good Earth Power AZ, LLC (5856); and Restoration Forest Products, LLC (6372). The Debtors' service address is 14005 Old Rte 66 Bellemont, Arizona 86015.

granting adequate protection to (A) the Prepetition Bridge Secured Parties (as defined herein), and (B) the Prepetition 2022A Bond Secured Parties (as defined herein); (iv) modifying the automatic stay; (v) scheduling a final hearing; and (vi) granting related relief. In support of the Motion, the Debtors submit the *Declaration of Kenneth Garnett in Support of the Debtors' DIP Financing Motion* (the "DIP Declaration"), filed contemporaneously herewith, and respectfully state as follows:[2]

## RELIEF REQUESTED

1.  By this Motion, the Debtors seek, among other things:

    (i)    authorization for each of the Debtors, in their capacity as borrowers, to obtain postpetition financing, on a joint and several basis, the Debtors' obligations in connection with a debtor-in-possession financing, comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $93,342,012.11 (the "DIP Facility"), which consists of (i) a new money multi-draw term loan facility in an aggregate principal amount of $29,000,000.00 (the commitments thereunder, the "New Money DIP Commitments" and the Interim Term Loans and Final Term Loans (each as defined in the DIP Credit Agreement (defined below)) advanced thereunder, the "New Money DIP Loans") to be funded by certain Prepetition Bridge Lenders (as defined below), and (ii) upon entry of the Interim Order, a deemed term loan "roll-up" postpetition financing of the outstanding Prepetition Bridge Obligations in an amount equal to $64,342,012.11, of which $62,000,000.00 is the original principal amount, $1,901,972.81 is accrued and capitalized interest and $440,039.31 is accrued, outstanding and uncapitalized interest (such rolled-up debt, the "Roll-Up Loans" and together with the New Money DIP Loans, the "Term Loans");

    (ii)    authorization for the Debtors (i) to enter into that certain *Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement* among the Debtors, the lenders from time to time party thereto (collectively, the "DIP Lenders"), and UMB Bank, National Association ("UMB") as administrative agent (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Parties") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement," together with all agreements, documents, and

---

2.  Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Interim Order or, to the extent not defined therein, then as defined in the DIP Credit Agreement (as defined herein).

instruments delivered or executed in connection therewith, the "<u>DIP Documents</u>"), which shall be in substantially the same form attached to the Interim Order as **<u>Exhibit 2</u>**, and (ii) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(iii)    authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined in the Interim Order), including Cash Collateral (as defined herein), in accordance with the terms of the DIP Orders, including pursuant to the DIP Budget (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein), and (y) upon entry of the Interim Order to effectuate the Roll-Up Loans;

(iv)    the granting of adequate protection to (x) the lenders under that certain Credit Agreement, dated as of June 5, 2023, as amended by that certain First Amendment to Credit Agreement, dated as of September 1, 2023 (as amended, supplemented or otherwise modified, the "<u>Prepetition Bridge Credit Agreement</u>" and, together with the Subordination Agreement (as defined below) and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith, each as amended, supplemented or otherwise modified, the "<u>Prepetition Bridge Documents</u>"), by and among the Borrowers (in such capacity, the "<u>Prepetition Bridge Obligors</u>"), the lenders from time to time party thereto (the "<u>Prepetition Bridge Lenders</u>") and UMB Trustee, National Association as administrative agent (in such capacity, the "<u>Prepetition Bridge Agent</u>" and, collectively with the Prepetition Bridge Lenders, the "<u>Prepetition Bridge Secured Parties</u>") and (y) the holders (the "<u>Prepetition 2022A Bondholders</u>") of Arizona Industrial Development Authority Revenue Bonds (NewLife Forest Restoration, LLC Project), Senior Federally Taxable Series 2022A (Sustainability-Linked Bonds) (the "<u>Prepetition 2022A Bonds</u>") issued by the Arizona Industrial Development Authority (the "<u>Authority</u>") pursuant to the Indenture of Trust, dated as of February 1, 2022, by and among the Authority and UMB Bank, National Association, as trustee (in such capacity, the "<u>Prepetition Trustee</u>" and together with the Prepetition 2022A Bondholders and the Authority, the "<u>Prepetition 2022A Bond Secured Parties</u>" and together with the Prepetition Bridge Secured Parties, the "<u>Prepetition Senior Secured Parties</u>"), as amended by the First Supplemental Indenture of Trust, dated as of April 11, 2023 and the Second Supplemental Indenture of Trust, dated as of June 16, 2023, by and between the Authority and the Prepetition Trustee (the "<u>Prepetition Indenture</u>"), the proceeds of which Prepetition 2022A Bonds were loaned to Restoration Forest Products Group, LLC pursuant to that certain Loan Agreement, dated as of February 1, 2022, by and among the Authority and Restoration Forest Products Group, LLC, as borrower and each of Just Right, LLC, Good Earth

3

Power, AZ, LLC, and Restoration Forest Products, LLC as guarantors (together, the "<u>Prepetition 2022A Bond Obligors</u>" and the Loan Agreement, the "<u>Prepetition Indenture Loan Agreement</u>" and, together with the Lateral Subordination Agreement (as defined below) and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith, each as amended, supplemented or otherwise modified, the "<u>Prepetition Indenture Documents</u>");

(v)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Closing Fee (as defined herein), the Agency Fee (as defined herein), the Exit Fee (as defined herein), and the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vi)    the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, that was not subject to a valid and perfected lien on the Petition Date (such property and assets, the "<u>Unencumbered Assets</u>"), except as otherwise specifically provided in the DIP Orders, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth in the DIP Orders and in the DIP Documents;

(vii)   the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided in the DIP Orders, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth in the DIP Orders and in the DIP Documents;

4

(viii)   the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided in the DIP Orders, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Bridge Liens (as defined below) and the Prepetition 2022A Bond Liens (as defined below), subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth in the DIP Orders and in the DIP Documents;

(ix)    the granting of superpriority administrative expense claims against each of the Debtors' estates in favor of the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth in the DIP Orders and in the DIP Documents;

(x)     the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(xi)    authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described in the DIP Orders upon the occurrence and during the continuance of a Termination Event (as defined in the Interim Order);

(xii)   the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of the DIP Orders and the DIP Documents;

(xiii)  pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on this Motion be held before the Bankruptcy Court to consider entry of the Interim Order;

(xiv)   that the Bankruptcy Court schedule a final hearing (the "Final Hearing") to consider entry of the Final Order authorizing and approving, on a final basis, among other things, the Debtors' borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $29,000,000.00 in New Money DIP Loans, the Roll-Up Loans and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents; and

(xv)    granting related relief.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Local Rule 9013-1(f) to the entry of a final order by the Bankruptcy Court in connection with this Motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 361, 362, 363, 364, 503(b) and 507(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 4001-2.

## BACKGROUND

4.      On the date hereof (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  No trustee, examiner, or creditors' committee has been appointed in these cases.  The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Kenneth Latz in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.

## FACTS RELEVANT TO THIS MOTION

I.   **Prepetition Capital Structure**

6.     As of the Petition Date, the Debtors have approximately $367 million in funded

debt obligations summarized as follows:

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| Bridge Loan | $64,342,012.11 |
| Series A Bonds | $138,868,000.00 |
| Series B Bonds | $107,374,000.00 |
| Lateral Loan Agreement | $56,704,000.00 |

7.     The following is a brief summary of the history and present status of the Debtors'

prepetition secured debt obligations (collectively, the "Prepetition Obligations").

A.   **The Lateral Loan Agreement**

8.     On May 15, 2017, Lateral US Credit Opportunities Fund, LLC and Lateral SMA

Agent, LLC (the "Lateral Lenders"), through Lateral Administrative Agent, LLC (the "Lateral

Agent," and collectively with the Lateral Lenders and certain of their affiliates, "Lateral") entered

into that certain Credit Agreement (the "Lateral Loan Agreement") with Restoration Forest

Products Group, LLC f/k/a NewLife Forest Restoration, LLC f/k/a FEC Logging USA Holdings,

LLC ("RFPG") and the remaining Debtors, collectively as borrowers under the Lateral Loan

Agreement.  As of February 24, 2022, the Lateral Lenders had made term loans to the Debtors

under the Lateral Loan Agreement in an aggregate principal amount of $131,396,436 (including

capitalized interest, but excluding other accrued interest, fees, and other obligations).

B.   **The 2022 Bonds**

9.     In early 2022, RFPG[3] requested that the Authority, a nonprofit corporation

designated as a political subdivision of the State of Arizona, issue bonds to assist the Debtors with

---

[3] At this time, RFPG was doing business as NewLife Forest Products, LLC.

financing and/or refinancing the costs of the acquisition, construction, improvement, equipping and operation of certain of the Debtors' facilities related to its residuals and lumber processing operations, which included exchanging some of the Debtors' debt owed to Lateral for subordinate bonds.  Pursuant to the Prepetition Indenture, the Authority agreed to issue two series of bonds through the Prepetition Indenture – Prepetition 2022A Bonds and the Subordinate Federally Taxable Series 2022B (Sustainability-Linked Bonds) (the "Prepetition 2022B Bonds," and together with the Prepetition 2022A Bonds, the "2022 Bonds").  The Authority issued the 2022 Bonds to lend the proceeds thereof to the Debtors.  Pursuant to the Prepetition Indenture, at the time of closing, the Authority issued the maximum amount of 2022 Bonds—$400,000,000. However, a lesser amount was delivered, with the balance of the maximum amount withheld to account for accrued interest (*i.e.* the PIK, or paid-in-kind, amount).

(i)      Issuance of the Prepetition 2022A Bonds

10.     The Prepetition Trustee issued and delivered the Prepetition 2022A Bonds, which had an aggregate principal amount of $112,885,000 on the effective date of the Prepetition Indenture, with the remaining $87,115,000 aggregate principal amount of Prepetition 2022A Bonds being issued but not delivered (representing PIK that could accrue).  All of the Prepetition 2022A Bonds were purchased by affiliates of Invesco Senior Secured Management, Inc. (collectively, "Invesco").  As of the Petition Date, Invesco and its affiliates continue to hold all the Prepetition 2022A Bonds, with Cede & Co. as the registered owner.

(ii)     Issuance of the Prepetition 2022B Bonds

11.     The Prepetition Trustee also issued the subordinate Prepetition 2022B Bonds, which had an aggregate principal amount of $86,806,759 on the effective date of the Prepetition Indenture, with the remaining $113,193,241 aggregate principal amount of Prepetition 2022B

Bonds being issued but not delivered (representing PIK that could accrue).  At the time of issuance, Lateral U.S. Credit Opportunities Fund, L.P. purchased Prepetition 2022B Bonds in the amount of $71,098,788.42, and Lateral SMA Agent, LLC purchased Prepetition 2022B Bonds in the amount of $11,800,490.99.  The remaining Prepetition 2022B Bonds, along with the amounts above, were delivered to or upon the order of Lateral Investment Management, LLC and its affiliates.  Lateral and its affiliates continue to hold all the Prepetition 2022B Bonds as of the Petition Date, with Cede & Co. as the registered owner (the holders of the Prepetition 2022B Bonds, the "Prepetition 2022B Bondholders").

### C.    The Prepetition Indenture Loan Agreement

12.    In conjunction with the issuance of the 2022 Bonds under the Prepetition Indenture, the Authority and RFPG, then operating as NewLife Forest Restoration, LLC, entered into the Prepetition Indenture Loan Agreement.  The Prepetition Indenture Loan Agreement was funded with the proceeds of the 2022 Bonds.  Pursuant to the Prepetition Indenture and the Prepetition Indenture Loan Agreement, the Prepetition 2022A Bondholders, would be paid first, and the bondholders of the Prepetition 2022B Bonds (collectively, the "Prepetition 2022B Bondholders") would be paid only after the Prepetition 2022A Bondholders were paid in full.  To secure payment of the obligations under the Prepetition Indenture and Prepetition Indenture Loan Agreement, each of the Debtors entered into certain pledge and security agreements with the Prepetition Trustee.[4]

---

[4] These agreements are the Pledge and Security Agreement, dated February 1, 2022, by and between NewLife Forest Restoration, LLC and UMB Bank, National Association; Pledge and Security Agreement, dated February 1, 2022, by and between NewLife Forest Products, LLC and UMB Bank, National Association; Pledge and Security Agreement, dated February 1, 2022, by and between Just Right, LLC and UMB Bank, National Association; and Pledge and Security Agreement, dated February 1, 2022, by and between Good Earth Power AZ, LLC and UMB Bank, National Association.  Pursuant to the Prepetition Indenture, the Prepetition 2022B Bonds are to be unsecured until payment in full of the Prepetition 2022A Bondholders, and the security agreements provide for a lien grant in favor of both series of bonds.

13.     The proceeds from the 2022 Bonds were used by the Debtors to pay down some of their outstanding debt under the Lateral Loan Agreement and to continue operations.

**D.      Amendment of the Lateral Loan Agreement**

14.     In 2022, Lateral and the Debtors agreed to amend the Lateral Loan Agreement and restructure the outstanding debt that the Debtors owed to Lateral.  Pursuant to that certain Amended and Restated Credit Agreement, dated February 24, 2022, by and between Lateral and the Debtors, the outstanding debt under the Lateral Loan Agreement in the aggregate amount of $131,396,436.61 was restructured into five (5) tranches as shown below:

| Tranche | Amount Outstanding | Priority |
|---------|--------------------|----------|
| Tranche 1 | $6,889,642.03 | n/a - satisfied from Prepetition 2022A Bonds proceeds |
| Tranche 2 | $71,098,788.43 | Exchanged for Prepetition 2022B Bonds - Lateral U.S. Credit Opportunities Fund, L.P. |
| Tranche 3 | $11,800,490.99 | Exchanged for Prepetition 2022B Bonds - Lateral SMA Agent, LLC |
| Tranche 4 | $20,653,146.89 | unsecured – Lateral SMA Agent, LLC |
| Tranche 5 | $20,954,368.27 | unsecured - $13,410,795.69 for Lateral U.S. Credit Opportunities Fund, L.P. and $7,543,572.58 for Lateral SMA Agent, LLC |

15.     Following the issuance of the 2022 Bonds and the amendments to the Lateral Loan Agreement, Lateral, the Debtors, the Authority, and the Prepetition Trustee agreed that the Prepetition 2022A Bondholders' liens (the "<u>Prepetition 2022A Bond Liens</u>") against the Debtors' assets would have first priority with the Prepetition 2022B Bondholders' liens (the "<u>Prepetition 2022B Bond Liens</u>") against the Debtors' assets having second priority.  Any other debt owed to

Lateral by the Debtors would be subordinate to both the Prepetition 2022A Bondholders and the Prepetition 2022B Bondholders.[5]

> **E.    The Prepetition Bridge Credit Agreement**

16.    By 2023, the Debtors had insufficient capital from operations and otherwise, and requested that Invesco make available one or more term loans to provide the Debtors with the time and funding needed to complete the installation of equipment at the Bellemont Facility (defined below), conduct a marketing process for the Company and, if necessary, prepare for a chapter 11 process.  Therefore, pursuant to the Prepetition Bridge Credit Agreement, Invesco agreed to make available to the Debtors a multi-draw term loan facility in the aggregate principal amount of up to $62,000,000 (the "Bridge Loan").  In connection with the Bridge Loan, the Debtors appointed Kenneth Latz as Chief Restructuring Officer of the Debtors on May 1, 2023.

17.    Pursuant to that certain Subordination Agreement, dated June 5, 2023 (the "Subordination Agreement"), among the Debtors, the Prepetition Trustee, and the Prepetition Bridge Lenders and UMB (as agent for the Authority, the Prepetition 2022A Bondholders, and the Prepetition 2022B Bondholders), the parties agreed that the Prepetition 2022A Bond Obligations (as defined in the Interim Order) are subordinated to the Prepetition Bridge Obligations (as defined in the Interim Order).  To secure payment of the obligations under the

---

[5]    *See* Subordination Agreement, dated February 1, 2022, by and between NewLife Forest Restoration, LLC; Good Earth Power AZ, LLC; NewLife Forest Products, LLC; Just Right, LLC; Lateral US Credit Opportunities Fund, LLC; Lateral SMA Agent, LLC; Lateral Administrative Agent, LLC; Arizona Industrial Administrative Authority; and UMB Bank, NA (the "Lateral Subordination Agreement").

11296360v.1

Prepetition Bridge Credit Agreement, each of the Debtors entered into certain pledge and security agreements with UMB, as agent for Invesco.[6]

F.    **Amendment to the Prepetition Indenture Loan Agreement and Prepetition Indenture**

18.    In connection with the Prepetition Bridge Credit Agreement, the Prepetition Indenture Loan Agreement was amended to subject certain subrogation provisions in Section 10.9 of the Prepetition Indenture Loan Agreement to the Subordination Agreement, and to add a new Section 10.14 to provide that the provisions of the Subordination Agreement would control in the event of any conflict or inconsistency between the provisions of the Subordination Agreement and the Prepetition Indenture Loan Agreement.

19.    Likewise, the Prepetition Indenture was amended pursuant to that certain Second Supplemental Indenture of Trust, dated June 16, 2023 (the "Second Supplement"), between the Authority and the Prepetition Trustee.  The Second Supplement amended the Prepetition Indenture to include references to the Prepetition Bridge Credit Agreement and related parties and to include as permitted debt the indebtedness incurred under the Prepetition Bridge Credit Agreement.

20.    At the time of the Prepetition Bridge Credit Agreement, the Debtors' indebtedness included $50,595,048 owed on the Lateral Loan Agreement, $199,691,759 in 2022 Bonds payable, and over $8 million in other debt.  Following the entry into the Prepetition Bridge Credit Agreement, the order of priority among the secured parties discussed above is shown below:

---

[6]    These agreements are the Pledge and Security Agreement, dated June 5, 2023, by and between Restoration Forest Products Group, LLC and UMB Bank, National Association; Pledge and Security Agreement, dated June 5, 2023, by and between Restoration Forest Products, LLC and UMB Bank, National Association; Pledge and Security Agreement, dated June 5, 2023, by and between Just Right, LLC and UMB Bank, National Association; and Pledge and Security Agreement, dated June 5, 2023, by and between Good Earth Power AZ, LLC and UMB Bank, National Association.

11296360v.1

| Priority | Party | Facility | Amount as of 6/5/23 |
|----------|-------|----------|---------------------|
| First | Invesco | Bridge Loan | Up to $55,000,000.00 |
| Second | Invesco | Prepetition 2022A Bondholders | $112,885,000.00 + PIK |
| Third | Lateral and others | Prepetition 2022B Bondholders | $86,806,759.00 + PIK |
| Fourth | Lateral | Unsecured debt | $50,595,048.00 |

### G. Unsecured Claims

21.     As of the Petition Date, the Debtors' unsecured claims are estimated to be about $8 million and primarily consist of trade and contract counterparty claims.

22.     Additionally, the Debtors owe $56.7 million in unsecured debt to the Lateral Lenders.

## II. Circumstances Leading to these Chapter 11 Cases

### A. Cancellation of the Phase II Contract

23.     Since their creation, the Debtors have worked actively with the U.S. Forest Service ("USFS") and Four Forest Restoration Initiative ("4FRI") to implement sustainable forestry practices, mitigate the risk of catastrophic wildfires, and improve forest health.  From 2002 to 2011 Arizona succumbed to a number of significant wildfires – the Rodeo-Chediski fire (destroying 468,638 acres of forest), the Cave Creek Complex fire (destroying 243,960 acres of forest), and the Wallow Fire (destroying 538,049 acres of forest) – all of which led to the signing of the 4FRI Charter, marking the beginning of a collaborative effort to restore the forest ecosystems that were decimated through mechanical harvests and controlled fires to thin dense strands of smaller trees, and leave larger, more mature trees.  As part of 4FRI's efforts, USFS awards contracts to certain companies in the forestry and logging industry.  In 2012, Pioneer Forest Products Corporation ("Pioneer') was awarded a Phase I Contract by the USFS (the "Phase I Contract").  The Phase I Contract allowed Pioneer to harvest up to 30,000 acres per year of 4FRI forestland in Arizona over

13

a 10-year term.  As part of the agreement, Pioneer received favorable pricing, which reduced stumpage costs.  Pioneer was unable to perform under the Phase I Contract, which led to Good Earth Power AZ, LLC acquiring Pioneer, and their rights under the Phase I Contract, in 2016.

24.     By 2022, RFOR was able to complete its obligations under the Phase I Contract but fell significantly short of the allowable annual harvest entitlement – only completing a harvesting of about 15,000 acres.  Nevertheless, the Company set its sights on acquiring a Phase II Contract with USFS (the "Phase II Contract"), which was announced by USFS in 2019.

25.     Unfortunately, the award process for the Phase II Contract took much longer than expected, as the application was much more extensive (being over 1000 pages in length).  Around this time, while RFOR was completing the application and related due diligence, and in anticipation of being awarded the Phase II Contract, the Debtors requested that the Authority issue the 2022 Bonds.  The Debtors anticipated using the proceeds of the 2022 Bonds to pay off some of its debt owed to Lateral, as well as fund the completion of the Bellemont Facility (defined below).  The Debtors hoped that with this additional funding the Bellemont Facility construction would be completed by the time they were awarded the Phase II Contract.

26.     Although the Debtors advanced in the award process, USFS ultimately decided to cancel its offering in 2021, stating that the amended RFOR Phase II Contract diverted too greatly from USFS' initial offer.  Accordingly, after a two-year application process and spending significant funds and time, the Debtors were unable to secure the Phase II Contract.

**B.     Delays in Completion of the Bellemont Facility**

27.     Around the time that the Phase II Contract was announced, the Company decided to build another sawmill, which would increase the Company's capacity to log, manufacture, distribute products, and restore additional acres of forest.  In these efforts, the Debtors purchased

14

land in Bellemont, Arizona to build a new sawmill, which would come to be known as the "Bellemont Facility." Eventually the Debtors transferred over all their operations from the Heber and Williams Facilities to the Bellemont Facility.

28.     After the Company completed its obligations under the Phase I Contract, the Company was under pressure to build another sawmill quickly in hopes of legitimizing its business within the Arizona forestry space and acquiring the Phase II Contract.   Unfortunately, the Company faced multiple challenges in completing the construction of the Bellemont Facility, which led to an overall delay of 16 months and cost increases of about $30 million.

**C.     The COVID-19 Pandemic and the Winter of 2022**

29.     In 2020, the COVID-19 Pandemic unexpectedly halted the Debtors' operations completely as they were forced to shut down the facilities that were operating and halt construction on the Bellemont Facility.  This unexpected halt in the Debtors' business, accordingly, led to revenue reductions.

30.     The Debtors found it increasingly hard to recover from the forced shut down due to the COVID-19 pandemic.  Although the Debtors' two other facilities were operating, it was at a loss of over $1 million per month.  To make matters worse, Arizona succumbed to a particularly harsh winter in 2022-2023.  That winter brought record snowfall to Arizona, with 21 days of measurable snow – the most the area had seen in years.

31.     In addition to stopping the construction of the Bellemont Facility, the snow in the winter of 2022, early 2023 slowed down the logging process.  Despite the growing demand, and increasing prices for wood products, the Debtors were unable to take advantage of the market.  The snow and wet weather that followed in the spring of 2023 significantly hindered the Company's

supply of logs and fiber, making them unable to process and manufacture their wood products at a rate to keep up with demand.  This led to large reductions in revenue.

      **D.**      **Default Under the Bridge Credit Agreement and Prepetition 2022A Bonds**

      32.      By April 2023, the Debtors had insufficient capital from operations and still had not finished construction of the Bellemont Facility.  As such, the Debtors requested that Invesco consider making available a delayed draw term loan facility.  Wanting to support the Company in its completion of the Bellemont Facility, Invesco agreed to issue the Bridge Loan.

      33.      Unable to fulfill their obligations, by September 2023, the Debtors had defaulted under the Prepetition Bridge Credit Agreement and the Prepetition 2022A Bonds.  As a result of negotiations with key stakeholders, Invesco, as investment manager or sub-adviser to the Prepetition 2022A Bondholders, UMB, as Prepetition Trustee, and the Company agreed to that certain forbearance agreement, whereby the Prepetition 2022A Bondholders agreed to forbear from exercising any right or remedies they may have.  In addition, UMB, as administrative agent, and the Company agreed to that certain forbearance agreement, whereby the Prepetition Bridge Lenders agreed to forbear from exercising any right or remedies it may have under the Prepetition Bridge Credit Agreement.  The forbearance period is set to expire on January 31, 2024.

<h3 style="text-align:center;">THE DEBTORS' URGENT AND IMMEDIATE LIQUIDITY NEEDS</h3>

      34.      As described in the First Day Declaration and the DIP Declaration, the Debtors require immediate access to liquidity to ensure that they are able to continue operating during these Chapter 11 Cases and preserve the value of their estates and pursue confirmation of a prepackaged chapter 11 plan of reorganization that provides for a comprehensive balance sheet restructuring of their funded debt obligations.

      35.      The Debtors undertook an analysis of how much postpetition financing would be required to operate the Debtors' business and pay administrative costs during the chapter 11

<div style="text-align:center;">16</div>

process.  This analysis included, among other things, assessing the potential acceleration of demands on available liquidity following the commencement of these Chapter 11 Cases including potential working capital contraction.  Based on this analysis, the Debtors determined that they would require loans and advances comprised of a multi-draw term loan facility in an aggregate principal amount of $93,342,012.71 of which (x) $29,000,000.00 shall be New Money DIP Loans, and (y) $64,342,012.11 shall be Roll-Up Loans to operate smoothly postpetition and satisfy all administrative costs and expenses.  Therefore, the Debtors believe the requested post-petition financing is essential to preserve and maximize the value of their estates, and responsibly administer these Chapter 11 Cases.  Additionally, the Debtors believe that the heavily negotiated milestone covenants contained in the DIP Documents are necessary and important to adhere to because the DIP Budget (as defined below) dictates the liquidity runway the Debtors have to operate in chapter 11 to pursue confirmation of a prepackaged plan of reorganization.  (DIP Decl. ¶¶ 12, 26.)  Failure to adhere to the dates set forth in the milestone covenants will cause the Debtors to be outside the DIP Budget and jeopardize the administration of these cases and the Debtors' ability to emerge from chapter 11.  (*Id.* ¶ 25.)  Further, the terms and conditions of the DIP Facility, including the deemed term loan "roll-up" postpetition financing of the outstanding prepetition Bridge Loan Obligations (the "Roll-Up Loans"), are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure, among other factors.  (*Id.* ¶ 23.)

36.    Beginning in July 2023, the Debtors began exploring restructuring alternatives.  In anticipation of their need for debtor-in-possession financing and the use of cash collateral, the Debtors have, in consultation with Intrepid Investment Bankers LLC ("Intrepid") and Riveron Management Services, LLC ("RMS"), performed a review and analysis of their projected cash

needs.  Based upon that review and analysis, the Debtors and their advisors determined that the use of cash collateral alone would be insufficient to operate their businesses, and that additional funding was necessary.  (*Id*. ¶ 10.)  The Debtors are in need of both access to Cash Collateral and an immediate infusion of liquidity to ensure sufficient working capital to operate their businesses, pay their employees and vendors, service their customers, administer their estates during these Chapter 11 Cases, and confirm a prepackaged plan of reorganization.  (*Id*. ¶¶ 10-11.)

37.     Without prompt access to postpetition financing and Cash Collateral, the Debtors will be unable to: (a) ensure payments to employees, third-party vendors, utilities, taxing authorities, and insurance companies, among others, who provide the essential services needed to operate, maintain, and insure the Debtors' assets; (b) ensure the timely payment of administrative expenses to be incurred; (c) provide a positive message to the market that these Chapter 11 Cases are sufficiently funded, which is critical to ensure confidence in the Debtors from, among others, their customers, employees, and vendors; and (d) continue to build out the Bellemont Facility.  (*Id.* ¶ 11.)  Immediate access to the Term Loans and continued access to the Cash Collateral is therefore crucial to the Debtors' efforts to preserve value for their stakeholders during these Chapter 11 Cases and to avoid immediate and irreparable harm to the value of the Debtors' estates.  (*Id.*)

38.     In furtherance of their cash needs, the Debtors, Intrepid, and certain of the Debtors' other professionals, prepared an initial budget (as may be amended, replaced, supplemented or otherwise modified in accordance with the terms of the DIP Orders and the DIP Documents, the "DIP Budget") outlining the funding that would be critical in the initial thirteen (13) weeks post-filing, with such budget to be updated pursuant to the terms of the DIP Credit Agreement and Interim DIP Order.  (DIP Decl. ¶ 12.)  Based on information available as of the Petition Date, the Debtors believe that the DIP Budget, as will be updated, is an accurate reflection of their initial

18

funding requirements and will allow them to meet their obligations in these Chapter 11 Cases. (*Id.*)  The Debtors also believe, and therefore submit, that the DIP Budget is fair, reasonable, and appropriate under the circumstances.  (*Id.*)

## ALTERNATIVE SOURCES OF FINANCING
## ARE NOT AVAILABLE ON BETTER TERMS

### I.    The Marketing Process

39.    The Debtors first engaged in a process to solicit new out-of-court financing as well as proposals to acquire the Debtors or their assets.  The Debtors were unable to obtain new out-of-court financing on acceptable terms.  On July 31, 2023, the Debtors retained Intrepid to act as the Debtors' investment banker in connection with , among other things, soliciting proposals to acquire the Debtors or their assets, and to the extent necessary, a marketing process for the Debtors' proposed debtor-in-possession financing facility.  (DIP Decl. ¶ 13.)

40.    Thereafter, the Debtors, through Intrepid, engaged in a process to solicit proposals to acquire the Debtors or their assets and, to the extent necessary, a marketing process for the Debtors' proposed debtor-in-possession financing facility.  (*Id.*)

### A.    Prepetition Sale Marketing Process

41.    Since its engagement, Intrepid has conducted a robust and extensive marketing and sale process for the sale of substantially all of the Debtors' assets.  This process included contacting 81 potential third-party purchasers from North and South America, Asia, Europe, and Oceania (including 42 strategic buyers and 39 financial buyers).  In addition, Intrepid assisted the Debtors in preparing a Confidential Information Presentation (the "CIP"), setting up and populating a detailed data room, and engaging in negotiations and discussions regarding the form of a potential sale.  Of these 81 parties, 17 executed non-disclosure agreements and were granted access to the virtual data room.  (*Id.* ¶ 14.)

42.    Despite these robust prepetition marketing efforts, the Debtors received no formal offers or agreements for the sale of the Debtors' assets with any third-party.  (*Id.* ¶ 15.)

**B.    Prepetition DIP Financing Marketing Process**

43.    The Debtors, through Intrepid, contacted twenty-two (22) potential lenders to seek proposals for debtor-in-possession financing.  (DIP Decl. ¶ 16.)

44.    To avoid a protracted and expensive priming fight, which the Debtors could not afford, the Debtors and their advisors believed that their only alternatives were to:  (a) obtain the consent of the Prepetition Senior Secured Parties to the priming of their liens by a third-party lender; (b) locate a third-party lender willing to provide postpetition financing on a junior or unsecured basis; (c) find lenders willing to refinance out the Prepetition Senior Secured Parties and provide incremental liquidity; or (d) find junior financing and a new secured lender.  (*Id.* ¶ 17.)

45.    Obtaining access to third-party postpetition financing was difficult because all or nearly all of the Debtors' assets are encumbered under the existing capital structure, which, along with the Debtors' approximately $367 million of prepetition funded indebtedness, restricts the availability of, and options for, postpetition financing.  (*Id.* ¶ 18.)  The prepetition sale process did not yield any offers sufficient to retire the debt; therefore, the Debtors believed that there was not an equity cushion available for the Debtors to obtain debtor-in-possession financing priming the liens of the Prepetition Senior Secured Parties over their objections.  (*Id.*)  Any dispute with the Prepetition Senior Secured Parties or perceived uncertainty surrounding the Debtors' ability to fund these Chapter 11 Cases could cause significant turmoil within the Debtors' workforce and vendors and could result in significant delays in production, as well as, the expansion and construction of the new mills to the detriment of the Debtors' estates.  (*Id.*)

20

46. Notwithstanding these considerations, the Debtors, with the assistance of Intrepid, solicited proposals for third-party debtor-in-possession financing.  (DIP Decl. ¶ 19.)  Intrepid reached out to twenty-two (22) third-party financing sources to gauge their interest in providing postpetition financing to the Debtors.  (*Id.*)  Of the third-party financing sources that Intrepid contacted, fourteen (14) demonstrated interest in pursuing a potential financing by executing a confidentiality agreement to facilitate an evaluation of funding a debtor-in-possession financing facility. (*Id.*)  However, after further review of the opportunity, no potential financing parties were willing to provide financing on a non-consensual or junior to the existing Prepetition Senior Secured Parties due to the amount of existing secured debt relative to the Debtors' financial position and the uncertainty surrounding the Chapter 11 Cases.  (*Id.*)  In addition, any senior financing that does not include the consent of the Prepetition Senior Secured Parties would have required non-consensual priming.  (*Id.*)  For the foregoing reasons, the Debtors, in consultation with Intrepid, determined that reaching out to additional third-party financing sources would be fruitless and unlikely to result in any financing proposals.  As a result, under these circumstances, there is no better financing available to the Debtors other than the DIP Facility.  (*Id.*)

## II.    **The DIP Facility Has Been Heavily Negotiated.**

47. The Debtors, their legal and financial advisors, and the DIP Lenders engaged in arm's length negotiations regarding the terms offered by the DIP Lenders.  At the conclusion of this process, the Debtors, in consultation with Intrepid and RMS, determined that the DIP Lenders offered the most viable and beneficial DIP financing terms available and the parties were able to come to an agreement on the terms of the DIP Facility.  (Decl. ¶ 20.)  The terms of the DIP Facility were negotiated over the course of months leading up to the Petition Date, with the Debtors and their advisors exchanging multiple drafts of the terms sheets and the DIP Credit Agreement.  (*Id.*)  The Debtors and their advisors worked to negotiate the most favorable terms of the DIP Facility

available to the Debtors given the Debtors' lack of alternative third-party financing. Ultimately, the DIP Lenders were unwilling to lend on terms other than those specifically set forth in the DIP Documents. (*Id.*)

## III.   The Roll-Up Loans, Rates, and Fees of the DIP Facility Are Reasonable.

48.   The terms and conditions of the DIP Facility, including the deemed term loan "roll-up" postpetition financing of the outstanding prepetition Prepetition Bridge Obligations (the "Roll-Up Loans"), are fair and reasonable under the circumstances, especially in light of the Debtors' need for postpetition financing and their capital structure, among other factors. (DIP Decl. ¶ 21) Pursuant to the DIP Documents, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain interest and fees to the DIP Agent and the DIP Lenders. Specifically, the Debtors have agreed to pay interest in kind on the Term Loans at a rate per annum equal to the Applicable Rate of 11%. (*Id.*) Upon the occurrence and during the continuation of an Event of Default (as defined in the DIP Credit Agreement), interest will accrue at the rate of interest otherwise in effect plus 2.00% per annum, payable in cash upon demand. (*Id.*) In addition, the Debtors have agreed to pay to the DIP Agent, for the benefit of the DIP Lenders: (i) the Closing Fee equal to $725,000.00 payable in kind on the Closing Date; (ii) the Agency Fee equal to $17,500 payable on the Closing Date; and (iii) the Exit Fee (collectively, with the Closing Fee and Agency Fee, the "DIP Fees") equal to 3.00% of the aggregate principal amount of the Term Loans, which shall be payable at the times specified in the DIP Credit Agreement. (*Id.*)

49.   The Roll-Up Loans, Applicable Rate, and the DIP Fees provided for in the DIP Facility are reasonable under the circumstances as compared to similar debtor-in-possession financings in the market as well as the attendant interest rates, fees, and premiums in comparable debtor-in-possession financing facilities. (DIP Decl. ¶ 22.) The Applicable Rate and DIP Fees are customary, usual, and in line with debtor-in-possession financings of this kind. (*Id.*) The Debtors

and their advisors considered the Applicable Rate and the DIP Fees when determining whether the DIP Facility constituted the best alternative reasonably available to the Debtors.  As a result, the Debtors' payment of the Applicable Rate and DIP Fees, is necessary to obtain the DIP Facility and is in the best interests of the estates.  (*Id.*)

50.    $64,342,012.11 of the DIP Facility will be used to satisfy the outstanding prepetition Prepetition Bridge Obligations in full on a cashless basis.  Under the circumstances of these Chapter 11 Cases, the Debtors believe this to be necessary and appropriate because, among other things, the DIP Facility is the only reasonably available postpetition financing facility available to the Debtors and will avoid a protracted and expensive priming fight.  Indeed, after negotiating with the Prepetition Senior Secured Parties, the Prepetition Bridge Lenders were willing to provide postpetition financing but conditioned such financing on a roll up of their prepetition debt pursuant to the Interim Order.  Moreover, given the Debtors' liquidity concerns and case milestones under the DIP Facility, the Debtors believe that reducing litigation, and the associated costs thereof, and entering the Chapter 11 Cases with collaboration between and among the Prepetition Senior Secured Parties is in the best interests of the estates.  (Id. ¶ 23)

51.    The Debtors and the DIP Lenders agree that the terms, covenants, interest rates, and fees were subject to negotiation and are an integral component of the overall terms of the DIP Facility, which, in turn, is integral to the broader restructuring's success through the implementation of the prepackaged plan of reorganization.  (*Id.* ¶ 24.)  Under the Debtors' circumstances, the loans, interest rates, premiums, and fees reflected in the DIP Credit Agreement are reasonable because such economics constitute the best terms on which the Debtors could obtain the financing necessary to maintain their ongoing business operations and fund their Chapter 11 Cases and are an integral component of the overall terms of the DIP Facility.  (*Id.*)  The DIP

11296360v.1

Facility is crucial to avoid immediate and irreparable harm to the Debtors' estates, employees, customers, and creditors.

**IV.**   **The Milestones that the Debtors Must Meet Under the Terms of the DIP Facility Are Reasonable.**

52.   The DIP Facility contemplates, as a product of negotiation with, and as required by, the DIP Lenders as a condition to providing the DIP Facility, certain milestones that the Debtors must meet throughout their Chapter 11 Cases, the failure of which would constitute an Event of Default under the DIP Credit Agreement.  These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility.  (DIP Decl. ¶ 25)

53.   The DIP Facility serves as an important component of these Chapter 11 Cases because it provides the Debtors with the stability and certainty that they can smoothly enter into chapter 11 and continue to operate in the ordinary course of business while pursuing confirmation of a plan of reorganization.  (*Id.* ¶ 26.)  The continued and viable operation of the Debtors' business would not be possible absent access to the DIP Facility.  (*Id.*)  The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with, among other parties in interest, employees, customers, and vendors, and satisfy working capital needs in the ordinary course.  (*Id.*)

**MATERIAL TERMS OF THE DIP CREDIT AGREEMENT**

54.   As detailed in the DIP Declaration, the Debtors presently lack sufficient liquidity not only to support their operations and continue to build out the new mills, but also to pursue a successful reorganization.  The Debtors have concluded that they require postpetition financing to meet their ongoing working capital and general business needs during these Chapter 11 Cases as well as the costs of bankruptcy administration.  Accordingly, in consultation with their legal and financial advisors, the Debtors, the DIP Agent, and the DIP Lenders have negotiated the DIP

Facility. The Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans made to the Debtors pursuant to the DIP Documents and all other Obligations (as defined in the DIP Credit Agreement) (the "DIP Obligations") are secured by substantially all of the tangible and intangible assets of the Debtors and the proceeds therefrom (the "DIP Collateral").

55.    The terms of the DIP Facility are memorialized in the DIP Credit Agreement, a substantially final version of which is attached to the proposed Interim Order as **Exhibit 2**.[7] The DIP Credit Agreement provides for a postpetition loan commitment in an aggregate principal amount not to exceed $93,342,012.71 (the "DIP Commitments"); *provided that*, until the Bankruptcy Court enters the Final Order, no loans under the DIP Credit Agreement shall be made other than the Interim Term Loans in an aggregate principal amount not to exceed $12,500,000.00 and the deemed Roll-Up Loans.

56.    Pursuant to Bankruptcy Rule 4001(b), (c), and (d) and Local Rule 4001-2, the Debtors submit the following concise statement of the material terms of the DIP Credit Agreement and Interim Order:

| Summary of the Material Terms | | Reference |
|---|---|---|
| **Borrowers:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Restoration Forest Products Group, LLC<br>Good Earth Power AZ, LLC<br>Restoration Forest Products, LLC<br>Just Right, LLC | DIP Credit Agreement *preamble* |

---

[7]    This Motion contains summaries of certain terms and conditions set forth in the DIP Credit Agreement and Interim Order. These summaries are intended solely for informational purposes to provide the Court and interested parties a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions of the DIP Facility, reference should be made to the DIP Documents and the DIP Orders. To the extent there exists any inconsistency between the summaries contained in this Motion and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, shall control in all respects.

11296360v.1

| Summary of the Material Terms | | Reference |
|---|---|---|
| **DIP Agent:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | UMB Bank, National Association, in its capacity as Administrative Agent for the DIP Lenders | DIP Credit Agreement, § 11.1 |
| **DIP Lenders:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | Invesco Senior Secured Management, Inc. and certain of its affiliates and any other lenders from time to time party to the DIP Credit Agreement | DIP Credit Agreement *preamble* |
| **Loan Facility:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(A), (O), (ii)* | The DIP Facility shall be comprised of superpriority senior secured multiple-draw term loans in an aggregate principal amount equal to $93,342,012.71, which shall be comprised of:<br><br>(i)  a new money multi-draw term loan facility in an aggregate principal amount of $29 million (the commitments thereunder, the "New Money DIP Commitments" and the Interim Term Loans and Final Term Loans (each as defined in the DIP Credit Agreement) advanced thereunder, the "New Money DIP Loans") to be funded by certain Prepetition Bridge Lenders (as defined in the Interim Order), and<br><br>(ii)  upon entry of the Interim Order, a deemed term loan "roll-up" postpetition financing of the remaining outstanding Prepetition Bridge Obligations in the aggregate equal to $64,342,012.11 (such rolled-up debt, the "Roll-Up Loans" and together with the New Money DIP Loans, the "Terms Loans") | DIP Credit Agreement, § 1.1(a)(i)-(iii)<br><br>Interim Order *preamble* |
| **Interest Rates:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(B), (ii)* | The Term Loans shall bear interest on the outstanding principal amount thereof from the date when made at a rate *per annum* equal to the Applicable Rate of 11.00%. | DIP Credit Agreement, §§ 1.3(a), 11.1 |
| **Default Interest:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(B), (ii)* | Effective immediately upon the occurrence of any Event of Default, the Debtors shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Term Loans (whether or not disbursed to the Debtors from the Blocked Account) from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding two percent (2.00%) per annum to the Applicable Rate then in effect for such Term Loans. | DIP Credit Agreement § 1.3(d) |

| Summary of the Material Terms | Reference |
|---|---|
| **Maturity Date:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iii), (c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(M)* | The earliest of (a) May 31, 2024 or if such day is not a Business Day, the preceding Business Day, (b) the effective date of a Chapter 11 Plan that has been confirmed by an order of the Bankruptcy Court, (c) 23 days after the Bankruptcy Court's entry of the Interim Order unless, on or before such day, the Final Order shall have been entered by the Bankruptcy Court, (d) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (e) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (f) the date of substantial consummation of a sale of all or substantially all of the assets of the Credit Parties, and (g) such earlier date on which the DIP Obligations shall become due and payable by acceleration or otherwise in accordance with the terms of the DIP Credit Agreement and the other DIP Documents | DIP Credit Agreement § 11.1 |
| **DIP Fees:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(B)* | <u>Closing Fee</u>.  The Debtors agree to pay to the DIP Agent, for the benefit of the DIP Lenders in accordance with their Pro Rata Shares, a closing fee equal to $725,000.00 (the "<u>Closing Fee</u>"), which fee shall be payable in kind on the Closing Date and deemed fully earned and non-refundable when paid.<br><br><u>Agency Fee</u>.  The Debtors shall pay to the DIP Agent a non-refundable agency fee (the "<u>Agency Fee</u>") equal to $17,500, which shall be deemed fully earned when paid and which shall be payable in immediately available funds on the Closing Date.<br><br><u>Exit Fee</u>.  A fee equal to 3.00% of the aggregate principal amount of the Term Loans, which fee shall be payable at the times specified in the DIP Credit Agreement (but in no event later than the earliest of (a) the date of repayment in full of all other DIP Obligations, (b) any Exit Conversion or (c) the date of a payment or reduction of the DIP Obligations in connection with any credit bid by the DIP Agent or DIP Lenders). | DIP Credit Agreement §§ 1,7; 11.1<br><br>Interim Order ¶ 6(d)(iii) |
| **Use of Proceeds:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(ii), (c)(1)(B)* | The proceeds of the Term Loans will be used in accordance in all material respects with the terms of the DIP Orders and the DIP Documents. Specifically: (i) the Roll-Up Loans shall be deemed to have converted on a cashless, dollar-for-dollar basis from Term Loans (as defined under the Prepetition Bridge Credit Agreement) under the Prepetition Bridge Credit Agreement on the Closing Date; (ii) the Interim Term Loans and Final Term Loans shall be used to (w) pay amounts due to the DIP Lenders and the DIP Agent and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by the DIP Lenders and the DIP Agent, including those incurred in connection with the preparation, negotiation, documentation and court | DIP Credit Agreement § 4.10 |

| Summary of the Material Terms | Reference |
|---|---|
| approval of the transactions contemplated by the DIP Credit Agreement, (x) provide working capital, and for other general corporate purposes of the Credit Parties, (y) pay administration costs of the Chapter 11 Cases, fund obligations benefiting from the Carve Out, and pay claims or amounts approved by the Bankruptcy Court, and (z) for working capital and general corporate purposes of the Credit Parties, subject in each case under this clause (ii) to the Rolling Forecast (subject to Permitted Variances) as then in effect.  No part of the proceeds of any of the Term Loans will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X, or for any purpose not permitted pursuant to the DIP Orders. | |
| **Priority and Security:**<br><br>*Bankruptcy Rules 4001(c)(1)(B)(i), (ii), (iii), (vii), (xi)*<br><br>*Local Rule 4001-2(a)(i)(G)* | Upon the execution and delivery thereof, and at all times while any Obligations remain outstanding, the Collateral Documents will be effective to create legally valid and enforceable Liens on the Collateral and have payment priority as described in the DIP Orders and all necessary recordings and filings will be recorded and filed on or prior to the Closing Date such that they will constitute perfected security interests in relation to such Collateral, subject only to Permitted Liens.<br><br>DIP Liens.  As security for the DIP Obligations, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve Out to the extent specifically provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, pursuant to the Interim Order and the DIP Documents, the "DIP Liens").  Other than as set forth for Avoidance Actions within, the DIP Liens shall be effective and automatically perfected upon the date of the Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined herein):<br><br>(a)    First Lien on Unencumbered Property.    Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy | DIP Credit Agreement § 3.23<br><br>Interim Order ¶ 10. |

| Summary of the Material Terms | Reference |
|---|---|
| Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (excluding Avoidance Actions but including, upon entry of the Final Order, the Avoidance Proceeds), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.<br><br>(b)    <u>Liens Priming the Prepetition Bridge Liens, Prepetition 2022A Bond Liens and Subordinate Liens</u>. Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits | |

| Summary of the Material Terms | Reference |
|---|---|
| and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Bridge Liens securing the Prepetition Bridge Obligations or the Prepetition 2022A Bond Liens securing the Prepetition 2022A Bond Obligations or the Subordinate Liens.<br><br>(c)    <u>Liens Junior to Certain Other Liens</u>.    Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of paragraph 10 of the Interim Order, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition Bridge Obligations, the Prepetition 2022A Bond Obligations, or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition Bridge Obligations or the Prepetition 2022A Bond Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "<u>Permitted Liens</u>"). | |

| Summary of the Material Terms | Reference |
|---|---|
| **Material Conditions to Closing:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(E)* | **Conditions Precedent to Effectiveness and Funding of Interim Term Loans**.  The DIP Credit Agreement and the DIP Lenders' obligation to make the Interim Term Loans shall be effective only upon the satisfaction or waiver of the following conditions, in a manner reasonably satisfactory to the DIP Agent (acting at the direction of the Required Lenders):<br><br>(a)    <u>Payment of Fees and Expenses</u>.  All fees and expenses due under the DIP Documents on the Closing Date shall have been paid by the applicable Credit Party contemporaneously with the funding under the DIP Credit Agreement, including the reimbursement or payment of all reasonable and documented out of pocket fees and expenses (including the legal fees and expenses of (i) Ropes & Gray LLP, as legal counsel to the DIP Lenders and (ii) Chipman Brown Cicero & Cole LLP, as Delaware counsel to the DIP Lenders, and (iii) Lewis Roca Rothgerber Christie, as legal counsel to the DIP Agent).<br><br>(b)    <u>Representations and Warranties.</u>  Each representation or warranty by any Credit Party contained in the DIP Credit Agreement or in any other DIP Loan Document is true or correct in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date).<br><br>(c)    <u>No Default or Event of Default.</u>  No Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any Term Loan.<br><br>(d)    <u>Delivery of Loan Documents and Corporate Documents.</u>  The DIP Agent shall have received on or before the Closing Date all of the agreements, documents, instruments and other items set forth on the Closing Checklist attached to the DIP Credit Agreement as <u>Exhibit 2.1(d)</u>, each in form and substance reasonably satisfactory to the DIP Lenders.<br><br>(e)    <u>Creation and Perfection of Security Interests</u>.  All actions necessary to establish that the DIP Agent will have a perfected security interest (subject to Permitted Liens) in the Collateral under the DIP Documents shall have been taken (including, without limitation, properly completed Uniform Commercial Code financing statements and the execution and delivery to the DIP Agent of all other documents and instruments required to establish and perfect such security interests). | DIP Credit Agreement § 2.1 |

11296360v.1

| Summary of the Material Terms | Reference |
|---|---|

(f)      <u>Chapter 11 Matters</u>.  Each of the following events or conditions shall have occurred or have been completed to the satisfaction of the DIP Agent and Required Lenders:

(i)      The DIP Agent and the DIP Lenders shall have received the Rolling Forecast for the 13-week period commencing on the Petition Date (such initial Rolling Forecast attached as <u>Exhibit C</u> to the DIP Credit Agreement), and such Rolling Forecast shall be in form and substance satisfactory to the DIP Agent and Required Lenders in their sole discretion.

(ii)      The Chapter 11 Cases shall have been commenced and all of the pleadings related to the requested "first day orders" shall have been delivered in advance to counsel to the DIP Agent and counsel to the DIP Lenders and shall be in form and substance reasonably satisfactory to the Required Lenders.

(iii)      All of the "first day orders" entered by the Bankruptcy Court on or about the Petition Date or the Closing Date (and if any such orders shall have not been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) regarding, relating to or impacting (x) (i) the Credit Parties' cash management systems and arrangements (such order, the "<u>Cash Management Order</u>"), (ii) any rights or remedies of the DIP Agent, the DIP Lenders, the Prepetition Bridge Agent, Prepetition Bridge Lenders and the Prepetition Trustee, (iii) the DIP Credit Agreement, the Prepetition Bridge Credit Agreement and the Prepetition Bond Loan Agreement, (iv) the Collateral, any Liens thereon or any DIP Superpriority Claims, or (v) the use of cash collateral, (vi) adequate protection or otherwise relating to the Prepetition Obligations, shall, in each case, be in form and substance satisfactory to the DIP Agent and the Required Lenders in their sole and absolute discretion, and (y) all other matters, shall, in each case, be in form and substance reasonably satisfactory to the DIP Agent and the Required Lenders.

(iv)      The amount of the Interim Term Loans to be made on or about the Closing Date shall not exceed the amount authorized by the Interim Order.

(v)      The Bankruptcy Court shall have entered the Interim Order, and the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.

32

| Summary of the Material Terms | Reference |
|---|---|
| (vi) The Chapter 11 Cases of any of the Credit Parties shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.<br><br>(vii) No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Credit Party shall have applied for, consented to or acquiesced in any such appointment.<br><br>(viii) The Credit Parties shall have filed the Pre-Packaged Plan and Disclosure Statement. | |
| **Material Conditions to Final Term Loans:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(E)* | **Conditions Precedent to Effectiveness and Funding of Interim Term Loans.** The DIP Credit Agreement and the Lenders' obligation to make the Interim Term Loans shall be effective only upon the satisfaction or waiver of the following conditions, in a manner reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders):<br><br>(a) Payment of Fees and Expenses. All fees and expenses due under the Loan Documents on the Closing Date shall have been paid by the applicable Credit Party contemporaneously with the funding hereunder, including the reimbursement or payment of all reasonable and documented out of pocket fees and expenses (including the legal fees and expenses of (i) Ropes & Gray LLP, as legal counsel to the Lenders, (ii) Chipman Brown Cicero & Cole, LLP, as Delaware counsel to the Lenders, and (ii) Lewis Roca Rothgerber Christie, as legal counsel to the Administrative Agent).<br><br>(b) Representations and Warranties. Each representation or warranty by any Credit Party contained in the DIP Credit Agreement or in any other Loan Document is true or correct in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without | DIP Credit Agreement § 2.2 |

11296360v.1

| Summary of the Material Terms | Reference |
|---|---|

duplication of any materiality qualifier contained therein) as of such earlier date).

(c)    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any Term Loan.

(d)    Delivery of Loan Documents and Corporate Documents. The Administrative Agent shall have received on or before the Closing Date all of the agreements, documents, instruments and other items set forth on the Closing Checklist attached to the DIP Credit Agreement as Exhibit 2.1(d), each in form and substance reasonably satisfactory to the Lenders.

(e)    Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing no later no later than two (2) Business Days prior to the proposed date of borrowing (or such later time as the Administrative Agent and the Required Lenders may agree in their sole discretion), which shall include (i) reasonably detailed information as to the intended use of the proceeds of such borrowing (such use shall be substantially consistent with the then-applicable Rolling Forecast), (ii) the amount of the requested withdrawal, and (iii) the date of the requested borrowing.

(f)    Creation and Perfection of Security Interests.  All actions necessary to establish that the Administrative Agent will have a perfected security interest (subject to Permitted Liens) in the Collateral under the Loan Documents shall have been taken (including, without limitation, properly completed Uniform Commercial Code financing statements and the execution and delivery to the Administrative Agent of all other documents and instruments required to establish and perfect such security interests).

(g)    Chapter 11 Matters.  Each of the following events or conditions shall have occurred or have been completed to the satisfaction of the Administrative Agent and Required Lenders:

(i)    The Administrative Agent and the Lenders shall have received the Rolling Forecast for the 13-week period commencing on the Petition Date (such initial Rolling Forecast attached as Exhibit C to the DIP Credit Agreement), and such Rolling Forecast shall be in form and substance satisfactory to the Administrative Agent and Required Lenders in their sole discretion.

11296360v.1

| **Summary of the Material Terms** | **Reference** |
|---|---|
| (ii)   The Chapter 11 Cases shall have been commenced and all of the pleadings related to the requested "first day orders" shall have been delivered in advance to counsel to the Administrative Agent and counsel to the Lenders and shall be in form and substance reasonably satisfactory to the Required Lenders.<br><br>(iii)   All of the "first day orders" entered by the Bankruptcy Court on or about the Petition Date or the Closing Date (and if any such orders shall have not been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) regarding, relating to or impacting (x) (i) the Credit Parties' cash management systems and arrangements (such order, the "<u>Cash Management Order</u>"), (ii) any rights or remedies of the Administrative Agent, the Lenders, the Prepetition Bridge Agent, Prepetition Bridge Lenders and the Prepetition Trustee, (iii) the DIP Credit Agreement, the Prepetition Bridge Credit Agreement and the Prepetition Bond Loan Agreement, (iv) the Collateral, any Liens thereon or any DIP Superpriority Claims, or (v) the use of cash collateral, (vi) adequate protection or otherwise relating to the Prepetition Obligations, shall, in each case, be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole and absolute discretion, and (y) all other matters, shall, in each case, be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.<br><br>(iv)   The amount of the Interim Term Loans to be made on or about the Closing Date shall not exceed the amount authorized by the Interim Order.<br><br>(v)   The Bankruptcy Court shall have entered the Interim Order, and the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.<br><br>(vi)   The Chapter 11 Cases of any of the Credit Parties shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.<br><br>(vii)   No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Credit Party shall have applied for, consented to or acquiesced in any such appointment. | |

| Summary of the Material Terms | Reference |
|---|---|

(viii) The Credit Parties shall have filed the Pre-Packaged Plan and Disclosure Statement.

**Conditions Precedent to Final Term Loans**.  The obligation of the Lenders to make the Final Term Loans under the DIP Credit Agreement after the Closing Date is subject to the satisfaction or waiver of the following conditions, in a manner reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders in their sole discretion):

(a)    Payment of Fees and Expenses.  All fees and expenses due under the Loan Documents shall have been paid by the applicable Credit Party contemporaneously with the funding hereunder, including the reimbursement or payment of all reasonable and documented out of pocket fees and expenses (including the legal fees and expenses of (i) Ropes & Gray LLP, as legal counsel to the Lenders, (ii) Chipman Brown Cicero & Cole LLP, as Delaware counsel to the Lenders, and (ii) Lewis Roca Rothgerber Christie, as legal counsel to the Administrative Agent).

(b)    Representations and Warranties.  Each representation or warranty by any Credit Party contained in the DIP Credit Agreement or in any other Loan Document is true or correct in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date).

(c)    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to such Final Term Loans.

(d)    Entry of Final Order.  (i) Within 30 days of the Petition Date, the Bankruptcy Court shall have entered the Final Order, and the Administrative Agent and the Lenders shall have received a true and complete copy of the Final Order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated and (ii) the Borrowing date of Final Terms Loans shall be no later than two (2) Business Days after entry of the Final Order.

(e)    Compliance with Orders. The Credit Parties shall be in compliance in all material respects with the Bankruptcy Court DIP Orders.

11296360v.1

| Summary of the Material Terms | Reference |
|---|---|
|       (f)    <u>Notice of Borrowing.</u>  The Administrative Agent shall have received a Notice of Borrowing no later no later than two (2) Business Days prior to the proposed date of borrowing (or such later time as the Administrative Agent and the Required Lenders may agree in their sole discretion), which shall include (i) reasonably detailed information as to the intended use of the proceeds of such withdrawal (such use shall be substantially consistent with the then-applicable Rolling Forecast), (ii) the amount of the requested withdrawal, and (iii) the date of the requested borrowing | |

| **Events of Default:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(i)(M)* | Any of the following shall constitute an "<u>Event of Default</u>":<br><br>    (a)    <u>Non-Payment</u>.  Any Credit Party fails (i) to pay when and as required to be the principal of the Term Loan, including after maturity of the Term Loans or (ii) to pay interest on any Term Loan, any fee or any other amount payable under the DIP Credit Agreement or pursuant to any other DIP Document; or<br><br>    (b)    <u>Representation or Warranty</u>.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries, in any other DIP Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under the DIP Credit Agreement, or in or under any other DIP Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or<br><br>    (c)    <u>Specific Defaults</u>.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of Sections 4.1, 4.2, 4.3, 4.6, 4.7, 4.9, 4.10, 4.11, 4.12, 4.16, 4.17, Article V or Article VI of the DIP Credit Agreement; or<br><br>    (d)    <u>Other Defaults</u>.<br><br>        (i)    [Reserved].<br><br>        (ii)    Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in the DIP Credit Agreement or any other DIP Document, and such default shall continue unremedied for a | DIP Credit Agreement § 7.1 |

| **Summary of the Material Terms** | **Reference** |
|---|---|
| period of ten (10) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Administrative Borrower by the DIP Agent or Required Lenders; or<br><br>(e)    Cross Default.  Any Credit Party or any Subsidiary thereof (i) fails to make any payment in respect of any Indebtedness (other than the Obligations and other than Indebtedness in respect of which the payment or remedies thereunder are subject to the automatic stay under Section 362 of the Bankruptcy Code and are stayed (but only for so long as such stay is in effect)) or Contingent Obligation (other than the Obligations) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or<br><br>(f)    Insolvency; Voluntary Proceedings.    Other than in connection with the Chapter 11 Cases, any Credit Party or any Subsidiary thereof:  (i) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (ii) except as expressly permitted under Section 5.3 of the DIP Credit Agreement, voluntarily ceases to conduct its business in the ordinary course; (iii) commences any Insolvency Proceeding with respect to itself; or (iv) takes any action to effectuate or authorize any of the foregoing; or<br><br>(g)    Involuntary Proceedings. Other than the Chapter 11 Cases, (i) any involuntary Insolvency Proceeding is commenced or filed against any Credit Party or any Subsidiary thereof, or any writ, judgment, warrant of attachment, execution or similar process, is issued or levied against a substantial part of any such Person's Properties, and any such proceeding or petition shall not be dismissed, or such writ, judgment, warrant of attachment, execution or similar process shall not be released, vacated or fully bonded within sixty (60) days after commencement, filing or levy; (ii) any Credit Party or any Subsidiary thereof admits the material allegations of a petition against it in any Insolvency Proceeding, or an order for relief (or similar order under non-U.S. law) is ordered in any Insolvency Proceeding; or (iii) any Credit Party or any Subsidiary thereof acquiesces in the appointment of a receiver, trustee, custodian, conservator, liquidator, mortgagee in possession (or agent therefor), or | |

| Summary of the Material Terms | Reference |
|---|---|
| other similar Person for itself or a substantial portion of its Property or business; or<br><br>(h)     Monetary Judgments.  One or more judgments, orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability in excess of the Threshold Amount (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of fifteen (15) days after the entry thereof (unless such judgment, order, decree or arbitration award is subject to the automatic stay under Section 362 of the Bankruptcy Code and only for so long as such stay remains in effect); or<br><br>(i)     Non-Monetary Judgments.  One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries, which has or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or<br><br>(j)     Adverse Action.  Any Credit Party or any Lateral Entity takes or omits to take any action or step whereby the rights of the Lenders contemplated under the DIP Credit Agreement, might be impaired, terminated or adversely affected in any respect; or<br><br>(k)     [Reserved; or<br><br>(l)     [Reserved]; or<br><br>(m)     Operations.  Any Credit Party shall be prohibited or otherwise materially restrained from conducting the business theretofore conducted by it by virtue of any casualty, any labor strike, any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction or any other event and such casualty, labor strike, determination, ruling, decision, decree, order or other event remains unstayed and in effect for any period of ten (10) days; or<br><br>(n)     Subordination Agreements.  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness including the Prepetition Bond Subordination Agreement |  |

39

| **Summary of the Material Terms** | **Reference** |
|---|---|
| and the Prepetition Bridge Subordination Agreement, shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable or a Credit Party or Affiliate or party thereto thereof shall, directly or indirectly, disavow or contest in any manner the effectiveness, validity or enforceability of any of the subordination provisions governing any such Subordinated Indebtedness; or<br><br>    (o)    <u>Collateral</u>. Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or the Subsidiaries party thereto, or any Credit Party or Subsidiaries party thereto shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document or the Bankruptcy Court DIP Orders shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected (to the extent perfection may be achieved under U.S. law) and subject to a security interest subject only to Permitted Liens and the carve-out, except to the extent such Collateral has an aggregate value (greater of fair market value and book value) of less than the Threshold Amount; or<br><br>    (p)    <u>Permitted Variances</u>.  Any Variance shall exceed the Permitted Variance; or<br><br>    (q)    <u>Milestones</u>. The Debtors shall fail to timely satisfy any of the Milestones; or<br><br>    (r)    <u>Bankruptcy Related Defaults</u>.<br><br>    (i)    Any Credit Party shall file a motion in the Chapter 11 Cases to obtain financing from a party other than Lenders under Section 364(c) or (d) of the Bankruptcy Code that (A) is not permitted under Section 5.5 of the DIP Credit Agreement and (B) does not commit to provide for the payment of the Obligations and the Prepetition Obligations in full and in cash upon the incurrence of such additional financing; or<br><br>    (ii)    Any Credit Party shall file a motion seeking an order (A) approving payment of any claim that arose prior to the Petition Date other than (x) as provided for in the "first day" or "second day" orders approved by the Required Lenders, (y) contemplated by the Applicable Rolling Forecast (including Permitted Variances) as then in effect, or (z) otherwise consented to by the Required Lenders in writing, (B) granting relief from the | |

40

| Summary of the Material Terms | Reference |
|---|---|
| automatic stay under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets, or (C) except with respect to the Prepetition Obligations as provided in the Bankruptcy Court DIP Orders, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Applicable Rolling Forecast as then in effect with any secured creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor; or | |

       (iii)     Any Credit Party violates any term, provision or condition in the DIP Orders; or

       (iv)     An order is entered in any of the Chapter 11 Cases appointing, or any Credit Party, or any Subsidiary of a Credit Party shall file an application for an order seeking the appointment of, (A) a trustee under Section 1104, or (B) an examiner with enlarged powers relating to the operation of the Credit Parties' business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

       (v)     An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the Term Loan Commitments, and payment in full in cash of all Obligations (other than Contingent Indemnity Obligations) of the Credit Parties hereunder and under the other Loan Documents upon entry thereof; or

       (vi)     An order is entered by the Bankruptcy Court in any of the Chapter 11 Cases (A) to revoke, reverse, stay, modify, supplement or amend the DIP Orders, (B) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever), in each case other than the Carve Out, to have administrative priority as to the Credit Parties equal or superior to the priority of the DIP Superpriority Claim shall be entered by the Bankruptcy Court, or (C) dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all Term Loan Commitments, and payment in cash in full of all Obligations (other than Contingent Indemnity Obligations) of the Credit Parties hereunder and under the other Loan Documents upon entry thereof; or

| Summary of the Material Terms | Reference |
|---|---|
| (vii)    An order is entered by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a Chapter 11 Plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or<br><br>(viii)    An order is entered by the Bankruptcy Court authorizing the sale, including via a Chapter 11 Plan, of all or substantially all of a credit Party's assets without the prior written consent of the Required Lenders (which may be given or withheld in such lenders' sole discretion); or<br><br>(ix)    An application for any of the orders described in Sections 7.1(r)(iv) - (viii) of the DIP Credit Agreement shall be made by a Person (including, for the avoidance of doubt, the Credit Parties) and such application is not contested by the Credit Parties in good faith or such Person actually obtains entry of an order of the Bankruptcy Code; or<br><br>(x)    (A) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests relating to the Prepetition Obligations or of the Administrative Agent, and/or the Lenders, or the claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (B) the Liens or security interests created by Collateral Documents or the DIP Orders with respect to the Collateral shall, for any reason, on and after the entry of the Interim Order, cease to be valid, or (C) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Administrative Agent and/or the Lenders created by any of the DIP Orders, the DIP Credit Agreement, or any Collateral Document, or created in connection with the Prepetition Obligations; or<br><br>(xi)    Any Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Credit Party) any other Person's motion to, (A) disallow in whole or in part, the Administrative Agent's and Lenders' claim in respect of the Obligations or contest any material provision of any Loan Documents or any material provision of any Loan Document, or (B) disallow in whole or in part, any claims in respect of the Prepetition Obligations or contest any material provision of any | |

| Summary of the Material Terms | Reference |
|---|---|
| Prepetition Document or any material provision of any such document; or<br><br>(xii)   Any Credit Parties or any of their Subsidiaries attempt to consummate a sale of substantially all of its assets, via a Chapter 11 Plan, other than the Pre-Packaged Plan, which does not provide for repayment in full of all Obligations; or<br><br>(xiii)   Any Chapter 11 Plan shall be filed without the Required Lenders' consent that is inconsistent in any material respect with the Pre-Packaged Plan or does not provide for repayment in full in cash of all Obligations; or<br><br>(xiv)   There shall be any Chapter 11 Plan confirmed in the Chapter 11 Cases other than the Pre-Packaged Plan; or<br><br>(xv)   The Credit Parties shall withdraw the Pre-Packaged Plan without the prior written consent of the Required Lenders (which consent may be given or withheld in the Required Lenders' sole discretion). | |
| **Case Milestones:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(v), (vi)*<br><br>*Local Rule 4001-2(a)(i)(H)* | 1.  The Credit Parties shall commence the solicitation of votes to accept or reject the Pre-Packaged Plan on or before January 22, 2024 and, in connection with such solicitation, establish a date no later than February 5, 2024 as the deadline to submit votes to accept or reject such Pre-Packaged Plan.<br><br>2.  No later than February 7, 2024 the Credit Parties shall deliver to counsel to each of the DIP Lenders of a report certifying results of the solicitation of acceptances of the Pre-Packaged Plan.<br><br>3.  The Petition Date shall be no later than January 29, 2024.<br><br>4.  On the Petition Date, the Credit Parties shall file the Pre-Packaged Plan and a disclosure statement for the Pre-Packaged Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law (the "Disclosure Statement").<br><br>5.  No later than (i) the earlier of (x) seven (7) days after the Petition Date and (y) the date that is one (1) Business Day after other customary first day orders are entered by the Bankruptcy Court, | DIP Credit Agreement § 4.18 and Schedule 4.18 |

| Summary of the Material Terms | Reference |
|---|---|
| the Bankruptcy Court shall have entered the Interim DIP Order and (ii) 30 days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>6. No later than 60 days after the Petition Date, the Bankruptcy Court shall have entered (i) the Confirmation Order and (ii) an order approving the Disclosure Statement and all other solicitation materials in respect of the plan (the "<u>Disclosure Statement Order</u>"), in each case, that has become a Final Order.<br><br>7. No later than 75 days after the Petition Date, the Credit Parties shall consummate the transactions contemplated by the Pre-Packaged Plan. | |
| **Reporting Information:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)* | **<u>Financial Statements</u>.**  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (<u>provided</u>, that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments).  The Debtors shall deliver to the Administrative Agent and in detail reasonably satisfactory:<br><br>(a)    as soon as available, but not later than one-hundred fifty (150) days after the end of each Fiscal Year, audited consolidated balance sheets of Holdings and each of its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of any independent certified public accounting firm reasonably acceptable to the Administrative Agent which report shall (A) contain an unqualified opinion, stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and (B) not include any explanatory paragraph expressing substantial doubt as to going concern status;<br><br>(b)    as soon as available, but not later than forty-five (45) days after the end of each Fiscal Quarter of each year (including the last Fiscal Quarter of each year), unaudited consolidated balance sheets of Holdings and each of its Subsidiaries, and the related consolidated statements of income and cash flows as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, each in form reasonably satisfactory to Administrative Agent and certified on behalf of the | DIP Credit Agreement §§ 4.1 and 4.2<br><br>Interim Order ¶ 8. |

| Summary of the Material Terms | Reference |
|---|---|
| Administrative Borrower by an appropriate Responsible Officer of the Administrative Borrower as fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures; and<br><br>(c)    as soon as available, but not later than thirty (30) days after the end of each fiscal month of each year (other than a month that is also the end of a Fiscal Quarter), unaudited consolidated balance sheets of Holdings and each of its Subsidiaries and the related consolidated statements of income and cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, each in form reasonably satisfactory to Administrative Agent and certified on behalf of the Administrative Borrower by an appropriate Responsible Officer of the Administrative Borrower as fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.<br><br>**<u>Certificates; Other Information</u>**.  The Debtors shall furnish to the DIP Agent:<br><br>(a)    together with each delivery of financial statements pursuant to Sections 4.1(a) and 4.1(b) of the DIP Credit Agreement, a management discussion and analysis report, in reasonable detail, signed by the chief executive officer and/or chief financial officer of the Administrative Borrower, describing the operations and financial condition of the Credit Parties and their Subsidiaries for the fiscal month and the portion of the Fiscal Year then ended (and for the Fiscal Year then ended in the case of annual financial statements), and a report (i) setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to Section 4.2(e) of the DIP Credit Agreement and discussing the reasons for any significant variations and (ii) containing a reasonably detailed summary of key performance indicators and operating metrics consistent with past practices of the Borrowers;<br><br>(b)    concurrently with the delivery of the financial statements referred to in Sections 4.1(a), 4.1(b) and 4.1(c) above, concurrently with the delivery of the equivalent deliverables thereunder), a fully and properly completed certificate in the form of <u>Exhibit 4.2(b)</u> (a "<u>Compliance Certificate</u>"), certified on behalf of the Borrowers by a Responsible Officer of the Administrative Borrower; | |

| Summary of the Material Terms | Reference |
|---|---|
| (c)    concurrently with the delivery of the financial statements referred to in Section 4.1(b) above, a certificate of a Responsible Officer of the Administrative Borrower confirming that there have been no changes in the information set forth in the Perfection Certificate (as amended and supplemented by the Administrative Borrower after the Closing Date pursuant to Section 4.2(c) or otherwise in a writing delivered to the Administrative Agent); <br><br> (d)    promptly after the same are sent, copies of all financial statements and reports which any Credit Party sends to its shareholders or other equity holders, as applicable, generally and promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which such Person may make to, or file with, the Securities and Exchange Commission or any successor or similar Governmental Authority; <br><br> (e)    as soon as available and in any event no later than 30 days after the first day of each Fiscal Year of Holdings, projections of the Credit Parties' (and their Subsidiaries') financial performance for the then current Fiscal Year on a consolidated basis and otherwise on a month-by-month basis (in a form, and consistent with the scope and detail, provided to the Lenders prior to the Closing Date); <br><br> (f)    promptly upon receipt thereof, copies of any reports submitted by the Borrowers' certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants; <br><br> (g)    promptly, such additional business, financial, corporate affairs, Perfection Certificates and other information as the Administrative Agent may from time to time reasonably request. | |
| **Variance Covenant:** <br><br> *Bankruptcy Rule 4001(c)(1)(B)* <br><br> *Local Rule 4001-2(a)(i)(E)* | <u>Weekly Thirteen Week Cash Flow Forecasts</u>.    (i) On each Friday, commencing on February 9, 2024, the Borrowers shall deliver a detailed rolling thirteen week forecast and analysis ("<u>Rolling Forecast</u>") of anticipated cash receipts and disbursements and (ii) on each Wednesday, commencing on the first Wednesday following delivery of the initial Rolling Forecast, a detailed report (each, a "<u>Variance Report</u>") setting forth the actual cash receipts and disbursements for the preceding week and on a rolling cumulative basis against the projections from the last Rolling Forecast (which report shall certify whether or not the Borrowers were in compliance with Article VI of the DIP Credit Agreement), together with a detailed narrative explanation of any variances, in each | DIP Credit Agreement §§ 4.17 and 6.1 <br><br> Interim Order ¶ 7(b). |

| Summary of the Material Terms | Reference |
|---|---|
| case, in form and substance satisfactory to the Required Lenders (such comparison, the "Variance"). On a rolling cumulative basis, commencing on the date on which the second Rolling Forecast is delivered, or is required to be delivered, hereunder, following the Closing Date (i) the aggregate actual cash receipts for the immediate preceding weekly period shall not be less than 90% of the anticipated cash receipts for such period, and for the Rolling Forecast delivered immediately prior to such period, (the "Applicable Rolling Forecast") and (ii) the actual aggregate disbursements shall not exceed 110% of the anticipated disbursements as set forth in the Applicable Rolling Forecast for such period. Any Variance that does not exceed the Variance permitted pursuant to the foregoing clauses (i) and (ii) shall be referred to herein as a "Permitted Variance". | |
| **Indemnification:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(ix)*<br><br>*Local Rule 4001-2(a)(i)(J)* | Each Credit Party agrees to indemnify, hold harmless and defend the Administrative Agent, each Lender and each of their respective Related Persons (each such Person being an "Indemnitee") from and against all Liabilities that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person) in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Term Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including Attorney's Costs in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "Indemnified Matters"); provided, however, that no Credit Party shall have any liability under Section 9.6(a) of the DIP Credit Agreement to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a | DIP Credit Agreement § 9.6;<br><br>Interim Order ¶ 26(b). |

| Summary of the Material Terms | Reference |
|---|---|
| court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, each Credit Party executing the DIP Credit Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person. Section 9.6(a) of the DIP Credit Agreement shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.<br><br>Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any Property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Property or natural resource or any Property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor- in- interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Administrative Agent or following Administrative Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee. | |
| **Parties with an Interest in Cash Collateral:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Senior Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral"). | Interim Order ¶ 4(c). |
| **Adequate Protection:**<br><br>*Bankruptcy Rules 4001(b)(1)(B)(iv), (c)(1)(B)(ii)* | Adequate Protection for the Prepetition Senior Secured Parties. Subject only to the Carve Out and the terms of the Interim Order, including, without limitation, the rights and limitations set forth in paragraphs 27 and 28 of the Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the | Interim Order ¶ 16. |

| Summary of the Material Terms | Reference |
|---|---|
| *Local Rule 4001-2(a)(i)(P)* | aggregate postpetition diminution in value of such interests (each such diminution, a "<u>Diminution in Value</u>"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Senior Secured Parties are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"): |  |

*(continued in cell)*

(a)     <u>Bridge Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, the Prepetition Bridge Agent, for the benefit of itself and the Prepetition Bridge Lenders, is hereby granted additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "<u>Bridge Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral (which for the avoidance of doubt, excluded Avoidance Actions, but includes, upon entry of the Final Order, Avoidance Proceeds).  Subject to the terms of the Interim Order, the Bridge Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any).  The Bridge Adequate Protection Liens shall be *pari passu* with the 2022A Bond Adequate Protection Liens in respect of all other DIP Collateral and otherwise shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Bridge Liens, Prepetition 2022A Bond Liens, the Prepetition Subordinate Liens, and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b)     <u>2022A Bond Adequate Protection Liens</u>.  As security for and solely to the extent of any Diminution in Value, the Prepetition Trustee, for the benefit of itself and the Prepetition 2022A Bondholders, is hereby granted additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "<u>2022A Bond Adequate Protection Liens</u>" and, together with the Bridge Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral (which for the avoidance of doubt, excluded Avoidance Actions, but

includes, upon entry of the Final Order, Avoidance Proceeds).  Subject to the terms of the Interim Order, the 2022A Bond Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any).  The 2022A Bond Adequate Protection Liens shall be *pari passu* with the Bridge Adequate Protection Liens in respect of all other DIP Collateral and otherwise shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition 2022A Bond Liens, the Prepetition Bridge Liens, and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(c)    Bridge Adequate Protection Superpriority Claim.    As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Bridge Agent, for the benefit of itself and the Prepetition Bridge Lenders, is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and the DIP Superpriority Claims (the "Bridge Adequate Protection Superpriority Claim").    The Bridge Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Bridge Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.    The Prepetition Bridge Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Bridge Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(d)    2022A Bond Adequate Protection Superpriority Claim.    As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Trustee, for the benefit of itself and the Prepetition 2022A Bondholders, is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the

extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Bridge Adequate Protection Superpriority Claim, the Carve Out, and the DIP Superpriority Claims (the "2022A Bond Adequate Protection Superpriority Claim" and, together with the Bridge Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").  The 2022A Bond Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds).  Subject to the Bridge Adequate Protection Superpriority Claim, the Carve Out, and the DIP Superpriority Claims in all respects, the 2022A Bond Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition 2022A Bond Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 2022A Bond Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(e)     Fees and Expenses.  As further adequate protection, the Debtors are authorized and directed to pay, without further Bankruptcy Court order, reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Senior Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (1) Ropes & Gray, LLP and Chipman Brown Cicero & Cole, LLP, counsel to the Prepetition Bridge Lenders and (2) Lewis Roca Rothgerber Christie, as counsel to the Prepetition Bridge Agent.  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.  The applicable professional shall serve copies of the invoices supporting the Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any Adequate Protection Fees shall be subject to prior ten (10) day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee (if any) shall file with this Bankruptcy Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid

| Summary of the Material Terms | Reference |
|---|---|
| until resolution of such objection by this Bankruptcy Court.   If no objection is filed within such ten (10) day review period, such invoice shall be paid without further order of the Bankruptcy Court within five (5) days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement.  For the avoidance of doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.<br><br>        (f)      Bridge Accrued Adequate Protection Payments.    As further adequate protection, the Prepetition Bridge Agent, on behalf of the Prepetition Bridge Lenders, shall receive, upon entry of the Interim Order, monthly adequate protection payments (the "Bridge Accrued Adequate Protection Payments" and together with the Bridge Adequate Protection Liens, Bridge Adequate Protection Superpriority Claim and the Adequate Protection Fees, the "Bridge Adequate Protection Obligations") payable in-kind on the thirtieth (30th) day of each month equal to the interest at the Applicable Margin (as defined in the Prepetition Bridge Credit Agreement) plus two percent (2%), until such time as the full Prepetition Bridge Obligations Amount is indefeasibly and irrevocably (x) paid in full, in cash; or (y) fully converted into DIP Obligations.<br><br>        (g)      2022A Bond Accrued Adequate Protection Payments.  As further adequate protection, the Prepetition Trustee, on behalf of the Prepetition 2022A Bondholders, shall receive, upon entry of the Interim Order, monthly adequate protection payments (the "2022A Bond Accrued Adequate Protection Payments" and together with the 2022A Bond Adequate Protection Liens, the 2022A Bond Adequate Protection Superpriority Claim and the Adequate Protection Fees, the "2022A Bond Adequate Protection Obligations") payable in-kind on the thirtieth (30th) day of each month equal to the interest at rate of 15% per annum that would otherwise be owed to the Prepetition 2022A Bondholders under the Prepetition Indenture during such monthly period in respect of the Prepetition 2022A Bond Obligations, until such time as the full Prepetition 2022A Bond Obligations Amount is indefeasibly and irrevocably paid in full, in cash. | |

| Summary of the Material Terms | | Reference |
|---|---|---|
| **Repayment Features:**<br>*Local Rule 4001-2(a)(i)(I)* | <u>Optional Prepayments of Term Loans</u>.  No optional prepayments of Term Loans may be made without the consent of the Lenders, which may be given (or not) in their sole and absolute discretion.  Any such optional prepayment of Term Loans shall be made on the terms consented to by the Lenders and shall include the payment of the Exit Fee.<br><br><u>Maturity Date Payment</u>.<br><br>    (a)    On the Maturity Date (unless the Facility Termination Date has already occurred), the entire principal balance of the Term Loans, plus all other Obligations (including, for the avoidance of doubt, the Exit Fee) shall be either (a) repaid in full in cash to the Administrative Agent (for distribution to the Lenders) or (b) subject to the prior written consent of the Required Lenders in their sole discretion, converted into an exit facility that is on terms and conditions satisfactory to the Required Lenders in their sole discretion and subject to documentation acceptable to the Administrative Agent and the Required Lenders in their sole discretion (such conversion, an "<u>Exit Conversion</u>"); <u>provided</u>, <u>however</u>, that no Exit Conversion shall be available to the Borrower and the other Credit Parties unless, in connection with such conversion, one or more Affiliates of the Lenders shall receive 100% of the equity of the reorganized Borrower and reorganized Credit Parties.<br><br>    (b)    <u>Asset Dispositions; Events of Loss</u>.  If a Credit Party or any Subsidiary of a Credit Party shall at any time or from time to time:<br><br>    (i)    make or agree to make a Disposition; or<br><br>    (ii)    suffer an Event of Loss;<br><br>then (A) the Administrative Borrower shall promptly notify the Administrative Agent of such proposed Disposition or Event of Loss (including the amount of the estimated Net Proceeds to be received by a Credit Party and/or such Subsidiary in respect thereof) and (B) promptly upon receipt by a Credit Party and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Borrowers shall deliver, or cause to be delivered, the Net Proceeds to the Administrative Agent for distribution to the Lenders as a prepayment of the Term Loans plus the Exit Fee on such Term Loans so prepaid, which prepayment shall be applied in accordance with <u>Section 1.6(e)</u> of the DIP Credit Agreement. | DIP Credit Agreement §§ 1.5, 1.6, and 1.8 |

| Summary of the Material Terms | Reference |
|---|---|
| (c)      Incurrence of Debt; Equity Issuance; Extraordinary Receipts.  Immediately upon receipt by any Credit Party or any Subsidiary of any Credit Party of (i) the Net Issuance Proceeds of the incurrence of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted hereunder) or Equity Issuances or (ii) the Net Proceeds of any Extraordinary Receipts, the Borrowers shall deliver, or cause to be delivered, to the Administrative Agent an amount equal to such Net Issuance Proceeds or Net Proceeds, as the case may be, in each instance, for distribution to the Lenders as a prepayment of the Term Loans plus the Exit Fee on such Term Loans so prepaid, which shall be applied in accordance with Section 1.6(e) of the DIP Credit Agreement.<br><br>(d)      [Reserved].<br><br>(e)      Notice and Application of Payments.<br><br>(i)      In connection with any prepayment required under Sections 1.6(b) or Section 1.6(c) of the DIP Credit Agreement, the Administrative Borrower shall provide written notice (in form and substance reasonably acceptable to the Administrative Agent) of each such prepayment by the Borrowers to the Administrative Agent, which notice shall specify the amount of the prepayment and the subsection pursuant to which such prepayment is being made (each, a "Prepayment Date").  Upon receipt by the Administrative Agent of such notice, the Administrative Agent shall immediately give notice to each Lender of the prepayment, the Prepayment Date and of such Lender's Pro Rata Share of the prepayment.<br><br>(ii)      Together with each payment under Section 1.6 of the DIP Credit Agreement, the Borrowers shall pay accrued but unpaid interest and the Exit Fee on the portion of the Term Loans to be prepaid in cash.<br><br>(iii)      Each prepayment pursuant to Section 1.6 of the DIP Credit Agreement shall be applied, first, to the outstanding principal balance of the Roll-Up Loans and an amount equal to the Exit Fee on such Roll-Up Loans being prepaid, until paid in full, and second, to the outstanding principal balance of all other Term Loans and an amount equal to the Exit Fee on such Term Loans being prepaid, until paid in full in cash.<br><br>Payments by the Borrowers. |  |

| Summary of the Material Terms | Reference |
|---|---|
| (a)    Subject to <u>Section 10.1</u> of the DIP Credit Agreement, all payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without setoff, recoupment, counterclaim or deduction of any kind, shall, except as otherwise directed by the Required Lenders from time to time, be made to an account of the Administrative Agent designated in writing from time to time, and shall be made in Dollars and by wire transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 1:00 p.m. on the date due.  Any payment which is received by the Administrative Agent later than 1:00 p.m. may in Administrative Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  Each Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.<br><br>(b)    If any payment under the DIP Credit Agreement shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be. | |

| Summary of the Material Terms | Reference |
|---|---|
| **Carve Out:**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br><br>*Local Rule 4001-2(a)(i)(F)* | The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, at any time, whether by interim order, procedural order, or otherwise, and, with respect to the amounts in clause (x) below, to the extent provided for in the DIP Budget, and all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and an official committee of unsecured creditors (the "Creditors' Committee"), if any, pursuant to Bankruptcy Code section 328 or 1103 (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") (x) at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (but not to exceed the amount of Allowed Professional Fees specified in the Applicable DIP Budget for the period from the Petition Date to the date of the Carve Out Trigger Notice, without giving effect to the Permitted Variance, if any, the "Pre-Carve Out Trigger Amount"), plus (y) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (y) the "Post-Carve Out Trigger Notice Cap" and the amounts set forth in clauses (x) and (y), collectively, the "Carve-Out Amount"). For the avoidance of doubt, the maximum aggregate Pre-Carve-Out Trigger Amount shall not exceed the cumulative amount set forth in the Applicable DIP Budget for the Professional Persons incurred from the Petition Date to the date of the Carve Out Trigger Notice. Within three (3) business days of the receipt of a Carve-Out Trigger Notice, each Professional Person shall provide its reasonable, good-faith estimate of the amount of its fees and expenses to be included in the Pre-Carve Out Trigger Amount. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee (if appointed) providing that a Termination Event has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked. | Interim Order ¶ 11(a). |

56

| Summary of the Material Terms | | Reference |
|---|---|---|
| **Disparate Treatment of Professionals Under Carve Out:**<br><br>*Local Rule 4001–2(a)(i)(F)* | The Interim Order contains no provision for disparate treatment for professionals retained by a Creditors' Committee, if any, with respect to the Carve Out. | Interim Order ¶ 11. |
| **Provisions Deeming Prepetition Debt to be Postpetition Debt:**<br><br>*Local Rule 4001–2(a)(i)(E)* | The Interim Order provides for provisions deeming prepetition debt to be converted to postpetition debt.  Specifically, the proceeds from the DIP Facility refinance $64,342,012.11 of the obligations under the Prepetition Bridge Credit Agreement on a cashless basis. | DIP Credit Agreement § 1.1(a)(iii)<br><br>Interim Order ¶ 6(c). |
| **Cross-Collateralization:**<br><br>*Local Rule 4001–2(a)(i)(N)* | See "Priority and Security" above. | Interim Order ¶ 10. |
| **Payment of Secured Parties' Fees Without Review:**<br>*Local Rule 4001-2(a)(i)(K)* | None. | Interim Order ¶ 16(e). |
| **Debtors' Stipulations:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iii)*<br><br>*Local Rule 4001–2(a)(i)(L), (Q)* | Pursuant to the Interim Order, the Debtors for themselves, their estates and all representatives of such estates, make the stipulations set forth in Paragraph 4 of the Interim Order. | Interim Order ¶ 4. |
| **Liens on Avoidance Actions:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(xi)* | Pursuant to Bankruptcy Code § 364(c)(1), the DIP Agent and the DIP Lenders are granted valid, perfected, enforceable and non-avoidable liens on, and security interests in, all now owned or hereafter acquired assets and property of the Debtors, including, without limitation, proceeds of Avoidance Actions upon entry of the Final Order. | Interim Order ¶ 9. |

| Summary of the Material Terms | | Reference |
|---|---|---|
| *Local Rule 4001–2(a)(i)(U)* | | |
| **Non-Consensual Priming Liens**:<br><br>*Local Rule 4001–2(a)(i)(G)* | The Interim Order does not provide for non-consensual priming of any existing secured lien.  See "Priority and Security" above. | Interim Order ¶ 10. |
| **Release, Waiver or Limitation on any Claim or Cause of Action**:<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)* | Subject to the rights and limitations set forth in paragraphs 27 and 28 of the Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Senior Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Bridge Obligations, the Prepetition Bridge Liens, the Prepetition 2022A Bond Obligations, and the Prepetition 2022A Bond Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties. | Interim Order ¶ 29. |

| Summary of the Material Terms | | Reference |
|---|---|---|
| **Waiver or Modification of Automatic Stay:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(iv)*<br><br>*Local Rule 4001-2(a)(i)(S)* | Upon the occurrence of a Termination Event and following the giving of not less than three (3) business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), but subject to and in accordance with the terms of the DIP Documents and any order of the Court, (a) the DIP Agent and the DIP Lenders may exercise any rights and remedies against the DIP Collateral available to them under the Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility, (b) the Prepetition Bridge Secured Parties may exercise any rights and remedies to satisfy the Prepetition Bridge Obligations, the Bridge Adequate Protection Superpriority Claims and any other Bridge Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, Permitted Liens and, in each case, the Carve Out, and (c) the Prepetition 2022A Bond Secured Parties may exercise any rights and remedies to satisfy the Prepetition 2022A Bond Obligations, the 2022A Bond Adequate Protection Superpriority Claims and any other 2022A Bond Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, the Bridge Adequate Protection Superpriority Claims, any other Bridge Adequate Protection Obligations, Permitted Liens and, in each case, the Carve Out.  The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties at the end of the Notice Period, without further notice or order of the Bankruptcy Court, unless the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties elect otherwise in a written notice to the Debtors, which may be by email. | Interim Order ¶ 22. |
| **Provisions that Limit the Court's Discretion**<br>*Local Rule 4001-2(a)(i)(C)* | None. | Not Applicable |
| **Funding of Non-Debtor Affiliates with Cash Collateral** | None. | Not Applicable |

| Summary of the Material Terms | | Reference |
|---|---|---|
| Local Rule 4001-2(a)(i)(D) | | |
| **Limitation on Remedies Hearings:**<br><br>*Local Rule 4001-2(a)(i)(T)* | None. | Not Applicable |
| **Section 506(c) Waiver:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(x)*<br><br>*Local Rule 4001–2(a)(i)(C), (V)* | Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties. | Interim Order ¶ 12. |
| **Section 552(b)(1) and Marshalling Waiver:**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(viii)*<br><br>*Local Rule 4001–2(a)(i)(W), (X)* | No Marshaling/Application of Proceeds. Subject to entry of the Final Order (but retroactive to the Petition Date), the DIP Agent, the Prepetition Bridge Agent, and the Prepetition Trustee shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Interim Order or the Final Order, as applicable, the DIP Documents, Prepetition Bridge Documents, or the Prepetition Indenture Documents, each as applicable, and in no event shall the DIP Agent, the DIP Lenders, or any of the Prepetition Senior Secured Parties, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.<br><br>Equities of the Case.  Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable. | Interim Order ¶¶ 13-14. |

**BASIS FOR RELIEF REQUESTED**

**I.**      **Approval of the DIP Facility Is Essential to the Debtors' Ability to Successfully Effectuate a Restructuring Transaction**

57.      It is essential to the success of the Chapter 11 Cases that the Debtors immediately obtain access to sufficient postpetition financing. The Debtors' continuing viability, the avoidance of business interruption, the preservation of estate assets and the Debtors' ability to successfully effectuate a restructuring transaction all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

58.      For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for approval of the DIP Facility.

**II.**      **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents**

59.      The Bankruptcy Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using Cash Collateral. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or super-priority financing under certain circumstances discussed in detail below.

**A.**      **Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment**

60.      Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility "reflect[ed] sound and prudent business judgement"); *In re Ames Dep't Stores,*

*Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment.").

61.     In determining whether debtors have exercised sound business judgment in selecting a particular DIP financing proposal, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah Oct. 8, 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

62.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the totality of the circumstances. *Farmland Indus., Inc.*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Bankruptcy Court may also appropriately take into consideration non-

economic benefits to the debtors offered by a proposed postpetition facility.  For example, in *In re Ion Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

63.     Here, the Debtors' determination to secure the DIP Facility is an exercise of sound business judgment. (DIP Decl. ¶ 30.)  As further discussed in the DIP Declaration, the DIP Facility was a product of an arms'-length, good faith negotiation and a careful evaluation of alternatives, as well as evaluation of the Debtors financial needs.  (*Id.* ¶ 20)  Specifically, the Debtors, with the advice and counsel of their advisors, determined that the Debtors will require immediate liquidity to fund the administrative costs of these Chapter 11 Cases and the ongoing needs of the Debtors' business.  Indeed, without immediate additional liquidity, the Debtors would be unable to preserve their business nor maximize value, to the detriment of the Debtors' customers, creditors, employees, vendors, and other parties in interest.  (*Id.* ¶ 11.)  The Debtors ultimately decided that moving forward with the proposed DIP Facility was an appropriate step given that the DIP Facility: (a) allows the Debtors to avoid a value-destructive priming fight; (b) provides a path forward in chapter 11 by allowing the Debtors to implement a plan or reorganization; and (c) allows the Debtors to operate in the ordinary course of business postpetition and fund the administration of the Chapter 11 Cases for the benefit of the estates and all of the Debtors' stakeholders.  The Debtors and their advisors therefore determined that entry into the DIP Facility was the best path available

63

and they have obtained the best terms currently achievable under the circumstances.  (*Id.* ¶¶ 24, 29.)

### B.   The Debtors Satisfy the Requirements for Entering in the DIP Facility Under Section 364(c) of the Bankruptcy Code

64.    The Debtors propose to obtain postpetition financing under the terms and conditions of the DIP Facility by providing security interests and other liens, as described herein and provided for in the DIP Documents, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  More specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, which include substantially all of the Debtors' assets, and, specifically, (a) a priming security interest and lien on the Prepetition Collateral to the extent such Prepetition Collateral is subject to prepetition liens that secure the prepetition facilities under the prepetition loan documents, (b) a junior security interest and lien to all property of the Debtors that is subject to prepetition Permitted Liens, (c) a first lien priority senior security interest in all property of the Debtors that is not subject to a valid, perfected and non-avoidable lien, subject to and as further provided for in the DIP Documents and the Interim Order.

65.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]."   11 U.S.C. § 364(c). Furthermore, section 364(c) financing is appropriate when the debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section

364(b) of the Bankruptcy Code); *Ames Dep't Stores*, 115 B.R. at 37-39 (holding that debtor must

show it made reasonable effort to seek other sources of financing under section 364(a) and (b) of

the Bankruptcy Code).

66.     Bankruptcy courts have articulated a three-part test to determine whether a debtor

is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to

whether:

> (a)     [The debtor is] unable to obtain unsecured credit under section
> 364(b), *i.e.,* by allowing a lender only an administrative claim per
> 11 U.S.C. § 503(b)(1)(A);
>
> (b)     The credit transaction is necessary to preserve the assets of the
> estate; and
>
> (c)     The terms of the transaction are fair, reasonable, and adequate, given
> the circumstances of the debtor-borrower and the proposed lender.

*L.A. Dodgers*, 457 B.R. at 312 (citing *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa.

1988)); *see also Crouse Grp.*, 71 B.R. at 549; *Ames Dep't Stores,* 115 B.R. at 37-39.  The elements

of this test are satisfied here.

67.     As described in the DIP Declaration, the Debtors recognized that it would be

particularly difficult to secure financing because all of the Debtors' cash and material assets are

encumbered by existing liens under their prepetition debt and the Prepetition Senior Secured

Parties indicated that they would not consent to a "priming" DIP financing provided by a third

party.  (DIP Decl. ¶ 18.)  In light of this, the Debtors understood that any third-party DIP financing

would require engaging in a protracted and costly priming fight or valuation dispute with the

secured parties under the prepetition loan documents at the very outset of these Chapter 11 Cases.

(*Id.* ¶ 17)  Regardless of the prospects of success, the expense and disruption associated with

complex litigation at the beginning of the case would seriously jeopardize the Debtors'

restructuring efforts, as already strained liquidity would be required to fund such a fight.  Such

litigation would also have had a disastrous effect on the Debtors' effort to implement a restructuring plan.

68.     Without adequate postpetition financing, the Debtors will be unable to administer these Chapter 11 Cases, which would significantly impair their ability to implement a plan of reorganization.  The DIP Facility ensures that the Debtors have the liquidity to fund these cases. Additionally, as set forth below, the terms of the DIP Facility are fair, reasonable and adequate given the facts and circumstances.

**C.     The Debtors Should Be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis.**

69.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

70.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is

unavailable."); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584

(S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain

credit as an administrative expense). When few lenders are likely to be able and willing to extend

the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to

conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr.

N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4

(N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and

holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it

approached four lending institutions, was rejected by two, and selected the most favorable of the

two offers it received).

71.    As described above, the Debtors are unable to obtain unsecured credit. Therefore,

approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

72.    Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain

credit secured by a senior or equal lien on property of the estate already subject to a lien, after

notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is

adequate protection of the interest of the holder of the lien on the property of the estate on which

such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may

incur "priming" liens under the DIP Facility to the extent such DIP Collateral is subject to

prepetition liens that secure the Prepetition Obligations. *See Anchor Savs. Bank FSB v. Sky Valley,*

*Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those

[undersecured] creditors relieved the debtor of having to demonstrate that they were adequately

protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either

11296360v.1

(a) their Prepetition Senior Secured Lenders have consented or (b) the Prepetition Senior Secured Lenders' interests in collateral are adequately protected.

73.     Here, the Prepetition Senior Secured Parties have affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility.  Further, pursuant to the Lateral Subordination Agreement, the Prepetition 2022A Bond Secured Parties are expressly permitted to provide DIP financing and such financing will be senior to the liens of the Prepetition 2022B Bondholders.  Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide an adequate protection package to protect the interests of the Prepetition Senior Secured Parties.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### D.     No Adequate Alternative to the DIP Facilities is Currently Available.

74.     To obtain a postpetition financing facility, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  *See YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009) (stating that debtor has an obligation only to make "reasonable efforts, under the circumstances . . . to obtain [unsecured financing], in the ordinary course of business or otherwise"); *In re Harborwalk, LP*, No. 10-80043-G3-11 (LZP) (Bankr. S.D. Tex. Jan. 29, 2010) [Docket No. 28] ("Section 364(d)(1) does not require that a debtor seek credit from every possible source, but a debtor must show that it made a reasonable effort to obtain postpetition financing from other potential lenders on less onerous terms and that such financing was unavailable.") (internal citations omitted).

68

75.     Given the amount of the Prepetition Obligations, procuring the necessary postpetition financing as unsecured debt or as debt secured by liens junior to the liens of the Prepetition Senior Secured Parties was not a viable alternative.  Moreover, the Debtors did not believe they would be able to secure third-party postpetition financing on a non-priming basis or on better terms than those provided by the DIP Lenders without protracted litigation regarding the priming of the Prepetition Senior Secured Parties' liens.  (DIP Decl. ¶ 17)  Accordingly, the Debtors have determined that, under the circumstances, the DIP Facility is the best postpetition financing option available to them and their estates.

76.     As a result, the Debtors have shown, in satisfaction of the requirements of sections 364(c) and (d) of the Bankruptcy Code, that alternative credit on more favorable terms was unavailable to them.

**E.      The Debtors Should Be Authorized to Use the Cash Collateral.**

77.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Here, the DIP Lenders and the Prepetition Senior Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

78.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting

replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

79.     As set forth above, the Prepetition Senior Secured Parties and the Prepetition 2022B Bondholders have or are deemed to have consented to the use of Cash Collateral. The Debtors propose providing the Prepetition Senior Secured Parties with adequate protection that (i) is fair and reasonable and (ii) adequately protects against the diminution in value of their interest in the Prepetition Collateral. Specifically, as detailed in the Interim Order, the Debtors are proposing the following adequate protection (collectively, the "<u>Adequate Protection Obligations</u>"):

(a) <u>Bridge Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, the Prepetition Bridge Agent, for the benefit of itself and the Prepetition Bridge Lenders, is hereby granted additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "<u>Bridge Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar

documents, all DIP Collateral (which for the avoidance of doubt, excluded Avoidance Actions, but includes, upon entry of the Final Order, Avoidance Proceeds). Subject to the terms of the Interim Order, the Bridge Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any). The Bridge Adequate Protection Liens shall be *pari passu* with the 2022A Bond Adequate Protection Liens in respect of all other DIP Collateral and otherwise shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Bridge Liens, Prepetition 2022A Bond Liens, the Prepetition Subordinate Liens, and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b) <u>2022A Bond Adequate Protection Liens</u>. As security for and solely to the extent of any Diminution in Value, the Prepetition Trustee, for the benefit of itself and the Prepetition 2022A Bondholders, is hereby granted additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of the Interim Order (the "<u>2022A Bond Adequate Protection Liens</u>" and, together with the Bridge Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral (which for the avoidance of doubt, excluded Avoidance Actions, but includes, upon entry of the Final Order, Avoidance Proceeds). Subject to the terms of the Interim Order, the 2022A Bond Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any). The 2022A Bond Adequate Protection Liens shall be *pari passu* with the Bridge Adequate Protection Liens in respect of all other DIP Collateral and otherwise shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition 2022A Bond Liens, the Prepetition Bridge Liens, and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(c) <u>Bridge Adequate Protection Superpriority Claim</u>. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Bridge Agent, for the benefit of itself and the Prepetition Bridge Lenders, is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and the DIP Superpriority Claims (the "<u>Bridge Adequate Protection Superpriority Claim</u>"). The Bridge Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds). Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Bridge Adequate

Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114. The Prepetition Bridge Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Bridge Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(d) <u>2022A Bond Adequate Protection Superpriority Claim</u>. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Trustee, for the benefit of itself and the Prepetition 2022A Bondholders, is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Bridge Adequate Protection Superpriority Claim, the Carve Out, and the DIP Superpriority Claims (the "<u>2022A Bond Adequate Protection Superpriority Claim</u>" and, together with the Bridge Adequate Protection Superpriority Claim, the "<u>Adequate Protection Superpriority Claims</u>"). The 2022A Bond Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds). Subject to the Bridge Adequate Protection Superpriority Claim, the Carve Out, and the DIP Superpriority Claims in all respects, the 2022A Bond Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114. The Prepetition 2022A Bond Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 2022A Bond Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(e) <u>Fees and Expenses</u>. As further adequate protection, the Debtors are authorized and directed to pay, without further Bankruptcy Court order, reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition Senior Secured Parties, including, without limitation, the reasonable and documented fees and expenses of

(1) Ropes & Gray, LLP and [Chipman Brown Cicero & Cole, LLP] counsel to the Prepetition Bridge Lenders and (2) Lewis Roca Rothgerber Christie, as counsel to the Prepetition Bridge Agent.  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.  The applicable professional shall serve copies of the invoices supporting the Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any Adequate Protection Fees shall be subject to prior ten (10) day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the Debtors, the U.S. Trustee or the Creditors' Committee (if any) shall file with this Bankruptcy Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Bankruptcy Court.  If no objection is filed within such ten (10) day review period, such invoice shall be paid without further order of the Bankruptcy Court within five (5) days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement.  For the avoidance of doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

(f) Bridge Accrued Adequate Protection Payments.  As further adequate protection, the Prepetition Bridge Agent, on behalf of the Prepetition Bridge Lenders, shall receive, upon entry of the Interim Order, monthly adequate protection payments (the "Bridge Accrued Adequate Protection Payments" and together with the Bridge Adequate Protection Liens, Bridge Adequate Protection Superpriority Claim and the Adequate Protection Fees, the "Bridge Adequate Protection Obligations") payable in-kind on the thirtieth (30th) day of each month equal to the interest at the Applicable Margin (as defined in the Prepetition Bridge Credit Agreement) plus two percent (2%), until such time as the full Prepetition Bridge Obligations Amount is indefeasibly and irrevocably (x) paid in full, in cash; or (y) fully converted into DIP Obligations.

(g) 2022A Bond Accrued Adequate Protection Payments.  As further adequate protection, the Prepetition Trustee, on behalf of the Prepetition 2022A Bondholders, shall receive, upon entry of the Interim Order, monthly adequate protection payments (the "2022A Bond Accrued Adequate Protection Payments" and together with the 2022A Bond Adequate Protection Liens, the 2022A Bond Adequate Protection Superpriority Claim and the Adequate Protection Fees, the "2022A Bond Adequate Protection Obligations") payable in-kind on the thirtieth (30th) day of each month equal to the interest at rate of 15% per annum that would otherwise be owed to the Prepetition 2022A Bondholders under the Prepetition Indenture during such monthly period in respect of the Prepetition 2022A Bond

Obligations, until such time as the full Prepetition 2022A Bond Obligations Amount is indefeasibly and irrevocably paid in full, in cash.

80.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Senior Secured Parties from any potential diminution in value to the Prepetition Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition Senior Secured Parties agree or are deemed to agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Senior Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**F.      The Roll-Up Loans Are Appropriate.**

81.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp*., 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

74

82.     Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.   The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) [Docket No. 216] (authorizing an approximately $120 million DIP facility, including a $60 million roll-up of the prepetition term loan); *In re Phoenix Servs. Topco LLC,* Case No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022) [Docket No. 73] (approving a $100 million interim DIP facility with a **3:1** roll-up ratio consisting of $75 million of prepetition debt and $25 million of new money); *In re TPC Group Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. June 3, 2022) [Docket No. 147] (authorizing an approximately $323 million DIP facility, including a $238 million roll-up of prepetition secured notes, of which approximately $59 million rolled up on an interim basis); *In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (MFW) (Bankr. D. Del. Mar. 17, 2021) [Docket No. 100] (approving a $13 million interim DIP facility with a **3:1** ratio consisting of $39 million of prepetition debt and $13 million of new money); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Jul. 23, 2019) [Docket No. 81] (authorizing DIP facilities in the aggregate amount of $240 million, including a $100 million roll-up of the prepetition term loan and an additional $140 million in incremental liquidity, pursuant to interim order); *In re Charlotte Russe Holding, Inc.*, Case No. 19-10210 (LSS) (Bankr. D. Del. Feb. 5, 2019) [Docket No. 92] (approving a $50 million interim DIP facility with a **2.57:1** roll-up ratio consisting of $36 million of prepetition debt and $14 million of new money); *In re ATD Corp.*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 5, 2018) [Docket No. 109] (authorizing an approximately $1,230 million DIP, including a full roll-up of the prepetition ABL outstanding principal of $639 million and an additional $250 million in additional liquidity, pursuant to interim

order); *In re Remington Outdoor Co., Inc.*, No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) [Docket No. 68] (authorizing approximately $338 million DIP and a roll-up of approximately $150 million, including a full ABL roll-up of $114 million, pursuant to interim order); *In re Appvion, Inc.*, Case No. 17-12082 (KJC) (Bankr. D. Del. Oct. 3, 2017) [Docket No. 66] (approving a $65 million interim DIP facility with a **3.69:1** ratio consisting of $240.2 million of prepetition debt and $65 million of new money.[8]

83.    As set forth above, the DIP Credit Agreement provides that the DIP Facility will be used to roll up, subject to entry of the Interim Order, $64,342,012.11 of the Debtors' prepetition debt under their capital structure.  This repayment is a sound exercise of the Debtors' business judgment and is a material component of the structure of the DIP Facility.  Without continued access to the additional liquidity provided under the DIP Facility, the Debtors will be unable to fund the administration of these Chapter 11 Cases and the sale process.

84.    As discussed in the DIP Declaration, the Roll-Up Loans were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, is an integral component of the overall terms of the DIP Facility and was required by the DIP Lenders as considerations for the extension of postpetition financing.  (DIP Decl. ¶¶ 21-23.)  Additionally, the Roll-Up Loans were a necessary condition for the DIP Lenders to agree to the Prepetition Bridge Credit Agreement on a prepetition basis.  (*Id*. ¶ 23)  The Prepetition Bridge Credit Agreement was required for the Debtors to continue funding their operations pending the filing of these Chapter 11 Cases and obtaining access to the DIP Facility.  Further, the Debtors believe the Prepetition Bridge Obligations are secured by perfected, first priority liens, and the portion being converted

---

[8]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

to Roll-Up Loans are fully secured such that the roll-up of the obligations merely accelerates the satisfaction of the obligations without affecting the recovery of other creditors. For these reasons and because no other party has put forward an actionable financing proposal, the granting of the Roll-Up Loans is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and ultimately in the best interests of all stakeholders given the alternatives.

### III.  The Debtors Should Be Authorized to Pay the Fees Required Under the DIP Documents.

85.     As described in the DIP Declaration, the Debtors have agreed, subject to Bankruptcy Court approval, to pay certain fees to the DIP Lenders (collectively, the "DIP Fees") in exchange for providing the DIP Facility. The DIP Fees include (i) a closing fee in an amount equal to $725,000.00 (the "Closing Fee"), which fee shall be payable in kind on the Closing Date and deemed fully earned and non-refundable when paid, (ii) an agency fee in cash in an amount equal to $17,500 (the "Agency Fee"), which shall be deemed fully earned when paid and which shall be payable on the Closing Date, and (iii) an exit fee in cash in an amount equal to 3.00% of the aggregate principal amount of the Term Loans (the "Exit Fee"), which fee shall be payable at the times specified in the DIP Credit Agreement.

86.     The DIP Fees, together with the other provisions of the DIP Documents, represent the most favorable terms the DIP Lenders or any other potential investor would agree to make the DIP Facility available to the Debtors. The Debtors considered the DIP Fees when determining in their sound business judgment whether the DIP Documents constituted the best terms on which the Debtors could obtain sufficient postpetition financing necessary to continue their operations and fund the Chapter 11 Cases. Paying the DIP Fees—which were negotiated at arms'-length among the parties—in order to obtain the DIP Facility is in the best interests of the Debtors' estates,

creditors and other parties in interest.  Accordingly, the Bankruptcy Court should authorize the Debtors to pay the DIP Fees.

**IV.**    **The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

87.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

*Id*.

88.    Here, the Debtors believe the DIP Documents embody the most favorable terms on which the Debtors could obtain DIP financing.  As discussed in the DIP Declaration, all negotiations regarding the provisions of the DIP Facility were conducted in good faith and on an arm's length basis.  The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Facility other than as disclosed herein.  Accordingly, the Bankruptcy Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.**    **The Scope of the Carve Out Is Appropriate.**

89.    The DIP Superpriority Claims, the DIP Liens, the Bridge Adequate Protection Liens, 2022A Bond Adequate Protection Liens, the Bridge Adequate Protection Superpriority

78

Claim, and the 2022A Bond Adequate Protection Superpriority Claim are subject to the Carve Out. The Carve Out ensures that assets will be available for the payment of fees of the U.S. Trustee and professional fees of the Debtors and an unsecured creditors' committee, if one is appointed. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted. *See Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Accordingly, the Carve Out is necessary and appropriate, and should be approved.

## VI. The Automatic Stay Should Be Modified on a Limited Basis.

90. The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to grant the DIP Liens. Specifically, the DIP Facility contemplates modifying the automatic stay so as to (i) permit the creation and perfection of the DIP Liens, and (ii) provide for the automatic vacation of such stay to permit the DIP Agent to enforce its rights with respect to the DIP Collateral in the event of an Event of Default under the DIP Facility, subject to three (3) business days' written notice to counsel to the Debtors, and the U.S. Trustee.

91. Stay modifications of this kind are ordinary and standard features for postpetition financings, and in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g.*, *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. Aug. 4, 2023) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an Event of Default); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. Apr. 26, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del.

Aug. 24, 2022) (same); *In re Town Sports Int'l, LLC*, No. 12-12168 (CTG) (Bankr. D. Del. Oct.

2, 2020) (same); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. Jun. 15,

2020) (same); *In re Akorn, Inc.*, No. 20-11177 (KBO) (Bankr. D. Del. May 22, 2020) (same).[9]

## SATISFACTION OF BANKRUPTCY RULE 6003

92.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the

estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within

twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is

necessary to avoid immediate and irreparable harm."  As described herein, and in the DIP

Declaration, the Debtors will suffer immediate and irreparable harm without the Court's

authorization to withdraw and borrow funds under the DIP Facility.  If the relief is not granted, the

Debtors' ability to continue to operate and pay their administrative expenses will be significantly

disrupted, which will have a disastrous effect on the Debtors' operations and the implementation

of a plan of reorganization.  The ability to obtain sufficient working capital and liquidity through

the DIP Facility is therefore vital to the preservation and maximization of the value of the Debtors'

estates.  (DIP Decl. ¶ 27.)  Accordingly, obtaining postpetition financing, as provided under the

DIP Credit Agreement, will minimize disruption of the businesses and operations of the Debtors

and permit the Debtors to meet payroll and other operating expenses, while they move forward

expeditiously in their efforts to confirm a prepackaged chapter 11 plan of reorganization that

provides for a comprehensive balance sheet restructuring of their funded debt obligations.  (*Id*. ¶

30)

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.
Copies of these orders are available upon request of the Debtors' proposed counsel.

93.     For this reason and those set forth above, the Debtors respectfully submit that Bankruptcy Rule 6003(b) has been satisfied and that the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

## INTERIM APPROVAL IS APPROPRIATE

94.     Bankruptcy Rules 4001(b) and 4001(c)(2) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.  *See* Fed. R. Bankr. P. 4001(c)(2).

95.     The Debtors request that the Bankruptcy Court authorize them, on an interim basis pending the Final Hearing, to borrow under the DIP Facility in an amount up to $76,842,012.11. As discussed above, this relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and thereby avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  Absent interim approval of this interim borrowing under the DIP Facility, the Debtors' businesses would suffer immediate and irreparable harm.

## REQUEST FOR FINAL HEARING

96.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Bankruptcy Court set a date for the Final Hearing that is as soon as practicable, and in no event after thirty (30) days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

97.     Pursuant to Bankruptcy Rules 6003(b) and 6004(h), the Debtors seek (a) immediate entry of an order granting the relief sought herein and (b) a waiver of any stay of the effectiveness of such an order.  Bankruptcy Rule 6003(b) provides, in relevant part, that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following . . . a motion to pay all or part of a claim that arose before the filing of the petition."  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  From this, courts have ruled that, where the failure to grant any such requested relief would result in immediate and irreparable harm to a debtor's estate, a court may allow a debtor to pay all or part of a claim that arose prepetition immediately.

98.     As set forth above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, the Debtors submit that ample cause exists to justify (a) the immediate entry of an order granting the relief sought herein and (b) a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## RESERVATION OF RIGHTS

99.     Nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion is intended or shall be construed as: (a) an admission as to the validity of any claim against a Debtor entity or the existence of any lien against the Debtors' property; (b) a waiver of the Debtors' rights to dispute any claim or lien on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim would constitute an allowed claim; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the

Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are valid, and the Debtors expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of any or all such liens.

## NOTICE

100.    Notice of this Motion will be provided to the following parties or their respective counsel:  (a) the Office of the United States Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis; (c) the Broker; (d) the financier under the premium Financing Agreement; (e) the DIP Agent; (f) the DIP Lenders; (g) the Bridge Loan Agent; (h) the Bridge Loan Lenders; (i) the Bond Trustee; (j) the Internal Revenue Service; (k) the United States Attorney's Office for the District of Delaware; (l) the state attorneys general for all states in which the Debtors conduct business; (m) the Insurance Carriers; (n) the Banks; (o) all parties which, to the best of the Debtor's knowledge, information, and belief, have asserted or may assert a lien in the Debtor's assets; (p) the Securities and Exchange Commission; (q) the Corporate/Finance Litigation Section, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; and (r) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  As this Motion is seeking "first day" relief, within forty-eight (48) hours of the entry of an order with respect to this Motion, the Debtors will serve copies of this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

## NO PRIOR REQUEST

101.    No prior request for the relief sought in this Motion has been made to this Bankruptcy Court or any other court.

11296360v.1

WHEREFORE, the Debtors respectfully request that this Court: (i) consider the Motion on an expedited basis; (ii) grant the Interim Order, substantially in the form attached as **Exhibit A** hereto, authorizing the Debtors to obtain the postpetition financing described herein on an interim basis and setting the Motion for a final hearing; and (iii) grant such other and further relief as the Court may deem just and proper.

Dated: January 29, 2024  
       Wilmington, Delaware

Respectfully submitted,

*/s/ M. Blake Cleary*
_____
M. Blake Cleary (No. 3614)  
Brett M. Haywood (No. 6166)  
Gregory J. Flasser (No. 6154)  
Katelin A. Morales (No. 6683)  
**POTTER ANDERSON & CORROON LLP**  
1313 N. Market Street, 6th Floor  
Wilmington, Delaware 19801  
Telephone: (302) 984-6000  
Facsimile:  (302) 658-1192  
Email: bcleary@potteranderson.com  
      rmcneill@potteranderson.com  
      gflasser@potteranderson.com  
      kmorales@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# EXHIBIT A

## Proposed Interim Order

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Restoration Forest Products Group, LLC, *et al.*,[1] | Case No. 24-10120 (___) |
| Debtors. | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE
DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING
SENIOR SECURED PRIMING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE
PROTECTION TO THE PREPETITION SENIOR SECURED PARTIES,
(IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING
A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion, dated January 29, 2024 (the "Motion"),[2] of Restoration Forest Products

Group, LLC ("Holdings") and its affiliated debtors and debtors in possession (collectively, the

"Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") commenced on

January 29, 2024 (the "Petition Date") for interim (this "Interim Order") and final orders under

sections 105(a), 361, 362, 363, 364, 503(b), 506(c) and 507(a) of title 11 of the United States Code,

11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004

and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"),

and the Local Rules of Bankruptcy Practice and Procedures (the "Local Rules") of the United

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Restoration Forest Products Group, LLC (8466); Just Right, LLC (3892); Good Earth Power, AZ, LLC (5856); and Restoration Forest Products, LLC (6372).  The Debtors' service address is 1839 S. Alma School Road, #380, Mesa, Arizona 85210.

[2] Unless otherwise indicated herein, capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

States Bankruptcy Court for the District of Delaware (this "<u>Bankruptcy Court</u>") seeking, among

other things,

(a)  authorization for Debtors Restoration Forest Products Group, LLC, Just Right, LLC, Good Earth Power, AZ, LLC, and Restoration Forest Products, LLC, each in its capacity as borrower (the "<u>Borrowers</u>"), to obtain postpetition financing on a joint and several basis, the Borrowers' obligations in connection with a debtor-in-possession financing comprising a superpriority senior secured multiple-draw term loan facility in an aggregate principal amount of up to $93,342,012.11 (the "<u>DIP Facility</u>"), which consists of (i) a new money multi-draw term loan facility in an aggregate principal amount of $29,000,000.00 (the commitments thereunder, the "<u>New Money DIP Commitments</u>" and the Interim Term Loans and Final Term Loans (each as defined below) advanced thereunder, the "<u>New Money DIP Loans</u>") to be funded by certain Prepetition Bridge Lenders (as defined herein), and (ii) a deemed term loan "roll-up" post-petition financing of upon entry of this Interim Order, the outstanding Prepetition Bridge Obligations (such rolled-up debt, the "<u>Roll-Up Loans</u>" and, the Roll-Up Loans together with the New Money DIP Loans, the "<u>Term Loans</u>");

(b)  authorization for the Debtors (i) to enter into that certain *Senior Secured Superpriority Priming Debtor-In-Possession Financing Agreement* among the Borrowers, the lenders from time to time party thereto (collectively, the "<u>DIP Lenders</u>"), and UMB Bank, National Association, as administrative agent (in such capacity, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Parties</u>") (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>," together with all agreements, documents, and instruments delivered or executed in connection therewith, the "<u>DIP Documents</u>"), which shall be in substantially the same form attached hereto as <u>Exhibit 2</u>, and (ii) to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Documents;

(c)  authorization for the Debtors (x) to use the proceeds of the New Money DIP Loans and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the terms hereof, including pursuant to the DIP Budget (as defined herein) as further described herein, to pay fees and interest under the DIP Facility, to provide working capital for, and for other general corporate purposes of, the Debtors, including for payment of any Adequate Protection Obligations (as defined herein), and (y) upon entry of this Interim Order, to effectuate the Roll-Up Loans;

(d)  the granting of adequate protection to (x) the lenders under that certain Credit Agreement, dated as of June 5, 2023, as amended by that certain First Amendment to Credit Agreement, dated as of September 1, 2023 (as amended, supplemented or otherwise modified, the "<u>Prepetition Bridge Credit Agreement</u>" and, together with the Subordination Agreement (as defined below) and all security agreements,

guarantees, pledge agreements and other agreements or instruments executed in connection therewith, each as amended, supplemented or otherwise modified, the "Prepetition Bridge Documents"), by and among the Borrowers (in such capacity, the "Prepetition Bridge Obligors"), the lenders from time to time party thereto (the "Prepetition Bridge Lenders") and UMB Trustee, National Association as administrative agent (in such capacity, the "Prepetition Bridge Agent" and, collectively with the Prepetition Bridge Lenders, the "Prepetition Bridge Secured Parties") and (y) the holders (the "Prepetition 2022A Bondholders") of Arizona Industrial Development Authority Revenue Bonds (NewLife Forest Restoration, LLC Project), Senior Federally Taxable Series 2022A (Sustainability-Linked Bonds) (the "Prepetition 2022A Bonds") issued by the Arizona Industrial Development Authority (the "Authority") pursuant to the Indenture of Trust, dated as of February 1, 2022, by and among the Authority and UMB Bank, National Association, as trustee (in such capacity, the "Prepetition Trustee" and together with the Prepetition 2022A Bondholders and the Authority, the "Prepetition 2022A Bond Secured Parties" and together with the Prepetition Bridge Secured Parties, the "Prepetition Senior Secured Parties"), as amended by the First Supplemental Indenture of Trust, dated as of April 11, 2023 and the Second Supplemental Indenture of Trust, dated as of June 16, 2023, by and between the Authority and the Prepetition Trustee (the "Prepetition Indenture"), the proceeds of which Prepetition 2022A Bonds were loaned to Restoration Forest Products Group, LLC pursuant to that certain Loan Agreement, dated as of February 1, 2022, by and among the Authority and Restoration Forest Products Group, LLC, as borrower and each of Just Right, LLC, Good Earth Power, AZ, LLC and Restoration Forest Products, LLC as guarantors (together, the "Prepetition 2022A Bond Obligors" and the Loan Agreement, the "Prepetition Indenture Loan Agreement" and, together with the Lateral Subordination Agreement (as defined below) and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith, each as amended, supplemented or otherwise modified, the "Prepetition Indenture Documents");

(e)     authorization for the Debtors to pay, on a final and irrevocable basis, the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due and payable, including, without limitation, the Closing Fee (as defined herein), the Agency Fee (as defined herein), the Exit Fee (as defined herein), and the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisors, accountants, appraisers, bankers and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(f)     the granting of valid, enforceable, non-avoidable and fully perfected first priority liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, that was not subject to a valid and perfected lien on the Petition Date (such property and assets, the "Unencumbered Assets"), except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of

-3-

the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, including, upon entry of the Final Order, the proceeds of Avoidance Actions (as defined herein), subject only to the Carve Out (as defined herein) and, if any, the Permitted Liens (as defined herein) on the terms and conditions set forth herein and in the DIP Documents;

(g)     the granting of valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of Section 541 of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(h)     the granting of valid, enforceable, non-avoidable and fully perfected liens on and junior security interests in all of the property, assets and other interests in property and assets of the Debtors, in favor of the DIP Agent and the DIP Lenders, except as otherwise specifically provided herein, whether such property is presently owned or after-acquired, and all other "property of the estate" (within the meaning of the Bankruptcy Code) of the Debtors, of any kind or nature whatsoever, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date, that is subject to valid and perfected security interests in and liens on such property in favor of third parties existing on the Petition Date, excluding the Prepetition Bridge Liens (as defined below) and the Prepetition 2022A Bond Liens (as defined below), subject only to the Carve Out and, if any, the Permitted Liens on the terms and conditions set forth herein and in the DIP Documents;

(i)     the granting of superpriority administrative expense claims against each of the Debtors' estates in favor of the DIP Agent and the DIP Lenders, with respect to the DIP Obligations (as defined herein) with priority over any and all administrative expenses of any kind or nature subject and subordinate only to the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(j)     the waiver of the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to Bankruptcy Code section 506(c), subject to entry of the Final Order (but retroactive to the Petition Date);

(k)     authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined herein);

(l)     the modification of the automatic stay imposed pursuant to Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(m)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Bankruptcy Court to consider entry of this Interim Order; and

(n)     that this Bankruptcy Court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, among other things, the Borrowers' borrowing from the DIP Lenders under the DIP Documents up to an aggregate principal amount of $29,000,000.00 in New Money DIP Loans, the Roll-Up Loans and the continued use of Cash Collateral and granting adequate protection, in each case, as described in the Motion and set forth in the DIP Documents.

The Bankruptcy Court having considered the Motion, the Garnett Declaration,[3] Latz Declaration,[4] the evidence submitted or proffered and the arguments of counsel made at the Interim Hearing; and proper notice of the Motion and the Interim Hearing having been given and in compliance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and the Local Rules; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and all objections, if any, to the relief requested in the Motion and to the entry of this Interim Order having been withdrawn, resolved, or overruled by the Bankruptcy Court; and it appearing to the Bankruptcy Court that granting the relief requested is fair and reasonable and in the best interests of the Debtors, their estates, creditors and parties in interest; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

---

3  Declaration of Kenneth Garnett in Support of Debtors' DIP Financing Motion (the "Garnett Declaration").

4  Declaration of Kenneth Latz in Support of Debtors' Chapter 11 Petitions and First Day Motions (the "Latz Declaration").

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[5]

1.    *Disposition*.  The Motion is GRANTED on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

2.    *Jurisdiction*.  This Bankruptcy Court has core jurisdiction over the Chapter 11 Cases commenced on the Petition Date, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    *Notice*.  Under the circumstances, the notice given by the Debtors of, and as described in, the Motion, the relief requested therein, and the Interim Hearing constitutes proper notice thereof and complies with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party, but subject to the limitations thereon contained in paragraphs 27 and 28 of this Interim Order, the Debtors represent, admit, stipulate, and agree as follows:

(a)    <u>Prepetition Bridge Stipulations.</u>

(i)    <u>Prepetition Bridge Obligations</u>.  As of the Petition Date, the Prepetition Bridge Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition Bridge Secured Parties under the

---

5 Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

Prepetition Bridge Documents in the aggregate amount of not less than $64,342,012.11, which consists of (x) approximately $63,901,972.80 in principal amounts of term loans advanced under the Prepetition Bridge Credit Agreement, plus (y) no less than approximately $440,039.31 on account of accrued and unpaid interest thereon as of the Petition Date ((x) and (y) together, the "Prepetition Bridge Obligations Amount"), plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Obligations" (as defined on the Prepetition Bridge Credit Agreement) and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Bridge Documents (collectively, including the Prepetition Bridge Obligations Amount, the "Prepetition Bridge Obligations").  The Prepetition Bridge Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Prepetition Bridge Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Bridge Agent or Prepetition Bridge Secured Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Petition Bridge Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other

challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(ii)  <u>Prepetition Bridge Liens</u>.  Pursuant to the Prepetition Bridge Documents, the Prepetition Bridge Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition Bridge Liens</u>") the "Collateral" (as defined in the Prepetition Bridge Documents) (the "<u>Prepetition Collateral</u>"), subject only to certain Permitted Liens as permitted under the Prepetition Bridge Documents and *pari passu* with the Prepetition 2022A Bond Liens (as defined below).  The Prepetition Bridge Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject or subordinate only to certain Permitted Liens (if any) as permitted by the terms of the Prepetition Bridge Documents and *pari passu* with the Prepetition 2022A Bond Liens, and (iv) constitute the legal, valid, and binding obligation of the Credit Parties (as defined in the Prepetition Bridge Documents), enforceable in accordance with the terms of the applicable Prepetition Bridge Documents.

(b)  <u>Prepetition 2022A Bonds Stipulations</u>.

(i)  <u>Prepetition 2022A Bond Obligations</u>.  As of the Petition Date, the Prepetition 2022A Bond Obligors, without defense, counterclaim, or offset of any kind, were jointly and severally indebted and liable to the Prepetition 2022A Bond Secured

Parties under the Prepetition Indenture Documents in the aggregate amount of not less than $138,868,355.73, which consists of (x) approximately $137,210,396.77 in principal amounts of 2022A Bonds issued under the Prepetition Indenture, plus (y) no less than approximately $1,657,958.96 on account of accrued and unpaid interest thereon as of the Petition Date ((x) and (y) together, the "Prepetition 2022A Bond Obligations Amount"), plus all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, if any, additional interest, any other "Senior Secured Obligations" (as defined on the Prepetition Indenture) and all other obligations of whatever nature owing on account of the Senior Bonds (as defined in the Prepetition Indenture), whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Indenture Documents (collectively, including the Prepetition 2022A Bond Obligations Amount, the "Prepetition 2022A Bond Obligations").  The Prepetition 2022A Bond Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Prepetition 2022A Bond Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Trustee or Prepetition 2022A Bond Secured Parties by or on behalf of any of the Debtors prior to the Petition Date under or in connection with any of the Petition Indenture Documents is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim,

-9-

cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(ii)    <u>Prepetition 2022A Bond Liens</u>.  Pursuant to the Prepetition Indenture Documents, the Prepetition 2022A Bond Obligations are secured by valid, binding, perfected and enforceable first priority liens on and security interests in (the "<u>Prepetition 2022A Bond Liens</u>") the "Collateral" (as defined in the Prepetition Indenture Documents) (the "<u>Prepetition Collateral</u>"), subject only to certain Permitted Liens as permitted under the Prepetition Indenture Documents and *pari passu* with the Prepetition Bridge Liens.  The Prepetition 2022A Bond Liens (i) are valid, binding, perfected, and enforceable first priority liens and security interests in the Prepetition Collateral, (ii) are not subject, pursuant to the Bankruptcy Code or other applicable law, to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind, (iii) as of the Petition Date are subject or subordinate only to certain Permitted Liens (if any) as permitted by the terms of the Prepetition Indenture Documents and are *pari passu* with the Prepetition Bridge Liens (but, for the avoidance of doubt, are subject to the Subordination Agreement as more fully set forth below), and (iv) constitute the legal, valid, and binding obligation of the Credit Parties (as defined in the Prepetition Indenture Documents), enforceable in accordance with the terms of the applicable Prepetition Indenture Documents.

(c)    <u>Cash Collateral</u>.  Any and all of the Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral

existing as of the Petition Date or from time to time, and the proceeds of any of the foregoing, is the Prepetition Senior Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(d)    Subordination Agreements.  Prior to the commencement of the Chapter 11 Cases, (x) the Prepetition Trustee, the Borrowers, and the Prepetition Bridge Lenders entered into the Subordination Agreement, dated as of June 5, 2023 (the "Subordination Agreement"), pursuant to which the payment of the Prepetition 2022A Bond Obligations are subordinated to the Prepetition Bridge Obligations (as defined therein) and (y) the Prepetition Trustee, the Borrowers, the Authority, and (A) lenders (the "Lateral Lenders") under that certain Amended and Restated Credit Agreement, dated as of February 24, 2022, by and among the Debtors, as borrowers, and the Lateral Administrative Agent, LLC (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Lateral Loan Agreement"), (B) Lateral Administrative Agent, LLC (in its capacity as the administrative agent pursuant to the Lateral Loan Agreement "Lateral Agent"), and (C) the beneficial holders (the "Prepetition 2022B Bondholders") of the Subordinate Federally Taxable Series 2022B (Sustainability-Linked Bonds) (the "Prepetition 2022B Bonds") issued pursuant to the Prepetition Indenture (the parties in clause (A), (B) and (C) collectively, the "Subordinate Lenders" and the liens held by such parties, the "Subordinate Liens") entered into the Subordination Agreement, dated as of February 1, 2022 (the "Lateral Subordination Agreement"), pursuant to which the obligations of the Subordinate Lenders (the "Prepetition Subordinate Obligations") are subordinated in priority of payment to the Prepetition 2022A Bond Obligations.

5.    *Findings Regarding the DIP Facility and Use of Cash Collateral.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)      As set forth in the Garnett Declaration, the Debtors have an immediate need to obtain the DIP Facility and to use the Cash Collateral in each case on an interim basis, in order to, among other things: (i) permit the orderly continuation of their respective businesses; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll and honor other obligations to employees; (iv) make capital expenditures; (v) make adequate protection payments; and (vi) pay the costs of the administration of the Chapter 11 Cases and satisfy other working capital and general corporate purposes of the Debtors.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the going concern value of the Debtors' business.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facility and authorized use of Cash Collateral.

(c)      As set forth in the Garnett Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  Notwithstanding the existence of Unencumbered Assets, the Debtors are unable to secure adequate funding, the Debtors are also unable to obtain secured credit allowable under Bankruptcy Code sections 364(c)(1), 364(c)(2), and 364(c)(3) for the purposes set forth in the DIP Documents without the Debtors granting to the DIP Agent, for the benefit of itself and the DIP Lenders, subject to the Carve Out as provided for herein and the Permitted Liens (if any), the DIP Liens (as defined herein) and the DIP Superpriority Claims (as defined herein) and, subject to the Carve Out, incurring the Adequate Protection Obligations, in each case, under

the terms and conditions set forth in this Interim Order and the DIP Documents. For the avoidance of doubt, the DIP Liens include liens on and security interests in the Unencumbered Assets pursuant to Bankruptcy Code section 364(c)(2).

(d)     The extensions of credit under the DIP Facility, the DIP Documents, and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Agent and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans (including, the Roll-Up Loans) made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other Obligations (as defined in the DIP Credit Agreement) (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e) and the terms of this Interim Order. The DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e).

(f)     The Roll-Up Loans as provided for under the DIP Facility are appropriate and the DIP Lenders would not be willing to provide the New Money DIP Loans or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Loans within the DIP Facility.

(g)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules. For the reasons set forth in the Motion, the declarations filed in support of the Motion, and the record presented to the Bankruptcy Court at

11296365v.1

the Interim Hearing, absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

6.    *Authorization of the DIP Facility and the DIP Documents.*

(a)    The Debtors are hereby expressly authorized and empowered to execute and deliver and, on such execution and delivery, directed to perform under the DIP Documents, including the DIP Credit Agreement.

(b)    Upon entry of this Interim Order, the Borrowers are hereby authorized to borrow borrowings up to an aggregate principal amount of $12,500,000.00 in New Money DIP Loans (plus an amount equal to the Closing Fee and Agency Fee, plus interest, fees, indemnities, and other expenses and other amounts provided for in the DIP Credit Agreement), subject to and in accordance with this Interim Order and the DIP Documents.

(c)    Upon the entry of this Interim Order, subject to the rights and limitations set forth in paragraph 27 and 28 of this Interim Order, Debtors are authorized to roll up and convert into DIP Obligations (plus interest, fees, indemnities and other expenses and other amounts provided for in the DIP Documents) the full amount of the Prepetition Bridge Obligations.

(d)    Proceeds of the Term Loans and Cash Collateral shall be used solely for the purposes permitted under the DIP Credit Agreement, this Interim Order and in accordance with the Applicable DIP Budget, the DIP Documents, and this Interim Order.

(e)    In furtherance of the foregoing and without further approval of this Bankruptcy Court, each Debtor is authorized, and the automatic stay imposed by Bankruptcy Code section 362

is hereby lifted to the extent necessary and applicable, to perform all acts and to make, execute and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby), and to pay all fees, expenses, indemnities, and other amounts contemplated thereby or that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Facility including, without limitation:

(i)     the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement and any collateral documents contemplated thereby;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case, in accordance with the terms of the DIP Documents and in such form as the Debtors, the DIP Agent and the Required Lenders (as defined in the DIP Credit Agreement) may agree), it being understood that no further approval of the Bankruptcy Court shall be required for any amendments, waivers, consents or other modifications to and under the DIP Documents or the DIP Budget, except that any modifications or amendments to the DIP Documents that shorten the maturity thereof or increase the aggregate commitments thereunder, the rate of interest payable with respect thereto, or effect any other material amendments shall be on notice and subject to a hearing and Bankruptcy Court approval, as necessary;

(iii)   the non-refundable and, upon entry of this Interim Order, irrevocable payment to each of the DIP Lenders or the DIP Agent, as applicable, of the fees referred to in the DIP Documents (which fees, in each case, shall be, and shall be deemed to have been, approved upon entry of this Interim Order, and which fees shall not be subject

-15-

to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise) and any amounts due (or that may become due) in respect of any indemnification obligations under the DIP Documents, including:

- a closing fee of $725,000.00 (the "Closing Fee"), which shall be paid in kind on the Closing Date (as defined in the DIP Credit Agreement);

- An agency fee of $17,500 to the DIP Agent (the "Agency Fee"), which shall be fully earned and payable in which shall be deemed fully earned when paid and which shall be payable in immediately available funds on the Closing Date;

- An exit fee of 3.00% of the aggregate principal amount of the Term Loans (the "Exit Fee"), which fee shall be payable at the times specified in the DIP Credit Agreement (but in no event later than the earliest of (a) the date of repayment in full of all Obligations (as defined in the DIP Credit Agreement) thereunder, (b) any Exit Conversion (as defined in the DIP Credit Agreement) or (c) the date of a payment or reduction of the Obligations in connection with any credit bid by the DIP Agent or DIP Lenders).

(iv)    make the payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(f)    Upon execution and delivery of the DIP Credit Agreement and the other DIP Documents, such DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Chapter 11 Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the

-16-

dismissal of any Case.  No obligation, payment, transfer, or grant of security under the DIP Credit

Agreement, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable,

avoidable or recoverable under the Bankruptcy Code or under any applicable law (including

without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable

state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable

Transaction Act or similar statute or common law), or subject to any defense, reduction, setoff,

recoupment or counterclaim.

   7. *DIP Budget*.

   (a) Except as otherwise provided herein or in the DIP Documents, the Debtors may

only use Cash Collateral and the proceeds of the DIP Facility in accordance with a projected

statement of sources and uses of cash for the Debtors for the 13 calendar weeks (but not any

preceding weeks) attached hereto as **Exhibit 1** (as may be amended, replaced, supplemented or

otherwise modified in accordance with the terms of this Interim Order and the DIP Documents,

the "DIP Budget"), subject to permitted variances as set forth in the DIP Documents, including

without limitation for: (A) working capital requirements; (B) general corporate purposes; and

(C) the costs and expenses (including making payments on account of the Adequate Protection

Obligations hereunder and payment of the allowed fees and expenses of professionals retained by

the Debtors' estates) of administering the Chapter 11 Cases (including payments under the Carve

Out as provided herein).  On each Friday, commencing on February 9, 2024, the Borrowers shall

deliver to (i) the DIP Agent, and (ii) the DIP Lenders (with a copy to the DIP Lenders' advisors),

an updated DIP Budget, in each case, substantially in the form attached hereto as **Exhibit 1** (with

only such changes thereto as the Required Lenders shall agree in their sole discretion) or is

otherwise in form and substance satisfactory to the Required Lenders in their sole discretion,

*provided*, *however*, that if the DIP Agent and Required Lenders do not provide notice of approval or disapproval of any such budget within three (3) business days of such receipt thereof, the DIP Agent and Required Lenders will be deemed to have approved such updated budget.

(b)     On each Wednesday, commencing on the first Wednesday following the Closing Date, the Borrowers shall deliver to (i) the DIP Agent, and (ii) the DIP Lenders (with a copy to the DIP Lenders' advisors), a detailed report setting forth the actual cash receipts and disbursements for the preceding week and on a rolling cumulative basis against the projections from the last DIP Budget (which report shall certify whether or not the Borrowers were in compliance with the Permitted Variance (as defined below)), together with a detailed narrative explanation of any variances, in each case, in form and substance satisfactory to the Required Lenders (such comparison, the "Variance").   Without giving effect to the making of Term Loans or the repayments or prepayments of Term Loans, commencing on the date on which the second DIP Budget is delivered, or is required to be delivered, following the Closing Date (as defined under the DIP Credit Agreement), it shall be an Event of Default under the DIP Documents if:  (a) the aggregate actual cash receipts for the immediate preceding weekly period is less than 90% of the anticipated cash receipts for such period, and for the DIP Budget delivered immediately prior to such period, (the "Applicable DIP Budget") or (ii) the actual aggregate disbursements exceed 110% of the anticipated disbursements as set forth in the Applicable DIP Budget for such period. Any Variance that does not exceed the Variance permitted pursuant to the foregoing clauses (a) and (b) shall be referred to herein as a "Permitted Variance".  Notwithstanding anything to the

-18-

contrary herein or in the DIP Documents, the Permitted Variance shall not modify the amount of the New Money Commitments or the Terms Loans authorized pursuant to this Interim Order.

(c)     The consent of the DIP Lenders to any Applicable DIP Budget shall not be construed as consent to the use of any Cash Collateral or Term Loans after the occurrence of an Event of Default (as defined in the DIP Credit Agreement), regardless of whether the aggregate funds shown on any Applicable DIP Budget have been expended.

8.     *Reporting Requirements/Access to Records*.   The Debtors shall provide the DIP Lenders with all reporting and other information required to be provided to the DIP Agent under the DIP Documents.   In addition to, and without limiting, whatever rights to access the DIP Agent and the DIP Lenders have under the DIP Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the DIP Agent and the DIP Lenders to: (i) have access to and inspect the Debtors' assets; (ii) examine the Debtors' books and records; and (iii) discuss the Debtors' affairs, finances, and condition with the Debtors' officers and relevant financial advisors; *provided that* nothing in this paragraph 8 or otherwise (x) shall require the Debtors or their advisors to furnish to, or discuss with, the DIP Agent and the DIP Lenders any materials (whether prepared by the Debtors' financial advisors or legal advisors or otherwise) or other information subject to any attorney-client or other privilege or confidentiality obligations or (y) shall be construed to obligate any of the aforementioned advisors to disclose any information or to otherwise take or refrain from taking any action, absent an express contractual requirement to do so.

9.     *DIP Superpriority Claims*.   Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed senior administrative expense claims of the DIP Agent and the DIP Lenders, against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>"),

without the need to file any proof of claim or request for payment of administrative expenses, with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of Bankruptcy Code section 1129(a)(9)(A) be considered administrative expenses allowed under Bankruptcy Code section 503(b) and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, upon entry of the Final Order, the proceeds of any claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions" and any proceeds thereof, the "Avoidance Proceeds"), subject only to the payment of the Carve Out to the extent specifically provided for herein.  Except as set forth in, or permitted by, this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

10.    *DIP Liens*.  As security for the DIP Obligations, the following security interests and liens are hereby granted by the Debtors to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject only to the payment of the Carve Out to the extent specifically provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens").  Other than as set forth for Avoidance Actions

within, the DIP Liens shall be effective and automatically perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Agent or any DIP Lender of, or over, any DIP Collateral (as defined herein):

(a)     <u>First Lien on Unencumbered Property</u>.  Pursuant to Bankruptcy Code section 364(c)(2), a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), including, without limitation, any unencumbered cash of the Debtors (whether maintained with the DIP Agent or otherwise) and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action (excluding Avoidance Actions but including, upon entry of the final

Order, the Avoidance Proceeds), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located.

(b)     <u>Liens Priming the Prepetition Bridge Liens, Prepetition 2022A Bond Liens and Subordinate Liens</u>.  Pursuant to Bankruptcy Code section 364(d)(1), a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all prepetition and postpetition property of the Debtors including, without limitation, the Prepetition Collateral, Cash Collateral, and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims (including, without limitation, any commercial tort claims against directors and officers of the Debtors), securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, causes of action, and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, that is subject to any of the Prepetition Bridge Liens securing the Prepetition Bridge Obligations or the Prepetition 2022A Bond Liens securing the Prepetition 2022A Bond Obligations or the Subordinate Liens.

(c)      <u>Liens Junior to Certain Other Liens</u>.      Pursuant to Bankruptcy Code section 364(c)(3), a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all prepetition and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date, if any, that are senior to the liens securing the Prepetition Bridge Obligations, the Prepetition 2022A Bond Obligations, or to valid and unavoidable liens in existence immediately prior to the Petition Date, if any, that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) that are senior to the liens securing the Prepetition Bridge Obligations or the Prepetition 2022A Bond Obligations, which security interests and liens in favor of the DIP Agent and the DIP Lenders are junior only to such valid, perfected and unavoidable liens (collectively, the "<u>Permitted Liens</u>").

11.     *Carve Out*.

(a)      <u>Carve Out</u>.  As used in this Interim Order, the "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000.00 incurred by a trustee under Bankruptcy Code section 726(b) (without regard to the notice set forth in (iii) below); (iii) to the extent allowed, at any time, whether by interim order, procedural order, or otherwise, and, with respect to the amounts in clause (x) below, to the extent provided for in the DIP Budget, and all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy

11296365v.1

Code (the "<u>Debtor Professionals</u>") and an official committee of unsecured creditors (the "<u>Creditors' Committee</u>"), if any, pursuant to Bankruptcy Code section 328 or 1103 (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") (x) at any time before or on the first business day following delivery by the DIP Agent or the Required Lenders of a Carve Out Trigger Notice (as defined herein), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (but not to exceed the amount of Allowed Professional Fees specified in the Applicable DIP Budget for the period from the Petition Date to the date of the Carve Out Trigger Notice, without giving effect to the Permitted Variance, if any, the "<u>Pre-Carve Out Trigger Amount</u>"), plus (y) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000.00 incurred after the first business day following delivery of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (y) the "<u>Post-Carve Out Trigger Notice Cap</u>" and the amounts set forth in clauses (x) and (y), collectively, the "<u>Carve-Out Amount</u>").  For the avoidance of doubt, the maximum aggregate Pre-Carve-Out Trigger Amount shall not exceed the cumulative amount set forth in the Applicable DIP Budget for the Professional Persons incurred from the Petition Date to the date of the Carve Out Trigger Notice.  Within three (3) business days of the receipt of a Carve-Out Trigger Notice, each Professional Person shall provide its reasonable, good-faith estimate of the amount of its fees and expenses to be included in the Pre-Carve Out Trigger Amount.  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent or the Required Lenders to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee (if appointed) providing that a

Termination Event has occurred and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     The Debtors shall be authorized and permitted to establish and maintain an escrow, to be held solely for the benefit of the Professional Persons and fund such escrow on a weekly basis the amount of the professional fees for the prior week set forth in the DIP Budget (solely to the extent of Carve-Out Amounts deposited, the "Funded Reserve Account"), to satisfy the Carve-Out.  The Funded Reserve Account shall be funded on a weekly basis (starting on the Closing Date and then on the first business day of each week, and ending on the date upon which a Carve-Out Trigger Notice is delivered) with the amount for Professional Persons set forth in the DIP Budget for that week.  After the delivery of a Carve-Out Trigger Notice, notwithstanding anything herein to the contrary, the Debtors shall be authorized to deposit cash on hand into the Funded Reserve Account up to the amount of the Carve-Out Amount.  The funds on deposit in the Funded Reserve Account shall be the sole source available to satisfy the obligations benefiting from the Carve-Out. The Debtors shall disburse funds on deposit in the Funded Reserve Account to satisfy the obligations benefiting from the Carve-Out, and shall be permitted to make such disbursement at any time, including following delivery of a Carve-Out Trigger Notice.

(c)     Application of Funded Reserve Account.  All funds in the Funded Reserve Account shall be used to pay the obligations set forth in Carve Out, until paid in full, and then, to the extent the Funded Reserve Account has not been reduced to zero, as follows: (1) first, to the DIP Agent for the benefit of the DIP Lenders, in accordance with the DIP Credit Agreement, until the DIP Facility is paid in full; (2) second, to the Prepetition Bridge Agent, for the benefit of the Prepetition Bridge Lenders, in accordance with the Prepetition Bridge Documents; (3) third, to the Prepetition Trustee, for the benefit of the Prepetition 2022A Bondholders, in accordance with the Prepetition

-25-

Indenture Documents; (4) fourth, to the Prepetition Trustee, for the benefit of the Prepetition 2022B Bondholders in accordance with the Prepetition Indenture Documents; and (5) fifth, to the Lateral Agent for the benefit of the Lateral Lenders in accordance with the Lateral Loan Agreement.   Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Funded Reserve Account has been fully funded, but shall have DIP Liens and DIP Superpriority Claims in any residual interest in the funds constituting the Funded Reserve Account, with any excess paid to the DIP Agent for application.   Further, notwithstanding anything to the contrary in this Interim Order or the Final Order, (i) the failure of the Funded Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (ii) in no way shall the DIP Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Funded Reserve Account or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.   For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, any Prepetition Bridge Documents, Prepetition Indenture Documents or any Subordinate Debt Documents (as defined in the Lateral Subordination Agreement), the Carve Out shall be senior to the DIP Superpriority Claims, the DIP Liens, the Bridge Adequate Protection Liens (as defined herein), the Bridge Adequate Protection Superpriority Claim (as defined herein), 2022A Bond Adequate Protection Liens (as defined herein), the 2022A Bond Adequate Protection Superpriority Claim (as defined herein), the Prepetition Bridge Liens, the Prepetition 2022A Bond Liens, the Prepetition Subordinate Liens, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Obligations, Prepetition Subordinate Obligations, and any and all other forms of

adequate protection, liens, or claims securing the DIP Obligations, the Prepetition Bridge Obligations, or the Prepetition 2022A Bond Obligations.

(d)    <u>Reduction for Unused Retainers</u>. During the time when a Carve-Out Trigger Notice is outstanding or following approval by this Bankruptcy Court of such Professional Person's final fee application, prior to any payment from the Funded Reserve Account, each Professional Person must apply any unused retainers held by or on behalf of such Professional Person as of the Petition Date to satisfy its Allowed Professional Fees prior to receiving payment from the funds in the Funded Reserve Account for its Allowed Professional Fees.

(e)    <u>Carve Out Procedure</u>.  The Debtors must, upon reasonable request of DIP Agent, provide to DIP Agent a written report (each, a "<u>Carve Out Report</u>"), in which Debtors disclose their then current estimate of:  (1) the aggregate amount of unpaid professional fees, costs, and expenses accrued or incurred by the Professional Persons through the date of the Carve Out Report; and (2) the projected fees, costs, and expenses of the Professional Persons for the thirty (30) day period following the date of such Carve Out Report.

(f)    <u>Reservation of Rights</u>.  Nothing herein may be construed as consent by the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties to the allowance of any fees, costs, or expenses of the Professionals Persons or will affect the right of DIP Agent, the DIP Lenders, the Prepetition Senior Secured Parties to object to the allowance and payment of any such fees, costs, or expenses, or the right of the DIP Agent, the DIP Lenders, the Prepetition Senior Secured Parties to the return of any portion of the Carve Out that is funded with respect to fees, costs, and expenses for a Professional Person that are approved on an interim basis, but that are later denied on a final basis.

(g)      <u>No Direct Obligation to Pay Allowed Professional Fees</u>.  Subject to the Carve Out, neither the DIP Agent, the DIP Lenders, nor the Prepetition Senior Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, nor the Prepetition Senior Secured Parties, nor the Debtors, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

12.      *Limitation on Charging Expenses Against Collateral*.  Subject to entry of the Final Order (but retroactive to the Petition Date), no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the DIP Collateral (except to the extent of the Carve Out), the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties pursuant to Bankruptcy Code sections 105(a) or 506(c) or any similar principle of law or equity, without the prior written consent of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties.

13.      *No Marshaling/Application of Proceeds*.  Subject to entry of the Final Order (but retroactive to the Petition Date), the DIP Agent, the Prepetition Bridge Agent, and the Prepetition Trustee shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of this Interim Order or the Final Order, as applicable, the DIP Documents, Prepetition Bridge Documents, or the Prepetition Indenture Documents, each

as applicable, and in no event shall the DIP Agent, the DIP Lenders, or any of the Prepetition Senior Secured Parties, be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral.

14.     *Equities of the Case*.   Subject to entry of the Final Order (but retroactive to the Petition Date), (i) the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b) and (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) shall not apply to such parties with respect to the proceeds, products, offspring or profits of any of the Prepetition Collateral or the DIP Collateral, as applicable.

15.     *Use of Cash Collateral*.   The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Documents and the Applicable DIP Budget, including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the date of the Final Hearing.   Except on the terms and conditions of this Interim Order, the Debtors shall be prohibited from at any time using the Cash Collateral.

16.     *Adequate Protection for the Prepetition Senior Secured Parties*. Subject only to the Carve Out and the terms of this Interim Order, including, without limitation, the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order, pursuant to Bankruptcy Code sections 361, 363(e), and 364, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for and equal in amount to the aggregate postpetition diminution in value of such interests (each such diminution, a "Diminution in Value"), resulting from the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' sale, lease or use of the Prepetition

Collateral (including Cash Collateral), the imposition of the automatic stay, and/or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Senior Secured Parties are hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a) Bridge Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value, the Prepetition Bridge Agent, for the benefit of itself and the Prepetition Bridge Lenders, is hereby granted additional and replacement valid, binding, enforceable non-avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "Bridge Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral (which for the avoidance of doubt, excluded Avoidance Actions, but includes, upon entry of the Final Order, Avoidance Proceeds). Subject to the terms of this Interim Order, the Bridge Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any). The Bridge Adequate Protection Liens shall be *pari passu* with the 2022A Bond Adequate Protection Liens in respect of all other DIP Collateral and otherwise shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition Bridge Liens, Prepetition 2022A Bond Liens, the Prepetition Subordinate Liens, and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(b) 2022A Bond Adequate Protection Liens. As security for and solely to the extent of any Diminution in Value, the Prepetition Trustee, for the benefit of itself and the Prepetition 2022A Bondholders, is hereby granted additional and replacement valid, binding, enforceable non-

avoidable, and effective and automatically perfected postpetition security interests in, and liens on, as of the date of this Interim Order (the "2022A Bond Adequate Protection Liens" and, together with the Bridge Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, all DIP Collateral (which for the avoidance of doubt, excluded Avoidance Actions, but includes, upon entry of the Final Order, Avoidance Proceeds). Subject to the terms of this Interim Order, the 2022A Bond Adequate Protection Liens shall be subordinate only to the (A) Carve Out, (B) the DIP Liens, and (C) the Permitted Liens (if any). The 2022A Bond Adequate Protection Liens shall be *pari passu* with the Bridge Adequate Protection Liens in respect of all other DIP Collateral and otherwise shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, the Prepetition 2022A Bond Liens, the Prepetition Bridge Liens, and any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551).

(c)  **Bridge Adequate Protection Superpriority Claim**. As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Bridge Agent, for the benefit of itself and the Prepetition Bridge Lenders, is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Carve Out and the DIP Superpriority Claims (the "Bridge Adequate Protection Superpriority Claim"). The Bridge Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order,

the Avoidance Proceeds).  Subject to the Carve Out and the DIP Superpriority Claims in all respects, the Bridge Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition Bridge Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Bridge Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(d)    2022A Bond Adequate Protection Superpriority Claim.  As further adequate protection, and to the extent provided by Bankruptcy Code sections 503(b) and 507(b), the Prepetition Trustee, for the benefit of itself and the Prepetition 2022A Bondholders, is hereby granted an allowed administrative expense claim in the Chapter 11 Cases to the extent of any postpetition Diminution in Value ahead of and senior to any and all other administrative expense claims in such Chapter 11 Cases, except the Bridge Adequate Protection Superpriority Claim, the Carve Out, and the DIP Superpriority Claims (the "2022A Bond Adequate Protection Superpriority Claim" and, together with the Bridge Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims").  The 2022A Bond Adequate Protection Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (excluding Avoidance Actions, but including, subject to entry of the Final Order, the Avoidance Proceeds).  Subject to the Bridge Adequate Protection Superpriority Claim,

the Carve Out, and the DIP Superpriority Claims in all respects, the 2022A Bond Adequate Protection Superpriority Claim will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(d), 726, 1113 and 1114.  The Prepetition 2022A Bond Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 2022A Bond Adequate Protection Superpriority Claims under Bankruptcy Code section 507(b) granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full, in cash, or satisfied in a manner otherwise agreed to by the Required Lenders, in each case as provided in the DIP Documents.

(e)     Fees and Expenses.  As further adequate protection, the Debtors are authorized and directed to pay, without further Bankruptcy Court order, reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Senior Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (1) Ropes & Gray, LLP and Chipman Brown Cicero & Cole, LLP counsel to the Prepetition Bridge Lenders and (2) Lewis Roca Rothgerber Christie, as counsel to the Prepetition Bridge Agent.  The invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.  The applicable professional shall serve copies of the invoices supporting the Adequate Protection Fees on counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee (if any), and any Adequate Protection Fees shall be subject to prior ten (10) day review by the Debtors, the U.S. Trustee and the Creditors' Committee (if any), and in the event the

Debtors, the U.S. Trustee or the Creditors' Committee (if any) shall file with this Bankruptcy Court an objection to any such legal invoice, the portion of such legal invoice subject to such objection shall not be paid until resolution of such objection by this Bankruptcy Court.  If no objection is filed within such ten (10) day review period, such invoice shall be paid without further order of the Bankruptcy Court within five (5) days following the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement.  For the avoidance of doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

(f)    <u>Bridge Accrued Adequate Protection Payments</u>.  As further adequate protection, the Prepetition Bridge Agent, on behalf of the Prepetition Bridge Lenders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "<u>Bridge Accrued Adequate Protection Payments</u>" and together with the Bridge Adequate Protection Liens, Bridge Adequate Protection Superpriority Claim and the Adequate Protection Fees, the "<u>Bridge Adequate Protection Obligations</u>") payable in-kind on the thirtieth (30th) day of each month equal to the interest at the Applicable Margin (as defined in the Prepetition Bridge Credit Agreement) plus two percent (2%), until such time as the full Prepetition Bridge Obligations Amount is indefeasibly and irrevocably (x) paid in full, in cash; or (y) fully converted into DIP Obligations.

(g)    <u>2022A Bond Accrued Adequate Protection Payments</u>.  As further adequate protection, the Prepetition Trustee, on behalf of the Prepetition 2022A Bondholders, shall receive, upon entry of this Interim Order, monthly adequate protection payments (the "<u>2022A Bond Accrued Adequate Protection Payments</u>" and together with the 2022A Bond Adequate Protection Liens, the 2022A Bond Adequate Protection Superpriority Claim and the Adequate Protection Fees, the "<u>2022A Bond Adequate Protection Obligations</u>") payable in-kind on the thirtieth (30th)

day of each month equal to the interest at rate of 15% per annum that would otherwise be owed to the Prepetition 2022A Bondholders under the Prepetition Indenture during such monthly period in respect of the Prepetition 2022A Bond Obligations, until such time as the full Prepetition 2022A Bond Obligations Amount is indefeasibly and irrevocably paid in full, in cash.

17.     *Section 507(b) Reservation*.  Nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in the event that the adequate protection provided to the Prepetition Senior Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Bankruptcy Court, or an acknowledgment by any of the Prepetition Senior Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Senior Secured Parties against any diminution in value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

18.     *Restrictions on Disposition of Material Assets Outside the Ordinary Course of Business*.  Except as expressly permitted under the "first day" pleadings or the DIP Documents, the Debtors shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of this Bankruptcy Court to the extent required by Bankruptcy Code section 363, without obtaining the prior written consent of the Required Lenders at least five (5) days (or such shorter period as the DIP Agent, at the direction of the Required Lenders, may agree) prior to the date on which the Debtors seek the Bankruptcy Court's authority for such use, sale, or lease. Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order), the Debtors are authorized and shall

promptly pay, without further notice or order of this Bankruptcy Court, the DIP Agent, for the benefit of the DIP Parties, 100% of the net cash proceeds resulting therefrom no later than the second business day following receipt of such proceeds.  Upon indefeasible and irrevocable payment in full of the DIP Obligations, subject to the Carve Out and Permitted Liens, and subject to the rights and limitations set forth in paragraph 27 and 28 of this Interim Order, the Debtors are authorized and shall promptly pay, without further notice or order of this Bankruptcy Court, the Prepetition Bridge Agent, for the benefit of the Prepetition Bridge Lenders, 100% of the net cash proceeds, up to the full amount of the Prepetition Bridge Obligations, resulting from any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order) no later than the second business day following receipt of such proceeds. Upon indefeasible and irrevocable payment in full of the DIP Obligations, subject to the Carve Out and Permitted Liens, and the Prepetition Bridge Obligations, the Debtors are authorized and shall promptly pay, without further notice or order of this Bankruptcy Court, the Prepetition Trustee, for the benefit of the Prepetition 2022A Bondholders, 100% of the net cash proceeds, up to the full amount of the Prepetition 2022A Bond Obligations, resulting from any such sale, lease, transfer, license, or other disposition of property of the Debtors that constitutes DIP Collateral outside the ordinary course of business (to the extent permitted by the DIP Documents and this Interim Order) no later than the second business day following receipt of such proceeds.  Except as otherwise provided under the DIP Documents, subject to the Carve Out and Permitted Liens, in the event of any casualty, condemnation, or similar event with respect to property that constitutes DIP Collateral, the Debtors are authorized and shall promptly pay to the DIP Agent, for the benefit of the DIP Parties, any insurance proceeds, condemnation award, or similar payment (excluding

any amounts on account of any D&O policies) no later than the second business day following receipt of payment by the Debtors, unless the Required Lenders consent, each in its sole discretion, in writing, to the funds being reinvested by the Debtors.

19.     *Insurance*.  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insured and lender's loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

20.     *Reservation of Rights of the DIP Agent, DIP Lenders, and Prepetition Senior Secured Parties*.  Notwithstanding any other provision in this Interim Order to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Prepetition Senior Secured Parties to seek any other or supplemental relief in respect of the Debtors, including the right to seek additional adequate protection; provided that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties to (i) request modification of the automatic stay of Bankruptcy Code section 362, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, (iii) seek to propose,

subject to the provisions of Bankruptcy Code section 1121, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties.  The delay in or failure of the DIP Agent, the DIP Lenders and/or the Prepetition Senior Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agent's, the DIP Lenders' or the Prepetition Senior Secured Parties' rights and remedies.

21.     *Termination Event*.  Subject to paragraph 22, the Debtors' authorization to use Cash Collateral and the proceeds of the DIP Facility pursuant to this Interim Order shall automatically terminate, and the DIP Obligations shall become due and payable, without further notice or action by the Bankruptcy Court following the earliest to occur of any of the following (each a "Termination Event"): (a) the occurrence of an Event of Default (as defined in the DIP Credit Agreement); (b) the Debtors' failure to (i) comply with any provision of this Interim Order, (ii) comply with any other covenant or agreement specified in this Interim Order or the DIP Credit Agreement (which covenants and agreements, together with any applicable grace periods, are explicitly incorporated by reference into this Interim Order), or (iii) comply with any of the milestones set forth in Schedule 4.18 of the DIP Credit Agreement; or (c) the occurrence of the Maturity Date (as defined in the DIP Credit Agreement).

22.     *Remedies Upon a Termination Event*.  The Debtors shall immediately provide notice to counsel to the DIP Agent, the DIP Lenders, the Prepetition Bridge Agent, and the Prepetition Trustee (with a copy to counsel to the Creditors' Committee (if any) and the U.S. Trustee), of the occurrence of any Termination Event, at which time the Debtors' ability to use Cash Collateral hereunder shall terminate (subject to the proviso at the end of this paragraph 22) and the DIP Obligations shall become due and payable.  Upon the occurrence of a Termination

Event and following the giving of not less than three (3) business days' advance written notice, which may be by email (the "Enforcement Notice"), to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee (if any) (the "Notice Period"), but subject to and in accordance with the terms of the DIP Documents and any order of the Court, (a) the DIP Agent and the DIP Lenders may exercise any rights and remedies against the DIP Collateral available to them under this Interim Order, the DIP Documents, and applicable non-bankruptcy law, including but not limited to terminating all commitments to extend credit under the DIP Facility, (b) the Prepetition Bridge Secured Parties may exercise any rights and remedies to satisfy the Prepetition Bridge Obligations, the Bridge Adequate Protection Superpriority Claims and any other Bridge Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, Permitted Liens and, in each case, the Carve Out, and (c) the Prepetition 2022A Bond Secured Parties may exercise any rights and remedies to satisfy the Prepetition 2022A Bond Obligations, the 2022A Bond Adequate Protection Superpriority Claims and any other 2022A Bond Adequate Protection Obligations, subject to the DIP Obligations, the DIP Superpriority Claims, the Bridge Adequate Protection Superpriority Claims, any other Bridge Adequate Protection Obligations, Permitted Liens and, in each case, the Carve Out. The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated with respect to the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties at the end of the Notice Period, without further notice or order of the Bankruptcy Court, unless the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties elect otherwise in a written notice to the Debtors, which may be by email. Upon termination of the automatic stay, the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties shall be permitted to exercise all rights and remedies set forth herein, in the DIP Documents, the Prepetition Bridge Documents, and the Prepetition Indenture

Documents, as applicable, and as otherwise available at law against the DIP Collateral or Prepetition Collateral, without any further order of or application or motion to the Bankruptcy Court, and without restriction or restraint imposed by any stay under Bankruptcy Code sections 362 or 105, or otherwise, against (x) the enforcement of the liens and security interests in the DIP Collateral or the Prepetition Collateral, or (y) the pursuit of any other rights and remedies granted to the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties pursuant to the DIP Documents, the Prepetition Bridge Documents, the Prepetition Indenture Documents, or this Interim Order; provided that during the Notice Period, the Debtors may use the proceeds of the DIP Facility (to the extent drawn prior to the occurrence of a Termination Event) or Cash Collateral, only to (i) fund operations in accordance with the DIP Credit Agreement and the DIP Budget, provided, however, that immediately upon the occurrence of a Termination Event, the Permitted Variance shall be reduced to 0.00% of the disbursements as set forth in the Applicable DIP Budget, and (ii) to fund the Funded Reserve Account, provided, however, for the avoidance of doubt, that the amount funded to the Funded Reserve Account following the occurrence of a Termination Event shall be limited to the difference between the balance of the Funded Reserve Account immediately prior to the occurrence of the Termination Event and the Carve Out Amount, without giving effect to any Permitted Variance; provided further that during the Notice Period, the Debtors, the DIP Lenders, and the DIP Agent consent to a hearing on an expedited basis; provided further, that if a hearing to consider the foregoing is requested to be heard before the end of the Notice Period but is scheduled for a later date by the Bankruptcy Court, the Notice Period shall be automatically extended to the date of such hearing, but in no event later than five (5) business days after delivery of the Enforcement Notice; provided further that any fees and expenses incurred by the Debtors or the Creditors' Committee (if any) during the Notice Period shall

-40-

permanently reduce the Post-Carve Out Trigger Notice Cap unless the Bankruptcy Court determines no Termination Event has occurred. Any party in interest shall be entitled to seek an emergency hearing for the purpose of contesting whether assets constitute assets of the Debtors' estates, and nothing in this Interim Order shall affect any party in interest's rights or positions at such hearing.

23.    *No Waiver for Failure to Seek Relief*. The failure or delay of the DIP Agent, the DIP Lenders or any of the Prepetition Senior Secured Parties to exercise rights and remedies under this Interim Order, the DIP Documents, the Prepetition Bridge Documents, the Prepetition Indenture Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.

24.    *Perfection of the DIP Liens and Adequate Protection Liens*.

(a)    The DIP Agent, the Prepetition Bridge Agent, and the Prepetition Trustee are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder. Whether or not the DIP Agent, the Prepetition Bridge Agent, or the Prepetition Trustee shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination (subject to the priorities set forth in this Interim Order, and subject to the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order), at the time and on the date of entry of this Interim

Order.  Upon the request of the DIP Agent, the Prepetition Bridge Agent, or the Prepetition Trustee, as applicable, each of the Prepetition Senior Secured Parties and the Debtors, without any further consent of any party, is authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition Senior Secured Parties, without representation or warranty of any kind) to enable the DIP Agent, the Prepetition Bridge Agent, and the Prepetition Trustee, in each case, to further validate, perfect, preserve, and enforce the DIP Liens and the Adequate Protection Liens, respectively.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  Notwithstanding anything to the contrary herein, but subject to the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order, any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction previously filed by the Prepetition Bridge Agent in order to validate and perfect the liens securing the Prepetition Bridge Obligations shall remain in existence and shall be deemed postpetition filings to validate and perfect the liens securing the Term Loans, including, without limitations, the Roll Up Loans.

(b)      A certified copy of this Interim Order, in the discretion of the DIP Agent, the Prepetition Bridge Agent, or the Prepetition Trustee, may be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; provided, however, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)      Effective upon entry of the Final Order, any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for

-42-

any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment, and/or the sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order.

25.    *Preservation of Rights Granted Under this Interim Order.*

(a)    Subject to the Carve Out, other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the Prepetition Senior Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Senior Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including the Cash Collateral) and all Adequate Protection Obligations.

(c)    Subject to the Carve Out, unless and until all DIP Obligations, Prepetition Bridge Obligations, Bridge Adequate Protection Obligations, Prepetition 2022A Bond Obligations, and

2022A Bond Adequate Protection Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents and with the prior written consent of the DIP Agent and the Required Lenders (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority claim for any administrative expense, secured claim or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Bankruptcy Code sections 503(b), 507(a) or 507(b)) in any of the Chapter 11 Cases, equal or superior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Prepetition Bridge Obligations, or the Prepetition 2022A Bond Obligations (or the liens and security interests securing such claims and obligations), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents, any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, the Prepetition Bridge Liens, or the Prepetition 2022A Bond Liens, as the case may be; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)    Notwithstanding any order dismissing any of the Chapter 11 Cases under Bankruptcy Code section 1112 or otherwise entered at any time, (x) the DIP Liens, the DIP

Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens (subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order), the Adequate Protection Superpriority Claims (subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order), and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Bridge Agent, and the Prepetition Bridge Lenders granted by the provisions of this Interim Order and the DIP Documents shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to Bankruptcy Code section 363(b) or (iii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to Bankruptcy Code section 1141(d)(4), the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The

-45-

terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any successor cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Obligations (subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order) and all other rights and remedies of the DIP Parties and the Prepetition Senior Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the Required Lenders).

26.    *Expenses and Indemnification*.

(a)    All (i) reasonable and documented out-of-pocket fees and expenses incurred by professionals or consultants retained by the DIP Agent and the DIP Lenders (collectively, the "DIP Professionals"), incurred in connection with the Chapter 11 Cases (in any capacity) and the DIP Facility, whether or not the DIP Facility is successfully consummated, and (ii) reasonable and documented out-of-pocket expenses (including, without limitation, fees, disbursements and other charges of DIP Professionals) of the DIP Agent and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby, are to be paid by the Debtors.  All fees and expenses described above shall be payable by the Debtors (whether accrued or incurred prior to, on, or after the Petition Date) within ten (10) calendar days after the delivery of invoices (which invoices shall not be required to comply with any particular format and may be in summary form only and may be in redacted form to protect privileged and confidential information) to the Debtors, the U.S. Trustee, and the Creditors' Committee (if any),

without the necessity of filing motions or fee applications and such fees and expenses shall not be subject to any further review, challenge, or disgorgement following the expiration of such period.

(b)     As set forth in the DIP Facility, the Debtors will, jointly and severally, indemnify the DIP Lenders, the DIP Agent, and their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person"), and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including but not limited to reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the execution or delivery of the DIP Credit Agreement and other DIP Documents, transactions contemplated hereby and thereby, and any actual or proposed use of the proceeds of any loans made under the DIP Facility in accordance with the terms of the DIP Credit Agreement; provided that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred solely by reason of the actual fraud, gross negligence, or willful misconduct of such person (or their related persons).  No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in an final non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence or willful misconduct, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

27.    *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral*

(a)    Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral or the proceeds thereof, including Cash Collateral, or the Carve Out may be used: (a) to investigate (except as expressly provided herein), initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (i) against any of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties (each in their capacities as such) or seeking relief that would impair the rights and remedies of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties (each in their capacities as such) under the DIP Documents, this Interim Order, the Prepetition Bridge Documents, or the Prepetition Indenture Documents to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Creditors' Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties to recover on the DIP Collateral or the Prepetition Collateral, as provided for herein, or seeking affirmative relief against any of the DIP Agent, the DIP Lenders or the Prepetition Senior Secured Parties related to the DIP Obligations, the Prepetition Bridge Obligations, or the Prepetition 2022A Bond Obligations, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Agent's and the DIP Lenders' liens or security interests in the DIP Collateral, the Prepetition Bridge Liens, the Prepetition Bridge Obligations, the

-48-

Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations, or (iii) for monetary, injunctive, or other affirmative relief against the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties (each in their capacities as such), or their respective liens on or security interests in the DIP Collateral or the Prepetition Collateral, or the DIP Superpriority Claims, that would impair the ability of any of the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Bridge Liens and the Prepetition 2022A Bond Liens) held by or on behalf of each of the Prepetition Senior Secured Parties related to the Prepetition Bridge Obligations and the Prepetition 2022A Bond Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, Prepetition Bridge Liens, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations; (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Agent or the DIP Lenders related to the DIP Obligations or the DIP Liens; or (y) any of the Prepetition Bridge Liens, Prepetition 2022A Bond Liens or any other rights or interests of any of the Prepetition Senior Secured Parties related to the Prepetition Bridge Liens, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations; and

-49-

(e) assert any claims, defenses, or any other causes of action any non-Debtor affiliates with respect to prepetition relationships with the Debtors; provided that no more than $25,000.00 of the proceeds of the DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Creditors' Committee, if appointed, solely to investigate the foregoing matters with respect to the Roll-Up Loans, Prepetition Bridge Liens, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations, within the Challenge Period (as defined herein) (the "Challenge Budget").

(b)     Subject to entry of the Final Order, all fees and expenses of the Committee Professionals incurred in connection with the investigation of the matters described in paragraph 27(a) in excess of the Challenge Budget shall not be entitled to administrative expense priority pursuant to section 503(b) of the Bankruptcy Code or otherwise.

28.     *Effect of Stipulations on Third Parties*.

(a)     The Debtors' acknowledgments, stipulations, admissions, waivers, and releases set forth in this Interim Order shall be binding on the Debtors, their respective representatives, successors and assigns upon entry of this Interim Order.  Subject to entry of the Final Order, the acknowledgments, stipulations, admissions, waivers, and releases contained in this Interim Order shall also be binding upon the Debtors' estates and all other parties in interest, including the Creditors' Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee"), unless (i) such party with requisite standing, has duly filed an adversary proceeding challenging the validity, perfection, priority, extent, or enforceability of the Roll-Up Loans, the Prepetition Bridge Liens, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action,

-50-

objections, contests, or defenses (each a "Challenge" and collectively, the "Challenges") against the Prepetition Senior Secured Parties in connection with any matter related to the Roll-Up Loans, the Prepetition Collateral, the Prepetition Bridge Liens, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations, by no later than the date that is seventy-five (75) days after the Petition Date (such time period, the "Challenge Period"); provided that the Creditors' Committee (if any) may agree to terminate the Challenge Period prior to the date that is seventy-five (75) days after the Petition Date which agreement shall be binding on all other parties in interest, including the any Trustee; provided further that in the event that, prior to the expiration or termination (as applicable) of the Challenge Period, (x) these Chapter 11 Cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these Chapter 11 Cases, then, in each such case, the Challenge Period shall be extended, solely with respect to such Trustee, until the later of (1) the Challenge Period and (2) the date that is ten (10) calendar days from the date such Trustee is appointed; and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding.  If no such adversary proceeding is timely filed prior to the expiration of the Challenge Period, without further order of this Bankruptcy Court: (x) the Roll-Up Loans, the Prepetition Bridge Obligations and the Prepetition 2022A Bond Obligations shall constitute allowed claims, not subject to any Challenges (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in these

Chapter 11 Cases and any subsequent chapter 7 cases, if any; (y) the Prepetition Bridge Liens and

Prepetition 2022A Bond Liens shall be deemed to have been, as of the Petition Date, legal, valid,

binding, perfected and of the priority specified in paragraphs 4(a)(ii) and 4(b)(ii), not subject to

setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction,

recoupment, or recovery; and (z) the Prepetition Bridge Liens, the Prepetition Bridge Obligations,

the Prepetition 2022A Bond Liens, or the Prepetition 2022A Bond Obligations, and the Prepetition

Senior Secured Parties (in their capacities as such) shall not be subject to any other or further

challenge and any party in interest shall be forever enjoined and barred from seeking to exercise

the rights of the Debtors' estates or taking any such action, including any successor thereto

(including any estate representative or a Trustee, whether such Trustee is appointed or elected prior

to or following the expiration of the Challenge Period).  If any such adversary proceeding is timely

filed prior to the expiration of the Challenge Period, (A) the stipulations and admissions contained

in this Interim Order shall nonetheless remain binding and preclusive on the Creditors' Committee

(if any) and any other party in these cases, including any Trustee, except as to any stipulations or

admissions that are specifically and expressly challenged in such adversary proceeding and (B)

any Challenges not brought in such adversary proceeding shall be forever barred; provided that, if

and to the extent any challenges to a particular stipulation or admission are withdrawn, denied or

overruled by a final non-appealable order, such stipulation also shall be binding on the Debtors'

estates and all parties in interest.

(b)     Nothing in this Interim Order vests or confers on any person (as defined in the

Bankruptcy Code), including any Creditors' Committee, standing or authority to pursue any cause

of action belonging to the Debtors or their estates, including, without limitation, any challenge

with respect to the Prepetition Bridge Documents, the Prepetition Bridge Obligations, the Prepetition 2022A Bond Obligations, or the Prepetition Indenture Documents.

29.     *Release.*  Subject to the rights and limitations set forth in paragraphs 27 and 28 of this Interim Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Lenders, the DIP Agent, the Prepetition Senior Secured Parties, and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, affiliated investment funds or investment vehicles, managed, advised or sub-advised accounts, funds or other entities, investment advisors, sub-advisors or managers, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the Prepetition Bridge Obligations, the Prepetition Bridge Liens, the Prepetition 2022A Bond Obligations, and the Prepetition 2022A Bond Liens, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes

-53-

of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection or avoidability of the liens or claims of the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties.

30.    *Credit Bidding*.  (a) the DIP Agent, or any assignee or designee of the DIP Agent, acting at the direction of the Required Lenders and on behalf of the DIP Parties, shall have, pursuant and subject to Bankruptcy Code section 363(k), the right to credit bid up to the full amount of any DIP Obligations (with respect to the Roll-Up Loans, subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order) in the sale of any of the DIP Collateral, including pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725, (b) subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order and subject to the satisfaction of the DIP Obligations, or as otherwise consented to by the DIP Agent (at the direction of the Required Lenders), the Prepetition Bridge Agent (on behalf of the Prepetition Bridge Lenders) shall have the right to credit bid up to the full amount of the Prepetition Bridge Obligations in the sale of any of the Prepetition Collateral, and (c) subject to the rights and limitations in paragraphs 27 and 28 of this Interim Order and subject to the satisfaction of the DIP Obligations, or as otherwise consented to by the DIP Agent (at the direction of the Required Lenders) and the satisfaction of the Prepetition Bridge Obligations, or as otherwise consented by the Prepetition Bridge Agent, and the Prepetition Trustee (on behalf of the Prepetition 2022A Bondholders) shall have the right to credit bid up to the full amount of the Prepetition 2022A Bond Obligations in the sale of any of the Prepetition Collateral, including, but not limited to, pursuant to (i) Bankruptcy Code section 363, (ii) a plan of reorganization or a plan of liquidation under Bankruptcy Code section 1129, or (iii) a sale or

disposition by a chapter 7 trustee for any Debtor under Bankruptcy Code section 725. The DIP Agent, at the direction of the Required Lenders, and on behalf of the DIP Parties, shall have the absolute right to assign, sell, or otherwise dispose of its right to credit bid in connection with any credit bid by or on behalf of the DIP Parties to any acquisition entity or joint venture formed in connection with such bid.

31.     *Interim Order Governs.*  In the event of any inconsistency between the provisions of this Interim Order or the DIP Documents, the provisions of this Interim Order shall govern.

32.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Senior Secured Parties, any Creditors' Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties, underlined provided that, except to the extent expressly set forth in this Interim Order, the Prepetition Senior Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any Trustee or similar responsible person appointed for the estates of the Debtors.

33.     *Limitation of Liability.*  In determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Documents, the Prepetition Bridge Documents, or the

Prepetition Indenture, the DIP Agent, the DIP Lenders, and the Prepetition Senior Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute), nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors. Furthermore, nothing in this Interim Order, the DIP Documents, the Prepetition Bridge Documents, or the Prepetition Indenture Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, or the Prepetition Senior Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

34.     *Effectiveness.*  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

35.     *Final Hearing.*  The Final Hearing is scheduled for [_____], 2024 at [__]:[__] [a.m. / p.m.] (prevailing Eastern Time), before the Honorable United States Bankruptcy Judge [_____], at the United States Bankruptcy Court for the District of Delaware.  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final

-56-

Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed

a request for notices with this Bankruptcy Court and to any Creditors' Committee after the same

has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.  Any

party in interest objecting to the relief sought at the Final Hearing shall serve and file a written

objection thereto, which shall be served upon the Notice Parties, and shall also be filed with the

Clerk of the Court, in each case to allow actual receipt by the foregoing no later than [_____]

at 4:00 p.m. (prevailing Eastern Time).

36.    No later than two (2) business days after the date of this Interim Order, the Debtors

shall serve on the Notice Parties (a) a copy of this Interim Order and shall file a certificate of

service no later than 24 hours after service.

11296365v.1

**<u>Exhibit 1</u>**

**DIP Budget**

**Restoration Forest Products Group, LLC**
*Weekly Cash Flow Forecast w. DIP Budget*

| $ in 000s | -1 Proj. 1/26/24 | 0 Proj. 2/2/24 * | 1 Proj. 2/9/24 | 2 Proj. 2/16/24 | 3 Proj. 2/23/24 | 4 Proj. 3/1/24 | 5 Proj. 3/8/24 | 6 Proj. 3/15/24 | 7 Proj. 3/22/24 | 8 Proj. 3/29/24 | 9 Proj. 4/5/24 | 10 Proj. 4/12/24 | 11 Proj. 4/19/24 | 12 Proj. 4/26/24 | 13 Proj. 5/3/24 | Total Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Petition Date 1/29 | | | | | | | | Effective Date 3/29 | | | | | | |
| **Total Collections** | $ - | $ - | $ - | $ 250 | $ - | $ - | $ 550 | $ - | $ - | $ 288 | $ - | $ - | $ - | $ - | $ 1,600 | $ 2,688 |
| ***Operating Disbursements:*** | | | | | | | | | | | | | | | | |
| Payroll & Benefits | (264) | (485) | (38) | (485) | (83) | (534) | (34) | (534) | (34) | (579) | (38) | (586) | (38) | (631) | (34) | (4,397) |
| Insurance | (121) | (45) | (45) | (45) | (45) | (36) | (36) | (36) | (36) | (36) | (295) | (45) | (45) | (45) | (36) | (945) |
| Leases | (19) | (221) | (17) | (1,051) | (15) | (221) | (17) | (64) | (15) | - | (221) | (17) | (64) | (15) | (220) | (2,177) |
| Utilities | (76) | (40) | (40) | (40) | (40) | (53) | (53) | (53) | (53) | (53) | (75) | (75) | (75) | (75) | (61) | (861) |
| Logging & Hauling | (390) | (302) | (302) | (302) | (302) | (244) | (244) | (244) | (244) | (244) | (498) | (498) | (498) | (498) | (398) | (5,212) |
| Manufacturing Costs | (17) | (38) | (38) | (38) | (38) | (52) | (52) | (52) | (52) | (52) | (153) | (153) | (153) | (153) | (135) | (1,179) |
| Ordinary Course Professionals | (77) | (19) | (19) | (19) | (19) | (9) | (9) | (9) | (9) | (9) | (11) | (11) | (11) | (11) | (9) | (253) |
| Other | (52) | (95) | (60) | (35) | (35) | (26) | (51) | (26) | (26) | (26) | (101) | (76) | (76) | (76) | (26) | (781) |
| **Total Op. Disbursements** | **(1,016)** | **(1,245)** | **(559)** | **(2,015)** | **(576)** | **(1,175)** | **(496)** | **(1,018)** | **(469)** | **(999)** | **(1,392)** | **(1,462)** | **(959)** | **(1,504)** | **(918)** | **(15,804)** |
| **Net Operating Cash Flow** | **(1,016)** | **(1,245)** | **(559)** | **(2,015)** | **(326)** | **(1,175)** | **(496)** | **(468)** | **(469)** | **(712)** | **(1,392)** | **(1,462)** | **(959)** | **(1,504)** | **682** | **(13,116)** |
| ***Non-Operating Disbursements:*** | | | | | | | | | | | | | | | | |
| Capital Expenditures | (1,745) | (899) | (1,422) | (1,949) | (1,731) | (1,609) | (987) | (1,464) | (816) | (1,176) | (778) | (629) | (250) | (125) | (716) | (16,295) |
| Restructuring Professionals | (1,346) | (160) | (320) | (320) | (403) | (353) | (278) | (278) | (278) | (1,148) | (156) | (156) | (156) | (351) | - | (5,706) |
| Adequate Assurance / 503(b)(9) | - | - | (100) | (100) | - | - | - | - | - | - | - | - | - | - | - | (200) |
| **Total Non-Op. Disbursements** | **(3,091)** | **(1,059)** | **(1,842)** | **(2,369)** | **(2,134)** | **(1,962)** | **(1,266)** | **(1,742)** | **(1,094)** | **(2,324)** | **(935)** | **(785)** | **(406)** | **(476)** | **(716)** | **(22,201)** |
| **Total Disbursements** | **(4,107)** | **(2,304)** | **(2,400)** | **(4,384)** | **(2,710)** | **(3,138)** | **(1,762)** | **(2,760)** | **(1,563)** | **(3,323)** | **(2,326)** | **(2,247)** | **(1,366)** | **(1,980)** | **(1,634)** | **(38,005)** |
| **Net Cash Flow** | **(4,107)** | **(2,304)** | **(2,400)** | **(4,384)** | **(2,460)** | **(3,138)** | **(1,762)** | **(2,210)** | **(1,563)** | **(3,036)** | **(2,326)** | **(2,247)** | **(1,366)** | **(1,980)** | **(34)** | **(35,317)** |
| **Beginning Cash Balance** | **5,268** | **1,161** | **14,356** | **11,956** | **7,573** | **5,112** | **12,475** | **10,713** | **8,502** | **6,940** | **9,904** | **7,578** | **5,331** | **3,966** | **1,985** | **5,268** |
| Net Cash Flow | (4,107) | (2,304) | (2,400) | (4,384) | (2,460) | (3,138) | (1,762) | (2,210) | (1,563) | (3,036) | (2,326) | (2,247) | (1,366) | (1,980) | (34) | (35,317) |
| Capital Infusion - Original Bridge | - | 3,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,000 |
| Capital Infusion - DIP | - | 12,500 | - | - | - | 10,500 | - | - | - | 6,000 | - | - | - | - | - | 29,000 |
| **Ending Cash Balance (Book)** | **1,161** | **14,356** | **11,956** | **7,573** | **5,112** | **12,475** | **10,713** | **8,502** | **6,940** | **9,904** | **7,578** | **5,331** | **3,966** | **1,985** | **1,951** | **1,951** |
| **Restructuring Professionals Escrow** | | | | | | | | | | | | | | | | |
| **Opening Balance** | **-** | **-** | **-** | **320** | **640** | **1,043** | **1,397** | **1,675** | **1,953** | **2,232** | **2,337** | **-** | **-** | **-** | **-** | **-** |
| Restructuring Professionals | - | - | 320 | 320 | 403 | 353 | 278 | 278 | 278 | 1,148 | - | - | - | - | - | 3,380 |
| Payments from Escrow | - | - | - | - | - | - | - | - | - | (1,043) | (2,337) | - | - | - | - | (3,380) |
| **Closing Balance** | **-** | **-** | **320** | **640** | **1,043** | **1,397** | **1,675** | **1,953** | **2,232** | **2,337** | **-** | **-** | **-** | **-** | **-** | **-** |

**Notes:**
* The week ended 2/2/2024 includes approximately $600,000 of prepetition payments expected to be made on Monday 1/29.

**Restoration Forest Products Group, LLC**
*DIP Budget - Supplemental Information*

$ in 000s

| | -1 Proj. 1/26/24 | 0 Proj. 2/2/24 (Petition Date 1/29) | 1 Proj. 2/9/24 | 2 Proj. 2/16/24 | 3 Proj. 2/23/24 | 4 Proj. 3/1/24 | 5 Proj. 3/8/24 | 6 Proj. 3/15/24 | 7 Proj. 3/22/24 | 8 Proj. 3/29/24 (Effective Date 3/29) | 9 Proj. 4/5/24 | 10 Proj. 4/12/24 | 11 Proj. 4/19/24 | 12 Proj. 4/26/24 | 13 Proj. 5/3/24 | Total Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP and Bridge Facility Roll Forwards** | | | | | | | | | | | | | | | | |
| ***DIP Facility - Roll Forward*** | | | | | | | | | | | | | | | | |
| Opening Balance | - | - | 78,185 | 78,185 | 78,185 | 78,185 | 89,404 | 89,404 | 89,404 | 89,404 | 99,062 | 99,062 | 99,062 | 99,062 | 99,062 | - |
| "New Money" Draws | - | 12,500 | - | - | - | 10,500 | - | - | - | 6,000 | - | - | - | - | - | 29,000 |
| Roll-Up of Bridge Loan | - | 64,342 | - | - | - | - | - | - | - | - | - | - | - | - | - | 64,342 |
| Fees | - | 1,343 | - | - | - | - | - | - | - | 2,862 | - | - | - | - | - | 4,205 |
| PIK Interest | - | - | - | - | - | 720 | - | - | - | 796 | - | - | - | - | 909 | 2,424 |
| **DIP Facility** | - | 78,185 | 78,185 | 78,185 | 78,185 | 89,404 | 89,404 | 89,404 | 89,404 | 99,062 | 99,062 | 99,062 | 99,062 | 99,062 | 99,971 | 99,971 |
| ***Bridge Facility - Roll Forward*** | | | | | | | | | | | | | | | | |
| Opening Balance | 60,902 | 63,902 | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,902 |
| Bridge Loan Draws | 3,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,000 |
| PIK Interest | - | 440 | - | - | - | - | - | - | - | - | - | - | - | - | - | 440 |
| Roll-Up of Bridge Loan | - | (64,342) | - | - | - | - | - | - | - | - | - | - | - | - | - | (64,342) |
| **Bridge Facility - Principal** | 63,902 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Professional Fee Detail** | | | | | | | | | | | | | | | | |
| ***Retainers*** | | | | | | | | | | | | | | | | |
| Potter Anderson | 150 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 150 |
| Ropes & Gray | 500 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 500 |
| **Total Retainers** | 650 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 650 |
| ***Fees*** | | | | | | | | | | | | | | | | |
| Potter Anderson | 231 | - | 75 | 75 | 75 | 50 | 50 | 50 | 50 | 125 | 38 | 38 | 38 | 38 | - | 931 |
| Ropes & Gray | 158 | - | 100 | 100 | 100 | 35 | 35 | 35 | 35 | 135 | 44 | 44 | 44 | 44 | - | 908 |
| Riveron | 142 | 160 | 125 | 125 | 125 | 100 | 100 | 100 | 100 | 100 | 63 | 63 | 63 | 63 | - | 1,427 |
| Joele Frank | 50 | - | 8 | 8 | 8 | - | - | - | - | 8 | - | - | - | - | - | 80 |
| Intrepid | 75 | - | - | - | - | 75 | - | - | - | 675 | - | - | - | - | - | 825 |
| Noticing Agent | 40 | - | 13 | 13 | 13 | 10 | 10 | 10 | 10 | 23 | 13 | 13 | 13 | 13 | - | 190 |
| UCC Professionals | - | - | - | - | 83 | 83 | 83 | 83 | 83 | 83 | - | - | - | - | - | 500 |
| Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | 195 | - | 195 |
| **Total Fees** | 696 | 160 | 320 | 320 | 403 | 353 | 278 | 278 | 278 | 1,148 | 156 | 156 | 156 | 351 | - | 5,056 |
| **Total Retainers & Fees** | 1,346 | 160 | 320 | 320 | 403 | 353 | 278 | 278 | 278 | 1,148 | 156 | 156 | 156 | 351 | - | 5,706 |

**<u>Exhibit 2</u>**

**DIP Credit Agreement**

**SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of January [31], 2024**

**by and among**

**RESTORATION FOREST PRODUCTS GROUP, LLC,**
**GOOD EARTH POWER AZ, LLC,**
**RESTORATION FOREST PRODUCTS, LLC,**
**JUST RIGHT, LLC,**
debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code,
as the Borrowers,

**THE OTHER PERSONS PARTY HERETO THAT ARE DESIGNATED AS CREDIT PARTIES,**

**UMB BANK, NATIONAL ASSOCIATION,**
as the Administrative Agent, and

**THE LENDERS PARTY HERETO,**
as Lenders

# TABLE OF CONTENTS

**Page**

ARTICLE I - THE FACILITIES ......................................................................................... 2

    1.1     Term Loan Facility ............................................................................................. 2

    1.2     Evidence of Term Loans; Term Notes ............................................................... 3

    1.3     Interest ............................................................................................................... 3

    1.4     Loan Accounts .................................................................................................... 4

    1.5     Optional Prepayments of Term Loans ................................................................ 4

    1.6     Mandatory Payments of Term Loans ................................................................. 4

    1.7     Fees .................................................................................................................... 5

    1.8     Payments by the Borrowers ................................................................................ 6

    1.9     Payments by the Lenders to the Administrative Agent:  Settlement ..................... 6

ARTICLE II – CONDITIONS PRECEDENT ................................................................... 8

    2.1     Conditions Precedent to Effectiveness and Funding of Interim Term Loans ........ 8

    2.2     Conditions Precedent to Final Term Loans ....................................................... 9

    2.3     Conditions Precedent to Additional Interim Term Loans .................................. 10

ARTICLE III - REPRESENTATIONS AND WARRANTIES ........................................ 11

    3.1     Corporate Existence and Power ........................................................................ 11

    3.2     Corporate Authorization; No Contravention .................................................... 12

    3.3     Governmental Authorization ............................................................................ 12

    3.4     Binding Effect .................................................................................................. 12

    3.5     Litigation ......................................................................................................... 13

    3.6     No Default ........................................................................................................ 13

    3.7     ERISA Compliance .......................................................................................... 13

    3.8     Margin Regulations .......................................................................................... 14

    3.9     Ownership of Property; Liens ........................................................................... 14

    3.10    Taxes ............................................................................................................... 14

    3.11    Financial Condition .......................................................................................... 14

    3.12    Environmental Matters ..................................................................................... 15

    3.13    Regulated Entities ............................................................................................ 16

    3.14    No Hinderance ................................................................................................. 16

    3.15    Labor Relations ................................................................................................ 16

| | | |
|---|---|---|
| 3.16 | Intellectual Property | 16 |
| 3.17 | Brokers' Fees | 16 |
| 3.18 | Insurance | 16 |
| 3.19 | Ventures, Subsidiaries and Affiliates; Outstanding Stock | 17 |
| 3.20 | Full Disclosure | 17 |
| 3.21 | Foreign Assets Control Regulations and Anti-Money Laundering | 17 |
| 3.22 | Patriot Act; Anti-Money Laundering; Anti-Corruption | 17 |
| 3.23 | Security Interests | 18 |
| 3.24 | Board Change | 18 |

**ARTICLE IV - AFFIRMATIVE COVENANTS** ... 18

| | | |
|---|---|---|
| 4.1 | Financial Statements | 18 |
| 4.2 | Certificates; Other Information | 19 |
| 4.3 | Notices | 20 |
| 4.4 | Preservation of Corporate Existence | 21 |
| 4.5 | Maintenance of Property | 21 |
| 4.6 | Insurance | 22 |
| 4.7 | Payment of Obligations | 22 |
| 4.8 | Compliance with Laws | 23 |
| 4.9 | Inspection of Property and Books and Records | 23 |
| 4.10 | Use of Proceeds | 24 |
| 4.11 | [Reserved]. | 24 |
| 4.12 | Further Assurances | 24 |
| 4.13 | Environmental Matters | 25 |
| 4.14 | [Reserved] | 25 |
| 4.15 | Material Contracts | 25 |
| 4.16 | Information Rights | 26 |
| 4.17 | Weekly Thirteen Week Cash Flow Forecasts | 26 |
| 4.18 | Milestones. | 26 |

**ARTICLE V - NEGATIVE COVENANTS** ... 26

| | | |
|---|---|---|
| 5.1 | Limitation on Liens | 26 |
| 5.2 | Disposition of Assets | 28 |
| 5.3 | Consolidations and Mergers | 28 |
| 5.4 | Loans and Investments | 28 |

| | | |
|---|---|---|
| 5.5 | Limitation on Indebtedness | 29 |
| 5.6 | Transactions with Affiliates | 29 |
| 5.7 | Management Fees and Compensation | 29 |
| 5.8 | Margin Stock | 30 |
| 5.9 | Contingent Obligations | 30 |
| 5.10 | Compliance with ERISA | 31 |
| 5.11 | Restricted Payments | 31 |
| 5.12 | Change in Business | 31 |
| 5.13 | Amendments to Organizational Documents and Material Contracts | 32 |
| 5.14 | Changes in Accounting; Name and Jurisdiction of Organization | 32 |
| 5.15 | No Negative Pledges | 32 |
| 5.16 | Anti-Money Laundering, Anti-Corruption and Sanctions | 33 |
| 5.17 | Sale-Leasebacks | 33 |
| 5.18 | Hazardous Materials | 33 |
| 5.19 | Chief Restructuring Officer | 33 |
| 5.20 | Material Transactions | 33 |
| 5.21 | Non-Credit Parties | 33 |
| 5.22 | Additional Bankruptcy Matters | 33 |
| **ARTICLE VI – PERFORMANCE COVENANTS** | | **34** |
| 6.1 | Projections | 34 |
| **ARTICLE VII - EVENTS OF DEFAULT** | | **34** |
| 7.1 | Event of Default | 34 |
| 7.2 | Remedies | 39 |
| 7.3 | Rights Not Exclusive | 40 |
| **ARTICLE VIII - THE ADMINISTRATIVE AGENT** | | **40** |
| 8.1 | Appointment and Duties | 40 |
| 8.2 | Binding Effect | 41 |
| 8.3 | Use of Discretion | 41 |
| 8.4 | Delegation of Rights and Duties | 42 |
| 8.5 | Reliance and Liability | 42 |
| 8.6 | Administrative Agent Individually | 44 |
| 8.7 | Lender Credit Decision | 44 |
| 8.8 | Expenses; Indemnities; Withholding | 44 |

8.9     Resignation of the Administrative Agent ............................................................ 45

8.10    Release of Collateral or Guarantors ................................................................. 46

8.11    Additional Secured Parties................................................................................ 47

ARTICLE IX - MISCELLANEOUS ................................................................................ 47

9.1     Amendments and Waivers ................................................................................ 47

9.2     Notices .............................................................................................................. 48

9.3     Electronic Transmissions ................................................................................. 49

9.4     No Waiver; Cumulative Remedies ................................................................... 50

9.5     Costs and Expenses .......................................................................................... 50

9.6     Indemnity .......................................................................................................... 51

9.7     Marshaling; Payments Set Aside ..................................................................... 52

9.8     Successors and Assigns..................................................................................... 52

9.9     Assignments and Participations; Binding Effect ............................................. 52

9.10    Non-Public Information; Confidentiality.......................................................... 55

9.11    Set-off; Sharing of Payments ........................................................................... 57

9.12    Counterparts; Facsimile Signature ................................................................... 57

9.13    Severability ....................................................................................................... 58

9.14    Captions ............................................................................................................ 58

9.15    Independence of Provisions .............................................................................. 58

9.16    Interpretation..................................................................................................... 58

9.17    No Third Parties Benefited ............................................................................... 58

9.18    Governing Law and Jurisdiction....................................................................... 58

9.19    Waiver of Jury Trial .......................................................................................... 59

9.20    Entire Agreement; Release; Survival................................................................ 59

9.21    Patriot Act ......................................................................................................... 60

9.22    Joint and Several ............................................................................................... 60

9.23    Creditor-Debtor Relationship ........................................................................... 61

9.24    Process Agent .................................................................................................... 61

9.25    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......... 62

9.26    Appointment of Administrative Borrower......................................................... 62

9.27    [Reserved.] ........................................................................................................ 63

9.28    [Reserved.] ........................................................................................................ 63

ARTICLE X - TAXES, YIELD PROTECTION AND ILLEGALITY ........................ 63

10.1    Taxes ........................................................................................ 63

10.2    [Reserved] ............................................................................... 67

10.3    Increased Costs ..................................................................... 67

10.4    Funding Losses ...................................................................... 68

10.5    [Reserved] ............................................................................... 68

10.6    [Reserved] ............................................................................... 68

10.7    Mitigation ............................................................................... 69

10.8    Certificates of Lenders ......................................................... 69

ARTICLE XI - DEFINITIONS .................................................................... 69

11.1    Defined Terms ....................................................................... 69

11.2    Other Interpretive Provisions .............................................. 90

11.3    Accounting Terms and Principles ....................................... 91

11.4    Payments ................................................................................ 92

SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Term Loan Commitments |
| Schedule 3.2(b) | Material Contractual Obligations |
| Schedule 3.5 | Litigation |
| Schedule 3.6(c) | Existing Defaults (Indebtedness) |
| Schedule 3.6(d) | Existing Defaults (Contractual Obligations) |
| Schedule 3.9 | Real Estate |
| Schedule 3.11 | Financial Condition |
| Schedule 3.15 | Labor Relations |
| Schedule 3.16 | Intellectual Property |
| Schedule 3.18 | Insurance |
| Schedule 3.19 | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 4.12(d) | Post-Closing Obligations |
| Schedule 4.18 | Milestones |
| Schedule 5.1 | Prepetition Liens |
| Schedule 5.4 | Prepetition Investments |
| Schedule 5.5 | Prepetition Indebtedness |
| Schedule 5.9 | Prepetition Contingent Obligations |

EXHIBITS

| | |
|---|---|
| Exhibit 2.1(d) | Closing Checklist |
| Exhibit 4.2(b) | Form of Compliance Certificate |
| Exhibit 10.1-1 | Form of U.S. Tax Compliance Certificate (For Foreign Participants that Are Not Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 10.1-2 | Form of U.S. Tax Compliance Certificate (For Foreign Participants that Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 10.1-3 | Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit 10.1-4 | Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes) |
| Exhibit A | Form of Assignment and Assumption |
| Exhibit I | Interim Order |
| Exhibit N | Form of Notice of Borrowing |
| Exhibit P | Form of Perfection Certificate |
| Exhibit PP | Pre-Packaged Plan |
| Exhibit R | Rolling Forecast as of Closing Date |

**SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSESSION CREDIT AGREEMENT**

    This SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT (including all exhibits and schedules hereto, as the same may be amended, amended and restated, supplemented or modified from time to time, this "**Agreement**") is entered into as of January [31], 2024 among (1) RESTORATION FOREST PRODUCTS GROUP, LLC, a Delaware limited liability company ("**Holdings**"), (2) GOOD EARTH POWER AZ, LLC, an Arizona limited liability company ("**GEPAZ**"), (3) RESTORATION FOREST PRODUCTS, LLC, an Arizona limited liability company ("**RFP**"), (4) JUST RIGHT, LLC, an Arizona limited liability company ("**Just Right**", and, together with Holdings, GEPAZ, and RFP, jointly and severally, each, a "**Borrower**" and collectively, the "**Borrowers**"), (5) the other Persons party hereto that are designated as Credit Parties, (6) the several lenders from time to time party to this Agreement (collectively, the "**Lenders**"), and (7) UMB BANK, NATIONAL ASSOCIATION, in its capacity as Administrative Agent for the Lenders (the "**Administrative Agent**").

W I T N E S E T H :

    **WHEREAS**, on January 29, 2024 (the "Petition Date"), the Borrowers commenced voluntary cases (collectively, the "Borrowers' Case") under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") jointly administered under Case No. 24- [_____];

    **WHEREAS**, the Borrowers continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

    **WHEREAS**, the Borrowers have asked the Lenders to make loans and advances to the Borrowers comprised of a term loan facility in an aggregate principal amount of $93,342,012.11 of which (x) $29,000,000.00 shall be new money Term Loans and (y) $64,342,012.11 shall be Roll-Up Loans.  The Lenders have severally, and not jointly, agreed to extend such credit to the Borrowers subject to the terms and conditions hereinafter set forth; and

    **WHEREAS**, to provide security for the repayment of the Obligations, the Borrowers will provide and grant to the Administrative Agent, for its benefit and the benefit of the Secured Parties, security interests, liens, and other rights and protections pursuant to the terms hereof, and security interests and liens pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and super-priority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code, and other rights and protections, as more fully described herein and in the Bankruptcy Court DIP Orders.

    **NOW**, **THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

## ARTICLE I - THE FACILITIES

1.1     Term Loan Facility.

(a)     Upon and subject to the terms and conditions of this Agreement:

(i)     Each Lender severally agrees to fund its Term Loan Commitment by making (A) a Term Loan to the Borrowers on the Closing Date in an aggregate principal amount not to exceed the lesser of (x) the amount of such Lender's Term Loan Commitment and (y) its Pro Rata Share of the aggregate amount of Term Loans approved by the Bankruptcy Court in the Interim Order to be extended prior to entry of the Final Order (the aggregate amount of Term Loans funded pursuant to this clause (a)(i)(A), the "Initial Interim Term Loans") and (B) in the Lenders' discretion, to the extent that the Final Order is entered after the date which is 30 days after the Petition Date, an additional Term Loan funded on the day that is 30 days after the Petition Date (or such later date as the Lenders determine in their sole discretion) and additional Term Loans on each thirtieth day thereafter until entry of the Final Order (or such later dates as the Lenders determine in their sole discretion), in each case, in an aggregate amount not to exceed the amount approved by Bankruptcy Court in any Supplemental Interim Order and in accordance with the Rolling Forecast (such additional Term Loans, the "Additional Interim Term Loans" and, together with the Initial Interim Term Loans, the "Interim Term Loans").

(ii)     Each Lender severally  agrees to fund its Term Loan Commitment (as in effect after giving effect to the Interim Term Loans) by making a single Term Loan to the Borrowers on any Business Day following, but not later than the second (2nd) Business Day following, the Bankruptcy Court's entry of the Final Order, in an aggregate principal amount not to exceed the lesser of (x) the amount of such Lender's Term Loan Commitment as in effect at such time and (y) its Pro Rata Share of the amount of Term Loans approved by the Bankruptcy Court in the Final Order to be extended (the aggregate amount of Term Loans funded pursuant to this clause (a)(ii), the "Final Term Loans").

(iii)     Upon entry of the Interim Order, each Lender shall be deemed to have advanced an additional loan in an amount equal to $64,342,012.11 which deemed loans will be deemed to have been converted on a cashless, dollar-for-dollar basis from Term Loans (as defined under the Prepetition Bridge Credit Agreement) under the Prepetition Bridge Credit Agreement (such loans, the "Roll-Up Loans" and, together with the Interim Term Loans and the Final Term Loans, when funded, the "Term Loans").

(iv)     Notwithstanding the foregoing, the aggregate principal amount of Interim Term Loans and Final Term Loans shall not exceed the Term Loan Commitment.  Any principal amount of the Term Loans repaid or prepaid may not be reborrowed.

(b)     Each Borrowing of a Term Loan shall be made upon the Administrative Borrower's irrevocable written notice delivered to the Administrative Agent substantially in the form of a Notice of Borrowing which notice must be received by the Administrative Agent prior to 2:00 p.m. (New York time) on the date which is three (3) Business Days (or such other date as consented to by the Administrative Agent at the direction of the Lenders in their sole discretion) prior to the requested Borrowing date.  Upon receipt of a Notice of Borrowing, the Administrative

Agent will promptly notify each Lender of such Notice of Borrowing and of its Maximum Pro Rata Share of such Borrowing. No Lender (i) shall be liable for any other Lender's failure to make or fund any Term Loan, or (iii) may fund more than its Maximum Pro Rata Share of any Borrowing requested hereunder.

      1.2    <u>Evidence of Term Loans; Term Notes</u>. Each Term Loan made by each Lender is evidenced by this Agreement and, if requested by such Lender, the Borrowers shall deliver to such Lender a term note (the form and substance of which shall be acceptable to such Lender) payable to such Lender, in an amount equal to the unpaid balance of the applicable Term Loans held by such Lender.

      1.3    <u>Interest</u>.

      (a)    Subject to subsections 1.3<u>(d)</u> and <u>1.3(e)</u>, the Term Loans shall bear interest on the outstanding principal amount thereof from the date when made at a rate *per annum* equal to the Applicable Rate. Each determination of an interest rate by the Administrative Agent shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error. All computations of fees and interest payable under this Agreement shall be made on the basis of a 360-day year and actual days elapsed. Interest and fees shall accrue during each period during which interest or such fees are computed from the first day thereof to the last day thereof, and shall be payable in arrears on each Interest Payment Date. The Borrowers agree to pay an effective rate of interest equal to the Applicable Rate and the additional rate, if any, resulting from any charge or fee in the nature of interest paid or to be paid by the Borrowers in connection with this Agreement and the other Loan Documents.

      (b)    Accrued and unpaid interest that is due and payable with respect to the Term Loans on any such Interest Payment Date shall be payable in kind in arrears on such date or, in the case of <u>Section 1.3(d)</u>, on demand, in each case, with such interest amount being added to the then outstanding principal amount of the Term Loans for all purposes hereof (including with respect to the accrual of interest on such increased outstanding principal amount at the rates applicable to such Term Loan under this Agreement) on such Interest Payment Date.

      (c)    [Reserved].

      (d)    Effective immediately upon the occurrence of any Event of Default, the Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on the Term Loans from and after the date of occurrence of such Event of Default, at a rate per annum which is determined by adding two percent (2.00%) per annum to the Applicable Rate then in effect for such Term Loans. All such interest shall be payable in cash on demand of the Required Lenders.

      (e)    Anything herein to the contrary notwithstanding, the obligations of the Borrowers hereunder shall be subject to the limitation that payments of interest shall not be required, for any period for which interest is computed hereunder, to the extent (but only to the extent) that contracting for or receiving such payment by the respective Lender would be contrary to the provisions of any law applicable to such Lender limiting the highest rate of interest which may be lawfully contracted for, charged or received by such Lender, and in such event the

Borrowers shall pay such Lender interest at the highest rate permitted by applicable law ("Maximum Lawful Rate"); provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrowers shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Lenders is equal to the total interest that would have been received had the interest payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement.

1.4    Loan Accounts.  The Administrative Agent, on behalf of the Lenders, shall record on its books and records the amount of each Term Loan made, the interest rate applicable thereto, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding.  The Administrative Agent shall deliver to the Administrative Borrower, at its request, a loan statement setting forth such record for the immediately preceding calendar month.  Such record shall, absent manifest error, be conclusive evidence of the amount of the Term Loans made by the Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder (and under any term note) to pay any amount owing pursuant to any Loan Document (including with respect to the Term Loans) or provide the basis for any claim against the Administrative Agent.

1.5    Optional Prepayments of Term Loans.  No optional prepayments of Term Loans may be made without the consent of the Lenders, which may be given (or not) in their sole and absolute discretion.  Any such optional prepayment of Term Loans shall be made on the terms consented to by the Lenders and shall include the payment of the Exit Fee.

1.6    Mandatory Payments of Term Loans.

(a)    Maturity Date Payment.  On the Maturity Date (unless the Facility Termination Date has already occurred), the entire principal balance of the Term Loans, plus all other Obligations (including, for the avoidance of doubt, the Exit Fee) shall be either (a) repaid in full in cash to the Administrative Agent (for distribution to the Lenders) or (b) subject to the prior written consent of the Required Lenders in their sole discretion, converted into an exit facility that is on terms and conditions satisfactory to the Required Lenders in their sole discretion and subject to documentation acceptable to the Administrative Agent and the Required Lenders in their sole discretion (such conversion, an "Exit Conversion"); provided, however, that no Exit Conversion shall be available to the Borrower and the other Credit Parties unless, in connection with such conversion, one or more Affiliates of the Lenders shall receive 100% of the equity of the reorganized Borrower and reorganized Credit Parties.

(b)    Asset Dispositions; Events of Loss.  If a Credit Party or any Subsidiary of a Credit Party shall at any time or from time to time:

(i)    make or agree to make a Disposition; or

(ii)    suffer an Event of Loss;

then (A) the Administrative Borrower shall promptly notify the Administrative Agent of such proposed Disposition or Event of Loss (including the amount of the

-4-

estimated Net Proceeds to be received by a Credit Party and/or such Subsidiary in respect thereof) and (B) promptly upon receipt by a Credit Party and/or such Subsidiary of the Net Proceeds of such Disposition or Event of Loss, the Borrowers shall deliver, or cause to be delivered, the Net Proceeds to the Administrative Agent for distribution to the Lenders as a prepayment of the Term Loans plus the Exit Fee on such Term Loans so prepaid, which prepayment shall be applied in accordance with Section 1.6(e).

(c)    Incurrence of Debt; Equity Issuance; Extraordinary Receipts.  Immediately upon receipt by any Credit Party or any Subsidiary of any Credit Party of (i) the Net Issuance Proceeds of the incurrence of Indebtedness (other than Net Issuance Proceeds from the incurrence of Indebtedness permitted hereunder) or Equity Issuances or (ii) the Net Proceeds of any Extraordinary Receipts, the Borrowers shall deliver, or cause to be delivered, to the Administrative Agent an amount equal to such Net Issuance Proceeds or Net Proceeds, as the case may be, in each instance, for distribution to the Lenders as a prepayment of the Term Loans plus the Exit Fee on such Term Loans so prepaid, which shall be applied in accordance with Section 1.6(e).

(d)    [Reserved]

(e)    Notice and Application of Prepayments.

(i)    In connection with any prepayment required under Sections 1.6(b) or Section 1.6(c), the Administrative Borrower shall provide written notice (in form and substance reasonably acceptable to the Administrative Agent) of each such prepayment by the Borrowers to the Administrative Agent, which notice shall specify the amount of the prepayment and the subsection pursuant to which such prepayment is being made (each, a "**Prepayment Date**").  Upon receipt by the Administrative Agent of such notice, the Administrative Agent shall immediately give notice to each Lender of the prepayment, the Prepayment Date and of such Lender's Pro Rata Share of the prepayment.

(ii)    Together with each payment under this Section 1.6, the Borrowers shall pay accrued but unpaid interest and the Exit Fee on the portion of the Term Loans to be prepaid in cash.

(iii)    Each prepayment pursuant to this Section 1.6 shall be applied, first, to the outstanding principal balance of the Roll-Up Loans and an amount equal to the Exit Fee on such Roll-Up Loans being prepaid, until paid in full, and second, to the outstanding principal balance of all other Term Loans and an amount equal to the Exit Fee on such Term Loans being prepaid, until paid in full in cash.

(f)    No Implied Consent.  Provisions contained in this Section 1.6 for application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

1.7    Fees.

-5-

(a)    Closing Fee.  The Borrowers agree to pay to the Administrative Agent, for the benefit of the Lenders in accordance with their Pro Rata Shares, a closing fee equal to $725,000 (the "Closing Fee"), which fee shall be payable in kind on the Closing Date and deemed fully earned and non-refundable when paid.

(b)    Agency Fee.  The Borrowers shall pay to the Administrative Agent a non-refundable agency fee (the "Agency Fee") equal to $17,500, which shall be deemed fully earned when paid and which shall be payable in immediately available funds on the Closing Date.

1.8    Payments by the Borrowers.

(a)    Subject to Section 10.1, all payments (including prepayments) to be made by each Credit Party on account of principal, interest, fees and other amounts required hereunder shall be made without setoff, recoupment, counterclaim or deduction of any kind, shall, except as otherwise directed by the Required Lenders from time to time, be made to an account of the Administrative Agent designated in writing from time to time, and shall be made in Dollars and by wire transfer in immediately available funds (which shall be the exclusive means of payment hereunder), no later than 1:00 p.m. on the date due.  Any payment which is received by the Administrative Agent later than 1:00 p.m. may in Administrative Agent's discretion be deemed to have been received on the immediately succeeding Business Day and any applicable interest or fee shall continue to accrue.  Each Credit Party hereby irrevocably waives the right to direct the application during the continuance of an Event of Default of any and all payments in respect of any Obligation and any proceeds of Collateral.

(b)    If any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.

1.9    Payments by the Lenders to the Administrative Agent:  Settlement.

(a)    Disbursements.  Upon receipt of the proceeds of the Term Loans from the Lenders, the Administrative Agent shall, on behalf of Lenders, disburse funds into an account of the Borrower designated in the applicable Notice of Borrowing.

(b)    Settlements.  In the case of any payment of principal or interest received by the Administrative Agent from the Borrowers prior to 12:00 p.m. on any Business Day, the Administrative Agent shall pay to each Lender such Lender's Pro Rata Share of such payment on such Business Day, and, in the case of any payment of principal or interest received by the Administrative Agent from the Borrowers later than 12:00 p.m. on any Business Day, the Administrative Agent shall pay to each Lender such Lender's Pro Rata Share of such payment, and such payments shall be made by wire transfer not later than 1:00 p.m. on the next Business Day.

(c)    Return of Payments.

(i)    If the Administrative Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be

received by the Administrative Agent from the Borrowers and such related payment is not received by the Administrative Agent, then the Administrative Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)    If the Administrative Agent determines at any time that any amount received by the Administrative Agent under this Agreement or any other Loan Document must be returned to any Credit Party or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, the Administrative Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to the Administrative Agent on demand any portion of such amount that the Administrative Agent has distributed to such Lender, together with interest at such rate, if any, as the Administrative Agent is required to pay to any Credit Party or such other Person, without setoff, counterclaim or deduction of any kind, and the Administrative Agent will be entitled to set-off against future distributions to such Lender any such amounts (with interest) that are not repaid on demand.

(d)    Procedures.  The Administrative Agent hereby is authorized by each Credit Party and each other Secured Party to establish reasonable procedures (and to amend such procedures from time to time) to facilitate administration and servicing of the Term Loans and other matters incidental thereto.

## ARTICLE II – CONDITIONS PRECEDENT

2.1    <u>Conditions Precedent to Effectiveness and Funding of Interim Term Loans</u>.  This Agreement and the Lenders' obligation to make the Interim Term Loans shall be effective only upon the satisfaction or waiver of the following conditions, in a manner reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders):

(a)    <u>Payment of Fees and Expenses</u>.  All fees and expenses due under the Loan Documents on the Closing Date shall have been paid by the applicable Credit Party contemporaneously with the funding hereunder, including the reimbursement or payment of all reasonable and documented out of pocket fees and expenses (including the legal fees and expenses of (i) Ropes & Gray LLP, as legal counsel to the Lenders, (ii) Chipman Brown Cicero & Cole LLP, as Delaware counsel to the Lenders, and (ii) Lewis Roca Rothgerber Christie, as legal counsel to the Administrative Agent).

(b)    <u>Representations and Warranties.</u>  Each representation or warranty by any Credit Party contained herein or in any other Loan Document is true or correct in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date).

(c)    <u>No Default or Event of Default.</u>  No Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to any Term Loan.

(d)    <u>Delivery of Loan Documents and Corporate Documents.</u>  The Administrative Agent shall have received on or before the Closing Date all of the agreements, documents, instruments and other items set forth on the Closing Checklist attached hereto as <u>Exhibit 2.1(d)</u>, each in form and substance reasonably satisfactory to the Lenders.

(e)    <u>Notice of Borrowing.</u>  The Administrative Agent shall have received a Notice of Borrowing no later no later than two (2) Business Days prior to the proposed date of borrowing (or such later time as the Administrative Agent and the Required Lenders may agree in their sole discretion), which shall include (i) reasonably detailed information as to the intended use of the proceeds of such borrowing (such use shall be substantially consistent with the then-applicable Rolling Forecast), (ii) the amount of the requested withdrawal, and (iii) the date of the requested borrowing.

(f)    <u>Creation and Perfection of Security Interests</u>.  All actions necessary to establish that the Administrative Agent will have a perfected security interest (subject to Permitted Liens) in the Collateral under the Loan Documents shall have been taken (including, without limitation, properly completed Uniform Commercial Code financing statements and the execution and delivery to the Administrative Agent of all other documents and instruments required to establish and perfect such security interests).

(g)  <u>Chapter 11 Matters</u>.  Each of the following events or conditions shall have occurred or have been completed to the satisfaction of the Administrative Agent and Required Lenders:

(i)  The Administrative Agent and the Lenders shall have received the Rolling Forecast for the 13-week period commencing on the Petition Date (such initial Rolling Forecast attached as <u>Exhibit C</u> hereto), and such Rolling Forecast shall be in form and substance satisfactory to the Administrative Agent and Required Lenders in their sole discretion.

(ii)  The Chapter 11 Cases shall have been commenced and all of the pleadings related to the requested "first day orders" shall have been delivered in advance to counsel to the Administrative Agent and counsel to the Lenders and shall be in form and substance reasonably satisfactory to the Required Lenders.

(iii)  All of the "first day orders" entered by the Bankruptcy Court on or about the Petition Date or the Closing Date (and if any such orders shall have not been entered by the Bankruptcy Court, the form of such orders submitted to the Bankruptcy Court for approval) regarding, relating to or impacting (x) (i) the Credit Parties' cash management systems and arrangements (such order, the "<u>Cash Management Order</u>"), (ii) any rights or remedies of the Administrative Agent, the Lenders, the Prepetition Bridge Agent, Prepetition Bridge Lenders and the Prepetition Trustee, (iii) this Agreement, the Prepetition Bridge Credit Agreement and the Prepetition Bond Loan Agreement, (iv) the Collateral, any Liens thereon or any DIP Superpriority Claims, or (v) the use of cash collateral, (vi) adequate protection or otherwise relating to the Prepetition Obligations, shall, in each case, be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole and absolute discretion, and (y) all other matters, shall, in each case, be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(iv)  The amount of the Interim Term Loans to be made on or about the Closing Date shall not exceed the amount authorized by the Interim Order.

(v)  The Bankruptcy Court shall have entered the Interim Order, and the Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.

(vi)  The Chapter 11 Cases of any of the Credit Parties shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(vii)  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Chapter 11 Cases, and no Credit Party shall have applied for, consented to or acquiesced in any such appointment.

(viii)  The Credit Parties shall have filed the Pre-Packaged Plan and Disclosure Statement.

2.2  <u>Conditions Precedent to Final Term Loans</u>.  The obligation of the Lenders to make the Final Term Loans hereunder after the Closing Date is subject to the satisfaction or waiver of

the following conditions, in a manner reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders in their sole discretion):

(a)    <u>Payment of Fees and Expenses</u>.  All fees and expenses due under the Loan Documents shall have been paid by the applicable Credit Party contemporaneously with the funding hereunder, including the reimbursement or payment of all reasonable and documented out of pocket fees and expenses (including the legal fees and expenses of (i) Ropes & Gray LLP, as legal counsel to the Lenders, (ii) Chipman Brown Cicero & Cole LLP, as Delaware counsel to the Lenders, and (ii) Lewis Roca Rothgerber Christie, as legal counsel to the Administrative Agent).

(b)    <u>Representations and Warranties.</u>  Each representation or warranty by any Credit Party contained herein or in any other Loan Document is true or correct in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date).

(c)    <u>No Default or Event of Default.</u>  No Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to such Final Term Loans.

(d)    <u>Entry of Final Order</u>.  (i) Within 30 days of the Petition Date, the Bankruptcy Court shall have entered the Final Order, and the Administrative Agent and the Lenders shall have received a true and complete copy of the Final Order, and such order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated and (ii) the Borrowing date of Final Terms Loans shall be no later than two (2) Business Days after entry of the Final Order.

(e)    <u>Compliance with Orders</u>. The Credit Parties shall be in compliance in all material respects with the Bankruptcy Court DIP Orders.

(f)    <u>Notice of Borrowing.</u>  The Administrative Agent shall have received a Notice of Borrowing no later no later than two (2) Business Days prior to the proposed date of borrowing (or such later time as the Administrative Agent and the Required Lenders may agree in their sole discretion), which shall include (i) reasonably detailed information as to the intended use of the proceeds of such withdrawal (such use shall be substantially consistent with the then-applicable Rolling Forecast), (ii) the amount of the requested withdrawal, and (iii) the date of the requested borrowing.

2.3    <u>Conditions Precedent to Funding of Additional Interim Term Loans</u>.  On or after the Closing Date, subject to Section 1.1(a)(i)(B), the Borrowers may request Additional Interim Term Loans from time to time subject to the waiver or the satisfaction (in each case, in a manner satisfactory to the Administrative Agent (acting at the direction of the Required Lenders in their sole discretion)) of the following conditions precedent:

(a)    <u>Payment of Fees and Expenses</u>.  All fees and expenses due under the Loan Documents shall have been paid by the applicable Credit Party contemporaneously with the funding hereunder, including the reimbursement or payment of all reasonable and documented out

of pocket fees and expenses (including the legal fees and expenses of (i) Ropes & Gray LLP, as legal counsel to the Lenders, (ii) Chipman Brown Cicero & Cole LLP  as Delaware counsel to the Lenders, and (ii) Lewis Roca Rothgerber Christie, as legal counsel to the Administrative Agent).

(b)    Representations and Warranties.  Each representation or warranty by any Credit Party contained herein or in any other Loan Document is true or correct in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date (in which event such representations and warranties were untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such earlier date).

(c)    No Default or Event of Default.  No Default or Event of Default has occurred and is continuing or would reasonably be expected to result after giving effect to such Additional Interim Term Loans.

(d)    Entry of Supplemental Interim Order.  The Bankruptcy Court shall have entered a Supplemental Interim Order approving the borrowing of Additional Interim Term Loans, and such Supplemental Interim Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed or vacated.

(e)    Compliance with Orders.

(i)    The Credit Parties shall be in compliance in all material respects with the Bankruptcy Court DIP Orders.

(f)    The amount of the Additional Interim Term Loans to be made on shall not exceed the amount authorized by the applicable Supplemental Interim Order.

(g)    Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing no later no later than two (2) Business Days prior to the proposed date of borrowing (or such later time as the Administrative Agent and the Required Lenders may agree in their sole discretion), which shall include (i) reasonably detailed information as to the intended use of the proceeds of such withdrawal (such use shall be substantially consistent with the then-applicable Rolling Forecast), (ii) the amount of the requested withdrawal, and (iii) the date of the requested borrowing.

## ARTICLE III - REPRESENTATIONS AND WARRANTIES

The Credit Parties, jointly and severally, represent and warrant to the Administrative Agent and each Lender that the following are, and immediately after giving effect to the Transactions will be, true, correct and complete:

3.1    Corporate Existence and Power.  Each Credit Party and each of their respective Subsidiaries:

(a)    is a corporation, limited liability company or limited partnership, as applicable, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, organization or formation, as applicable;

(b)      has the power and authority and all governmental licenses, authorizations, Permits, consents and approvals to own its assets, carry on its business and execute, deliver, and perform its obligations under, the Loan Documents to which it is a party;

(c)      is duly qualified as a foreign corporation, limited liability company or limited partnership, as applicable, and licensed and in good standing, under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification or license; and

(d)      is in compliance with all Requirements of Law;

except, in each case referred to in clause (c) or clause (d), to the extent that the failure to do so could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

3.2      <u>Corporate Authorization; No Contravention</u>.   The execution, delivery and performance by each of the Credit Parties of this Agreement and by each Credit Party and each of their respective Subsidiaries of any other Loan Document to which such Person is party, have been duly authorized by all necessary action, and do not and will not:

(a)      contravene the terms of any of that Person's Organization Documents;

(b)      except as set forth on <u>Schedule 3.2(b)</u>, conflict with or result in any material breach or contravention of (i) any document evidencing any material Contractual Obligation (including indenture, mortgage, deed of trust, loan agreement, or Project Document (as defined under the Prepetition Bond Loan Agreement) to which such Credit Party is a party or by which it or its properties are otherwise subject or bound) to which such Person is a party or any order, injunction, writ or decree of any Governmental Authority to which such Person or its Property is subject or (ii) result in the creation or imposition of any Lien on any of Property of such Credit Party, except for the Liens created pursuant to the Security Documents in favor of the Prepetition Trustee and Permitted Liens; or

(c)      violate any Requirement of Law in any material respect.

3.3      <u>Governmental Authorization</u>.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Credit Party or any Subsidiary of any Credit Party of this Agreement or any other Loan Document except (a) for recordings and filings in connection with the Liens granted to the Administrative Agent under the Collateral Documents and (b) those obtained or made on or prior to the Closing Date.

3.4      <u>Binding Effect</u>.  This Agreement and each other Loan Document to which any Credit Party or any Subsidiary of any Credit Party is a party constitute the legal, valid and binding obligations of each such Person which is a party thereto, enforceable against such Person in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

3.5     <u>Litigation</u>.    Except as set forth on <u>Schedule 3.5</u>, there are no actions, suits, proceedings, claims or disputes pending, or to the knowledge of each Credit Party, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, against or affecting any Credit Party, any Subsidiary of any Credit Party or any of their respective Properties which:

(a)     purport to affect or pertain to this Agreement, any other Loan Document or any of the transactions contemplated hereby or thereby; or

(b)     could reasonably be expected to result in monetary judgment(s) or relief, individually or in the aggregate, in excess of the Threshold Amount; or

(c)     seek an injunction or other equitable relief which could reasonably be expected to have a Material Adverse Effect.

No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Authority purporting to enjoin or restrain the execution, delivery or performance of this Agreement or any other Loan Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.    No Credit Party or any Subsidiary of any Credit Party is the subject of an audit or, to each Credit Party's knowledge, any review or investigation by any Governmental Authority (excluding the IRS and other taxing authorities) concerning the violation or possible violation of any Requirement of Law.

3.6     <u>No Default</u>.

(a)     No Default or Event of Default exists or would result from the incurring of any Obligations by any Credit Party or the grant or perfection of the Administrative Agent's Liens on the Collateral or the consummation of the Transactions;

(b)     No Default of Event of Default has occurred and is continuing under the Loan Documents;

(c)     No default and no waiver of default is currently in effect, in the payment of any principal or interest on any Indebtedness of any Credit Party and no event or condition exists with respect to any Indebtedness of any Credit Party that would permit, or that with notice or the lapse of time, or both, would permit, one or more Persons to cause such Indebtedness to become due and payable before its stated maturity or before its regularly scheduled dates of payment, except as set forth on <u>Schedule 3.6(c)</u>; and

(d)     No Credit Party and no Subsidiary of any Credit Party is in default under or with respect to any Contractual Obligation in any respect which, individually or together with all such defaults, could reasonably be expected to have any Material Liability, except as set forth on <u>Schedule 3.6(d)</u>.

3.7     <u>ERISA Compliance</u>.    To the extent applicable, no Credit Party, no Subsidiary of any Credit Party, nor any of their ERISA Affiliates has established, maintains, contributes, or has any liability (contingent or otherwise) to any Defined Benefit Plan or Multiemployer Plan. Each

Credit Party satisfies an exception under the Plan Asset Regulations so that its underlying assets do not constitute Plan Assets.  The execution, delivery and performance of this Credit Agreement and the other Loan Documents and the borrowing and repayment of amounts under this Credit Agreement, do not and will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975(c)(1)(A) - (D) of the Code.

3.8     Margin Regulations.  No Credit Party and no Subsidiary of any Credit Party is engaged, principally or as one of its important activities, in the business of purchasing or selling Margin Stock or extending credit for the purpose of purchasing or carrying Margin Stock.  Proceeds of the Term Loans shall not be used for the purpose of purchasing or carrying Margin Stock.  No Credit Party and no Subsidiary of any Credit Party owns any Margin Stock.

3.9     Ownership of Property; Liens.   At the Closing Date, the Real Estate listed in Schedule 3.9 constitutes all of the Real Estate of each Credit Party and each of their respective Subsidiaries.  Each of the Credit Parties and their respective Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all Real Estate, and good and valid title to all owned personal property and valid leasehold interests in all leased personal property, in each instance, necessary or used in the ordinary conduct of their respective businesses.  None of the Property of any Credit Party or any Subsidiary of any Credit Party is subject to any Liens other than Permitted Liens and no Permitted Lien interferes in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party at any Real Estate.

3.10    Taxes.  All federal, state, local and foreign income and franchise and other material Tax returns, reports and statements (collectively, the "**Tax Returns**") required to be filed by any Credit Party have been filed with the appropriate Governmental Authorities, all such Tax Returns are true and correct in all material respects, and all Taxes reflected therein or otherwise due and payable have been paid prior to the date on which any Liability may be added thereto for non-timely payment thereof except for those that are contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves are maintained on the books of the appropriate Credit Party in accordance with GAAP.  No Tax Return of any Credit Party is under audit or examination by any Governmental Authority and no written notice of any audit or examination or any written assertion of any claim for Taxes of any Credit Party has been given or made by any Governmental Authority, which audit, examination or claim has not been resolved.  Proper and accurate amounts have been withheld by each Credit Party from their respective employees for all periods in material compliance with the Tax, social security and unemployment withholding provisions of applicable Requirements of Law and such withholdings have been timely paid to the respective Governmental Authorities.  No Credit Party is a party to any tax sharing agreement.

3.11    Financial Condition.  Except as set forth on Schedule 3.11:

(a)     [Reserved].

(b)     The Credit Parties and their Subsidiaries have no Indebtedness other than Indebtedness permitted pursuant to Section 5.5 and have no Contingent Obligations other than Contingent Obligations permitted pursuant to Section 5.9.

-14-

(c)    All financial information (other than financial projections) delivered to the Administrative Agent was true and correct in all material respects on the date such financial information was delivered to the Administrative Agent.  No such information is materially misleading as of the Closing Date or any other date of a Borrowing hereunder (subject to such written supplements and updates thereto as have been delivered to the Administrative Agent).  All financial performance projections delivered to the Administrative Agent, including the financial performance projections delivered on or prior to the Closing Date, represent the Borrowers' good faith estimate of future financial performance and are based on assumptions believed by the Borrowers to be fair and reasonable in light of current market conditions, it being acknowledged and agreed by the Administrative Agent and Lenders that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by such projections may differ from the projected results.  Each of the financial statements of each Credit Party delivered pursuant hereto has been prepared in accordance with GAAP, and fairly presents in all material respects the financial condition of each Credit Party as at the dates thereof and the results of its operations for the period then ended (subject, in the case of unaudited financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnotes).

3.12    <u>Environmental Matters</u>.  Except where any failures to comply could not reasonably be expected to result in, either individually or in the aggregate, any Material Liability to the Credit Parties and their Subsidiaries or materially affect the prospects of completing the Project (as defined in the Prepetition Bond Loan Agreement), (a) the operations of each Credit Party and each Subsidiary of each Credit Party are and have been in compliance with all applicable Environmental Laws, including obtaining, maintaining and complying with all Permits required by any applicable Environmental Law, (b) no Credit Party and no Subsidiary of any Credit Party is party to, and no Credit Party and no Subsidiary of any Credit Party and no Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Person is subject to or the subject of, any Contractual Obligation or any pending (or, to the knowledge of any Credit Party, threatened) order, action, investigation, suit, proceeding, audit, claim, demand, dispute or notice of violation or of potential liability or similar notice relating in any manner to any Environmental Law, (c) no Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities has attached to any Property of any Credit Party or any Subsidiary of any Credit Party and, to the knowledge of any Credit Party, no facts, circumstances or conditions exist that could reasonably be expected to result in any such Lien attaching to any such Property, (d) to their knowledge, no Credit Party and no Subsidiary of any Credit Party has caused or, to their knowledge, suffered to occur a Release of Hazardous Materials at, to or from any Real Estate, (e) all Real Estate currently (or to the knowledge of any Credit Party previously) owned, leased, subleased, operated or otherwise occupied by or for any such Credit Party and each Subsidiary of each Credit Party is, to their knowledge, free of contamination by any Hazardous Materials, and (f) to their knowledge, no Credit Party and no Subsidiary of any Credit Party (i) is or has been engaged in, or has permitted any current or former tenant to engage in, operations in violation of any Environmental Law or (ii) has been made aware of any facts, circumstances or conditions reasonably constituting notice of a violation of any Environmental Law, including receipt of any information request or notice of potential responsibility under the Comprehensive Environmental Response, Compensation and Liability Act or similar Environmental Laws.

-15-

3.13    <u>Regulated Entities</u>.  None of any Credit Party, any Person controlling any Credit Party, or any Subsidiary of any Credit Party, is (a) an "investment company" within the meaning of the Investment Company Act of 1940 or (b) subject to regulation under any federal or state statute, rule or regulation limiting its ability to incur Indebtedness, pledge its assets or perform its obligations under the Loan Documents.

3.14    <u>No Hinderance</u>.  No transfer of property is being made by any Credit Party and no obligation is being incurred by any Credit Party in connection with the transactions contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Credit Party.

3.15    <u>Labor Relations</u>.  Except as set forth on <u>Schedule 3.15</u>, there are no strikes, work stoppages, slowdowns or lockouts existing, pending (or, to the knowledge of any Credit Party, threatened) against or involving any Credit Party or any Subsidiary of any Credit Party, except for those that could not, in the aggregate, reasonably be expected to result in any Material Liability. There is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Credit Party or any Subsidiary of any Credit Party.  No petition for certification or election of any such representative is existing or pending with respect to any employee of any Credit Party or any Subsidiary of any Credit Party. No such representative has sought certification or recognition with respect to any employee of any Credit Party or any Subsidiary of any Credit Party.

3.16    <u>Intellectual Property</u>.

(a)    Each Credit Party and each Subsidiary of each Credit Party owns, or is licensed to use, all Intellectual Property necessary to conduct its business as currently conducted and is set forth under <u>Schedule 3.16</u>.

(b)    The conduct and operations of each Credit Party and each Subsidiary of each Credit Party does not, infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and no other Person has contested any right, title or interest of any Credit Party or any Subsidiary of any Credit Party in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated therein and could not, in the aggregate, reasonably be expected to result in any Material Liability.

3.17    <u>Brokers' Fees</u>.  None of the Credit Parties or any of their respective Subsidiaries has any obligation to any Person in respect of any finder's, broker's or investment banker's fee in connection with the transactions contemplated hereby.

3.18    <u>Insurance</u>.  Each of the Credit Parties and each of their respective Subsidiaries and their respective Properties are insured with financially sound and reputable insurance companies which are not Affiliates of the Borrowers, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses of the same size and character as the business of the Credit Parties and, to the extent relevant, owning similar Properties in localities where such Person operates.  A true and complete listing of such insurance, including issuers, coverages and deductibles is set forth on <u>Schedule 3.18</u>.

-16-

3.19    <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock</u>.  Except as set forth in <u>Schedule 3.19</u>, no Credit Party and no Subsidiary of any Credit Party (a) has any Subsidiaries, or (b) is engaged in any joint venture or partnership with any other Person.  All issued and outstanding Stock and Stock Equivalents of each of the Credit Parties and each of their respective Subsidiaries are duly authorized and validly issued, fully paid, non-assessable, and free and clear of all Liens other than Permitted Liens.  All such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  All of the issued and outstanding Stock of each Credit Party is owned by each of the Persons and in the amounts set forth in <u>Schedule 3.19</u>.  Except as set forth in <u>Schedule 3.19</u>, there are no pre-emptive or other outstanding rights to purchase, options, warrants or similar rights or agreements pursuant to which any Credit Party may be required to issue, sell, repurchase or redeem any of its Stock or Stock Equivalents or any Stock or Stock Equivalents of its Subsidiaries.

3.20    <u>Full Disclosure</u>.  None of the representations or warranties made by any Credit Party or any of their Subsidiaries in the Loan Documents as of the date such representations and warranties are made or deemed made, and none of the statements contained in each exhibit, report, statement or certificate furnished by or on behalf of any Credit Party or any of their Subsidiaries in connection with the Loan Documents (including the offering and disclosure materials, if any, delivered by or on behalf of any Credit Party to the Administrative Agent or the Lenders prior to the Closing Date), contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

3.21    <u>Foreign Assets Control Regulations and Anti-Money Laundering</u>.  Each Credit Party and each Subsidiary of each Credit Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it and other laws relating to sanctions.  No Credit Party, no Subsidiary of a Credit Party, and no director, officer, employee, agent, or affiliate of a Credit Party or any Subsidiary thereof is an individual or entity (each, a "**Designated Person**") that is, or is owned or controlled by Designated Persons that are Blocked Persons or the subject of (or have been notified that it may be the subject of) any sanctions administered or enforced by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, His Majesty's Treasury, Canada or any political subdivisions thereof or other relevant sanctions authority (collectively, "**Sanctions**") or have been found in violation of, or been charged or convicted under, any sanctions.

3.22    <u>Patriot Act; Anti-Money Laundering; Anti-Corruption</u>.  Each Credit Party and each Subsidiary of each Credit Party is in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No Credit Party or Subsidiary of a Credit Party nor, to the knowledge of the Credit Parties, any director, officer, agent, employee or other person acting on behalf of a Credit Party or any of its Subsidiaries has taken any action, directly or indirectly, that could result in a violation by such persons of any Anti Money Laundering Laws or Anti-Corruption Laws (and the Credit

-17-

Parties have instituted and maintain policies and procedures designed to promote and achieve continued compliance therewith). No part of the proceeds of any Term Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity or any Blocked Person, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any Anti Money Laundering Laws or Anti-Corruption Laws (and the Credit Parties have instituted and maintain policies and procedures designed to ensure continued compliance therewith).

3.23   <u>Security Interests</u>.  Upon the execution and delivery thereof, and at all times while any Obligations remain outstanding, the Collateral Documents will be effective to create legally valid and enforceable Liens on the Collateral and have payment priority as described in the Bankruptcy Court DIP Orders and all necessary recordings and filings will be recorded and filed on or prior to the Closing Date such that they will constitute perfected security interests in relation to such Collateral, subject only to Permitted Liens.

3.24   <u>Board Change</u>.  No Board Change has occurred.

<div align="center">ARTICLE IV - <u>AFFIRMATIVE COVENANTS</u></div>

Each Credit Party covenants and agrees that until the Facility Termination Date:

4.1   <u>Financial Statements.</u>  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit the preparation of financial statements in conformity with GAAP (<u>provided</u>, that monthly and quarterly financial statements shall not be required to have footnote disclosures and are subject to normal year-end adjustments). The Borrowers shall deliver to the Administrative Agent and in detail reasonably satisfactory:

(a)   as soon as available, but not later than one-hundred fifty (150) days after the end of each Fiscal Year, audited consolidated balance sheets of Holdings and each of its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income or operations, shareholders' equity and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, and accompanied by the report of any independent certified public accounting firm reasonably acceptable to the Administrative Agent which report shall (A) contain an unqualified opinion, stating that such consolidated financial statements present fairly in all material respects the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years and (B) not include any explanatory paragraph expressing substantial doubt as to going concern status;

(b)   as soon as available, but not later than forty-five (45) days after the end of each Fiscal Quarter of each year (including the last Fiscal Quarter of each year), unaudited consolidated balance sheets of Holdings and each of its Subsidiaries, and the related consolidated statements of income and cash flows as of the end of such Fiscal Quarter and for the portion of the Fiscal Year then ended, each in form reasonably satisfactory to Administrative Agent and certified on behalf of the Administrative Borrower by an appropriate Responsible Officer of the Administrative Borrower as fairly presenting, in all material respects, in accordance with GAAP,

<div align="center">-18-</div>

the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures; and

(c)     as soon as available, but not later than thirty (30) days after the end of each fiscal month of each year (other than a month that is also the end of a Fiscal Quarter), unaudited consolidated balance sheets of Holdings and each of its Subsidiaries and the related consolidated statements of income and cash flows as of the end of such fiscal month and for the portion of the Fiscal Year then ended, each in form reasonably satisfactory to Administrative Agent and certified on behalf of the Administrative Borrower by an appropriate Responsible Officer of the Administrative Borrower as fairly presenting, in all material respects, in accordance with GAAP, the financial position and the results of operations of Holdings and its Subsidiaries, subject to normal year-end adjustments and absence of footnote disclosures.

4.2     <u>Certificates; Other Information</u>.  The Borrowers shall furnish to the Administrative Agent:

(a)     together with each delivery of financial statements pursuant to Sections 4.1(a) and 4.1(b), a management discussion and analysis report, in reasonable detail, signed by the chief executive officer and/or chief financial officer of the Administrative Borrower, describing the operations and financial condition of the Credit Parties and their Subsidiaries for the fiscal month and the portion of the Fiscal Year then ended (and for the Fiscal Year then ended in the case of annual financial statements), and a report (i) setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the most recent projections for the current Fiscal Year delivered pursuant to Section 4.2(e) and discussing the reasons for any significant variations and (ii) containing a reasonably detailed summary of key performance indicators and operating metrics consistent with past practices of the Borrowers;

(b)     concurrently with the delivery of the financial statements referred to in Sections 4.1(a), 4.1(b) and 4.1(c) above, concurrently with the delivery of the equivalent deliverables thereunder), a fully and properly completed certificate in the form of <u>Exhibit 4.2(b)</u> (a "<u>Compliance Certificate</u>"), certified on behalf of the Borrowers by a Responsible Officer of the Administrative Borrower;

(c)     concurrently with the delivery of the financial statements referred to in Section 4.1(b) above, a certificate of a Responsible Officer of the Administrative Borrower confirming that there have been no changes in the information set forth in the Perfection Certificate (as amended and supplemented by the Administrative Borrower after the Closing Date pursuant to Section 4.2(c) or otherwise in a writing delivered to the Administrative Agent);

(d)     promptly after the same are sent, copies of all financial statements and reports which any Credit Party sends to its shareholders or other equity holders, as applicable, generally and promptly after the same are filed, copies of all financial statements and regular, periodic or special reports which such Person may make to, or file with, the Securities and Exchange Commission or any successor or similar Governmental Authority;

-19-

(e)      as soon as available and in any event no later than 30 days after the first day of each Fiscal Year of Holdings, projections of the Credit Parties' (and their Subsidiaries') financial performance for the then current Fiscal Year on a consolidated basis and otherwise on a month-by-month basis (in a form, and consistent with the scope and detail, provided to the Lenders prior the Closing Date);

(f)      promptly upon receipt thereof, copies of any reports submitted by the Borrowers' certified public accountants in connection with each annual, interim or special audit or review of any type of the financial statements or internal control systems of any Credit Party made by such accountants;

(g)      promptly, such additional business, financial, corporate affairs, Perfection Certificates and other information as the Administrative Agent may from time to time reasonably request.

4.3      Notices. The Borrowers shall notify promptly the Administrative Agent in writing of each of the following (and in no event later than three (3) Business Days after a Responsible Officer becomes aware thereof):

(a)      the occurrence or existence of any Default or Event of Default;

(b)      any breach or non-performance of, or any default under, any Contractual Obligation of any Credit Party or any Subsidiary of any Credit Party, or any violation of, or non-compliance with, any Requirement of Law, or any other event or circumstance, which could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect, including a description of such breach, non-performance, default, violation, non-compliance, event or circumstance and the steps, if any, such Person has taken, is taking or proposes to take in respect thereof;

(c)      any dispute, litigation, investigation, proceeding or suspension which may exist at any time between any Credit Party or any Subsidiary of any Credit Party and any Governmental Authority which could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect;

(d)      the commencement of, or any material development in, any litigation or proceeding affecting any Credit Party or any Subsidiary of any Credit Party or its respective property (i) in which the amount of damages claimed is greater than the Threshold Amount, (ii) which could reasonably be expected to result in any Material Liability, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement, any other Loan Document or any Material Contract;

(e)      (i) the receipt by any Credit Party of any notice of violation of or potential liability or similar notice under Environmental Law, (ii)(A) unpermitted Releases, (B) the existence of any condition that could reasonably be expected to result in violations of or Environmental Liabilities under, any Environmental Law or (C) the commencement of, or any material change to, any action, investigation, suit, proceeding, audit, claim, demand, dispute alleging a violation of or Liability under any Environmental Law which in the case of clauses (A), (B) and (C) above, in the aggregate for all such clauses, could reasonably be expected to result in

-20-

any Material Liability, (iii) the receipt by any Credit Party of notification that any Property of any Credit Party is subject to any Lien in favor of any Governmental Authority securing, in whole or in part, Environmental Liabilities and (iv) any proposed acquisition or lease of Real Estate, if such acquisition or lease could reasonably be expected to result in a Material Liability;

   (f) any termination, lapse or default under any Material Contract;

   (g) any material change in accounting policies or financial reporting practices by any Credit Party or any Subsidiary of any Credit Party; and

   (h) the creation, establishment or acquisition of any Subsidiary or the issuance by or to any Credit Party of any Stock or Stock Equivalent.

   Each notice pursuant to this Section shall be in electronic form accompanied by a statement by a Responsible Officer of the Administrative Borrower setting forth details of the occurrence referred to therein (including, with respect to notices delivered under Section 4.3(a), the particular clauses of this Agreement and/or other Loan Documents that have been breached or violated), and stating what action the Borrowers or other Person propose(s) to take with respect thereto and at what time.

   4.4 <u>Preservation of Corporate Existence</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to:

   (a) preserve and maintain in full force and effect its organizational existence and good standing under the laws of its jurisdiction of incorporation, organization or formation, as applicable, except as permitted by Section 5.3;

   (b) preserve and maintain in full force and effect all rights, privileges, qualifications, permits, licenses and franchises necessary in the normal conduct of its business except as permitted by Sections 5.2 and 5.3;

   (c) use its commercially reasonable efforts, in the Ordinary Course of Business, to preserve its business organization and preserve the goodwill and business of the customers, suppliers and others having material business relations with it;

   (d) preserve or renew all of its Intellectual Property the non-preservation of which could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect; and

   (e) conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person in any respect and shall comply in all respects with the terms of its IP Licenses except, in each case, as could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

   4.5 <u>Maintenance of Property</u>.  Each Credit Party shall maintain, and shall cause each of its Subsidiaries to maintain, and preserve all its Property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and shall make all necessary repairs thereto and renewals and replacements thereof.

-21-

4.6     <u>Insurance</u>.

(a)     Each Credit Party shall, and shall cause each of its Subsidiaries to, (i) maintain or cause to be maintained in full force and effect all policies of insurance of any kind with respect to the Property and businesses of the Credit Parties and such Subsidiaries (including policies of fire, theft, product liability, public liability, Flood Insurance, casualty, employee fidelity, workers' compensation, business interruption and employee health and welfare insurance) with financially sound and reputable insurance companies or associations (in each case that are not Affiliates of the Borrower) of a nature and providing such coverage as is sufficient and as is customarily carried by businesses of the size and character of the business of the Credit Parties and (ii) cause all such insurance relating to any Property or business of any Credit Party to name Administrative Agent as additional insured or lenders loss payee as agent for the Lenders, as appropriate.  All policies of insurance on real and personal Property of the Credit Parties will contain an endorsement, in form and substance acceptable to Administrative Agent, showing loss payable to Administrative Agent (Form CP 1218 or equivalent and naming the Administrative Agent as lenders loss payee as agent for the Lenders) and (to the extent applicable) business interruption endorsements.   Such endorsement, or an independent instrument furnished to Administrative Agent, will provide that the insurance companies will give Administrative Agent at least 30 days' prior written notice before any such policy or policies of insurance shall be canceled.  If any insurance proceeds are paid by check, draft or other instrument payable to any Credit Party and Administrative Agent jointly, Administrative Agent may endorse such Credit Party's name thereon and do such other things as Administrative Agent may deem advisable to reduce the same to cash.  Administrative Agent reserves the right at any time, upon review of each Credit Party's risk profile, to require additional forms and limits of insurance.  Notwithstanding the requirement in clause (i) above, Flood Insurance shall not be required for (x) Real Estate not located in a Special Flood Hazard Area, or (y) Real Estate located in a Special Flood Hazard Area in a community that does not participate in the National Flood Insurance Program.

(b)     If the Credit Parties fail to take out or maintain the insurance coverage required hereunder, the Administrative Agent, upon ninety (90) days' prior notice, may (but shall not be obligated to) take out the required policies of insurance and pay the premiums on the same.  Any insurance permissibly obtained by the Administrative Agent may, but need not, protect the Credit Parties' and their Subsidiaries' interests.  If the Administrative Agent purchases insurance in accordance with the foregoing, the Credit Parties will be responsible for the costs of that insurance, including interest and any other charges the Administrative Agent may impose in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance shall be added to the Obligations.  The costs of the insurance may be more than the cost of insurance the Credit Parties may be able to obtain on its own.

(c)     The Credit Parties shall use best reasonable efforts to deliver certificates of insurance and endorsements that provide for substantially similar rights as those granted to the Prepetition Trustee under the Prepetition Bond Loan Agreement.

4.7     <u>Payment of Obligations</u>.  Subject to the Bankruptcy Code, each Credit Party shall, and shall cause each of its Subsidiaries to, pay, discharge and perform as the same shall become

due and payable or required to be performed, all their respective obligations and liabilities, including:

(a)    all Tax liabilities, unless either (i) the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person or (ii) the aggregate amount of all such Tax liabilities at any one time that remain unsatisfied after becoming due and payable do not exceed an amount equal $15,000;

(b)    all lawful claims which, if unpaid, would by law become a Lien upon its Property unless the same are being contested in good faith by appropriate proceedings diligently prosecuted which stay the imposition or enforcement of any Lien and for which adequate reserves in accordance with GAAP are being maintained by such Person;

(c)    all Indebtedness, as and when due and payable, but subject to any subordination provisions contained herein, in any other Loan Documents and/or in any instrument or agreement evidencing such Indebtedness; and

(d)    the performance of all obligations under any Contractual Obligation to which such Credit Party or any of its Subsidiaries is bound, or to which it or any of its Property is subject, except where the failure to perform could not reasonably be expected to have, either individually or in the aggregate, any Material Liability.

4.8    <u>Compliance with Laws</u>.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply in all material respects with all Requirements of Law of any Governmental Authority having jurisdiction over it or its business.

4.9    <u>Inspection of Property and Books and Records</u>.  Each Credit Party shall maintain and shall cause each of its Subsidiaries to maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Person.  Each Credit Party shall, and shall cause each of its Subsidiaries to, with respect to each owned, leased, or controlled property, during normal business hours and no notice shall be required and the Administrative Agent shall have access at any and all times during the continuance thereof:  (a) provide access to such property to the Administrative Agent and any of its Related Persons, as frequently as the Administrative Agent determines to be appropriate; (b) permit the Administrative Agent and any of its Related Persons to conduct field examinations, audit, inspect, and make extracts and copies (or take originals if reasonably necessary) from all of such Credit Party's books and records, and evaluate and make physical verifications and appraisals of the inventory and other Collateral in any manner and through any medium that the Administrative Agent considers advisable, in each instance, at the Credit Parties' expense (it being agreed that any Lender may accompany the Administrative Agent or its Related Persons in connection with any inspection at the Borrower's expense); and (c) cause members of senior management of each Credit Party to be available for meetings (including telephonic, virtual and in person) with the Administrative Agent or the Lenders or their representatives, in each case, during business hours and at other times to be reasonably agreed.

-23-

4.10    Use of Proceeds.  The proceeds of the Term Loans will be used in accordance in all material respects with the terms of the Bankruptcy Court DIP Orders and the Loan Documents. Specifically: (i) the Roll-Up Loans shall be deemed to have converted on a cashless, dollar-for-dollar basis from Term Loans (as defined under the Prepetition Bridge Credit Agreement) under the Prepetition Bridge Credit Agreement on the Closing Date; (ii) the Interim Term Loans and Final Term Loans shall be used to (w) pay amounts due to Lenders and the Administrative Agent hereunder and professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby, (x) provide working capital, and for other general corporate purposes of the Credit Parties, (y) pay administration costs of the Chapter 11 Cases, fund obligations benefiting from the Carve Out, and pay claims or amounts approved by the Bankruptcy Court, and (z) for working capital and general corporate purposes of the Credit Parties, subject in each case under this clause (ii) to the Rolling Forecast (subject to Permitted Variances) as then in effect.  No part of the proceeds of any Term Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X, or for any purpose not permitted pursuant to the Bankruptcy Court DIP Orders.

4.11    [Reserved].

4.12    Further Assurances.

(a)    Each Credit Party shall ensure that all written information, exhibits and reports furnished to the Administrative Agent or the Lenders will not contain any untrue statement of a material fact and will not omit to state any material fact or any fact necessary to make the statements contained therein not misleading in light of the circumstances in which made, and will promptly disclose to the Administrative Agent and the Lenders and correct any defect or error that may be discovered therein or in any Loan Document or in the execution, acknowledgement or recordation thereof.

(b)    The Credit Parties shall, and shall cause each of their Subsidiaries to take such additional actions and execute such documents as the Administrative Agent may reasonably require from time to time in order to (i) carry out more effectively the purposes of this Agreement or any other Loan Document, (ii) to subject to the Liens created by any of the Collateral Documents any of the Properties, rights or interests covered by any of the Collateral Documents, (iii) to perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document.  With respect to each Subsidiary formed or acquired after the Closing Date, within ten (10) Business Days after the formation or acquisition of any such Subsidiary, the Credit Parties shall cause such Subsidiary to guarantee the Obligations and to cause each such Subsidiary to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in, all of such Subsidiaries' Property (excluding any immaterial Property as determined by the Required Lenders in their sole discretion) to secure such guaranty.  Furthermore and except as otherwise approved in writing by Required Lenders, each Credit Party shall, and shall cause each of its Subsidiaries to, pledge all of the Stock and Stock Equivalents of each of its Subsidiaries and, in each instance, to the Administrative Agent, for the

-24-

benefit of the Secured Parties, to secure the Obligations.  In connection with each pledge of Stock and Stock Equivalents, the Credit Parties shall deliver, or cause to be delivered, to the Administrative Agent, irrevocable proxies and stock powers and/or assignments, as applicable, duly executed in blank, and appropriate resolutions, secretary certificates, certified Organization Documents and, if requested by the Administrative Agent, legal opinions relating to the matters described in this Section 4.12(b) (which opinions shall be in form and substance reasonably acceptable to the Administrative Agent and, to the extent applicable, substantially similar to the opinions delivered on the Closing Date).

(c)    In the event any Credit Party or any Subsidiary of any Credit Party acquires a fee interest in any Real Estate with a then current fair market value in excess of $200,000, simultaneously with such acquisition, within 60 days (or such longer time as agreed to by the Administrative Agent in its sole discretion) such Person shall satisfy, or caused to be satisfied, the Real Estate Collateral Requirements.

(d)    The Credit Parties shall execute and deliver the documents and complete the tasks set forth on Schedule 4.12(d), in each case within the time limits specified therein (or such longer period of time reasonably acceptable to the Administrative Agent).

4.13    Environmental Matters.  Each Credit Party shall, and shall cause each of its Subsidiaries to, comply with, and maintain its Real Estate, whether owned, leased, subleased or otherwise operated or occupied, in compliance with, all applicable Environmental Laws (including by implementing any Remedial Action necessary to achieve compliance with applicable Environmental Laws) or that is required by orders and directives of any Governmental Authority except where the failure to comply could not reasonably be expected to, individually or in the aggregate, result in a Material Liability.  Without limiting the foregoing, if an Event of Default is continuing or if the Administrative Agent at any time has a reasonable basis to believe that there exist violations of Environmental Laws by any Credit Party or any Subsidiary of any Credit Party or that there exist any Environmental Liabilities that could reasonably be expect to result in a Material Liability, then each Credit Party shall, promptly upon receipt of request from the Administrative Agent (accompanied by an explanation of the reason for the request), cause the performance of, and allow the Administrative Agent and its Related Persons access to such Real Estate for the purpose of conducting, such environmental audits and assessments, including subsurface sampling of soil and groundwater, and cause the preparation of such reports, in each case as the Administrative Agent may from time to time reasonably request.  Such audits, assessments and reports, to the extent not conducted by the Administrative Agent or any of its Related Persons, shall be conducted and prepared by reputable environmental consulting firms reasonably acceptable to the Administrative Agent and shall be in form and substance reasonably acceptable to the Administrative Agent.

4.14    [Reserved].

4.15    Material Contracts.  Each Credit Party shall, and shall cause each of its Subsidiaries to (a) perform and observe in all material respects all the terms and provisions of each Material Contract to be performed or observed by it, (b) maintain each such Material Contract in full force and effect (unless such Material Contract has lapsed in accordance with its stated term or has been breached by any counterparty thereto), (c) enforce, to the extent the applicable Credit Party elects

-25-

to do so in the exercise of its reasonable business judgment, each such Material Contract in accordance with its terms, and (d) if an Event of Default has occurred and is continuing, take all such actions to such end as may be from time to time reasonably requested by the Administrative Agent and, upon request of the Administrative Agent, make to each other party to each such Material Contract such demands and requests for information and reports or for action as any Credit Party or any of its Subsidiaries is entitled to make under such Material Contract.

4.16    <u>Information Rights</u>.  For so long as any principal or interest remains due and unpaid under and pursuant to the Term Loans, the Lenders shall be entitled to receive copies of all materials distributed to participants at all meetings of the board of directors or similar governing body of each Credit Party, subject to exceptions in respect of disclosures that would otherwise vitiate any applicable attorney-client privilege or violate any applicable fiduciary duty or confidentiality obligation due to another party.

4.17    <u>Weekly Thirteen Week Cash Flow Forecasts</u>.  (i) On each Friday, commencing on February 9, 2024, the Borrowers shall deliver a detailed rolling thirteen week forecast and analysis ("<u>Rolling Forecast</u>") of anticipated cash receipts and disbursements and (ii) on each Wednesday, commencing on the first Wednesday following delivery of the initial Rolling Forecast, a detailed report (each, a "<u>Variance Report</u>") setting forth the actual cash receipts and disbursements for the preceding week and on a rolling cumulative basis against the projections from the last Rolling Forecast (which report shall certify whether or not the Borrowers were in compliance with Article VI), together with a detailed narrative explanation of any variances, in each case, in form and substance satisfactory to the Required Lenders (such comparison, the "<u>Variance</u>").

4.18    <u>Milestones</u>.  By the times specified on <u>Schedule 4.18</u> hereto, pursue and comply with each of the milestones set forth on <u>Schedule 4.18</u> hereto (each a "<u>Milestone</u>" and, collectively, the "<u>Milestones</u>").

ARTICLE V - <u>NEGATIVE COVENANTS</u>

Each Credit Party covenants and agrees that until the Facility Termination Date:

5.1    <u>Limitation on Liens</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its Property, whether now owned or hereafter acquired, other than the following ("<u>Permitted Liens</u>"):

(a)    (i) any Lien existing on the Property of a Credit Party or a Subsidiary of a Credit Party on the Closing Date (i) securing the Prepetition Obligations or (ii) as otherwise set forth in <u>Schedule 5.1</u> securing Indebtedness outstanding on such date and permitted by <u>Section 5.5(c)</u>;

(b)    any Lien created under any Loan Document;

(c)    Liens for Taxes (i) which are not past due or remain payable without penalty, or (ii) the non-payment of which is permitted by <u>Section 4.7</u>;

-26-

(d)     carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the Ordinary Course of Business which are not delinquent for more than thirty (30) days or remain payable without penalty or which are being contested in good faith and by appropriate proceedings diligently prosecuted, which proceedings have the effect of preventing the forfeiture or sale of the Property subject thereto and for which adequate reserves in accordance with GAAP are being maintained; provided, that, all such Liens are limited to the goods provided or to the goods relating to which services were rendered;

(e)     Liens (other than any Lien imposed by ERISA) consisting of (x) pledges or deposits required in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation, (y) to secure the performance of tenders, statutory obligations, surety, stay, customs and appeals bonds, bids, leases, governmental contract, trade contracts, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money incurred in the Ordinary Course of Business in an amount not to exceed $5,000,000) or (z) to secure liability to insurance carriers;

(f)     Liens consisting of judgment or judicial attachment liens (other than for payment of Taxes), provided that the enforcement of such Liens is effectively stayed and all such Liens secure claims in the aggregate at any time outstanding for the Credit Parties and their Subsidiaries that do not constitute an Event of Default under Section 7.1(h).

(g)     easements, rights of way, zoning and other restrictions, minor defects or other irregularities in title, and other similar encumbrances incurred in the Ordinary Course of Business which, either individually or in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the Property subject thereto or interfere in any material respect with the ordinary conduct of the businesses of any Credit Party or any Subsidiary of any Credit Party;

(h)     [Reserved].

(i)     [Reserved].

(j)     Liens arising from the filing of precautionary uniform commercial code financing statements with respect to any lease permitted by this Agreement;

(k)     non-exclusive licenses and sublicenses granted by a Credit Party or any Subsidiary of a Credit Party and leases and subleases (by a Credit Party or any Subsidiary of a Credit Party as lessor or sublessor) to third parties in the Ordinary Course of Business not interfering with the business of the Credit Parties or any of their Subsidiaries;

(l)     Liens in favor of collecting banks arising by operation of law under Section 4-210 of the UCC or, with respect to collecting banks located in the State of New York, under Section 4-208 of the UCC;

(m)     Liens (including the right of set-off) in favor of a bank or other depository institution arising as a matter of law encumbering deposits.

-27-

5.2    <u>Disposition of Assets</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, directly or indirectly, sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Property (including the Stock of any Subsidiary of any Credit Party, whether in a public or private offering or otherwise, and accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except:

(a)    dispositions in the Ordinary Course of Business in connection with (1) sales of lumber, engineered wood products, wood chips, sawdust, planer shavings and related byproducts for fair market value and (2) the sale of Investment Securities (as defined under the Prepetition Bond Loan Agreement) pursuant to the terms of the Prepetition Bond Loan Agreement,

(b)    dispositions of Property that is worn out or defective, <u>provided</u> that such disposition is not prohibited under any Necessary Business Contract (as defined under the Prepetition Bond Loan Agreement) and is for no less than fair market value;

(c)    dispositions constituting an Event of Loss;

(d)    dispositions of Cash Equivalents in the Ordinary Course of Business made to a Person that is not an Affiliate of any Credit Party and conversions of Cash Equivalents into cash or other Cash Equivalents; and

(e)    transactions otherwise permitted by <u>Section 5.3</u>.

Anything contained herein to the contrary notwithstanding (a) no Credit Party shall issue any Stock or Stock Equivalents if such issuance would result in an Event of Default under Sections 7.1(k) or 7.1(j) and (b) no Subsidiary of a Credit Party shall sell or issue any Stock or Stock Equivalents to any Person other than to a Credit Party (other than Holdings).

5.3    <u>Consolidations and Mergers</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

5.4    <u>Loans and Investments</u>.  No Credit Party shall and no Credit Party shall suffer or permit any of its Subsidiaries to (i) purchase or acquire, or make any commitment to purchase or acquire any Stock or Stock Equivalents, or any obligations or other securities of, or any interest in, any Person, (ii) make or commit to make any Acquisitions, or any other acquisition of all or substantially all of the assets of another Person, or of any business or division of any Person, including by way of merger, consolidation or other combination, or (iii) make or purchase or commit to make or purchase, any advance, loan, extension of credit or capital contribution to or any other investment in, any Person (the items described in clauses (i), (ii) and (iii) are referred to as "**Investments**"), except for:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments consisting of extensions of credit or capital contributions by any Credit Party to or in any other then existing Credit Party (other than Holdings); <u>provided</u>, if

-28-

such Investments are evidenced by notes, such notes shall be pledged to the Administrative Agent, for the benefit of the Secured Parties;

(c)     [Reserved]

(d)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business and Investments acquired in connection with the settlement of delinquent Accounts in the Ordinary Course of Business or in connection with the bankruptcy or reorganization of suppliers or customers;

(e)     [Reserved];

(f)     [Reserved]; or

(g)     Investments comprised of Contingent Obligations permitted by Section 5.9;

5.5     Limitation on Indebtedness.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume, permit to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness consisting of Contingent Obligations permitted pursuant to Section 5.9;

(c)     Indebtedness set forth in Schedule 5.5;

(d)     [reserved];

(e)     unsecured intercompany Indebtedness permitted pursuant to Section 5.4(b);

(f)     Indebtedness arising under the Prepetition Documents or the Lateral Loan Agreement up to the amount outstanding on the Petition Date; or

(g)     Unsecured Promissory Notes (as defined under the Prepetition Indenture) outstanding in an amount as of the Petition Date not to exceed $3,464,165.

5.6     Transactions with Affiliates.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, enter into any transaction with any Affiliate of a Credit Party or with any such Subsidiary, except on terms no less favorable to such Credit Party or such Subsidiary than could reasonably be obtained in a comparable arm's length transaction with a Person not an Affiliate of a Credit Party or such Subsidiary and which are disclosed in writing to the Administrative Agent.

5.7     Management Fees and Compensation.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, pay any management, consulting or similar fees to any Affiliate of any Credit Party or to any officer, director or employee of any Credit Party or any

-29-

Affiliate of any Credit Party or pay or reimburse any of its Affiliates (other than a Credit Party) for any costs, expenses and similar items, except:

(a)     payment of reasonable compensation (including the issuance of Stock and Stock Equivalents pursuant to a board approved equity incentive plan) to officers and employees for actual services rendered to the Credit Parties and their Subsidiaries in the Ordinary Course of Business (including for the avoidance of doubt, the fees and expenses pursuant to the Riveron Engagement Letter and Independent Manager Agreement);

(b)     reimbursement of ordinary and necessary out-of-pocket expenses incurred by an officer of a Credit Party for travel, meals, and entertainment in each case directly related to the conduct of the Credit Parties' businesses;

(c)     reimbursement of actual out-of-pocket expenses incurred in connection with attending Board of Director meetings not to exceed $15,000 in the aggregate in any Fiscal Year of Holdings; and

(d)     reimbursement of reasonable out-of-pocket costs and expenses of consultants approved by the Required Lenders.

5.8     Margin Stock.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, use any portion of the Term Loan proceeds, directly or indirectly, to purchase or carry Margin Stock or repay or otherwise refinance Indebtedness of any Credit Party or others incurred to purchase or carry Margin Stock, or otherwise in any manner which is in contravention of any Requirement of Law or in violation of this Agreement.

5.9     Contingent Obligations.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Contingent Obligations except in respect of the Obligations and except:

(a)     endorsements for collection or deposit in the Ordinary Course of Business;

(b)     Contingent Obligations of the Credit Parties and their Subsidiaries listed in Schedule 5.9, including extension and renewals thereof which do not increase the amount of such Contingent Obligations or impose materially more restrictive or adverse terms on the Credit Parties or their Subsidiaries as compared to the terms of the Contingent Obligation being renewed or extended;

(c)     Contingent Obligations otherwise constituting Indebtedness otherwise permitted to be incurred pursuant to Section 5.5;

(d)     Contingent Obligations arising under indemnity agreements to title insurers to cause such title insurers to issue to the Administrative Agent title insurance policies;

(e)     Contingent Obligations arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions permitted under Section 5.2(b);

-30-

(f)     Contingent Obligations arising under guaranties made in the Ordinary Course of Business of obligations of any Credit Party; provided, that (i) such obligations are unsecured and otherwise permitted hereunder, and (ii) if such obligation is subordinated to the Obligations, such guaranty shall be subordinated to the same extent;

(g)     Contingent Obligations arising under guaranties issued by Holdings in respect of Indebtedness of another Credit Party incurred in reliance upon Section 5.5(d) of this Agreement, so long as Holdings' guaranty obligations are unsecured; and

(h)     Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeals bonds, performance bonds and other similar obligations not exceeding $5,000,000.

5.10    Compliance with ERISA.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (a) establish, sponsor, contribute, incur any liability (contingent or otherwise) to or otherwise become bound by a Defined Benefit Plan or Multiemployer Plan or (b) fail to comply with the requirements of ERISA or other applicable laws, where such failure could reasonably be expected to result in a Material Liability to a Credit Party with respect to any Benefit Plan or the imposition of a Lien with respect to any Benefit Plan. To the extent applicable, no Credit Party shall fail to satisfy an exception under the Plan Asset Regulations which failure causes the assets of such Credit Party to be deemed Plan Assets.  No Credit Party shall take any action, or omit to take any action that would give rise to a non-exempt prohibited transaction under Section 4975(c)(1)(A), (B), (C) or (D) of the Code or Section 406(a) of ERISA.

5.11    Restricted Payments.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Stock or Stock Equivalent, (ii) purchase, redeem or otherwise acquire for value any Stock or Stock Equivalent now or hereafter outstanding or (iii) make any payment or prepayment of principal of, premium, if any, interest, fees, redemption, exchange, purchase, retirement, defeasance, sinking fund or similar payment with respect to, Subordinated Indebtedness (the items described in clauses (i), (ii) and (iii) above are referred to as "Restricted Payments"); except that:

(a)     Holdings may declare and make dividend payments or other distributions payable solely in its common Stock or Stock Equivalents as part of a management incentive plan; and

(b)     (i) any Credit Party (other than Holdings) may declare and pay dividends to the holders of such Credit Party's Stock that are otherwise a Credit Party; and (ii) any Subsidiary of a Credit Party that is not otherwise a Credit Party may declare and pay dividends to a Credit Party.

5.12    Change in Business.

(a)     No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in any line of business substantially different from those lines of business carried on by it on the Closing Date.

-31-

(b)     Holdings shall not (i) conduct, transact or otherwise engage in any business or operations other than those incidental to (A) its ownership of the Stock of the other Credit Parties, (B) the maintenance of its legal existence, (C) the performance of the Loan Documents, (D) any transaction that Holdings is permitted to enter into or consummate in accordance with the Loan Documents, (E) participating in Tax, accounting and other administrative matters as a member of the consolidated group of Holdings, the Credit Parties and their Subsidiaries, and (F) providing indemnification to officers and directors, (ii) own any material assets other than the Stock of the Credit Parties or (iii) grant any Liens in any of its assets (other than Liens granted to the Administrative Agent).

5.13    <u>Amendments to Organizational Documents and Material Contracts</u>.

(a)     No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, amend, restate, supplement or otherwise modify any of its Organization Documents or Material Contracts in any manner that is adverse in any material respect to the Credit Parties, the Administrative Agent or the Lenders.

(b)     No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, amend, restate, supplement or otherwise modify the Prepetition Documents in any manner that could reasonably be expected to result in an Event of Default under this Agreement.

5.14    <u>Changes in Accounting; Name and Jurisdiction of Organization</u>.  No Credit Party shall, and no Credit Party shall suffer or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, (ii) change the Fiscal Year or method for determining Fiscal Quarters of any Credit Party or of any consolidated Subsidiary of any Credit Party, (iii) change its name as it appears in official filings in its jurisdiction of organization or (iv) change its jurisdiction of organization, in the case of clauses (iii) and (iv), without at least twenty (20) days' prior written notice to the Administrative Agent and the acknowledgement of Administrative Agent that all actions required by the Administrative Agent, including those to continue the perfection of its Liens, have been completed.

5.15    <u>No Negative Pledges</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual restriction or encumbrance of any kind on the ability of any Credit Party or Subsidiary to pay dividends or make any other distribution on any of such Credit Party's or Subsidiary's Stock or Stock Equivalents or to pay fees or make other payments and distributions to any Credit Party, other than any such restriction or encumbrance contained in this Agreement, the Prepetition Documents or the Lateral Loan Agreement.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, directly or indirectly, enter into, assume or become subject to any Contractual Obligation prohibiting or otherwise restricting the existence of any Lien upon any of its assets in favor of the Administrative Agent, whether now owned or hereafter acquired except in connection with any document or instrument governing Liens permitted pursuant to <u>Section 5.1(h)</u>; provided, in each case, that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien.

5.16    <u>Anti-Money Laundering, Anti-Corruption and Sanctions</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to fail to comply with the laws, regulations and executive orders referred to in Section 3.21 and Section 3.22.

5.17    <u>Sale-Leasebacks</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, engage in a sale leaseback, synthetic lease or similar transaction involving any of its assets.

5.18    <u>Hazardous Materials</u>.  No Credit Party shall, and no Credit Party shall permit any of its Subsidiaries to, cause or suffer to exist any Release of any Hazardous Material at, to or from any Real Estate that would violate any Environmental Law, form the basis for any Environmental Liabilities, other than such violations, Environmental Liabilities and effects that could not, in the aggregate, reasonably be expected to have any Material Liability.

5.19    <u>Chief Restructuring Officer</u>.  Within thirty (30) days of the Petition Date, the Bankruptcy Court shall approve the appointment of Kenneth Latz as Chief Restructuring Officer. Thereafter, the Credit Parties shall not (i) terminate or modify the terms of the retention of Riveron or the scope of Chief Restructuring Officer's duties from the terms and scope in effect upon the appointment of the Chief Restructuring Officer or (ii) change or interfere with the responsibilities or duties of the Chief Restructuring Officer, in each case, as approved by the Bankruptcy Court.

5.20    <u>Material Transactions.</u>  The Credit Parties shall not enter into any transaction outside the Ordinary Course of Business, incur additional Indebtedness outside the Ordinary Course of Business, or make any voluntary or mandatory payment on any Indebtedness other than the 2022A Bonds or the Term Loans hereunder, or execute any document pertaining thereto.

5.21    <u>Non-Credit Parties.</u>  The Credit Parties shall not permit Seymour International Group, LLC, Seymour Forest Products, LLC, Lumberjack Timber, LLC or Pioneer Forest Products Corporation to have any material assets, either individually or collectively.

5.22    <u>Additional Bankruptcy Matters.</u>  So long as any principal of or interest on any Term Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Term Loan Commitment hereunder, each Credit Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)    Use any portion or proceeds of the Term Loans or the Collateral, or disbursements set forth in the Rolling Forecast, for payments or purposes that would violate the terms of the Interim Order or the Final Order.

(b)    Incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Secured Parties against any Credit Party, except for the Carve Out or as otherwise expressly permitted by the Bankruptcy Court DIP Orders.

(c)    Subject to the Bankruptcy Court DIP Orders, assert, join, investigate, support or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against any of the Secured Parties.

(d)      Seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Interim Order, the Final Order or any of the other Loan Documents.

(e)      Subject to the terms of the Bankruptcy Court DIP Orders, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent, or other Secured Parties with respect to the Collateral following the occurrence of an Event of Default, including without limitation a motion or petition by any Secured Party to lift an applicable stay of proceedings to do the foregoing (provided that any Credit Party may raise any issue permitted under the terms of the Bankruptcy Court DIP Orders).

(f)      Except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement) or, with the prior consent of the Administrative Agent, make any payment or distribution to any non-Credit Party Affiliate or insider of any Credit Party unless otherwise contemplated in the Applicable Rolling Forecast.

(g)      Except for the Carve Out or as otherwise expressly permitted by the Bankruptcy Court DIP Orders, incur, create, assume, suffer to exist or permit (or file an application for the approval of) any other DIP Superpriority Claim which is pari passu with or senior to the claims of the Administrative Agent and Lenders against the Credit Parties or the adequate protection Liens or claims.

(h)      Make or permit to be made any change to the Bankruptcy Court DIP Orders without the consent of the Administrative Agent.

(i)      Except where not reasonably practicable, fail to provide prior notice and copies to the Administrative Agent of any material motions or other material documents to be filed with the Bankruptcy Court.

ARTICLE VI – <u>PERFORMANCE COVENANTS</u>

6.1      <u>Projections</u>.  On a rolling cumulative basis, commencing on the date on which the second Rolling Forecast is delivered, or is required to be delivered, hereunder, following the Closing Date (i) the aggregate actual cash receipts for the immediate preceding weekly period shall not be less than 90% of the anticipated cash receipts for such period, and for the Rolling Forecast delivered immediately prior to such period, (the "<u>Applicable Rolling Forecast</u>") and (ii) the actual aggregate disbursements shall not exceed 110% of the anticipated disbursements as set forth in the Applicable Rolling Forecast for such period. Any Variance that does not exceed the Variance permitted pursuant to the foregoing clauses (i) and (ii) shall be referred to herein as a "<u>Permitted Variance</u>".

ARTICLE VII - <u>EVENTS OF DEFAULT</u>

7.1      <u>Event of Default</u>.  Any of the following shall constitute an "<u>Event of Default</u>":

(a)    <u>Non-Payment</u>.  Any Credit Party fails (i) to pay when and as required to be the principal of the Term Loan, including after maturity of the Term Loans or (ii) to pay interest on any Term Loan, any fee or any other amount payable hereunder or pursuant to any other Loan Document; or

(b)    <u>Representation or Warranty</u>.  Any representation, warranty or certification by or on behalf of any Credit Party or any of its Subsidiaries, in any other Loan Document, or which is contained in any certificate, document or financial or other statement by any such Person, or their respective Responsible Officers, furnished at any time under this Agreement, or in or under any other Loan Document, shall prove to have been incorrect in any material respect (without duplication of other materiality qualifiers contained therein) on or as of the date made or deemed made; or

(c)    <u>Specific Defaults</u>.  Any Credit Party fails to perform or observe any term, covenant or agreement contained in any of Sections 4.1, 4.2, 4.3, 4.6, 4.7, 4.9, 4.10,  4.12, 4.16, 4.17, Article V or Article VI hereof; or

(d)    <u>Other Defaults</u>.

(i)    [Reserved].

(ii)    Any Credit Party or Subsidiary of any Credit Party fails to perform or observe any other term, covenant or agreement contained in this Agreement or any other Loan Document, and such default shall continue unremedied for a period of ten (10) days after the earlier to occur of (i) the date upon which a Responsible Officer of any Credit Party becomes aware of such default and (ii) the date upon which written notice thereof is given to the Administrative Borrower by the Administrative Agent or Required Lenders; or

(e)    <u>Cross Default</u>.  Any Credit Party or any Subsidiary thereof (i) fails to make any payment in respect of any Indebtedness (other than the Obligations and other than Indebtedness in respect of which the payment or remedies thereunder are subject to the automatic stay under Section 362 of the Bankruptcy Code and are stayed (but only for so long as such stay is in effect)) or Contingent Obligation (other than the Obligations) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and such failure continues after the applicable grace or notice period, if any, specified in the document relating thereto on the date of such failure; or

(f)    <u>Insolvency; Voluntary Proceedings</u>.  Other than in connection with the Chapter 11 Cases, any Credit Party or any Subsidiary thereof:  (i) generally fails to pay, or admits in writing its inability to pay, its debts as they become due, subject to applicable grace periods, if any, whether at stated maturity or otherwise; (ii) except as expressly permitted under <u>Section 5.3</u>, voluntarily ceases to conduct its business in the ordinary course; (iii) commences any Insolvency Proceeding with respect to itself; or (iv) takes any action to effectuate or authorize any of the foregoing; or

-35-

(g)     Involuntary Proceedings. Other than the Chapter 11 Cases,    (i) any involuntary Insolvency Proceeding is commenced or filed against any Credit Party or any Subsidiary thereof, or any writ, judgment, warrant of attachment, execution or similar process, is issued or levied against a substantial part of any such Person's Properties, and any such proceeding or petition shall not be dismissed, or such writ, judgment, warrant of attachment, execution or similar process shall not be released, vacated or fully bonded within sixty (60) days after commencement, filing or levy; (ii) any Credit Party or any Subsidiary thereof admits the material allegations of a petition against it in any Insolvency Proceeding, or an order for relief (or similar order under non-U.S. law) is ordered in any Insolvency Proceeding; or (iii) any Credit Party or any Subsidiary thereof acquiesces in the appointment of a receiver, trustee, custodian, conservator, liquidator, mortgagee in possession (or agent therefor), or other similar Person for itself or a substantial portion of its Property or business; or

(h)     Monetary Judgments.   One or more judgments, orders, decrees or arbitration awards shall be entered against any one or more of the Credit Parties or any of their respective Subsidiaries involving in the aggregate a liability in excess of the Threshold Amount (excluding amounts covered by insurance to the extent the relevant independent third-party insurer has not denied coverage therefor), and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of fifteen (15) days after the entry thereof (unless such judgment, order, decree or arbitration award is subject to the automatic stay under Section 362 of the Bankruptcy Code and only for so long as such stay remains in effect); or

(i)     Non-Monetary Judgments.   One or more non-monetary judgments, orders or decrees shall be rendered against any one or more of the Credit Parties or any of their respective Subsidiaries, which has or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, and there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(j)     Adverse Action.  Any Credit Party or any Lateral Entity takes or omits to take any action or step whereby the rights of the Lenders contemplated under this Agreement, might be impaired, terminated or adversely affected in any respect; or

(k)     [Reserved]; or

(l)     [Reserved]; or

(m)     Operations.  Any Credit Party shall be prohibited or otherwise materially restrained from conducting the business theretofore conducted by it by virtue of any casualty, any labor strike, any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction or any other event and such casualty, labor strike, determination, ruling, decision, decree, order or other event remains unstayed and in effect for any period of ten (10) days; or

(n)     Subordination Agreements.  The subordination provisions of the documents evidencing or governing any Subordinated Indebtedness including the Prepetition Bond Subordination Agreement and the Prepetition Bridge Subordination Agreement, shall, in whole or

-36-

in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable or a Credit Party or Affiliate or party thereto thereof shall, directly or indirectly, disavow or contest in any manner the effectiveness, validity or enforceability of any of the subordination provisions governing any such Subordinated Indebtedness; or

(o)     Collateral.  Any material provision of any Loan Document shall for any reason cease to be valid and binding on or enforceable against any Credit Party or the Subsidiaries party thereto, or any Credit Party or Subsidiaries party thereto shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any Collateral Document or the Bankruptcy Court DIP Orders shall for any reason (other than pursuant to the terms thereof) cease to create a valid security interest in the Collateral purported to be covered thereby or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected (to the extent perfection may be achieved under U.S. law) and subject to a security interest subject only to Permitted Liens and the carve-out, except to the extent such Collateral has an aggregate value (greater of fair market value and book value) of less than the Threshold Amount; or

(p)     Permitted Variances.  Any Variance shall exceed the Permitted Variance; or

(q)     Milestones. The Borrowers shall fail to timely satisfy any of the Milestones; or

(r)     Bankruptcy Related Defaults.

(i)     Any Credit Party shall file a motion in the Chapter 11 Cases to obtain financing from a party other than Lenders under Section 364(c) or (d) of the Bankruptcy Code that (A) is not permitted under Section 5.5 and (B) does not commit to provide for the payment of the Obligations and the Prepetition Obligations in full and in cash upon the incurrence of such additional financing; or

(ii)     Any Credit Party shall file a motion seeking an order (A) approving payment of any claim that arose prior to the Petition Date other than (x) as provided for in the "first day" or "second day" orders approved by the Required Lenders, (y) contemplated by the Applicable Rolling Forecast (including Permitted Variances) as then in effect, or (z) otherwise consented to by the Required Lenders in writing, (B) granting relief from the automatic stay under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets, or (C) except with respect to the Prepetition Obligations as provided in the Bankruptcy Court DIP Orders, approving any settlement or other stipulation not approved by the Required Lenders and not included in the Applicable Rolling Forecast as then in effect with any secured creditor of any Credit Party providing for payments as adequate protection or otherwise to such secured creditor; or

(iii)     Any Credit Party violates any term, provision or condition in the Bankruptcy Court DIP Orders; or

-37-

(iv)    An order is entered in any of the Chapter 11 Cases appointing, or any Credit Party, or any Subsidiary of a Credit Party shall file an application for an order seeking the appointment of, (A) a trustee under Section 1104, or (B) an examiner with enlarged powers relating to the operation of the Credit Parties' business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(v)    An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, in each case, which does not contain a provision for termination of the Term Loan Commitments, and payment in full in cash of all Obligations (other than Contingent Indemnity Obligations) of the Credit Parties hereunder and under the other Loan Documents upon entry thereof; or

(vi)    An order is entered by the Bankruptcy Court in any of the Chapter 11 Cases (A) to revoke, reverse, stay, modify, supplement or amend the Bankruptcy Court DIP Orders, (B) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever), in each case other than the Carve Out, to have administrative priority as to the Credit Parties equal or superior to the priority of the DIP Superpriority Claim shall be entered by the Bankruptcy Court, or (C) dismissing any of the Chapter 11 Cases which does not contain a provision for termination of all Term Loan Commitments, and payment in cash in full of all Obligations (other than Contingent Indemnity Obligations) of the Credit Parties hereunder and under the other Loan Documents upon entry thereof; or

(vii)    An order is entered by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a Chapter 11 Plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders; or

(viii)    An order is entered by the Bankruptcy Court authorizing the sale, including via a Chapter 11 Plan, of all or substantially all of a credit Party's assets without the prior written consent of the Required Lenders (which may be given or withheld in such lenders' sole discretion); or

(ix)    An application for any of the orders described in Sections 7.1(r)(iv) - (viii) shall be made by a Person (including, for the avoidance of doubt, the Credit Parties) and such application is not contested by the Credit Parties in good faith or such Person actually obtains entry of an order of the Bankruptcy Code; or

(x)    (A) Any Credit Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests relating to the Prepetition Obligations or of the Administrative Agent, and/or the Lenders, or the claims or rights against such Person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (B) the Liens or security interests created by Collateral Documents or the Bankruptcy Court DIP Orders with respect to the Collateral shall,

-38-

for any reason, on and after the entry of the Interim Order, cease to be valid, or (C) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Administrative Agent and/or the Lenders created by any of the Bankruptcy Court DIP Orders, this Agreement, or any Collateral Document, or created in connection with the Prepetition Obligations; or

(xi)    Any Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Credit Party) any other Person's motion to, (A) disallow in whole or in part, the Administrative Agent's and Lenders' claim in respect of the Obligations or contest any material provision of any Loan Documents or any material provision of any Loan Document, or (B) disallow in whole or in part, any claims in respect of the Prepetition Obligations or contest any material provision of any Prepetition Document or any material provision of any such document; or

(xii)    Any Credit Parties or any of their Subsidiaries attempt to consummate a sale of substantially all of its assets, via a Chapter 11 Plan other than the Pre-Packaged Plan, which does not provide for repayment in full of all Obligations; or

(xiii)    Any Chapter 11 Plan shall be filed without the Required Lenders' consent that is inconsistent in any material respect with the Pre-Packaged Plan or does not provide for repayment in full in cash of all Obligations; or

(xiv)    There shall be any Chapter 11 Plan confirmed in the Chapter 11 Cases other than the Pre-Packaged Plan; or

(xv)    The Credit Parties shall withdraw the Pre-Packaged Plan without the prior written consent of the Required Lenders (which consent may be given or withheld in the Required Lenders' sole discretion).

7.2    Remedies.  Subject to the Bankruptcy Court DIP Orders, upon the occurrence and during the continuance of any Event of Default:

(a)    the Administrative Agent shall at the request of the Required Lenders declare all or any portion of the unpaid principal amount of all outstanding Term Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable; and/or

(b)    the Administrative Agent shall at the request of the Required Lenders exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law; provided, however, that upon the occurrence of any event specified in Sections 7.1(f) or 7.1(g) above (in the case of clause (i) of Section 7.1(g) upon the expiration of the sixty (60) day period mentioned therein), the unpaid principal amount of all outstanding Term Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

-39-

7.3     Rights Not Exclusive.  The rights provided for in this Agreement and the other Loan Documents are cumulative and are not exclusive of any other rights, powers, privileges or remedies provided by law or in equity, or under any other instrument, document or agreement now existing or hereafter arising.

## ARTICLE VIII - THE ADMINISTRATIVE AGENT

8.1     Appointment and Duties.

(a)     Appointment of Administrative Agent.  (i) Each Lender hereby appoints UMB Bank, National Association (together with any successor Administrative Agent pursuant to Section 8.9) as the Administrative Agent hereunder and authorizes the Administrative Agent to (x) execute and deliver the Loan Documents and accept delivery thereof on its behalf from any Credit Party, (y) take such action on its behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to the Administrative Agent under such Loan Documents and (z) exercise such powers as are reasonably incidental thereto.

(b)     Duties as Collateral and Disbursing Agent.  Without limiting the generality of clause (a) above, the Administrative Agent shall have the sole and exclusive right and authority (to the exclusion of the Lenders), and is hereby authorized, to (i) act as the disbursing and collecting agent for the Lenders with respect to all payments and collections arising in connection with the Loan Documents (including in any proceeding described in Sections 7.1(f) or 7.1(g) or any other bankruptcy, insolvency or similar proceeding), and each Person making any payment in connection with any Loan Document to any Secured Party is hereby authorized to make such payment to the Administrative Agent, (ii) file and prove claims and file other documents necessary or desirable to allow the claims of the Secured Parties with respect to any Obligation in any proceeding described in Section 7.1(f) or 7.1(g) or any other bankruptcy, insolvency or similar proceeding (but not to vote, consent or otherwise act on behalf of such Person), (iii) act as collateral agent for each Secured Party for purposes of the perfection of all Liens created by such agreements and all other purposes stated therein, (iv) manage, supervise and otherwise deal with the Collateral, (v) take such other action as is necessary or desirable to maintain the perfection and priority of the Liens created or purported to be created by the Loan Documents, (vi) except as may be otherwise specified in any Loan Document, exercise all remedies given to the Administrative Agent and the other Secured Parties with respect to the Credit Parties and/or the Collateral, whether under the Loan Documents, applicable Requirements of Law or otherwise, and (vii) execute any amendment, consent or waiver under the Loan Documents on behalf of any Lender that has consented in writing to such amendment, consent or waiver.

(c)     Limited Duties.  Under the Loan Documents, the Administrative Agent (i) is acting solely on behalf of the Lenders and the other Secured Parties (except to the limited extent provided in Section 9.9(d)(ii) with respect to the Register), with duties that are entirely administrative in nature, notwithstanding the use of the defined terms "Administrative Agent" or the terms "agent" and "collateral agent" and similar terms in any Loan Document to refer to the Administrative Agent, which terms are used for title purposes only, (ii) is not assuming any obligation under any Loan Document other than as expressly set forth therein or any role as agent, fiduciary or trustee of or for any Lender or any other Person and (iii) shall have no implied functions, responsibilities, duties, obligations or other liabilities under any Loan Document, and

-40-

each Secured Party by accepting the benefits of the Loan Documents hereby waives and agrees not to assert any claim against the Administrative Agent based on the roles, duties and legal relationships expressly disclaimed in clauses (i) through (iii) above.

8.2     <u>Binding Effect</u>.    Each Secured Party, by accepting the benefits of the Loan Documents, agrees that (i) any action taken by the Administrative Agent or the Required Lenders (or, if expressly required hereby, a greater proportion of the Lenders) in accordance with the provisions of the Loan Documents, (ii) any action taken by the Administrative Agent in reliance upon the instructions of Required Lenders (or, where so required, such greater proportion) and (iii) the exercise by the Administrative Agent or the Required Lenders (or, where so required, such greater proportion) of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Secured Parties.

8.3     <u>Use of Discretion</u>

(a)     <u>No Action without Instructions</u>.    The Administrative Agent shall not be required to exercise any discretion or take, or to omit to take, any action, including with respect to enforcement or collection, except any action it is required to take or omit to take (i) under any Loan Document or (ii) pursuant to instructions from the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders).

(b)     <u>Right Not to Follow Certain Instructions</u>.    Notwithstanding clause (a) above, the Administrative Agent shall not be required to take, or to omit to take, any action (i) unless, upon demand, the Administrative Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to the Administrative Agent, any other Person) against all Liabilities that, by reason of such action or omission, may be imposed on, incurred by or asserted against the Administrative Agent or any Related Person thereof or (ii) that is, in the opinion of the Administrative Agent or its counsel, contrary to any Loan Document or applicable Requirement of Law.

(c)     <u>Exclusive Right to Enforce Rights and Remedies</u>.    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with the Loan Documents for the benefit of all the Lenders.  In connection with the foregoing, the Lenders hereby irrevocably authorize (and by its acceptance of the benefits of the Loan Documents, each other Secured Party shall be deemed to authorize) the Administrative Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code, or at any sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law.  In any event, nothing herein shall prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Administrative Agent) hereunder and under the other Loan Documents, (ii) any Lender from

-41-

exercising setoff rights in accordance with Section 9.11 or (iii) subject to the following paragraph, any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Credit Party under any bankruptcy or other Debtor Relief Law.  If at any time there is no Person acting as the Administrative Agent hereunder and under the other Loan Documents, then the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 7.2 and in addition to the matters set forth in clauses (ii) and (iii) of the preceding sentence and subject to Section 9.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

In case of the pendency of any bankruptcy or other debtor relief proceeding or any other judicial proceeding relative to any Credit Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Credit Party) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent allowed in such judicial proceeding and to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same, and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent hereunder.

8.4     <u>Delegation of Rights and Duties</u>.  The Administrative Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any trustee, co-agent, employee, attorney-in-fact and any other Person (including any Secured Party).  Any such Person shall benefit from this Article VIII to the extent provided by the Administrative Agent.

8.5     <u>Reliance and Liability</u>.

(a)     The Administrative Agent may, without incurring any liability hereunder, (i) treat the payee of any term note as its holder until such term note has been assigned in accordance with <u>Section 9.9</u>, (ii) rely on the Register to the extent set forth in Section 1.4, (iii) consult with any of its Related Persons and, whether or not selected by it, any other advisors, accountants and other experts (including advisors to, and accountants and experts engaged by, any Credit Party) and (iv) rely and act upon any document and information (including those transmitted by Electronic Transmission) and any telephone message or conversation, in each case believed by it to be genuine and transmitted, signed or otherwise authenticated by the appropriate parties.

(b)     The Administrative Agent and its Related Persons shall not be liable for any action taken or omitted to be taken by any of them under or in connection with any Loan Document, and each Secured Party and Credit Party hereby waive and shall not assert (and the Borrowers shall cause each other Credit Party not a signatory hereto to waive and agree not to assert) any right, claim or cause of action based thereon, except to the extent of liabilities resulting from the gross negligence or willful misconduct of the Administrative Agent or, as the case may be, such Related Person (each as determined in a final, non-appealable judgment by a court of competent jurisdiction) in connection with the duties expressly set forth herein.   Without limiting the foregoing, the Administrative Agent:

(i)     shall not be responsible or otherwise incur liability to any Lender or other Person for any action or omission taken in reliance upon the instructions of the Required Lenders or for the actions or omissions of any of its Related Persons selected with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent);

(ii)     shall not be responsible to any Lender or other Person for the due execution, legality, validity, enforceability, effectiveness, genuineness, sufficiency or value of, or the attachment, perfection or priority of any Lien created or purported to be created under or in connection with, any Loan Document;

(iii)     makes no warranty or representation, and shall not be responsible, to any Lender or other Person for any statement, document, information, representation or warranty made or furnished by or on behalf of any Credit Party or any Related Person of any Credit Party in connection with any Loan Document or any transaction contemplated therein or any other document or information with respect to any Credit Party, whether or not transmitted or (except for documents expressly required under any Loan Document to be transmitted to the Lenders) omitted to be transmitted by the Administrative Agent, including as to completeness, accuracy, scope or adequacy thereof, or for the scope, nature or results of any due diligence performed by the Administrative Agent in connection with the Loan Documents; and (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any provision of any Loan Document, whether any condition set forth in any Loan Document is satisfied or waived, as to the financial condition of any Credit Party or as to the existence or continuation or possible occurrence or continuation of any Default or Event of Default and shall not be deemed to have notice or knowledge of such occurrence or continuation unless it has received a notice from the Administrative Borrower or any Lender describing such Default or Event of Default clearly labeled "notice of default" (in which case the Administrative Agent shall promptly give notice of such receipt to all Lenders).

and, for each of the items set forth in clauses (i) through (iv) above, each Lender, the Credit Parties hereby waive and agree not to assert (and the Credit Parties shall cause each other Credit Party not a signatory hereto to waive and agree not to assert) any right, claim or cause of action it might have against the Administrative Agent based thereon.

8.6     <u>Administrative Agent Individually</u>.  The Administrative Agent and its Affiliates may make loans and other extensions of credit to, acquire Stock and Stock Equivalents of, engage in any kind of business with, any Credit Party or Affiliate thereof as though it were not acting as Administrative Agent and may receive separate fees and other payments therefor.  To the extent the Administrative Agent or any of its Affiliates makes any Term Loan or otherwise becomes a Lender hereunder, it shall have and may exercise the same rights and powers hereunder and shall be subject to the same obligations and liabilities as any other Lender and the terms "Lender" and "Required Lender" and any similar terms shall, except where otherwise expressly provided in any Loan Document, include the Administrative Agent or such Affiliate, as the case may be, in its individual capacity as Lender or as one of the Required Lenders.

8.7     <u>Lender Credit Decision</u>.

(a)     Each Lender acknowledges that it shall, independently and without reliance upon the Administrative Agent or any Lender or any of their Related Persons or upon any document (including any offering and disclosure materials in connection with the syndication of the Term Loans) solely or in part because such document was transmitted by the Administrative Agent or any of its Related Persons, conduct its own independent investigation of the financial condition and affairs of each Credit Party and make and continue to make its own credit decisions in connection with entering into, and taking or not taking any action under, any Loan Document or with respect to any transaction contemplated in any Loan Document, in each case based on such documents and information as it shall deem appropriate.  Except for documents expressly required by any Loan Document to be transmitted by the Administrative Agent to the Lenders, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, Property, financial and other condition or creditworthiness of any Credit Party or any Affiliate of any Credit Party that may come in to the possession of the Administrative Agent or any of its Related Persons.

(b)     If any Lender has elected to abstain from receiving MNPI concerning the Credit Parties or their Affiliates such Lender acknowledges that, notwithstanding such election, the Administrative Agent and/or the Credit Parties will, from time to time, make available syndicate-information (which may contain MNPI) as required by the terms of, or in the course of administering the Term Loans to the credit contact(s) identified for receipt of such information on the Lender's administrative questionnaire who are able to receive and use all syndicate-level information (which may contain MNPI) in accordance with such Lender's compliance policies and contractual obligations and applicable law, including federal and state securities laws; provided, that if such contact is not so identified in such questionnaire, the relevant Lender hereby agrees to promptly (and in any event within one (1) Business Day) provide such a contact to the Administrative Agent and the Credit Parties upon request therefor by the Administrative Agent or the Credit Parties.  Notwithstanding such Lender's election to abstain from receiving MNPI, such Lender acknowledges that if such Lender chooses to communicate with the Administrative Agent, it assumes the risk of receiving MNPI concerning the Credit Parties or their Affiliates.

8.8     <u>Expenses; Indemnities; Withholding</u>.

(a)     Each Lender agrees to reimburse the Administrative Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party), promptly upon demand,

-44-

severally and ratably, for any costs and expenses (including fees, charges and disbursements of financial, legal and other advisors and Other Taxes paid in the name of, or on behalf of, any Credit Party) that may be incurred by the Administrative Agent or any of its Related Persons in connection with the preparation, syndication, execution, delivery, administration, modification, consent, waiver or enforcement of, or the taking of any other action (whether through negotiations, through any work-out, bankruptcy, restructuring or other legal or other proceeding (including preparation for and/or response to any subpoena or request for document production relating thereto or otherwise)) in respect of, or legal advice with respect to its rights or responsibilities under, any Loan Document.

(b)    Each Lender further agrees to indemnify, defend and hold the Administrative Agent and each of its Related Persons (to the extent not reimbursed by any Credit Party), in each case, severally and ratably, harmless from and against Liabilities (including, to the extent not indemnified pursuant to Section 8.8(c), Taxes, interests and penalties imposed for not properly withholding or backup withholding on payments made to or for the account of any Lender) that may be imposed on, incurred by or asserted against the Administrative Agent or any of its Related Persons in any matter relating to or arising out of, in connection with or as a result of any Loan Document, any related document or any other act, event or transaction related, contemplated in or attendant to any such document, or, in each case, any action taken or omitted to be taken by the Administrative Agent or any of its Related Persons under or with respect to any of the foregoing; provided, that no Lender shall be liable to the Administrative Agent or any of its Related Persons to the extent such liability has resulted primarily from the gross negligence or willful misconduct of the Administrative Agent or, as the case may be, such Related Person, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.

(c)    To the extent required by any Requirement of Law, the Administrative Agent may withhold from any payment to any Lender under a Loan Document an amount equal to any applicable withholding Tax (including withholding Taxes imposed under Chapters 3 and 4 of Subtitle A of the Code).  If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender (because the appropriate certification form was not delivered, was not properly executed, or fails to establish an exemption from, or reduction of, withholding Tax with respect to a particular type of payment, or because such Lender failed to notify the Administrative Agent or any other Person of a change in circumstances which rendered the exemption from, or reduction of, withholding Tax ineffective, failed to maintain a Participant Register or for any other reason), or the Administrative Agent reasonably determines that it was required to withhold Taxes from a prior payment but failed to do so, such Lender shall promptly indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties and interest, and together with all expenses incurred by the Administrative Agent, including legal expenses, allocated internal costs and out-of-pocket expenses.  The Administrative Agent may offset against any payment to any Lender under a Loan Document, any applicable withholding Tax that was required to be withheld from any prior payment to such Lender but which was not so withheld, as well as any other amounts for which the Administrative Agent is entitled to indemnification from such Lender under this Section 8.8(c).

8.9    <u>Resignation of the Administrative Agent.</u>

-45-

(a)     The Administrative Agent may resign at any time by delivering notice of such resignation to the Lenders and the Administrative Borrower, effective on the date set forth in such notice or, if no such date is set forth therein, upon the date such notice shall be effective in accordance with the terms of this Section 8.9(a).  If the Administrative Agent delivers any such notice, the Required Lenders shall have the right to appoint a successor Administrative Agent.  If, after 30 days after the date of the retiring Administrative Agent's notice of resignation, no successor Administrative Agent has been appointed by the Required Lenders that has accepted such appointment, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent from among the Lenders.

(b)     Effective immediately upon its resignation, (i) the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents, (ii) the Lenders shall assume and perform all of the duties of the retiring Administrative Agent until a successor Administrative Agent shall have accepted a valid appointment hereunder, (iii) the retiring Administrative Agent and its Related Persons shall no longer have the benefit of any provision of any Loan Document other than with respect to any actions taken or omitted to be taken while such retiring Administrative Agent was, or because such retiring Administrative Agent had been, validly acting as Administrative Agent under the Loan Documents and (iv) subject to its rights under Section 8.3, the retiring Administrative Agent shall take such action as may be reasonably necessary to assign to the successor Administrative Agent its rights as Administrative Agent under the Loan Documents.  Effective immediately upon its acceptance of a valid appointment as Administrative Agent a successor Administrative Agent shall succeed to, and become vested with, all the rights, powers, privileges and duties of the retiring Administrative Agent under the Loan Documents.

8.10   <u>Release of Collateral or Guarantors</u>.  Each Lender hereby consents to the release and hereby directs the Administrative Agent to release (or, in the case of clause (b)(ii) below, release or subordinate) the following, in each case, solely at the direction of the Required Lenders:

(a)     any Subsidiary of a Borrower (other than another Borrower) from its guaranty of any Obligation if all of the Stock and Stock Equivalents of such Subsidiary owned by any Credit Party are sold or transferred in a transaction permitted under the Loan Documents (including pursuant to a waiver or consent), to the extent that, after giving effect to such transaction, such Subsidiary would not be required to guaranty any Obligations pursuant to <u>Section 4.12</u>; and

(b)     any Lien held by the Administrative Agent for the benefit of the Secured Parties against (i) any Collateral that is sold, transferred, conveyed or otherwise disposed of by a Credit Party in a transaction permitted by the Loan Documents (including pursuant to a valid waiver or consent), to the extent all Liens required to be granted in such Collateral pursuant to Section 4.12 after giving effect to such transaction have been granted, (ii) any Property subject to a Lien permitted hereunder in reliance upon Section 5.1(h) and (iii) all of the Collateral and all Credit Parties, upon (A) the occurrence of the Facility Termination Date and (B) to the extent requested by the Administrative Agent, receipt by Administrative Agent and the Secured Parties of liability releases from the Credit Parties each in form and substance acceptable to the Administrative Agent.

Each Lender hereby directs the Administrative Agent, and the Administrative Agent hereby agrees, upon receipt of reasonable advance written notice from the Administrative Borrower, to execute and deliver or file such documents and to perform other actions reasonably necessary to release the guaranties and Liens when and as directed in this Section 8.10.

8.11   <u>Additional Secured Parties</u>.  The benefit of the provisions of the Loan Documents directly relating to the Collateral or any Lien granted thereunder shall extend to and be available to any Secured Party that is not a Lender party hereto as long as, by accepting such benefits, such Secured Party agrees, as among the Administrative Agent and all other Secured Parties, that such Secured Party is bound by (and, if requested by the Administrative Agent shall confirm such agreement in a writing in form and substance acceptable to the Administrative Agent) this Article VIII, Section 9.3, Section 9.9, Section 9.10, Section 9.11, Section 9.17, Section 9.23 and Section 10.1) and the decisions and actions of the Administrative Agent and the Required Lenders (or, where expressly required by the terms of this Agreement, a greater proportion of the Lenders or other parties hereto as required herein) to the same extent a Lender is bound; provided, however, that, notwithstanding the foregoing, (a) such Secured Party shall be bound by Section 8.8 only to the extent of Liabilities, costs and expenses with respect to or otherwise relating to the Collateral held for the benefit of such Secured Party, in which case the obligations of such Secured Party thereunder shall not be limited by any concept of pro rata share or similar concept, (b) the Administrative Agent and the Lenders party hereto shall be entitled to act at its sole discretion, without regard to the interest of such Secured Party, regardless of whether any Obligation to such Secured Party thereafter remains outstanding, is deprived of the benefit of the Collateral, becomes unsecured or is otherwise affected or put in jeopardy thereby, and without any duty or liability to such Secured Party or any such Obligation and (c) except as otherwise set forth herein, such Secured Party shall not have any right to be notified of, consent to, direct, require or be heard with respect to, any action taken or omitted in respect of the Collateral or under any Loan Document.

## ARTICLE IX - <u>MISCELLANEOUS</u>

9.1   <u>Amendments and Waivers</u>.  (a) No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Credit Party therefrom, shall be effective unless the same shall be in writing and signed by the Administrative Agent, the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders), and the Borrowers, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, or consent shall, unless in writing and signed by all the Lenders directly affected thereby (or by the Administrative Agent with the consent of all the Lenders directly affected thereby), in addition to the Administrative Agent, the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders), and the Borrowers, do any of the following:

(i)     [reserved];

(ii)     postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document (for the avoidance of doubt, mandatory prepayments pursuant to Section 1.6 may

-47-

be postponed, delayed, reduced, waived or modified with the consent of Required Lenders);

(iii)    reduce the principal of, or the rate of interest specified herein (it being agreed that waiver of the default interest margin shall only require the consent of Required Lenders) or the amount of interest payable in cash specified herein on any Term Loan, or of any fees or other amounts payable hereunder or under any other Loan Document (for the avoidance of doubt, interest may be paid in kind pursuant to Section 1.3(b) with the consent of Required Lenders);

(iv)    change the percentage of the aggregate unpaid principal amount of the Term Loans which shall be required for the Lenders or any of them to take any action hereunder;

(v)    amend this Section 9.1 or, subject to the terms of this Agreement, the definition of Required Lenders or any provision providing for consent or other action by all Lenders;

(vi)    discharge any Credit Party from its respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents; or

(vii)    amend or modify Section 1.6(e) and Section 1.9(b);

it being agreed that all Lenders shall be deemed to be directly affected by an amendment or waiver of the type described in the preceding clauses (iv), (v), (vi) and (vii).

(b)    No amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent, in addition to the Required Lenders or all Lenders directly affected thereby or all the Lenders, as the case may be (or by the Administrative Agent with the consent of the Required Lenders or all the Lenders directly affected thereby or all the Lenders), affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.

(c)    Notwithstanding anything to the contrary contained in this Section 9.1 or any other provision of this Agreement or any other Loan Document:

(i)    the Administrative Agent may amend Schedule 1.1(a) to reflect Sales entered into pursuant to Section 9.9; and

(ii)    the Administrative Agent and the Borrowers may amend or modify this Agreement and any other Loan Document (without the consent of any Lender) to (1) cure any ambiguity, omission, defect or inconsistency therein, and (2) grant a new Lien for the benefit of the Secured Parties, extend an existing Lien over additional Property for the benefit of the Secured Parties or join additional Persons as Credit Parties.

9.2    Notices.

-48-

(a)    Addresses.  All notices and other communications required or expressly authorized to be made by this Agreement shall be given in writing, unless otherwise expressly specified herein, and (i) addressed to the address set forth on the applicable signature page hereto, or (ii) addressed to such other address as shall be notified in writing (A) in the case of the Borrowers and the Administrative Agent, to the other parties hereto and (B) in the case of all other parties, to the Administrative Borrower and the Administrative Agent.  Transmissions made by electronic mail or E-Fax to the Administrative Agent shall be effective only (x) for notices where such transmission is specifically authorized by this Agreement, (y) if such transmission is delivered in compliance with procedures of the Administrative Agent applicable at the time and previously communicated to the Administrative Borrower, and (z) if receipt of such transmission is acknowledged by the Administrative Agent.

(b)    Effectiveness.  All communications described in clause (a) above and all other notices, demands, requests and other communications made in connection with this Agreement shall be effective and be deemed to have been received (i) if delivered by hand, upon personal delivery, (ii) if delivered by overnight courier service, one (1) Business Day after delivery to such courier service, (iii) if delivered by mail, three (3) Business Days after deposit in the mail, and (iv) if delivered by facsimile, upon sender's receipt of confirmation of proper transmission; provided, however, that no communications to the Administrative Agent pursuant to Article I shall be effective until received by the Administrative Agent.

(c)    Change in Lender Address.  Each Lender shall notify the Administrative Agent in writing of any changes in the address to which notices to such Lender should be directed, of addresses of its lending office, of payment instructions in respect of all payments to be made to it hereunder and of such other administrative information as the Administrative Agent shall reasonably request.

9.3    Electronic Transmissions.

(a)    Authorization.  Subject to the provisions of Section 9.2(a), each of the Administrative Agent, the Lenders, each Credit Party and each of their Related Persons, is authorized (but not required) to transmit, post or otherwise make or communicate, in its sole discretion, Electronic Transmissions in connection with any Loan Document and the transactions contemplated therein.  Each Credit Party and each Secured Party hereto acknowledges and agrees that the use of Electronic Transmissions is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the transmission of Electronic Transmissions.

(b)    LIMITATION OF LIABILITY.  ALL E-SYSTEMS AND ELECTRONIC TRANSMISSIONS SHALL BE PROVIDED "AS IS" AND "AS AVAILABLE".  NONE OF THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS WARRANTS THE ACCURACY, ADEQUACY OR COMPLETENESS OF ANY ELECTRONIC TRANSMISSION AND DISCLAIMS ALL LIABILITY FOR ERRORS OR OMISSIONS THEREIN.  NO WARRANTY OF ANY KIND IS MADE BY THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY OF THEIR RELATED PERSONS IN CONNECTION WITH ANY ELECTRONIC COMMUNICATION, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-

-49-

INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS.  Each Credit Party executing this Agreement and each Secured Party agrees that the Administrative Agent have no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Electronic Transmission.

9.4     No Waiver; Cumulative Remedies.   No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  No course of dealing between any Credit Party, any Affiliate of any Credit Party, the Administrative Agent or any Lender shall be effective to amend, modify or discharge any provision of this Agreement or any of the other Loan Documents.

9.5     Costs and Expenses.  Any action taken by any Credit Party under or with respect to any Loan Document, even if required under any Loan Document or at the request of the Administrative Agent or Required Lenders, shall be at the expense of such Credit Party, and neither the Administrative Agent nor any other Secured Party shall be required under any Loan Document to reimburse any Credit Party or any Subsidiary of any Credit Party therefor except as expressly provided therein.  In addition, each Credit Party agrees to pay or reimburse promptly following written demand (a) the Administrative Agent and the Lenders for all reasonable out-of-pocket costs and expenses incurred by it or any of its Related Persons, in connection with the investigation, development, preparation, negotiation, syndication, execution, interpretation or administration of, any modification of any term of or termination of, any Loan Document, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein, in each case including Attorney Costs to the Administrative Agent and the Lenders, the cost of environmental audits, Collateral audits and appraisals, background checks and similar expenses, to the extent permitted hereunder, (b) the Lenders for all valuations of the Term Loans and\or any Stock and Stock Equivalents of Holdings held by any Lender, (c) the Administrative Agent and the Lenders for all reasonable costs and expenses incurred by it or any of its Related Persons in connection with internal audit reviews, field examinations and Collateral examinations (which shall be reimbursed, in addition to the out-of-pocket costs and expenses of such examiners, at the per diem rate per individual charged by the Administrative Agent for its examiners), (d) the Administrative Agent, the Lenders and their respective Related Persons for all costs and expenses incurred in connection with (i) any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "workout", (ii) the enforcement or preservation of any right or remedy under any Loan Document, any Obligation, with respect to the Collateral or any other related right or remedy or (iii) the commencement, defense, conduct of, intervention in, or the taking of any other action (including preparation for and/or response to any subpoena or request for document production relating thereto) with respect to, any proceeding (including any bankruptcy or insolvency proceeding) related to any Credit Party, any Subsidiary of any Credit Party, Loan Document, Obligation, including Attorney Costs and (e) fees and disbursements of fees, costs and expenses (including Attorney Costs and all legal fees of Ropes & Gray LLP) of the Lenders (other than Administrative Agent) incurred in connection with this Agreement or any of the matters referred to in this paragraph.

-50-

9.6     <u>Indemnity</u>.

(a)     Each Credit Party agrees to indemnify, hold harmless and defend the Administrative Agent, each Lender and each of their respective Related Persons (each such Person being an "**<u>Indemnitee</u>**") from and against all Liabilities that may be imposed on, incurred by or asserted against any such Indemnitee (whether brought by a Credit Party, an Affiliate of a Credit Party or any other Person) in any matter relating to or arising out of, in connection with or as a result of (i) any Loan Document, any Obligation (or the repayment thereof), the use or intended use of the proceeds of any Term Loan or any securities filing of, or with respect to, any Credit Party, (ii) any commitment letter, proposal letter or term sheet with any Person or any Contractual Obligation, arrangement or understanding with any broker, finder or consultant, in each case entered into by or on behalf of any Credit Party or any Affiliate of any of them in connection with any of the foregoing and any Contractual Obligation entered into in connection with any Electronic Transmissions, (iii) any actual or prospective investigation, litigation or other proceeding, whether or not brought by any such Indemnitee or any of its Related Persons, any holders of securities or creditors (and including Attorney's Costs in any case), whether or not any such Indemnitee, Related Person, holder or creditor is a party thereto, and whether or not based on any securities or commercial law or regulation or any other Requirement of Law or theory thereof, including common law, equity, contract, tort or otherwise or (iv) any other act, event or transaction related, contemplated in or attendant to any of the foregoing (collectively, the "**<u>Indemnified Matters</u>**"); provided, however, that no Credit Party shall have any liability under this Section 9.6(a) to any Indemnitee with respect to any Indemnified Matter, and no Indemnitee shall have any liability with respect to any Indemnified Matter other than (to the extent otherwise liable), to the extent such liability has resulted from the gross negligence or willful misconduct of such Indemnitee, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. Furthermore, each Credit Party executing this Agreement waives and agrees not to assert against any Indemnitee, and shall cause each other Credit Party to waive and not assert against any Indemnitee, any right of contribution with respect to any Liabilities that may be imposed on, incurred by or asserted against any Related Person.  This Section 9.6(a) shall not apply with respect to Taxes other than any Taxes that represent Liabilities arising from any non-Tax claim.

(b)     Without limiting the foregoing, "Indemnified Matters" includes all Environmental Liabilities imposed on, incurred by or asserted against any Indemnitee, including those arising from, or otherwise involving, any Property of any Credit Party or any Related Person of any Credit Party or any actual, alleged or prospective damage to Property or natural resources or harm or injury alleged to have resulted from any Release of Hazardous Materials on, upon or into such Property or natural resource or any Property on or contiguous to any Real Estate of any Credit Party or any Related Person of any Credit Party, whether or not, with respect to any such Environmental Liabilities, any Indemnitee is a mortgagee pursuant to any leasehold mortgage, a mortgagee in possession, the successor- in-interest to any Credit Party or any Related Person of any Credit Party or the owner, lessee or operator of any Property of any Related Person through any foreclosure action, in each case except to the extent such Environmental Liabilities (i) are incurred solely following foreclosure by Administrative Agent or following Administrative Agent or any Lender having become the successor-in-interest to any Credit Party or any Related Person of any Credit Party and (ii) are attributable solely to acts of such Indemnitee.

-51-

9.7     Marshaling; Payments Set Aside.  No Secured Party shall be under any obligation to marshal any Property in favor of any Credit Party or any other Person or against or in payment of any Obligation.  To the extent that any Secured Party receives a payment from the Borrowers, from any other Credit Party, from the proceeds of the Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

9.8     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, that (a) any assignment by any Lender shall be subject to the provisions of Section 9.9, and (b) no Credit Party may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent and each Lender.

9.9     Assignments and Participations; Binding Effect.

(a)     Binding Effect.

(i)     This Agreement shall become effective when it shall have been executed by the Credit Parties signatory hereto, the Administrative Agent and each Lender.  Thereafter, it shall be binding upon and inure to the benefit of, but only to the benefit of, the Credit Parties hereto (in each case except for Article VIII), the Administrative Agent and each Lender receiving benefits of the Loan Documents and, to the extent provided in Section 8.11, each other Secured Party and, in each case, their respective successors and permitted assigns.  Except as expressly provided in any Loan Document (including in Section 8.9 of this Agreement), no Credit Party or the Administrative Agent shall have the right to assign any rights or obligations hereunder or any interest herein.

(ii)     To the extent that any Credit Party has or hereafter may acquire (or may be attributed, whether or not claimed) any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service of process or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its Property, such Credit Party hereby irrevocably waives and agrees not to plead or claim, to the fullest extent permitted by law, such immunity in respect of (A) its obligations under the Loan Documents, (B) any legal proceedings to enforce such obligation, and (C) any legal proceedings to enforce any judgment rendered in any proceedings to enforce such obligations.  Each Credit Party hereby agrees that the waivers set forth in this Section 9.9(a)(ii) are effective to the fullest extent permitted under the Foreign Sovereign Immunities Act and are intended to be irrevocable and not subject to withdrawal for purposes of the Foreign Sovereign Immunities Act.

-52-

(b)     Right to Assign.  Each Lender may sell, transfer, negotiate or assign (a "**Sale**") all or a portion of its rights and obligations hereunder (including all or a portion of its right to fund Term Loans and its rights and obligations with respect to its Term Loans) to:

> (i)     any existing Lender;

> (ii)    any Affiliate or Approved Fund of any existing Lender; or

> (iii)   any other Person (other than a Credit Party, a Subsidiary or Affiliate of a Credit Party, or a natural person) reasonably acceptable to the Administrative Agent.

(c)     Procedure.  The parties to each Sale made in reliance on clause (b) above (other than those described in clause (e) or (f) below) shall execute and deliver to the Administrative Agent an Assignment via an electronic settlement system designated by the Administrative Agent (or, if previously agreed with the Administrative Agent, via a manual execution and delivery of the Assignment) evidencing such Sale, together with any existing term note subject to such Sale (or any affidavit of loss therefor acceptable to the Administrative Agent), any Tax forms required to be delivered pursuant to Section 10.1 and payment of an assignment fee in the amount of $3,500 to the Administrative Agent, unless waived or reduced by the Administrative Agent, provided that (1) if a Sale by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such Sale, and (2) if a Sale by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such Assignee, then only one assignment fee of $3,500 (unless waived or reduced by the Administrative Agent) shall be due in connection with such Sale.  Upon receipt of all the foregoing, and conditioned upon such receipt and, if such Assignment is made in accordance with Section 9.9(b)(iii), upon the Administrative Agent consenting to such Assignment, from and after the effective date specified in such Assignment, the Administrative Agent shall record or cause to be recorded in the Register the information contained in such Assignment.

(d)     Effectiveness.

> (i)     Subject to the Register recording requirements by the Administrative Agent relating to an Assignment pursuant to Section 9.9(d)(ii), (A) the assignee thereunder shall become a party hereto and, to the extent that rights and obligations under the Loan Documents have been assigned to such assignee pursuant to such Assignment, shall have the rights and obligations of a Lender, (B) any applicable term note shall be transferred to such assignee through such entry and (C) the assignor thereunder shall, to the extent that rights and obligations under this Agreement have been assigned by it pursuant to such Assignment, relinquish its rights (except for those surviving the payment in full of the Obligations) and be released from its obligations under the Loan Documents, other than those relating to events or circumstances occurring prior to such assignment (and, in the case of an Assignment covering all or the remaining portion of an assigning Lender's rights and obligations under the Loan Documents, such Lender shall cease to be a party hereto).

-53-

(ii)    The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts (and stated interest) of the Term Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). Notwithstanding anything in the Loan Documents to the contrary, the entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Administrative Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    <u>Grant of Security Interests</u>.  In addition to the other rights provided in this Section 9.9(e), each Lender may grant a security interest in, or otherwise assign as collateral, any of its rights under this Agreement, whether now owned or hereafter acquired (including rights to payments of principal or interest on the Term Loans), to (A) any federal reserve bank (pursuant to Regulation A of the Federal Reserve Board), without notice to the Administrative Agent or (B) any holder of, or trustee for the benefit of the holders of, such Lender's Indebtedness or equity securities, by notice to the Administrative Agent; provided, however, that no such holder or trustee, whether because of such grant or assignment or any foreclosure thereon (unless such foreclosure is made through an assignment in accordance with clause (b) above and the Register recording requirements of Section 9.9(d)(ii)), shall be entitled to any rights of such Lender hereunder and no such Lender shall be relieved of any of its obligations hereunder.

(f)    <u>Participants and SPVs</u>.  In addition to the other rights provided in this Section 9.9(f), each Lender may, (x) with notice to the Administrative Agent, grant to an SPV the option to make all or any part of any Term Loan that such Lender would otherwise be permitted to make hereunder and such SPV may assign to such Lender the right to receive payment with respect to any Obligation and (y) without notice to or consent from the Administrative Agent or the Credit Parties, sell participations to one or more Persons other than a Credit Party or an Affiliate of a Credit Party in or to all or a portion of its rights and obligations under the Loan Documents (including all its rights and obligations with respect to all or any portion of the Term Loans); provided, however, that, whether as a result of any term of any Loan Document or of such grant or participation, (i) [reserved] and (ii) such Lender's rights and obligations, and the rights and obligations of the Credit Parties and the Secured Parties towards such Lender, under any Loan Document shall remain unchanged and each other party hereto shall continue to deal solely with such Lender, which shall remain the holder of the Obligations in the Register, except that (A) each such participant and SPV shall be entitled to the benefit of Article X, but, with respect to Section 10.1, only to the extent such participant or SPV agrees, for the benefit of the Borrowers, to be subject to and comply with Section 10.1(f) (it being understood that the documentation required under Section 10.1(f) shall be delivered to the granting or participating Lender) and then only to the extent of any amount to which such Lender would be entitled in the absence of any such grant or participation, unless the right to any greater payment results from a Change in Law that occurs after the participant or SPV acquired the applicable participation and (B) each such SPV may receive other payments that would otherwise be made to such Lender with respect to Term Loans funded by such SPV to the extent provided in the applicable option agreement and set

-54-

forth in a notice provided to the Administrative Agent by such SPV and such Lender; provided, however, that in no case (including pursuant to clause (A) or (B) above) shall an SPV or participant have the right to enforce any of the terms of any Loan Document.  No party hereto shall institute (and the Borrowers shall cause each other Credit Party that is not a party hereto not to institute) against any SPV grantee of an option pursuant to this clause (f) any bankruptcy, reorganization, insolvency, liquidation or similar proceeding, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper of such SPV; provided, however, that each Lender having designated an SPV as such agrees to indemnify each Indemnitee against any Liability that may be incurred by, or asserted against, such Indemnitee as a result of failing to institute such proceeding (including a failure to be reimbursed by such SPV for any such Liability). The agreement in the preceding sentence shall survive the payment in full of the Obligations.  Each Lender that sells a participation shall, acting solely for this purpose as a non- fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest on) of each participant's interest in the Term Loans or other interests, rights and obligations under the Loan Documents (the "**Participant Register**"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any loans or its other obligations under any Loan Document) to any Person other than the Administrative Agent except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Notwithstanding anything in the Loan Documents to the contrary, the entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement and any other Loan Documents notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent shall have no responsibility for maintaining a Participant Register.

9.10    Non-Public Information; Confidentiality

(a)    Non-Public Information.  The Administrative Agent and each Lender acknowledges and agrees that it may receive material non-public information ("**MNPI**") hereunder concerning the Credit Parties and their Affiliates and agrees to use such information in compliance with all relevant policies, procedures and applicable Requirements of Laws (including United States federal and state securities laws and regulations).

(b)    Confidential Information.  The Administrative Agent and each Lender agrees to use all reasonable efforts to maintain, in accordance with its customary practices for transactions of the type contemplated hereby, the confidentiality of information obtained by it pursuant to any Loan Document or otherwise related to any Credit Party, except that such information may be disclosed (i) with the Administrative Borrower's consent, (ii) to Related Persons of such Lender or the Administrative Agent or the Authority on a need to know basis, as the case may be, that are advised of the confidential nature of such information and are instructed to keep such information confidential in accordance with the terms hereof, (iii) to the extent such information presently is or hereafter becomes (A) publicly available other than as a result of a breach of this Section 9.10 or (B) available to such Lender or the Administrative Agent or any of their Related Persons, as the case may be, from a source (other than any Credit Party) not known by them to be subject to disclosure restrictions, (iv) to the extent disclosure is required by

-55-

applicable Requirements of Law or other legal process or requested or demanded by any Governmental Authority (including, without limitation, public disclosures by the Administrative Agent, any Lender or any of their Related Persons required by law, legal process (including, without limitation, subpoenas, requests for information, interrogatories and other similar process), the SEC or any other governmental or regulatory authority or agency), (v) (A) to the National Association of Insurance Commissioners or any similar organization, any examiner or any nationally recognized rating agency or (B) otherwise to the extent consisting of general portfolio information that does not identify Credit Parties, (vi) to current or prospective assignees, SPVs (including the investors and prospective investors therein) or participants, Persons that hold a security interest in any Lender's rights under this Agreement in accordance with Section 9.9(e) (and those Persons for whose benefit such holder of a security interest is acting), in each case to the extent such assignees, investors, participants, secured parties (and such benefited Persons), agree to be bound by provisions substantially similar to the provisions of this Section 9.10(b) (and such Person may disclose information to their respective Related Persons in accordance with clause (ii) above) and, (vii) to any other party hereto, and (viii) in connection with the exercise or enforcement of any right or remedy under any Loan Document, in connection with any litigation or other proceeding relating to the Loan Documents to which such Lender or the Administrative Agent or any of their Related Persons is a party or bound, or to the extent necessary to respond to public statements or disclosures by Credit Parties or their Related Persons referring to a Lender or the Administrative Agent or any of their Related Persons.  In the event of any conflict between the terms of this Section 9.10(b) and those of any other Contractual Obligation entered into with any Credit Party (whether or not a Loan Document), the terms of this Section 9.10(b) shall govern.

(c)    Tombstones.  Subject to the following sentence, each Credit Party consents to the publication by the Administrative Agent or any Lender of any press releases, tombstones, advertising or other promotional materials (including via any Electronic Transmission) relating to the financing transactions contemplated by this Agreement using such Credit Party's name, product photographs, logo or trademark.  The Administrative Agent or such Lender shall provide a draft of any such press release, advertising or other promotional material to the Administrative Borrower for review and comment prior to the publication thereof, the form and substance of which shall be subject to the approval of the Administrative Borrower, not to be unreasonably withheld or delayed.

(d)    Press Release and Related Matters.  No Credit Party shall, and no Credit Party shall permit any of its Affiliates to, issue any press release or other public disclosure (other than any document filed with any Governmental Authority relating to a public offering of securities of any Credit Party) using the name, logo or otherwise referring to the Administrative Agent or of any of its Affiliates or the Loan Documents without the prior written consent of the Administrative Agent or such Affiliate except to the extent required to do so under applicable Requirements of Law and then, only after consulting with the Administrative Agent.

(e)    Distribution of Materials to Lenders.  The Credit Parties acknowledge and agree that the Loan Documents and all reports, notices, communications and other information or materials provided or delivered by, or on behalf of, the Credit Parties hereunder (collectively, the "Borrower Materials") may be disseminated by, or on behalf of, the Administrative Agent, and made available, to the Lenders by Electronic Transmission.

-56-

9.11    Set-off; Sharing of Payments.

(a)    Right of Setoff.  The Administrative Agent, each Lender and each Affiliate (including each branch office thereof) of any of them is hereby authorized, without notice or demand (each of which is hereby waived by each Credit Party), at any time and from time to time during the continuance of any Event of Default and to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (whether general or special, time or demand, provisional or final) at any time held and other Indebtedness, claims or other obligations at any time owing by the Administrative Agent, such Lender or any of their respective Affiliates to or for the credit or the account of any Credit Party against any Obligation of any Credit Party now or hereafter existing, whether or not any demand was made under any Loan Document with respect to such Obligation.  No Lender shall exercise any such right of set off without the prior written consent of the Administrative Agent or Required Lenders.  The Administrative Agent and each Lender agrees promptly to notify the Administrative Borrower and the Administrative Agent after any such setoff and application made by such Lender or its Affiliates; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights under this Section 9.11(a) are in addition to any other rights and remedies (including other rights of setoff) that the Administrative Agent, the Lenders, their Affiliates and the other Secured Parties, may have.

(b)    Sharing of Payments, Etc.  If any Lender, directly or through an Affiliate or branch office thereof, obtains any payment of any Obligation of any Credit Party (whether voluntary, involuntary or through the exercise of any right of setoff or the receipt of any Collateral or "proceeds" (as defined under the applicable UCC) of Collateral) other than pursuant to Section 9.9 or Article X and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, the Administrative Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by the Administrative Agent and applied in accordance with this Agreement (or, if such application would then be at the discretion of the Borrowers, applied to repay the Obligations in accordance herewith); provided, however, that (i) if such payment is rescinded or otherwise recovered from such Lender in whole or in part, such purchase shall be rescinded and the purchase price therefor shall be returned to such Lender without interest and (ii) such Lender shall, to the fullest extent permitted by applicable Requirements of Law, be able to exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of the applicable Credit Party in the amount of such participation.

9.12    Counterparts; Facsimile Signature.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission, electronic signature or Electronic Transmission shall be as effective as delivery of a manually executed counterpart hereof.

9.13   <u>Severability</u>.  The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.14   <u>Captions</u>.  The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

9.15   <u>Independence of Provisions</u>.  The parties hereto acknowledge that this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, and that such limitations, tests and measurements are cumulative and must each be performed, except as expressly stated to the contrary in this Agreement.

9.16   <u>Interpretation</u>.  This Agreement is the result of negotiations among and has been reviewed by counsel to the Credit Parties, the Administrative Agent, each Lender and other parties hereto, and is the product of all parties hereto.  Accordingly, this Agreement and the other Loan Documents shall not be construed against the Lenders or the Administrative Agent merely because of the Administrative Agent's or Lenders' involvement in the preparation of such documents and agreements.  Without limiting the generality of the foregoing, each of the parties hereto has had the advice of counsel with respect to Sections 9.18 and 9.19.

9.17   <u>No Third Parties Benefited</u>.  This Agreement is made and entered into for the sole protection and legal benefit of the Borrowers, the Lenders, the Administrative Agent and, subject to the provisions of Section 8.11, each other Secured Party, and their permitted successors and assigns, and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  Neither the Administrative Agent nor any Lender shall have any obligation to any Person not a party to this Agreement or the other Loan Documents.

9.18   <u>Governing Law and Jurisdiction</u>.

(a)   <u>Governing Law</u>.  The laws of the State of New York shall govern all matters arising out of, in connection with or relating to this Agreement, including its validity, interpretation, construction, performance and enforcement (including any claims sounding in contract or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest).

(b)   <u>Submission to Jurisdiction</u>.  Any legal action or proceeding with respect to any Loan Document shall be brought exclusively in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America sitting in the Southern District of New York and, by execution and delivery of this Agreement, each Credit Party executing this Agreement hereby accepts for itself and in respect of its Property, generally and unconditionally, the jurisdiction of the aforesaid courts; provided, that nothing in this Agreement shall limit the right of the Administrative Agent to commence any proceeding in the federal or state courts of any other jurisdiction to the extent the Administrative Agent determines that such action is necessary or appropriate to exercise its rights or remedies under the Loan

-58-

Documents. The parties hereto (and, to the extent set forth in any other Loan Document, each other Credit Party) hereby irrevocably waive any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

(c)    Service of Process. Each Credit Party hereby irrevocably waives personal service of any and all legal process, summons, notices and other documents and other service of process of any kind and consents to such service in any suit, action or proceeding brought in the United States with respect to or otherwise arising out of or in connection with any Loan Document by any means permitted by applicable Requirements of Law, including by the mailing thereof (by registered or certified mail, postage prepaid) to the address of the Administrative Borrower specified herein (and shall be effective when such mailing shall be effective, as provided therein). Each Credit Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Non-Exclusive Jurisdiction. Nothing contained in this Section 9.18 shall affect the right of the Administrative Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Credit Party in any other jurisdiction.

9.19    Waiver of Jury Trial. THE PARTIES HERETO, TO THE EXTENT PERMITTED BY LAW, WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING ARISING OUT OF, IN CONNECTION WITH OR RELATING TO, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ANY OTHER TRANSACTION CONTEMPLATED HEREBY AND THEREBY. THIS WAIVER APPLIES TO ANY ACTION, SUIT OR PROCEEDING WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.20    Entire Agreement; Release; Survival.

(a)    THE LOAN DOCUMENTS EMBODY THE ENTIRE AGREEMENT OF THE PARTIES AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS RELATING TO THE SUBJECT MATTER THEREOF AND ANY PRIOR LETTER OF INTEREST, COMMITMENT LETTER, CONFIDENTIALITY AND SIMILAR AGREEMENTS INVOLVING ANY CREDIT PARTY AND ANY LENDER OR ANY OF THEIR RESPECTIVE AFFILIATES RELATING TO A FINANCING OF SUBSTANTIALLY SIMILAR FORM, PURPOSE OR EFFECT. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT, THE TERMS OF THIS AGREEMENT SHALL GOVERN (UNLESS OTHERWISE EXPRESSLY STATED IN SUCH OTHER LOAN DOCUMENTS OR SUCH TERMS OF SUCH OTHER LOAN DOCUMENTS ARE NECESSARY TO COMPLY WITH APPLICABLE REQUIREMENTS OF LAW, IN WHICH CASE SUCH TERMS SHALL GOVERN TO THE EXTENT NECESSARY TO COMPLY THEREWITH).

(b)    Execution of this Agreement by the Credit Parties constitutes a full, complete and irrevocable release of any and all claims which each Credit Party may have at law or in equity in respect of all prior discussions and understandings, oral or written, relating to the

-59-

subject matter of this Agreement and the other Loan Documents.  In no event shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential or punitive damages (including any loss of profits, business or anticipated savings).  Each Credit Party signatory hereto hereby waives, releases and agrees (and shall cause each other Credit Party to waive, release and agree) not to sue upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     (i) Any indemnification or other protection provided to any Indemnitee pursuant to Article VIII, Section 9.5, Section 9.6, this Section 9.20, and Article X and (ii) the provisions of Section 5(e) of each Security Agreement, in each case, shall (x) survive the payment in full of all Obligations and (y) with respect to clause (i) above, inure to the benefit of any Person that at any time held a right thereunder (as an Indemnitee or otherwise) and, thereafter, its successors and permitted assigns.

9.21     Patriot Act.  Each Lender that is subject to the Patriot Act hereby notifies the Credit Parties that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Lender to identify each Credit Party in accordance with the Patriot Act.

9.22     Joint and Several.

(a)     The obligations of the Credit Parties hereunder and under the other Loan Documents are joint and several.  Time is of the essence.

(b)     Without limiting the generality of the preceding clause (a):

(i)     the Borrowers shall be liable for all amounts due to the Administrative Agent, the Lenders and other Secured Parties under this Agreement and the other Loan Documents, regardless of which Borrower actually receives the proceeds of the Term Loans or the manner in which the Administrative Agent or any Lender accounts for the Term Loans on its books and records.  Each Borrower's Obligations, and each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder, shall be separate and distinct obligations, but all such Obligations shall be primary obligations of each Borrower.  Each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder shall, to the fullest extent permitted by law, be unconditional irrespective of (a) the validity or enforceability, avoidance or subordination of the Obligations of the other Borrowers or of any Loan Document evidencing all or any part of the Obligations of the other Borrowers, (b) the absence of any attempt to collect the Obligations from the other Borrowers or any other security therefor, or the absence of any other action to enforce the same, (c) the waiver, consent, extension, forbearance or granting of any indulgence by the Administrative Agent and the Required Lenders with respect to any provision of any instrument evidencing the Obligations of the other Borrowers, or any part thereof, or any other agreement now or hereafter executed by the other Borrowers and delivered to the Administrative Agent and the Lenders, (d) the failure by the

-60-

Administrative Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or Collateral of the other Borrowers, (e) any election in any proceeding instituted under the Bankruptcy Code of the application of section 1111(b)(2) of the Bankruptcy Code, (f) any borrowing or grant of a security interest by the other Borrowers, as debtors-in-possession under section 364 of the Bankruptcy Code, (g) the disallowance of all or any portion of any claim by the Administrative Agent or any Lender for the repayment of the Obligations of the other Borrowers under section 502 of the Bankruptcy Code, or (h) any other circumstances which might constitute a legal or equitable discharge or defense of the other Borrowers.  With respect to each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers under this Agreement and the other Loan Documents, each Borrower waives any right to enforce any right of subrogation or any remedy which the Administrative Agent or any Lender now has or may hereafter have against such Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent or any Lender to secure payment of the Obligations or any other liability of the Borrowers to the Administrative Agent or any Lender.  Upon and during the continuance of any Event of Default, the Administrative Agent may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for the Obligations.  Each Borrower consents and agrees that the Administrative Agent, the Lenders, and the Secured Parties shall be under no obligation to marshal any assets in favor of such Borrower or against or in payment of any or all of the Obligations.

(ii)    Each Credit Party hereby expressly waives to the fullest extent permitted by applicable law any and all benefits and defenses under the provisions of A.R.S. §§ 12-1641 through 12-1644, § 47-3605 and Arizona Rules of Civil Procedure, Rule 17(f), and any other statutes or rules now or hereafter in effect that purport to confer specific rights upon or make specific defenses and procedures available to a surety or guarantor.

9.23    Creditor-Debtor Relationship.  The relationship between the Administrative Agent and each Lender, on the one hand, and the Credit Parties, on the other hand, is solely that of creditor and debtor.  No Secured Party has any fiduciary relationship or duty to any Credit Party arising out of or in connection with, and there is no agency, tenancy or joint venture relationship between the Secured Parties and the Credit Parties by virtue of, any Loan Document or any transaction contemplated therein.

9.24    Process Agent.  If for any reason there is no authorized agent for service of process in New York, the Credit Parties irrevocably consent to the service of process out of the courts referred to in Section 9.18 hereof by mailing copies thereof by registered United States air mail postage prepaid to it at its address specified pursuant to Section 9.2.  Nothing in this Section shall affect the right of any Secured Party to (i) commence legal proceedings or otherwise sue any Credit Party in the country in which it is domiciled or in any other court having jurisdiction over such

-61-

Credit Party or (ii) serve process upon any Credit Party in any manner authorized by the laws of any such jurisdiction.

9.25   <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-in-Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

9.26   <u>Appointment of Administrative Borrower</u>.  Each Borrower hereby irrevocably appoints Holdings as the borrowing agent and attorney-in-fact for each other Borrower (the "**<u>Administrative Borrower</u>**") which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Administrative Borrower.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (a) to provide the Administrative Agent with all notices with respect to the Term Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by the Administrative Borrower shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from the Administrative Agent, the Lenders or any other Secured Party (and any notice or instruction provided by any such Person to the Administrative Borrower in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Term Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the loan accounts and Collateral in a combined fashion, as more fully set forth herein, is done solely as an

-62-

accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that the Administrative Agent, the Lenders and the Secured Parties shall not incur liability to any Borrower as a result hereof.  Each Borrower and each other Credit Party expects to derive benefit, directly or indirectly, from the handling of the loan accounts and the Collateral in a combined fashion since the successful operation of each Credit Party is dependent on the continued successful performance of the integrated group.  To induce the Administrative Agent, the Lenders and the other Secured Parties to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify the Administrative Agent, the Lenders and the other Secured Parties and hold the Administrative Agent, the Lenders and the other Secured Parties harmless against any and all liability, expense, loss or claim of damage or injury, made against the Administrative Agent, the Lenders and the other Secured Parties by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the loan accounts and Collateral of the Borrowers as herein provided, or (ii) any reliance upon any instructions of the Administrative Borrower, except that the Borrowers will have no liability pursuant to this Section 9.26 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Administrative Agent, the Lenders or any other Secured Party.

9.27    [Reserved.]

9.28    [Reserved.]

### ARTICLE X - TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes.  For purposes of this Section 10.1, the term "applicable law" includes FATCA.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by any applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by the Credit Parties.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    Indemnification by the Credit Parties.  The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of

-63-

any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Administrative Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.9(f)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this Section 10.1(d).

(e)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 10.1, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Administrative Borrower and the Administrative Agent, at the time or times reasonably requested by the Administrative Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Administrative Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Administrative Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Administrative Borrower or the Administrative Agent as will enable the Administrative Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the

-64-

completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(f)(ii)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)    Without limiting the generality of the foregoing,

(A)    any Lender that is a U.S. Person shall deliver to the Administrative Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W- 8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit 10.1-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax

-65-

<u>Compliance Certificate</u>") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W- 8ECI, IRS Form W-8BEN or W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 10.1-2 or Exhibit 10.1-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 10.1-4 on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Administrative Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Administrative Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 147 l(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Administrative Borrower or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 10.1 (including by the payment of additional amounts pursuant to this Section 10.1), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 10.1(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 10.1(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 10.1(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 10.1(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Survival.  Each party's obligations under this Section 10.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the repayment, satisfaction or discharge of all obligations under any Loan Document.

10.2     [Reserved].

10.3     Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

-67-

(iii)    impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Term Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Term Loan or of maintaining its obligation to make any such Term Loan or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 10.3(a) or (b) and delivered to the Administrative Borrower, shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

10.4    Funding Losses.  The Borrowers agree to reimburse each Lender and to hold each Lender harmless from any loss or expense which such Lender may sustain or incur as a consequence of the failure of the Borrowers to borrow a Term Loan after the Borrowers have given (or are deemed to have given) a Notice of Borrowing.

10.5    [Reserved].

10.6    [Reserved].

10.7    <u>Mitigation</u>.  If any Lender requires the Borrowers to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1 or 10.3, then such Lender shall (at the request of the Administrative Borrower) use reasonable efforts to designate a different lending office for funding or booking its Term Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.3, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

10.8    <u>Certificates of Lenders</u>.  Any Lender claiming reimbursement or compensation pursuant to this Article X shall deliver to the Administrative Borrower (with a copy to the Administrative Agent) a certificate setting forth in reasonable detail the nature and amount payable to such Lender hereunder and such certificate shall be conclusive and binding on the Borrowers in the absence of manifest error.

## ARTICLE XI - <u>DEFINITIONS</u>

11.1    <u>Defined Terms</u>.  The following terms are defined in the Section referenced opposite such terms:

| | |
|---|---|
| "**Additional Interim Term Loans**" | 1.1(a)(i)(B) |
| "**Administrative Borrower**" | 9.26 |
| "**Agency Fee**" | 1.7(b) |
| "**Agreement**" | Preamble |
| "**Applicable Rolling Forecast**" | 6.1 |
| "**Borrower**" and "**Borrowers**" | Preamble |
| "**Borrower Materials**" | 9.10(e) |
| "**Borrowers' Case**" | Recitals |
| "**Compliance Certificate**" | 4.2(b) |
| "**Closing Fee**" | 1.7(a) |
| "**Designated Persons**" | 3.21 |
| "**Event of Default**" | 7.1 |
| "**Exit Conversion**" | 1.6(a) |
| "**FCPA**" | 3.22 |
| "**Final Term Loans**" | 1.1(a)(ii) |
| "**GEPAZ**" | Preamble |
| "**Holdings**" | Preamble |
| "**Indemnified Matters**" | 9.6(a) |
| "**Indemnitee**" | 9.6(a) |
| "**Initial Interim Term Loans**" | 1.1(a)(i)(A) |
| "**Interim Term Loans**" | 1.1(a)(i)(B) |
| "**Investments**" | 5.4 |
| "**Just Right**" | Preamble |
| "**Lender**" and "**Lenders**" | Preamble |
| "**Maximum Lawful Rate**" | 1.3(e) |

| | |
|---|---|
| "**MNPI**" | 9.10(a) |
| "**OFAC**" | 3.21 |
| "**Participant Register**" | 9.9(f) |
| "**Permitted Liens**" | 5.1 |
| "**Permitted Variance**" | 6.1 |
| "**Prepayment Date**" | 1.6(e)(i) |
| "**Register**" | 9.9(d)(ii) |
| "**Restricted Payments**" | 5.11 |
| "**RFP**" | Preamble |
| "**Roll-Up Loans**" | 1.1(a)(iii) |
| "**Rolling Forecast**" | 4.17 |
| "**Sale**" | 9.9(b) |
| "**Sanctions**" | 3.21 |
| "**Tax Returns**" | 3.10 |
| "**Term Loans**" | 1.1(a)(iii) |
| "**U.S. Tax Compliance Certificate**" | 10.1(f)(ii)(B)(3) |
| "**Variance**" | 4.17 |
| "**Variance Report**" | 4.17 |

In addition to the terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Acquisition**" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of a Person, or of any business or division of a Person, (b) the acquisition of in excess of fifty percent (50%) of the Stock and Stock Equivalents of any Person or otherwise causing any Person to become a Subsidiary of Holdings, or (c) a merger or consolidation or any other combination with another Person.

"**Administrative Agent**" means UMB Trustee, National Association in its capacity as administrative agent for the Lenders hereunder, and any successor administrative agent.

"**Affiliate**" means, with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; provided, however, that no Secured Party shall be an Affiliate of any Credit Party or of any Subsidiary of any Credit Party solely by reason of the provisions of the Loan Documents. For purposes of this definition, "control" means the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the voting Stock of such Person (either directly or through the ownership of Stock Equivalents) or (b) the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, Affiliate shall exclude the Senior Bondholders (as defined under the Prepetition Bond Loan Agreement), the Lenders, Invesco Senior Secured Management, Inc. and its Affiliates and managed funds, the Prepetition Trustee, the Prepetition Bridge Agent and the Administrative Agent.

"**Anti-Corruption Laws**" means any law or regulation in a U.S. or any non- U.S. jurisdiction regarding bribery or any other corrupt activity, including the U.S Foreign Corrupt Practices Act and the U.K. Bribery Act 2010.

"**Anti-Money Laundering Laws**" means any law or regulation in a U.S. or any non-U.S. jurisdiction regarding money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes, including the Currency and Foreign Transactions Reporting Act of 1970 (otherwise known as the Bank Secrecy Act) and the U.S.A. PATRIOT Act.

"**Applicable Rate**" means eleven percent (11.0%) per annum.

"**Approved Fund**" means, with respect to any Lender, any Person (other than a natural Person) that (a) (i) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business or (ii) temporarily warehouses loans for any Lender or any Person described in clause (i) above and (b) is advised or managed by (i) such Lender, (ii) any Affiliate of such Lender or (iii) any Person (other than an individual) or any Affiliate of any Person (other than an individual) that administers or manages such Lender.

"**Assignment**" means an assignment agreement entered into by a Lender, as assignor, and any Person, as assignee, pursuant to the terms and provisions of Section 9.9 (with the consent of any party whose consent is required by Section 9.9), accepted by the Administrative Agent, substantially in the form of Exhibit A or any other form approved by the Administrative Agent.

"**Attorney Costs**" means and includes all reasonable fees and disbursements of any law firm or other external counsel.

"**Authority**" means the Arizona Industrial Development Authority, a nonprofit corporation organized and existing under the laws of the State of Arizona.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended from time to time and any successor statute thereto.

"**Bankruptcy Court**" has the meaning specified therefor in the recitals hereto.

"**Bankruptcy Court DIP Orders**" means the Interim Order and, upon entry thereof and thereafter, the Final Order, as applicable and as the context requires.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

-71-

"**Benefit Plan**" means any employee benefit plan as defined in Section 3(3) of ERISA (whether governed by the laws of the United States or otherwise) to which any Credit Party incurs or otherwise has any obligation or liability, contingent or otherwise.

"**Blocked Person**" (a) a Person whose name appears on the list of Specially Designated Nationals and Blocked Persons published by OFAC, (b) a Person, entity, organization, country or regime that is blocked or a target of sanctions that have been imposed under U.S. economic sanctions laws or Canadian economic sanctions laws or (c) a Person that is an agent, department or instrumentality of, or is otherwise beneficially owned by, controlled by or acting on behalf of, directly or indirectly, any Person, entity, organization, country or regime described in clause (a) or (b).

"**Board Change**" means (a) Alan Carr shall cease for any reason (including, without limitation, termination of employment, death or disability) to be a director of Holdings or (b) any other director of Holdings shall cease to be satisfactory to the Administrative Agent and the Required Lenders in their sole discretion.

"**Board of Directors**" means, as to any Person, the board of directors (or comparable managers) of such Person, or any committee thereof duly authorized to act on behalf of the board of directors (or comparable managers).

"**Borrowing**" means a borrowing hereunder consisting of Term Loans made to or for the benefit of the Borrowers by the Lenders pursuant to Article I.

"**Business Day**" means any day that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York City.

"**Capital Lease**" means, with respect to any Person, any lease of, or other arrangement conveying the right to use, any Property by such Person as lessee that has been or should be accounted for as a capital lease on a balance sheet of such Person prepared in accordance with GAAP.

"**Capital Lease Obligations**" means, at any time, with respect to any Capital Lease, any lease entered into as part of any sale leaseback transaction of any Person or any synthetic lease, the amount of all obligations of such Person that is (or that would be, if such synthetic lease or other lease were accounted for as a Capital Lease) capitalized on a balance sheet of such Person prepared in accordance with GAAP.

"**Carve Out**" has the meaning specified in the Bankruptcy Court DIP Orders.

"**Cash Equivalents**" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-l" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-l" by S&P or "P-1" by Moody's and

-72-

issued by any Person organized under the laws of any state of the United States, (d) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $500,000,000 and (e) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a), (b), (c) or (d) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a), (b), (c) or (d) above shall not exceed 365 days.

"**Cash Management Order**" has the meaning specified therefor in Section 2.1(g)(iii).

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Chapter 11 Cases**" has the meaning specified therefor in the recitals hereto.

"**Chapter 11 Plan**" means any plan of reorganization or liquidation with respect to the Credit Parties and their Subsidiaries pursuant to the Chapter 11 Cases.

"**Chief Restructuring Officer**" means Kenneth Latz from Riveron as the chief restructuring officer.

"**Closing Date**" means January [31], 2024.

"**Code**" means the Internal Revenue Code of 1986.

"**Collateral**" means all Property and interests in Property and proceeds thereof now owned or hereafter acquired by any Credit Party, any of their respective Subsidiaries and any other Person who has granted a Lien to the Administrative Agent, in or upon which a Lien is granted, purported to be granted, or now or hereafter exists in favor of any Lender or the Administrative Agent for the benefit of the Administrative Agent, the Lenders and other Secured Parties, whether under this Agreement or under any other documents executed by any such Persons and delivered to the Administrative Agent.  For the avoidance of doubt, "Collateral" shall not include any Excluded Property.

"**Collateral Access Agreement**" means a landlord access or acknowledgement agreement of any lessor or other Person in possession of, having a Lien upon, or having rights or interests in a Credit Party's books and records or chattel paper, in each case, in form and substance reasonably satisfactory to Administrative Agent.

"**Collateral Documents**" means, collectively, the Security Agreements, the Pledge Agreements, and all other security agreements, pledge agreements, patent and trademark security agreements, lease assignments, guaranties and other similar agreements, and all amendments, restatements, modifications or supplements thereof or thereto, now or hereafter delivered to the Lenders or the Administrative Agent pursuant to or in connection with the transactions contemplated hereby, and all financing statements (or comparable documents now or hereafter filed in accordance with the UCC or comparable law) against any such Person as debtor in favor of any Lender or the Administrative Agent for the benefit of the Administrative Agent, the Lenders and the other Secured Parties, as secured party, as any of the foregoing may be amended, restated and/or modified from time to time.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes.

"**Contingent Indemnity Obligations**" means any Obligation constituting a contingent indemnification obligation of any Credit Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made with respect thereto.

"**Contingent Obligation**" means, as to any Person, any direct or indirect liability, contingent or otherwise, of that Person:  (a) with respect to any Indebtedness, lease, dividend or other obligation of another Person if the primary purpose or intent of the Person incurring such liability, or the primary effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (c) under any Rate Contracts; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for the obligations of another Person through any agreement to purchase, repurchase or otherwise acquire such obligation or any Property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another Person.  The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed or supported.

"**Contractual Obligations**" means, as to any Person, any provision of any security (whether in the nature of Stock, Stock Equivalents or otherwise) issued by such Person or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument, document or agreement (other than a Loan Document) to which such Person is a party or by which it or any of its Property is bound or to which any of its Property is subject.

"**Copyrights**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to copyrights and all mask work, database and design rights, whether or not registered or published, all registrations and recordations thereof and all applications in connection therewith.

"**Credit Parties**" means (a) each Borrower and (b) each other Person (i) which executes a guaranty of the Obligations or (ii) which grants a Lien to secure payment of the Obligations.  Credit Parties shall not include Seymour International Group, LLC, Seymour Forest Products, LLC and Lumberjack Timber, LLC and Pioneer Forest Products Corporation.

"**Debtor Relief Law**" means the Bankruptcy Code of the United States, the *Bankruptcy and Insolvency Act* (Canada), *Companies Creditors Arrangement Act* (Canada), the *Winding-Up and Restructuring Act* (Canada) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws, including corporate Laws (to the extent the relief sought under such corporate laws relates to or involves the compromise, settlement, adjustment or arrangement of debt), of the United States, Canada or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event or circumstance that, with the passing of time or the giving of notice or both, would (if not cured or otherwise remedied during such time) become an Event of Default.

"**Defined Benefit Plan**" means a "defined benefit plan" (as defined in Section 3(35) of ERISA) that is subject to Title IV of ERISA for which a Borrower or any of its Subsidiaries or ERISA Affiliates has been an "employer" (as defined in Section 3(5) of ERISA) within the past six years.

"**DIP Superpriority Claim**" means an allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503, and 507 granted pursuant to the Bankruptcy Court DIP Orders.

"**Disposition**" means (a) the sale, lease, conveyance or other disposition of Property (including for the avoidance of doubt, the dispositions permitted under Section 5.2) and (b) the sale or transfer by Holdings or any Subsidiary of Holdings of any Stock or Stock Equivalent issued by any Subsidiary of Holdings and held by such transferor Person.

"**Disqualified Stock**" means any Stock or Stock Equivalent which, by its terms (or by the terms of any security or other Stock into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the date that is ninety-one (91) days following the Maturity Date (excluding any provisions requiring redemption upon a "change of control" or similar event; provided, that such "change of control" or similar event results in the prior payment in full in cash of the Obligations (other than Contingent Indemnity Obligations), the termination of this Agreement), (b) is convertible into or exchangeable for (i) debt securities or (ii) any Stock or Stock Equivalents referred to in (a) above, in each case, at any time on or prior to the date that

-75-

is ninety-one (91) days following the Maturity Date of the Term Loans, or (c) is entitled to receive scheduled dividends or distributions in cash prior to the time that the Obligations (other than other than Contingent Indemnity Obligations) are paid in full in cash.

"**Dollars**", "dollars" and "$" each mean lawful money of the United States.

"**E-Fax**" means any system used to receive or transmit faxes electronically.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electronic Transmission**" means each document, instruction, authorization, file, information and any other communication transmitted, posted or otherwise made or communicated by e-mail or E- Fax, or otherwise to or from an E-system.

"**Environmental Laws**" means all Requirements of Law and Permits imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the workplace, the environment and natural resources, and including public notification requirements and environmental transfer of ownership, notification or approval statutes.

"**Environmental Liabilities**" means all Liabilities (including costs of Remedial Actions, natural resource damages and costs and expenses of investigation and feasibility studies, including the cost of environmental consultants and attorneys' costs) that may be imposed on, incurred by or asserted against any Credit Party or any Subsidiary of any Credit Party as a result of, or related to, any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law or otherwise, arising under any Environmental Law or in connection with any environmental, health or safety condition or with any Release and resulting from the ownership, lease, sublease or other operation or occupation of property by any Credit Party or any Subsidiary of any Credit Party, whether on, prior or after the date hereof.

"**Equity Issuance**" means any issuance of Stock or Stock Equivalents by, or a capital contribution to, Holdings.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means, collectively, any Credit Party and any Person under common control or treated as a single employer with, any Credit Party, within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Loss**" means, with respect to any Property, any of the following: (a) any loss, destruction or damage of such Property; or (b) any condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation of such Property or the requisition of the use of such Property.

"**Excluded Property**" means, collectively,

(a)        assets owned by the Borrowers or their Subsidiaries that are subject to a purchase money Lien or a Capital Lease Obligation permitted hereunder if the contractual obligation pursuant to which such Lien is granted (or in the document providing for such Capital Lease) prohibits the creation of any other Lien on such property, in each case, to the extent and for so long as the grant of a security interest therein constitutes a breach or default that would be enforceable after giving effect to the automatic stay under Section 362 of the Bankruptcy Code and is under, or results in the termination of or requires a consent not obtained under the documents governing such purchase money Lien or Capital Lease or results in the invalidation of such purchase money Lien or Capital Lease with a right of termination (in each case, after giving effect to Sections 9-406, 9-407, 9-408 and 9-409 of the UCC);

(b)        governmental licenses or state or local franchises, charters and authorizations and any other property or assets to the extent that the Administrative Agent on behalf of the other Secured Parties may not validly possess a security interest therein under the applicable Requirement of Law (including, without limitation, rules and regulations of any Governmental Authority), unless otherwise permitted pursuant to the Bankruptcy Code;

(c)        any intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, to the extent, if any, that, and solely during the period, if any, in which the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law;

(d)        [reserved]; and

(e)        any particular asset or right under contract, if the pledge thereof or the security interest therein is prohibited by any Requirement of Law (including rules and regulations of any Governmental Authority or agency) (including any requirement thereunder to obtain the consent of any Governmental Authority or agency) or any contract or agreement with a third party, in each case, to the extent and for so long as the grant of a security interest therein constitutes a breach or default that would be enforceable after giving effect to the automatic stay under Section 362 of the Bankruptcy Code and is under, or results in the termination of or requires a consent not obtained under such contract or agreement or results in the invalidation of such contract or agreement with a right of termination (in each case, after giving effect to Sections 9-406, 9-407, 9-408 and 9-409 of the UCC);

provided, however, that for the avoidance of doubt any proceeds (as defined under the applicable UCC), substitutions or replacements of any Excluded Property shall not be Excluded Property (unless such proceeds, substitutions or replacements are otherwise, in and of themselves, Excluded Property); provided, further, that to the extent any asset constituting Excluded Property ceases to satisfy the requirements set forth in this definition, such asset shall immediately cease to be Excluded Property.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loans (other than pursuant to an assignment request by the Administrative Borrower under Section 10.7) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 10.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 10.1 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Exit Fee**" means a fee equal to 3.00% of the aggregate principal amount of the Term Loans, which fee shall be payable in kind at the times specified in this Agreement (but in no event later than the earliest of (a) the date of repayment in full of all Obligations hereunder, (b) any Exit Conversion or (c) the date of a payment or reduction of the Obligations in connection with any credit bid by the Administrative Agent or Lenders).

"**Extraordinary Receipts**" means all amounts received by a Credit Party or any Subsidiary thereof not in the Ordinary Course of Business, including: (a) foreign, United States, state or local tax refunds and any governmental agency tax or similar credit paid in cash; (b) pension plan reversions; (c) proceeds of business interruption insurance; (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action; (e) indemnity payments; and (f) any purchase price adjustment received in connection with any purchase agreement.

"**Facility Termination Date**" means the date on which all Term Loans have been paid and satisfied in full. In the case of any contingent Obligations (excluding contingent Obligations as to which no claim has been asserted), there shall have been deposited cash collateral with respect to all such contingent Obligations in amounts and on terms and conditions and with parties reasonably satisfactory to the Administrative Agent and each Indemnitee that is, or may be, owed such Obligations.

"**FATCA**" means Sections 1471, 1472, 1473 and 1474 of the Code, as in effect as of the date of this Agreement (and any amended or successor version that is substantively comparable and not materially more onerous to comply with), current or future United States Treasury

Regulations promulgated thereunder or official interpretations with respect thereto and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Federal Flood Insurance**" means federally backed Flood Insurance available under the National Flood Insurance Program to owners of real property improvements located in Special Flood Hazard Areas in a community participating in the National Flood Insurance Program.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System, or any entity succeeding to any of its principal functions.

"**FEMA**" means the Federal Emergency Management Agency, a component of the U.S. Department of Homeland Security that administers the National Flood Insurance Program.

"**Final Order**" means a final order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents under sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered on or substantially contemporaneously with a final hearing, in form and substance satisfactory to the Administrative Agent and Lenders (in their sole discretion).

"**Fiscal Quarter**" means any of the quarterly accounting periods of the Credit Parties ending on March 31, June 30, September 30 and December 31 of each year.

"**Fiscal Year**" means any of the annual accounting periods of the Credit Parties ending on December 31 of each year.

"**Flood Insurance**" means, for any Real Estate located in a Special Flood Hazard Area, Federal Flood Insurance or private insurance reasonably satisfactory to the Administrative Agent, in either case, that (a) meets the requirements set forth by FEMA in its Mandatory Purchase of Flood Insurance Guidelines, (b) shall include a deductible not to exceed $25,000 and (c) shall have a coverage amount equal to the lesser of (i) the "replacement cost value" of the buildings and any personal property Collateral located on the Real Estate as determined under the National Flood Insurance Program or (ii) the maximum policy limits set under the National Flood Insurance Program.

"**Foreign Lender**" means a Lender that is not a U.S. Person.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions and comparable stature and authority within the accounting profession) that are applicable to the circumstances as of the date of determination. Subject to Section 11.3, all references to "GAAP" shall be to GAAP applied consistently.

"**Governmental Authority**" means any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body,

arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"**Guarantor**" means any Person that has guaranteed any Obligations.

"**Hazardous Material**" means any substance, material or waste that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar meaning or regulatory effect, including petroleum or any fraction thereof, asbestos, polychlorinated biphenyls and radioactive substances.

"**Indebtedness**" of any Person means, without duplication:  (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of Property or services, including earnouts (other than trade payables entered into in the Ordinary Course of Business and which are not past due by more than 90 days); (c) the face amount of all letters of credit issued for the account of such Person and without duplication, all drafts drawn thereunder and all reimbursement or payment obligations with respect to letters of credit, surety bonds and other similar instruments issued by such Person; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of Property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property); (f) all Capital Lease Obligations; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing product; (h) all obligations of such Person, whether or not contingent, in respect of Disqualified Stock, valued at, in the case of redeemable preferred Stock, the greater of the voluntary liquidation preference and the involuntary liquidation preference of such Stock plus accrued and unpaid dividends; (i) all indebtedness referred to in clauses (a) through (h) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property (including accounts and contracts rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness; (j) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligations of another; and (k) all Contingent Obligations in respect of indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Independent Manager Agreement**" means that certain agreement, dated as of May 16, 2023, by and among Alan Carr and RFP.

"**Insolvency Proceeding**" means (a) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (b) any general assignment for the

benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in (a) and (b) above, undertaken under U.S. federal, state or foreign law, including the Bankruptcy Code.

"**Intellectual Property**" means all rights, title and interests in or relating to intellectual property and industrial property arising under any Requirement of Law and all IP Ancillary Rights relating thereto, including, without limitation, all Copyrights, Trademarks, Patents, IP Licenses and internet domain names.

"**Interest Payment Date**" means the last day of each calendar month, commencing with the last day of February.

"**Interim Order**" means (a) the order of the Bankruptcy Court in the Chapter 11 Cases authorizing and approving this Agreement and the other Loan Documents for an interim period under sections 364(c) and (d) of the Bankruptcy Code and entered after a hearing, in the form attached as Exhibit I hereto and (b) any Supplemental Interim Orders.

"**IP Ancillary Rights**" means, with respect to any Intellectual Property, as applicable, all foreign counterparts to, and all divisionals, reversions, continuations, continuations-in-part, reissues, reexaminations, renewals and extensions of, such Intellectual Property and all income, royalties, proceeds and Liabilities at any time due or payable or asserted under or with respect to any of the foregoing or otherwise with respect to such Intellectual Property, including all rights to sue or recover at law or in equity for any past, present or future infringement, misappropriation, dilution, violation or other impairment thereof, and, in each case, all rights to obtain any other IP Ancillary Right.

"**IP License**" means all Contractual Obligations (and all related IP Ancillary Rights), whether written or oral, granting any right, title and interest in or relating to any Intellectual Property.

"**IRS**" means the Unites States Internal Revenue Service and any successor thereto.

"**Lender**" means each Lender that may fund a Term Loan or has funded a Term Loan, including such Lender's successors and permitted assigns.

"**Liabilities**" means all claims, actions, suits, judgments, damages, losses, liability, obligations, responsibilities, fines, penalties, sanctions, costs, fees, Taxes, commissions, charges, disbursements and expenses (including those incurred upon any appeal or in connection with the preparation for and/or response to any subpoena or request for document production relating thereto), in each case of any kind or nature (including interest accrued thereon or as a result thereto and fees, charges and disbursements of financial, legal and other advisors and consultants), whether joint or several, whether or not indirect, contingent, consequential, actual, punitive, treble or otherwise.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention

agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"**Loan**" means an extension of credit by a Lender to the Borrowers under Article I of this Agreement.

"**Loan Documents**" means this Agreement, the term notes (if any), the Bankruptcy Court DIP Orders, the Collateral Documents, the Collateral Access Agreements, the Prepetition Bridge Subordination Agreement and all documents delivered to the Administrative Agent and/or any Lender in connection with any of the foregoing.

"**Margin Stock**" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"**Material Adverse Effect**" means an effect that results in or causes, or could reasonably be expected to result in or cause, a material adverse change in any of (a) the condition (financial or otherwise), business, performance, operations or Property of any Borrower or the Credit Parties and their Subsidiaries taken as a whole; (b) the ability of any Credit Party, any Subsidiary of any Credit Party or any other Person (other than the Administrative Agent or Lenders) to perform its obligations under any Loan Document; or (c) the validity or enforceability of any Loan Document or the rights and remedies of the Administrative Agent, the Lenders and the other Secured Parties under any Loan Document.

"**Material Contract**" means, with respect to each Credit Party, (a) the agreements entered into in connection with the development and construction of the so- called small log mill, (b) each contract or agreement to which such Credit Party or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $15,000 or more (other than purchase orders in the Ordinary Course of Business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the Ordinary Course of Business upon less than 60 days notice without penalty or premium) (c) the Prepetition Documents and the Lateral Loan Agreement, and (d) all other contracts or agreements, the loss of which could reasonably be expected to result in any Material Liability or a Material Adverse Effect.

"**Material Liability**" means, with respect to each Credit Party, any claim or other liability upon such Credit Party or its assets exceeding $15,000.

"**Maturity Date**" means the earliest of (a) May 31, 2024, or if such day is not a Business Day, the preceding Business Day, (b) the effective date of a Chapter 11 Plan that has been confirmed by an order of the Bankruptcy Court, (c) 23 days after the Bankruptcy Court's entry of the Interim Order unless, on or before such day, the Final Order shall have been entered by the Bankruptcy Court, (d) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (e) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (f) the date of substantial consummation of a sale of all or substantially all of the assets of the Credit Parties, and (g) such earlier date on which the Obligations shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"**Maximum Pro Rata Share**" means, as of any date of determination, the percentage determined by dividing (i) the amount of such Lender's Uncommitted DDTL Tranche provided for in Schedule 1.1(a) by (ii) the total amount of the Uncommitted DDTL Tranche provided for in Schedule 1.1(a).

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means any deed of trust, leasehold deed of trust, mortgage, leasehold mortgage, deed to secure debt, leasehold deed to secure debt or other document creating a Lien on Real Estate or any interest in Real Estate.

"**Multiemployer Plan**" means any multiemployer plan, as defined in Section 3(37) or 4001(a)(3) of ERISA, as to which any ERISA Affiliate incurs or otherwise has any obligation or liability, contingent or otherwise.

"**National Flood Insurance Program**" means the program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973, as revised by the National Flood Insurance Reform Act of 1994, that mandates the purchase of flood insurance to cover real property improvements located in Special Flood Hazard Areas in participating communities and provides protection to property owners through a federal insurance program.

"**Net Issuance Proceeds**" means, in respect of any incurrence of Indebtedness or the issuance of Stock or Stock Equivalents by, or a capital contribution to, Holdings, cash proceeds (including cash proceeds as and when received in respect of non-cash proceeds received or receivable in connection with such incurrence or issuance), net of underwriting discounts and reasonable out-of-pocket costs and expenses paid or incurred in connection therewith in favor of any Person not an Affiliate of Holdings.

"**Net Proceeds**" means proceeds in cash, checks or other cash equivalent financial instruments (including Cash Equivalents) as and when received by the Person making a Disposition, as well as insurance proceeds and condemnation and similar awards received on account of an Event of Loss or otherwise in respect of the receipt of any Extraordinary Receipts, net of:  (a) in the event of a Disposition (i) the direct costs relating to such Disposition excluding amounts payable to a Borrower or any Affiliate of a Borrower, and (ii) sale, use or other transaction Taxes paid or payable as a result thereof, (b) in the event of an Event of Loss, (i) all money actually applied to repair or reconstruct the damaged Property or Property affected by the condemnation or taking, (ii) all of the costs and expenses reasonably incurred in connection with the collection of such proceeds, award or other payments, and (iii) any amounts retained by or paid to parties having superior rights to such proceeds, awards or other payments, and (c) in the event of the receipt of any Extraordinary Receipts, all of the costs and expenses reasonably incurred in connection therewith.

"**Notice of Borrowing**" means a notice given by the Administrative Borrower to the Administrative Agent in substantially the form of Exhibit N hereto.

"**Obligations**" means all Term Loans and other Indebtedness, advances, debts, liabilities, obligations, covenants and duties owing by any Credit Party to any Lender, the Administrative

-83-

Agent or any other Person required to be indemnified, that arises under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired. For the avoidance of doubt, Obligations shall include, without limitation, (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, the Exit Fee, charges, expenses, fees, premiums, attorneys' fees and disbursements, indemnities and other amounts payable by any Credit Party under the Loan Documents, and (b) the obligation of such Credit Party to reimburse any amount in respect of any of the foregoing that the Administrative Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Credit Party.

"**Ordinary Course of Business**" means, in respect of any transaction involving any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organization Documents**" means, (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of determination or instrument relating to the rights of preferred shareholders of such corporation and any shareholder rights agreement, (b) for any partnership, the partnership agreement and, if applicable, certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation, or (d) any other document setting forth the manner of election or duties of the officers, directors, managers or other similar persons, or the designation, amount or relative rights, limitations and preference of the Stock of a Person.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax, other than any such connection arising from the Recipient having executed, delivered, become a party to, performed its obligations or received a payment under, received or perfected as a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Term Loan or Loan Document.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.7).

"**Patents**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to letters patent and applications therefor.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, P.L. 107-56.

-84-

"**Perfection Certificate**" shall mean a perfection certificate in the form of Exhibit P or any other form approved by the Administrative Agent.

"**Permits**" means, with respect to any Person, any permit, approval, authorization, license, registration, certificate, concession, grant, franchise, variance or permission from, and any other Contractual Obligations with, any Governmental Authority, in each case whether or not having the force of law and applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Person**" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"**Petition Date**" has the meaning specified therefor in the Recitals hereto.

"**Plan Assets**" means "plan assets" within the meaning of the Plan Asset Regulations.

"**Plan Asset Regulations**" means 29 C.F.R. §2510.3-101, as modified by Section 3(42) of ERISA.

"**Pledge Agreements**" means the (i) Membership Interest Pledge Agreement, dated as of the Closing Date, by and between the Administrative Borrower and the Administrative Agent, (ii) Membership Interest Pledge Agreement, dated as of the Closing Date, by and between the RFP and the Administrative Agent, (iii) Membership Interest Pledge Agreement, dated as of the Closing Date, by and between the GEPAZ and the Administrative Agent and (iv) Membership Interest Pledge Agreement, dated as of the Closing Date, by and between the Just Right and the Administrative Agent.

"**Pre-Packaged Plan**" means the joint pre-packaged plan of reorganization for the Credit Parties in form and substance satisfactory to the Required Lenders in their sole discretion and attached hereto as Exhibit PP.

"**Prepetition 2022A Bonds**" means the Arizona Industrial Development Authority Revenue Bonds (NewLife Forest Restoration, LLC Project), Senior Federally Taxable Series 2022A (Sustainability-Linked Bonds) that are issued pursuant to the Indenture.

"**Prepetition Bond Documents**" means the Prepetition Bond Loan Agreement, the Prepetition Indenture Subordination Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"**Prepetition Bond Loan Agreement**" means that (i) certain Loan Agreement, dated as of February 1, 2022 (as amended by that certain First Amendment to Loan Agreement, dated as of April 11, 2023 and by that certain Second Amendment to Loan Agreement, dated as of June 16, 2023) between the Authority and RFP (f/k/a NewLife Forest Restoration, LLC), and acknowledged by the other Credit Parties party thereto and (ii) the Prepetition Indenture.

"**Prepetition Bond Obligations**" means all obligations of the Borrowers under the Prepetition Bond Loan Agreement.

"**Prepetition Bond Subordination Agreement**" means that certain Subordination Agreement between UMB Bank, National Association, the Borrowers, Arizona Industrial Development Authority, the Lateral Lenders (as defined therein), pursuant to which the obligations of the Subordinate Lenders (as defined therein) are subordinated in priority of payment to the Senior Secured Obligations (as defined therein).

"**Prepetition Bridge Agent**" means the Administrative Agent as administrative agent under the Prepetition Bridge Credit Agreement.

"**Prepetition Bridge Credit Agreement**" means that certain Credit Agreement, dated as of June 5, 2023, as amended by that certain First Amendment to Credit Agreement, dated as of September 1, 2023, by and among the Borrowers, the lenders from time to time party thereto and the Administrative Agent.

"**Prepetition Bridge Documents**" means the Prepetition Bridge Credit Agreement, the Prepetition Bridge Subordination Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"**Prepetition Bridge Lenders**" means the lenders under the Prepetition Bridge Credit Agreement.

"**Prepetition Bridge Obligations**" means the "Obligations" (as defined in the Prepetition Bridge Credit Agreement).

"**Prepetition Bridge Subordination Agreement**" means the Subordination Agreement between the Authority and the Administrative Agent, pursuant to which the loans under the Prepetition Bridge Credit Agreement are subordinated in priority of payment to the Series 2022 Bonds and the Liens granted to the Administrative Agent are subordinated to the Liens granted to the Authority under and/or pursuant to the Prepetition Bond Loan Agreement.

"**Prepetition Documents**" means the Prepetition Bridge Documents, the Prepetition Bond Documents and each of the other agreements, instruments or documents executed pursuant thereto prior to the Petition Date.

"**Prepetition Indebtedness**" means Indebtedness of the Borrowers outstanding, or secured, under the Prepetition Documents and outstanding as of the Petition Date.

"**Prepetition Indenture**" means that certain Indenture of Trust, dated as of February 1, 2022, by and among the Authority and the Prepetition Trustee, as amended by the First Supplemental Indenture of Trust, dated as of April 11, 2023 and the Second Supplemental Indenture of Trust, dated as of June 16, 2023, by and between the Authority and the Prepetition Trustee.

"**Prepetition Lateral Loan Agreement**" means the Loan Agreement, dated as of February 11, 2022, by and among others, the Borrowers and the Lateral Administrative Agent, LLC (as

amended, restated, amended and restated, modified, supplemented, extended or replaced prior to the date of this Agreement).

"**Prepetition Obligations**" means all (i) Prepetition Bridge Obligations and (ii) Prepetition Bond Obligations.

"**Prepetition Trustee**" means UMB Bank, National Association, as trustee under the Indenture.

"**Pro Rata Share**" means, as of any date of determination, with respect to each Lender's right to receive payments of interest, fees, and principal with respect to the Term Loans, and with respect to all other computations and other matters related to the Term Loans, this Agreement or any other Loan Document, the percentage obtained by dividing (i) the outstanding principal balances of all Term Loans of such Lender by (ii) the aggregate outstanding principal balances of all Term Loans of all Lenders.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, and whether tangible or intangible.

"**Rate Contracts**" means swap agreements (as such term is defined in Section 101 of the Bankruptcy Code) designed to provide protection against fluctuations in interest or currency exchange rates and any other agreements or arrangements designed to provide such protection.

"**Real Estate**" means any real property owned, leased, subleased or otherwise operated or occupied by any Credit Party or any Subsidiary of any Credit Party.

"**Real Estate Collateral Requirements**" means the following:

(a)    the Administrative Agent shall have received (i) a commitment for a policy of title insurance that is acceptable to the Administrative Agent in its sole discretion with the final title insurance policy being delivered promptly following the recordation of the applicable Mortgage, insuring the Secured Parties' Liens and showing no Liens prior to the Secured Parties' Liens other than Permitted Liens (each, a "Title Policy"), (ii) copies of all recorded documents creating exceptions to the applicable Title Policy, (iii) a Phase I environmental assessment and such other environmental reports reasonably requested by the Administrative Agent regarding each parcel of real property subject to a Mortgage by an environmental engineering firm acceptable to the Administrative Agent showing no environmental conditions in violation of Environmental Laws or liabilities under Environmental Laws that could reasonably be expected to result in any Material Liability, and (iv) all applicable Real Estate Support Documents;

(b)    the Title Policy shall provide an insured amount that is acceptable to Administrative Agent in its sole discretion, and shall provide for all endorsements required by the Administrative Agent; and

(c)    the Administrative Borrower shall have provided or obtained any customary estoppels, affidavits and indemnities as may be required or necessary to obtain title insurance satisfactory to the Administrative Agent.

"**Real Estate Support Documents**" means, collectively, flood hazard certification, permanent certificates of occupancy, evidence of zoning compliance, if any, and evidence of Flood Insurance (if required), and any other agreement or instrument as the Administrative Agent may reasonably request, all in form and substance satisfactory to the Administrative Agent.

"**Recipient**" means the Administrative Agent and any Lender.

"**Related Persons**" means, with respect to any Person, each Affiliate of such Person and each director, officer, employee, agent, trustee, representative, attorney, accountant and each insurance, environmental, legal, financial and other advisor and other consultants and agents of or to such Person or any of its Affiliates.

"**Releases**" means any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"**Remedial Action**" means all actions required to (a) clean up, remove, treat or in any other way address any Hazardous Material in the indoor or outdoor environment, (b) prevent or minimize any Release so that a Hazardous Material does not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or (c) perform pre remedial studies and investigations and post-remedial monitoring and care with respect to any Hazardous Material.

"**Required Lenders**" means the Lender having more than fifty percent (50%) of the outstanding principal amount of the Term Loans.

"**Requirement of Law**" means, with respect to any Person, the common law and any federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Responsible Officer**" means the chief executive officer, chief restructuring officer or the chief financial officer of a Credit Party, as applicable, or any other officer having substantially the same authority and responsibility.

"**Riveron**" means Riveron Management Services, LLC.

"**Riveron Engagement Letter**" means that certain letter, dated as of May 1, 2023, by and among Riveron and RFP.

"**S&P**" means Standard & Poor's Rating Services.

"**Secured Party**" means the Administrative Agent, each Lender and each other holder of any Obligation of a Credit Party.

-88-

"**Security Agreements**" means the (i) Security Agreement, dated as of the Closing Date, by and between the Administrative Borrower and the Administrative Agent, (ii) Security Agreement, dated as of the Closing Date, by and between the RFP and the Administrative Agent, (iii) Security Agreement, dated as of the Closing Date, by and between the GEPAZ and the Administrative Agent and (iv) Security Agreement, dated as of the Closing Date, by and between the Just Right and the Administrative Agent.

"**Special Flood Hazard Area**" means an area that FEMA's current flood maps indicate has at least a one percent (1%) chance of a flood equal to or exceeding the base flood elevation (a 100-year flood) in any given year.

"**SPV**" means any special purpose funding vehicle identified as such in a writing by any Lender to the Administrative Agent.

"**Stock**" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"**Stock Equivalents**" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"**Subordinated Indebtedness**" means the Indebtedness of any Credit Party or any Subsidiary of any Credit Party which is subordinated to the Obligations as to right and time of payment and as to other rights and remedies thereunder and having such other terms as are, in each case, satisfactory to the Administrative Agent.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture, limited liability company, association or other entity, the management of which is, directly or indirectly, controlled by, or of which an aggregate of more than fifty percent (50%) of the voting Stock is, at the time, owned or controlled directly or indirectly by, such Person or one or more Subsidiaries of such Person.

"**Supplemental Interim Order**" means any order of the Bankruptcy Court in the Chapter 11 Cases entered into after the Interim Order and prior to the Final Order, in each case, authorizing and approving any Additional Interim Term Loans for an interim period under sections 364(c) and (d) of the Bankruptcy Code and entered after a hearing.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan Commitment**" means, with respect to each Lender, the commitment of such Lender to make a Term Loan (other than a Roll-Up Loan) to the Borrowers in the amount set forth in Schedule 1.1 hereto or in the Assignment to which such Lender became a Lender under this Agreement, as the same may be terminated or reduced from time to time in accordance with the

terms of this Agreement, and "<u>Term Loan Commitments</u>" means the aggregate amount of each Lender's Term Loan Commitment.

"**<u>Threshold Amount</u>**" means $15,000.

"**<u>Title Company</u>**" means a title insurance company reasonably acceptable to the Administrative Agent.

"**<u>Trademark</u>**" means all rights, title and interests (and all related IP Ancillary Rights) arising under any Requirement of Law in or relating to trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers and, in each case, all goodwill associated therewith, all registrations and recordations thereof and all applications in connection therewith.

"**<u>Transactions</u>**" shall mean, collectively, the transactions to occur on or prior to the Closing Date pursuant to, or contemplated by, the Loan Documents, including the execution, delivery and performance of the Loan Documents and the Interim Loans hereunder.

"**<u>UCC</u>**" means the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect from time to time in the State of New York.

"**<u>United States</u>**" and "<u>U.S.</u>"  each means the United States of America.

"**<u>U.S. Person</u>**" means any Person that is a "United States Person" as defined in Section 7701(a) (30) of the Code.

"**<u>Wholly-Owned Subsidiary</u>**" of a Person means any Subsidiary of such Person, all of the Stock and Stock Equivalents of which (other than directors' qualifying shares required by law) are owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

"**<u>Withholding Agent</u>**" means the Administrative Borrower and the Administrative Agent.

"**<u>Write-Down and Conversion Powers</u>**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

11.2    <u>Other Interpretive Provisions</u>.

(a)    <u>Defined Terms</u>.  Unless otherwise specified herein or therein, all terms defined in this Agreement or in any other Loan Document shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.  The meanings of defined terms shall be equally applicable to the singular and plural forms of the defined terms. Terms (including uncapitalized terms) not otherwise defined herein and that are defined in the UCC shall have the meanings therein described.

-90-

(b)      The Agreement.  The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement or any other Loan Document shall refer to this Agreement or such other Loan Document as a whole and not to any particular provision of this Agreement or such other Loan Document; and subsection, section, schedule and exhibit references are to this Agreement or such other Loan Documents unless otherwise specified.

(c)      Certain Common Terms.  The term "documents" includes any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.  The term "including" is not limiting and means "including without limitation."

(d)      Performance; Time.  Whenever any performance obligation hereunder or under any other Loan Document (other than a payment obligation) shall be stated to be due or required to be satisfied on a day other than a Business Day, such performance shall be made or satisfied on the next succeeding Business Day.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including." All references to the time of day shall be a reference to New York time.  If any provision of this Agreement or any other Loan Document refers to any action taken or to be taken by any Person, or which such Person is prohibited from taking, such provision shall be interpreted to encompass any and all means, direct or indirect, of taking, or not taking, such action.

(e)      Contracts.  Unless otherwise expressly provided herein or in any other Loan Document, references to agreements and other contractual instruments, including this Agreement and the other Loan Documents, shall be deemed to include all subsequent amendments thereto, restatements and substitutions thereof and other modifications and supplements thereto which are in effect from time to time, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document.

(f)      Laws.  References to any statute or regulation may be made by using either the common or public name thereof or a specific cite reference and, except as otherwise provided with respect to FATCA, are to be construed as including all statutory and regulatory provisions related thereto or consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(g)      Knowledge.  As used herein, the phrase "to the knowledge" of any Credit Party shall mean the actual knowledge (after reasonable inquiry) of (a) Ted Dergousoff; (b) Sal Penza, (c) Adam Cooley, and (d) Kenneth Latz.

11.3    Accounting Terms and Principles.  All accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in accordance with GAAP.  No change in the accounting principles used in the preparation of any financial statement hereafter adopted by any Credit Party shall be given effect for purposes of measuring compliance with any provision of Article V or Article VII unless the Borrowers, the Administrative Agent and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in

-91-

GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to in Article V and Article VII shall be made, without giving effect to any election under Accounting Standards Codification 825-10 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other Liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value."  Any lease that was treated as an operating lease under GAAP at the time it was entered into that later becomes a capital lease as a result of a change in GAAP during the life of such lease, including any renewals, and any lease entered into after the date of this Agreement that would have been considered an operating lease under the provisions of GAAP in effect as of December 31, 2016, in each case, shall be treated as an operating lease for all purposes under this Agreement.  A breach of a financial covenant contained in Article VII shall be deemed to have occurred as of any date of determination by the Administrative Agent or as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered to the Administrative Agent.

    11.4    <u>Payments</u>.  The Administrative Agent may set up standards and procedures to determine or redetermine the equivalent in Dollars of any amount expressed in any currency other than Dollars and otherwise may, but shall not be obligated to, rely on any determination made by any Credit Party.  Any such determination or redetermination by the Administrative Agent shall be conclusive and binding for all purposes, absent manifest error.  No determination or redetermination by any Secured Party or any Credit Party and no other currency conversion shall change or release any obligation of any Credit Party or of any Secured Party (other than the Administrative Agent and its Related Persons) under any Loan Document, each of which agrees to pay separately for any shortfall remaining after any conversion and payment of the amount as converted.  The Administrative Agent may round up or down, and may set up appropriate mechanisms to round up or down, any amount hereunder to nearest higher or lower amounts and may determine reasonable de minimis payment thresholds.

    [*Balance of page intentionally left blank; signature pages follow.*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the day and year first above written.

<u>BORROWERS</u>:

**RESTORATION FOREST GROUP PRODUCTS, LLC**, a
Delaware limited liability company

By: _____
Name:
Title:

Address for notices:

14005 E. Old Route 66,
Bellemont, AZ, 86015
Attention:
Email:

**GOOD EARTH POWER AZ, LLC**, an Arizona
limited liability company

By: _____
Name:
Title:

Address for notices:

14005 E. Old Route 66,
Bellemont, AZ, 86015
Attention:
Email:

**RESTORATION FOREST PRODUCTS, LLC**,
an Arizona limited liability company

By: _____
Name:
Title:

Address for notices:

14005 E. Old Route 66,
Bellemont, AZ, 86015
Attention:
Email:

<u>BORROWERS (CONTINUED)</u>:                **JUST RIGHT, LLC**, an Arizona limited liability company, as a Borrower


By: _____
Name:
Title:

Address for notices:

14005 E. Old Route 66,
Bellemont, AZ, 86015
Attention:
Email:

ADMINISTRATIVE AGENT:        **UMB BANK, NATIONAL ASSOCIATION**,
as Administrative Agent

By:
Name:
Title:

<u>LENDERS</u>:                              [●]

Schedule 4.18

Milestones

1.  The Credit Parties shall commence the solicitation of votes to accept or reject the Pre-Packaged Plan on or before January 22, 2024 and, in connection with such solicitation, establish a date no later than February 5, 2024 as the deadline to submit votes to accept or reject such Pre-Packaged Plan.

2.  No later than February 7, 2024 the Credit Parties shall deliver to counsel to each of the DIP Lenders of a report certifying results of the solicitation of acceptances of the Pre-Packaged Plan.

3.  The Petition Date shall be no later than January 29, 2024.

4.  On the Petition Date, the Credit Parties shall file the Pre-Packaged Plan and a disclosure statement for the Pre-Packaged Plan, including all exhibits and schedules thereto, as it may be amended from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law (the "Disclosure Statement").

5.  No later than (i) the earlier of (x) seven (7) days after the Petition Date and (y) the date that is one (1) Business Day after other customary first day orders are entered by the Bankruptcy Court, the Bankruptcy Court shall have entered the Interim DIP Order and (ii) 30 days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

6.  No later than 60 days after the Petition Date, the Bankruptcy Court shall have entered (i) the Confirmation Order and (ii) an order approving the Disclosure Statement and all other solicitation materials in respect of the plan (the "Disclosure Statement Order"), in each case, that has become a Final Order.

7.  No later than 75 days after the Petition Date, the Credit Parties shall consummate the transactions contemplated by the Pre-Packaged Plan.