*SOLICITATION VERSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Restoration Forest Products Group, LLC, *et al.*,[1] | Case No. 24-10120 (___) |
| Debtors. | (Joint Administration Requested) |

## DISCLOSURE STATEMENT FOR THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF RESTORATION FOREST PRODUCTS GROUP, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: Restoration Forest Products Group, LLC (8466); Just Right, LLC (3892); Good Earth Power AZ, LLC (5856); and Restoration Forest Products, LLC (6372).  The Debtors' service address is 14005 Old Rte 66 Bellemont, Arizona 86015.

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT A JOINT PLAN OF REORGANIZATION *PRIOR* TO THE FILING OF THE CHAPTER 11 CASES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE.[2]  BECAUSE NO CHAPTER 11 CASES HAVE YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS[3] INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE AND SUBJECT TO THE PLAN DOCUMENTS.  EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY THE DEBTORS, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO CLASS 3, CLASS 4, AND CLASS 5 CLAIMS IS BEING MADE PURSUANT TO APPLICABLE NON-BANKRUPTCY LAW, INCLUDING TO THE EXTENT APPLICABLE, EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, INCLUDING PURSUANT TO SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS, AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(a) OF THE SECURITIES ACT ("ACCREDITED INVESTORS") OR A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("QIB").  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT FOR SOLICITATION OF VOTES ON THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF RESTORATION FOREST PRODUCTS GROUP, LLC AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING CLAIMS IN THE FOLLOWING CLASSES:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | BRIDGE LOAN CLAIMS |
| CLASS 4 | SENIOR SERIES A BOND CLAIMS |

---

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms elsewhere in this disclosure statement (as may be amended, supplemented, or otherwise modified from time to time, this "Disclosure Statement") or in the *Joint Prepackaged Chapter 11 Plan of Reorganization of Restoration Forest Products Group, LLC and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

[3]     The term "Debtor" as used hereunder shall mean each of Restoration Forest Products Group, LLC; Just Right, LLC; Good Earth Power AZ, LLC; and Restoration Forest Products, LLC (collectively, the "Debtors," the "Company," or "RFOR").

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 5 | SUBORDINATED SERIES B BOND CLAIMS |

**IF YOU ARE A HOLDER OF A CLAIM IN CLASSES 3, 4, OR 5, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU MAY BE ENTITLED TO VOTE ON THE PLAN**

---

**DELIVERY OF BALLOTS**

**BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT BY THE VOTING DEADLINE, WHICH IS 5:00 P.M. (PREVAILING EASTERN TIME) ON FEBRUARY 5, 2024.**

**HOLDERS OF CLASS 3 CLAIMS (BRIDGE LOAN CLAIMS) MAY SUBMIT BALLOTS VIA THE SOLICITATION AGENT'S ONLINE E-BALLOTING PORTAL USING THE LOGIN INFORMATION ON YOUR BALLOT.**

**HOLDERS OF CLAIMS IN CLASS 4 (SENIOR SERIES A BOND CLAIMS) OR CLASS 5 (SUBORDINATED SERIES B BOND CLAIMS) MAY SUBMIT BALLOTS BY EMAIL TO: RFORBALLOTS@RA.KROLL.COM WITH "RESTORATION FOREST PRODUCTS GROUP BALLOT PROCESSING" IN THE SUBJECT LINE.**

**HOLDERS OF CLAIMS IN CLASS 3 (BRIDGE LOAN CLAIMS), CLASS 4 (SENIOR SERIES A BOND CLAIMS), AND CLASS 5 (SUBORDINATED SERIES B BOND CLAIMS) MAY SUBMIT BALLOTS VIA FIRST CLASS MAIL, OVERNIGHT MAIL, OR PERSONAL DELIVERY TO:**

**RESTORATION FOREST PRODUCTS GROUP, LLC
BALLOT PROCESSING, C/O KROLL RESTRUCTURING ADMINISTRATION LLC
850 THIRD AVENUE, SUITE 412
BROOKLYN, NY 11232.**

**BALLOTS RECEIVED VIA MEANS OTHER THAN THE AFOREMENTIONED MEANS WILL NOT BE COUNTED.**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT KROLL RESTRUCTURING ADMINISTRATION LLC (THE DEBTORS' SOLICITATION AGENT) BY (A) CALLING (844) 274-2766 (US/CANADA TOLL FREE) OR +1 (646) 440-4878 (INTERNATIONAL TOLL FREE) OR (B) BY EMAILING RFORBALLOTS@RA.KROLL.COM WITH "RESTORATION FOREST PRODUCTS GROUP SOLICITATION" IN THE SUBJECT LINE.**

---

  **This Disclosure Statement provides information pursuant to section 1125 of the Bankruptcy Code for use in solicitation of votes on the Plan which the Debtors are seeking**

to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit A**.  The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

The Plan is currently supported by the Debtors and the Consenting Stakeholders (as defined herein).

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article VIII of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

You are encouraged to read this Disclosure Statement (including "Certain Factors to Be Considered" described in Article VI of this Disclosure Statement) and the Plan in their entirety before submitting your Ballot to vote on the Plan.

The Debtors urge each Holder of a Claim or Equity Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Classes 3, 4, and 5 to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

### RECOMMENDATION BY THE DEBTORS

EACH DEBTOR'S BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF EACH DEBTOR'S ESTATE, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.  EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>FEBRUARY 5, 2024 AT 5:00 P.M. (PREVAILING EASTERN TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.

---

### SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not be issued pursuant to a

registration statement filed with the United States Securities and Exchange Commission (the "<u>SEC</u>") under the United States Securities Act of 1933 (as amended, the "<u>Securities Act</u>") or any securities regulatory authority of any state under any state securities law ("<u>Blue Sky Laws</u>"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain Holders of Bridge Loan Claims, Senior Series A Bond Claims, and Subordinated Series B Bond Claims of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "<u>Solicitation</u>").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, or other exemptions under the Securities Act to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of New Class A Units and New Class B Units under the Plan. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan may contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934 (as amended, the "<u>Securities Exchange Act</u>") and the rules and regulations promulgated thereunder.

# DISCLAIMER

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims entitled to vote are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims reviewing this Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Equity Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances of the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with their advisors, have prepared the financial projections attached hereto as **Exhibit E** and described in this Disclosure Statement. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' business (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions, and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial

projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against or Equity Interests in, the Debtors or any other party in interest. Please refer to Article VI of this Disclosure Statement, entitled "Certain Factors to Be Considered" for a discussion of certain risk factors that Holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................................... ix

**ARTICLE I:    BUSINESS DESCRIPTION AND CAPITAL STRUCTURE** ..........................2
    2.1    Overview of the Company's Business ...................................................................2
    2.2    Corporate and Capital Structure.........................................................................5

**ARTICLE II :  CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES** ...........9
    2.1    Cancellation of the Phase II Contract ................................................................9
    2.2    Delays in the Completion of the Bellemont Facility ...........................................10
    2.3    The COVID-19 Pandemic..................................................................................11
    2.4    Winter of 2022 .................................................................................................11
    2.5    Negotiations with the Consenting Stakeholders .................................................11
    2.6    The Marketing Process ....................................................................................12
    2.7    Development of the Plan....................................................................................12

**ARTICLE III :  THE PLAN** ..............................................................................................13
    3.1    Treatment of Claims and Equity Interests .........................................................13
    3.2    Compromise and Settlement of Claims, Interests, and Controversies..................15
    3.3    New Capital Structure......................................................................................15
    3.4    Issuance of Reorganized Company Equity Interests ...........................................15
    3.5    Management Incentive Plan...............................................................................16
    3.6    Claims Cash Pool Account ...............................................................................16
    3.7    Unclassified Claims .........................................................................................16
    3.8    Liquidation Analysis........................................................................................27
    3.9    Valuation Analysis ..........................................................................................28
    3.10   Financial Information and Projections................................................................28

**ARTICLE IV :  VOTING PROCEDURES AND REQUIREMENTS** .............................29
    4.1    Classes Entitled to Vote on the Plan .................................................................29
    4.2    Votes Required for Acceptance by a Class.........................................................29
    4.3    Certain Factors to Be Considered Prior to Voting .............................................30
    4.4    Classes Not Entitled To Vote on the Plan..........................................................30
    4.5    Solicitation Procedures ....................................................................................31
    4.6    Voting Procedures............................................................................................32
    4.7    Opt-In Process .................................................................................................34

**ARTICLE V :  OTHER MATERIAL ASPECTS OF THE PLAN**...................................34
    5.1    Distributions....................................................................................................34
    5.2    Distribution on Account of Claims  and Equity Interests Allowed as of the Effective Date ..................................................................................................34
    5.3    Distribution on Account of Claims  and Equity Interests Allowed After the Effective Date ..................................................................................................34
    5.4    Timing and Calculation of Amounts to Be Distributed .......................................35
    5.5    No Substantive Consolidation...........................................................................39
    5.6    General Settlement of Claims and Equity Interests ............................................39

5.7      Restructuring Transactions ...................................................39
5.8      Continued Corporate Existence ............................................42
5.9      Vesting of Assets .................................................................42
5.10    Cancellation of Existing Securities and Agreements............43
5.11    Sources of Consideration for Plan Distributions .................44
5.12    Exemption from Registration Requirements ........................44
5.13    Organizational Documents...................................................45
5.14    Exemption from Certain Transfer Taxes and Recording Fees............45
5.15    Directors and Officers of the Reorganized Debtors................45
5.16    Insurance Policies ...............................................................46
5.17    Corporate Action.................................................................46
5.18    Effectuating Documents; Further Transactions ...................46
5.19    Restructuring Expenses........................................................47
5.20    Retained Causes of Action...................................................47
5.21    Treatment of Executory Contracts and Unexpired Leases ............48
5.22    Employee Compensation and Benefits ................................50
5.23    Release, Injunction, and Related Provisions........................51
5.24    Setoffs and Recoupment .....................................................55
5.25    Release of Liens..................................................................56
5.26    Plan Modifications..............................................................56
5.27    Effect of Confirmation on Modifications ............................56
5.28    Certain Technical Amendments...........................................57
5.29    Revocation or Withdrawal of Plan......................................57
5.30    Reservation of Rights..........................................................57
5.31    Conditions Precedent to the Effective Date ........................57
5.32    Waiver of Conditions Precedent .........................................59
5.33    Effect of Failure of Conditions Precedent ..........................59

**ARTICLE VI :  CERTAIN FACTORS TO BE CONSIDERED ............................................59**
6.1      General ................................................................................60
6.2      Risks Relating to the Plan and Other Bankruptcy Law Considerations ...............60
6.3      Risks Relating to the Restructuring Transactions................66
6.4      Risks Relating to the Reorganized Company Equity Interests ............68
6.5      Risks Relating to the Debtors' Business..............................69
6.6      Certain Tax Implications of the Chapter 11 Cases and the Plan............71
6.7      Disclosure Statement Disclaimer ........................................71

**ARTICLE VII :  CONFIRMATION PROCEDURES.................................................................73**
7.1      The Confirmation Hearing...................................................73
7.2      Confirmation Standards.......................................................74
7.3      Best Interests Test/Liquidation Analysis .............................74
7.4      Feasibility............................................................................75
7.5      Confirmation Without Acceptance by All Impaired Classes................75
7.6      Alternatives to Confirmation and Consummation of the Plan..............76

**ARTICLE VIII :  IMPORTANT SECURITIES LAW DISCLOSURE................................76**
8.1      Reorganized Company Equity Interests................................76

ix

    8.3      Resales of Reorganized Company Equity Interests ...............................................77

**ARTICLE IX :  CERTAIN UNITED STATES FEDERAL  INCOME TAX  CONSEQUENCES OF THE PLAN....................................................................................79**
    9.1      Tax Background........................................................................................79
    9.2      Certain U.S. Federal Income Tax  Consequences to the Debtors and Reorganized Debtors....................................................................................80
    9.3      Certain U.S. Federal Income Tax  Consequences to U.S. Holders of Secured Bondholder Claims .............................................................................81
    9.4      Certain U.S. Federal Income Tax Consequences to Holders of  Owning and Disposing of Reorganized Company Equity Interests ...................................86
    9.5      Certain U.S. Federal Income Tax Consequences to  Holders of Owning and Disposing of Partnership Reorganized Company ...........................................90
    9.6      FATCA ...................................................................................................93
    9.7      Information Reporting and Backup Withholding....................................................94
    9.8      Importance of Obtaining Professional Tax Assistance ..........................................94

**ARTICLE X :  CONCLUSION AND RECOMMENDATION..............................................95**

## EXHIBITS

Exhibit A        Joint Prepackaged Chapter 11 Plan of Reorganization

Exhibit B        LLC Agreement Term Sheet

Exhibit C        Liquidation Analysis

Exhibit D        Valuation Analysis

Exhibit E        Financial Projections

Exhibit F        Corporate Organizational Chart

## EXECUTIVE SUMMARY

The Plan implements a prepackaged restructuring agreed to among the Debtors and the Debtors' major stakeholders, including the Consenting Stakeholders. The restructuring will result in a significant deleveraging of the Debtors' capital structure.

The anticipated benefits of the Plan include, without limitation, the following:

(a)    Conversion of approximately $35.0 million of DIP Claims to an Exit Facility with the balance of DIP Claims to receive their ratable share of the New Class A Units, subject to dilution on account of the Management Incentive Plan;

(b)    Discharge of the Bridge Loan Claims with the Holders of such claims to receive their ratable share of the New Class A Units, subject to dilution on account of the Management Incentive Plan;

(c)    Discharge of the Senior Series A Bond Claims with the Holders of such claims to receive their ratable share of New Class A Units, subject to dilution on account of the Management Incentive Plan;

(d)    Discharge of the Subordinated Series B Bond Claims with the Holders of such claims to receive their ratable share of New Class B Units, subject to dilution on account of the Management Incentive Plan;

(e)    Discharge of approximately $307 million of prepetition Claims in the aggregate;[4]

(f)    Cancellation of Equity Interests; and

(g)    Prompt emergence from chapter 11.

---

[4]    This amount does not include Bridge Loan Claims rolled up into the DIP Facility.

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' business, and protects the jobs of the Debtors' invaluable employees, including the management team.  As described in further detail below, under the terms of the Plan, among other things: (i) each Holder of Bridge Loan Claims will receive, on account of their Allowed Bridge Loan Claims, its ratable share of the New Class A Units; (ii) each Holder of Senior Series A Bond Claims will receive, on account of their Allowed Senior Series A Bond Claims, its ratable share of the New Class A Units; and (iii) each Holder of Subordinated Series B Bond Claims will receive, on account of their Allowed Subordinated Series B Bond Claims, its Pro-Rata Share of the New Class B Units.

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' business and certain historical events, (ii) the Chapter 11 Cases, (iii) the rights of Holders of Claims and Equity Interests under the Plan, and (iv) other information necessary to enable each Holder of a Claim to make an informed judgment as to whether to vote to accept or reject the Plan.

## ARTICLE I:

## BUSINESS DESCRIPTION AND CAPITAL STRUCTURE

### 2.1    Overview of the Company's Business

The Debtors, initially founded in 2008, are a leading sustainable forestry and wood products manufacturing company.  By operating as a vertically-integrated wood processer with in-house logging, manufacturing, and distribution capabilities, RFOR works to thin and restore the forests of Northern Arizona.  Headquartered in Mesa, Arizona, the Company maintains operations in Northern Arizona adjacent to the world's largest contiguous Ponderosa Pine Forest.  Ponderosa pine is generally recognized as the most versatile wood found in North America and is usable throughout every phase of light construction, such as architectural/interior woodwork, furniture cases, cabinets, boxes, crates, and wood packaging.

### (a)    History of the Debtors

Debtor Just Right, LLC ("Just Right"), an Arizona limited liability company, was founded in 2008, initially holding all of the Debtors' assets including facilities located in Williams, Arizona (the "Williams Facility") and in Heber, Arizona (the "Heber Facility").  The Williams Facility originally consisted of three different parcels of land: (i) 8 acres of leased land, which was used to operate a small sawmill; (ii) 40 acres of leased land, which was used primarily for storage; and (iii) 25 acres of land purchased by Just Right in 2018, on which RFOR intended to build a sawmill on.  RFOR owns the Heber Facility and the land it resides, which was used as a sawmill.

In or around 2012 and 2013, non-Debtor affiliates Seymour Forest Products and Lumberjack Timber were formed.  Just Right, Seymour Forest Products, and Lumberjack Timber were all owned by Adam Cooley and Seymour International Group.

Later, Debtor Good Earth Power, AZ ("GEPAZ") acquired Pioneer Forest Products Corporation ("Pioneer') and Seymour International Group.  As a result, GEPAZ became two-thirds

owner of Lumberjack Timber, Seymour Forest Products, and Just Right, and the owner of the Phase I Contract (described below).

Since their creation, the Debtors have worked actively with the U.S. Forest Service ("USFS") and Four Forest Restoration Initiative ("4FRI") to implement sustainable forestry practices, mitigate the risk of catastrophic wildfires, and improve forest health. From 2002 to 2011 Arizona suffered a number of significant wildfires – the Rodeo-Chediski fire (destroying 468,638 acres of forest), the Cave Creek Complex fire (destroying 243,960 acres of forest), and the Wallow Fire (destroying 538,049 acres of forest) – all of which led to the signing of the 4FRI Charter, marking the beginning of a collaborative effort to restore the forest ecosystems through mechanical harvests and controlled fires to thin dense strands of smaller trees, and leave larger, more mature trees. As part of 4FRI's efforts, USFS awards contracts to certain companies in the forestry and logging industry. In 2012, Pioneer was awarded a Phase I Contract by the USFS (the "Phase I Contract"). The Phase I Contract allowed Pioneer to harvest up to 30,000 acres per year of 4FRI forestland in Arizona over a 10-year term. As part of the agreement, Pioneer received favorable pricing, which reduced stumpage costs. Pioneer was unable to perform under the Phase I Contract, which led to GEPAZ acquiring Pioneer, and their rights under the Phase I Contract, in 2016.

In connection with this acquisition in 2016, GEPAZ received a loan in the amount of $15 million from GEP Funding ("GEP"). After the acquisition, GEPAZ required incremental capital and, thus, secured (i) $10 million of additional debt financing from GEP, and (ii) a $15 million loan from Lateral Investment Management, LLC ("Lateral Investment"). In connection with the Lateral Investment financing, the loans provided by GEP were converted to equity.

At this time, (i) Debtor Restoration Forest Products Group, LLC ("RFPG"), a Delaware limited liability company, was formed, originally under the name FEC Logging USA Holdings, LLC, as the holding company of the Debtors;[5] and (ii) Debtor Restoration Forest Products, LLC, an Arizona limited liability company, was formed, originally under the name Life-Pine Forest Products, LLC, as the operating company of the Debtors.[6] Just Right continued to hold the assets of the Debtors and GEPAZ continued to hold the Phase I Contract.

RFOR was recognized as the only legitimate forest products company in Arizona practicing sustainable forestry and was often seen as the blueprint for other jurisdictions to successfully operate in the space. By 2022, RFOR was able to complete its obligations under the Phase I Contract but fell significantly short of the allowable annual harvest entitlement – only completing a harvesting of about 15,000 acres. Nevertheless, the Company set its sights on acquiring a Phase II Contract with USFS (the "Phase II Contract"), which was announced by USFS in 2019.

Around this time, building off of the momentum of completing the Phase I Contract and in efforts to demonstrate its legitimacy to USFS and local politicians in the forestry space, the

---

[5]    FEC Logging USA Holdings, LLC was renamed as NewLife Forest Restoration, LLC in 2019, and then again in 2022 to its current name today.

[6]    Life-Pine Products, LLC was renamed as NewLife Forest Products in 2019, and then renamed again in 2022 to its current name.

Company decided to build another sawmill, which would increase the Company's capacity to log, manufacture, distribute products, and restore additional acres of forest. In these efforts, the Debtors purchased land in Bellemont, Arizona to build a new sawmill, which would come to be known as the "Bellemont Facility." Eventually the Debtors stopped operation at the Heber and Williams Facilities.[7] Today, the Debtors mainly operate out of the Bellemont Facility.

Today, the Debtors maintain an employee base of over 120 people and operate out of the Bellemont Facility – a 425,000 square foot manufacturing facility equipped with a sawmill, dry kilns, a planer mill, and engineered wood products ("EWP") value-add capabilities. At full capacity, the Bellemont Facility is capable of employing over 200 full-time employees and producing 121-thousand-foot board measure ("MMfbm") per annum of lumber and value-added wood products.

    **(b)**    **The Business**

As noted above, the Debtors' business is split into three categories: forestry, manufacturing, and distribution.

Forestry: With their proximity to the Ponderosa Pine Forest, the Debtors themselves are able to harvest the timber, as well as any forest residuals such as branches, tops, stumps, and brush (in an effort to make the forest more fire resistant). In addition, the Company uses its equipment to process forest residuals, while leveraging experienced partners to handle other portions of timber harvesting. The Debtors also have in-house trucking capabilities, allowing them to haul harvested timber and the forest residuals from the Ponderosa Pine Forest, which is located only 25-30 miles from the Bellemont Facility. The proximity of the Bellemont Facility to the Ponderosa Pine Forest results in significant costs savings for the Debtors.

Manufacturing: Since its inception, RFOR has developed extensive manufacturing capabilities that enables the Debtors to process logs into a diverse product portfolio of value-added wood products such as, lumber, and sawmill and forest residuals (which include wood chips, bark, sawdust, planer shavings, and slash). Additionally, the Debtors manufacture EWP. Through sophisticated, automated scanning and optimization technology, the Debtors' EWP lines are designed to convert low-grade lumber material into high-grade, higher margin customer-end products.

The Debtors have focused on creating visually appealing consumer branded products that resonate with end-customers. The Debtors' sales team has worked to educate wholesalers, lumberyard customers, and more direct sales channels (contractors, homebuilders, and remodelers) on its sustainability initiatives to drive sales. Much of RFOR's products are ultimately used for aesthetic (non-structural) purposes.

Distribution: RFOR pre-sells large volumes of its products to customers. Historically, the Debtors have sold lumber and EWP through purchase agreements and residuals via standby purchase orders or letters of intent with identified purchasers. Additionally, the Debtors utilize

---

[7]    The leases related to the Williams Facility have lapsed and the Debtors do not intend to renew those leases. As a result, today, the Williams Facility consists of only the 25 acres of land which the Debtors own and is being used as storage.

their in-house trucking capabilities, a fleet of 24 trucks and an assortment of chip vans and log trailers, outside trucking vendors, and their proximity to rail transportation to effectively and efficiently sell and distribute their products.

## 2.2    Corporate and Capital Structure

### (a)    Corporate Structure

Debtor RFPG currently owns, directly or indirectly, each of the other Debtor entities.  An organizational chart illustrating the corporate structure of the Debtors is annexed hereto as **Exhibit F**.

### (b)    The Debtors' Capital Structure

#### (1)    The Lateral Loan Agreement

On May 15, 2017, Lateral US Credit Opportunities Fund, LLC and Lateral SMA Agent, LLC (the "Lateral Lenders"), through Lateral Administrative Agent, LLC (the "Lateral Agent," and collectively with the Lateral Lenders and certain of their affiliates, "Lateral") entered into that certain Credit Agreement (the "Lateral Loan Agreement") with Debtor Restoration Forest Products Group, LLC f/k/a NewLife Forest Restoration, LLC f/k/a FEC Logging USA Holdings, LLC ("RFPG") and the remaining Debtors as borrowers (collectively, the "Borrowers").  As of February 24, 2022, the Lateral Lenders had made term loans to the Debtors under the Lateral Loan Agreement in an aggregate principal amount of $131,396,436 (including capitalized interest, but excluding other accrued interest, fees, and other obligations).

#### (2)    The 2022 Bonds

In 2021, RFPG[8] requested that AZIDA, a nonprofit corporation designated as a political subdivision of the State of Arizona, issue bonds to assist the Debtors with financing and/or refinancing the costs of the acquisition, construction, improvement, equipping and operation of certain of the Debtors' facilities related to its residuals and lumber processing operations, which included exchanging some of the Debtors' debt owed to Lateral for subordinate bonds.  Per the Indenture, AZIDA authorized the issuance of two series of bonds through the Indenture – the Series A Bonds and the Series B Bonds (together, the "2022 Bonds").  AZIDA issued the 2022 Bonds to lend the proceeds thereof to the Debtors.  Pursuant to the Indenture, at the time of closing, AZIDA issued the maximum authorized amount of 2022 Bonds – $400,000,000.  However, a lesser amount was delivered, with the balance of the maximum amount withheld to account for accrued interest (*i.e.* the PIK, or paid-in-kind, amount).

#### A.    Issuance of the Series A Bonds

At closing, the Bond Trustee delivered the Series A Bonds in the aggregate principal amount of $112,885,000, with the remaining $87,115,000 aggregate principal amount of Series A Bonds being issued but not delivered (representing PIK that could accrue).

---

[8]    At this time, RFPG was doing business as NewLife Forest Restoration, LLC.

At the time of issuance, all of the Series A Bonds were purchased by affiliates of Invesco Senior Secured Management, Inc. (collectively, "Invesco") in the amounts set forth below.

- Invesco Dynamic Credit Opportunity Fund purchased Series A Bonds in the amount of $3,372,000.00.
- Invesco Floating Rate ESG Fund purchased Series A Bonds in the amount of $13,209,000.00.
- Invesco Floating Rate Income Fund purchased Series A Bonds in the amount of $534,000.00.
- Invesco Senior Floating Rate Fund purchased Series A Bonds in the amount of $15,101,000.00.
- Invesco Senior Income Trust purchased Series A Bonds in the amount of $4,109,000.00.
- Invesco Senior Loan Fund purchased Series A Bonds in the amount of $2,154,000.00.
- Invesco Zodiac Funds – Invesco European Senior Loan ESG Fund purchased Series A Bonds in the amount of $685,000.00.
- Invesco Zodiac Funds – Invesco European Senior Loan Fund purchased Series A Bonds in the amount of $6,841,000.00.
- Invesco Zodiac Funds – Invesco US Senior Loan ESG Fund purchased Series A Bonds in the amount of $3,631,000.00.
- Invesco Zodiac Funds – Invesco US Senior Loan Fund purchased Series A Bonds in the amount of $29,916,000.00.
- Invesco Credit Partners Opportunities Fund 2020, LP purchased Series A Bonds in the amount of $3,267,000.00.
- Invesco Credit Partners Master Fund II, LP purchased Series A Bonds in the amount of $30,066,000.00.

Invesco and its affiliates continue to hold all the Series A Bonds as of the Petition Date, with Cede & Co. as the registered owner.

### B.    Issuance of the Series B Bonds

At closing, the Bond Trustee also delivered the Series B Bonds in the aggregate principal amount of $86,806,759, with the remaining $113,193,241 aggregate principal amount of Series B Bonds being issued but not delivered (representing PIK that could accrue).

At the time of issuance, Lateral U.S. Credit Opportunities Fund, L.P. purchased Series B Bonds in the amount of $71,098,788.42, and Lateral SMA Agent, LLC purchased Series B Bonds in the amount of $11,800,490.99. The remaining Series B Bonds, along with the amounts above, were delivered to or upon the order of Lateral Investment Management, LLC and its affiliates. Lateral and its affiliates continue to hold all the Series B Bonds as of the Petition Date, with Cede & Co. as the registered owner.

11295777v.1

### (3)    The Authority Loan Agreement

In conjunction with the issuance of the 2022 Bonds under the Indenture, AZIDA and RFPG, then operating as NewLife Forest Restoration, LLC, entered into that certain Loan Agreement, dated as of February 1, 2022 (the "Authority Loan Agreement" and, together with the Indenture, the "Bond Loan Agreements").  The Authority Loan Agreement was funded with the proceeds of the 2022 Bonds.

Pursuant to the Bond Loan Agreements, the bondholders of the Series A Bonds (collectively, the "Series A Bondholders"), would be paid first, and the bondholders of the Series B Bonds (collectively, the "Series B Bondholders") would be paid only after the Series A Bondholders were paid in full.  To secure payment of the obligations under the Bond Loan Agreements, each of the Borrowers entered into a pledge and security agreement with the Trustee (collectively, the "Bond Loan Security Agreements").[9]

The proceeds from the 2022 Bonds were used by the Borrowers to pay down some of their outstanding debt under the Lateral Loan Agreement and to continue the Debtors' operations.

### (4)    Amendment of the Lateral Loan Agreement

In 2022, Lateral and the Debtors agreed to amend the Lateral Loan Agreement and restructure the outstanding debt that the Debtors owed to Lateral.  Pursuant to that certain Amended and Restated Credit Agreement, dated February 24, 2022, by and between Lateral and the Debtors, the outstanding debt under the Lateral Loan Agreement in the aggregate amount of $131,396,436.61 was restructured into 5 tranches, listed below:

| Tranche | Amount Outstanding | Priority |
| --- | --- | --- |
| Tranche 1 | $6,889,642.03 | n/a - satisfied from Series A Bond proceeds |
| Tranche 2 | $71,098,788.43 | Exchanged for Series B Bonds - Lateral U.S. Credit Opportunities Fund, L.P. |
| Tranche 3 | $11,800,490.99 | Exchanged for Series B Bonds - Lateral SMA Agent, LLC |
| Tranche 4 | $20,653,146.89 | Unsecured – Lateral SMA Agent, LLC |

---

[9] These agreements are the: Pledge and Security Agreement, dated February 1, 2022, by and between NewLife Forest Restoration, LLC and UMB Bank, National Association; Pledge and Security Agreement, dated February 1, 2022, by and between NewLife Forest Products, LLC and UMB Bank, National Association; Pledge and Security Agreement, dated February 1, 2022, by and between Just Right, LLC and UMB Bank, National Association; and Pledge and Security Agreement, dated February 1, 2022, by and between Good Earth Power AZ, LLC and UMB Bank, National Association.  While the Indenture stated that the Series B Bonds were to be unsecured until payment in full of the Series A Bondholders, the security agreements appear to attach to both series of bonds.  Regardless, even if considered secured and perfected at the outset, the Series A Bondholders will have priority.

| Tranche 5 | $20,954,368.27 | Unsecured - $13,410,795.69 for Lateral U.S. Credit Opportunities Fund, L.P. and $7,543,572.58 for Lateral SMA Agent, LLC |

Following the issuance of the 2022 Bonds and the amendments to the Lateral Loan Agreement, Lateral, the Debtors, AZIDA, and the Bond Trustee agreed that the Series A Bondholders' liens against the Borrowers' assets would have first priority (sometimes referred to herein as the "Senior Series A Bondholder Liens," with the Series B Bondholder liens against the Borrowers' assets having second priority (sometimes referred to herein as the "Subordinate Series B Bondholder Liens"). Any other debt owed to Lateral by the Borrowers would be subordinate to both the Series A Bondholders and the Series B Bondholders.[10]

### (5)   The Bridge Loan Credit Agreement

By 2023, the Debtors had insufficient capital from operations and otherwise, and requested that Invesco make available one or more term loans to provide the Debtors with the time and funding needed to complete the installation of equipment at the Bellemont Facility, conduct a marketing process for the Company and, if necessary, prepare for a chapter 11 process. Therefore, pursuant to that certain Credit Agreement, dated June 5, 2023, by and between the Borrowers, Invesco, and UMB, in its capacity as Administrative Agent (the "Bridge Loan Credit Agreement"), Invesco agreed to make available to Borrowers a delayed draw term loan facility in the aggregate original principal amount of up to $55 million (the "Bridge Loan").[11] In connection with the Bridge Loan, the Debtors appointed Kenneth Latz as Chief Restructuring Officer of the Debtors on May 1, 2023.

Pursuant to that certain Subordination Agreement, dated June 5, 2023, among the Debtors, Invesco, and UMB (as agent for the Authority, the Series A Bondholders, and the Series B Bondholders) (the "Bridge Loan Subordination Agreement"), the parties agreed that the Bridge Loan would have first priority over the 2022 Bonds. To secure payment of the obligations under the Bridge Loan Credit Agreement, each of the Debtors entered into a pledge and security agreement with UMB, as agent for Invesco (collectively, the "Bridge Loan Security Agreements").

### (6)   Amendment to the Authority Loan Agreement and Indenture

In connection with the Bridge Loan Credit Agreement, the Authority Loan Agreement was amended subject to certain subrogation provisions in section 10.9 of the Authority Loan Agreement to the Bridge Loan Subordination Agreement, and to add a new section 10.14 to

---

[10]   *See* Subordination Agreement, dated February 1, 2022, by and between NewLife Forest Restoration, LLC; Good Earth Power AZ, LLC; NewLife Forest Products, LLC; Just Right, LLC; Lateral US Credit Opportunities Fund, LLC; Lateral SMA Agent, LLC; Lateral Administrative Agent, LLC; Arizona Industrial Administrative Authority; and UMB Bank, NA (the "Lateral Subordination Agreement").

[11]   In relation to the Bridge Loan and negotiations with Invesco concerning a marketing process and possible reorganization under chapter 11 of the Bankruptcy Code, on May 1, 2023, the Debtors appointed Kenneth Latz as Chief Restructuring Officer of the Debtors.

provide that the provisions of the Bridge Loan Subordination Agreement would control in the event of any conflict or inconsistency between the provisions of the Bridge Loan Subordination Agreement and the Authority Loan Agreement.

Likewise, the Indenture was amended pursuant to that certain Second Supplemental Indenture of Trust, dated June 16, 2023 (the "Second Supplement"), between AZIDA and the Bond Trustee. The Second Supplement amended the Indenture to include references to the Bridge Loan Credit Agreement and related parties and to include as permitted debt the indebtedness incurred under the Bridge Loan Credit Agreement.

At the time of the Bridge Loan Credit Agreement, the Debtors' indebtedness included $50,595,048 owed on the Lateral Loan Agreement, $199,691,759 in 2022 Bonds payable, and over $8 million in other debt.

Following the entry into the Bridge Loan Credit Agreement, the order of priority discussed above is shown below:

| Priority | Party | Facility | Amount as of June 5, 2023 | Amount as of Petition Date |
|---|---|---|---|---|
| First | Invesco | Bridge Loan | Up to $55,000,000 | $64,342,013 |
| Second | Invesco | Series A Bondholders | $112,885,000+PIK | $138,868,000 |
| Third | Lateral and others | Series B Bondholders | $86,806,759+PIK | $107,374,000 |
| Fourth | Lateral | Unsecured debt | $50,595,048 | $56,704,000 |

## ARTICLE II:

## CIRCUMSTANCES LEADING TO THESE CHAPTER 11 CASES

As stated above, the Debtors intend to file the Chapter 11 Cases to implement a prepackaged chapter 11 plan of reorganization that provides for a comprehensive balance sheet restructuring of their funded debt obligations with the consent of the Consenting Stakeholders. Given the events described in greater detail below and other considerations, the Debtors have concluded in the exercise of their business judgment and as fiduciaries for all of the Debtors' stakeholders that the best path to maximize the value of their business is a strategic chapter 11 filing to implement the Plan.

### 2.1    Cancellation of the Phase II Solicitation Process

The USFS announced solicitation of the Phase II Contract in 2019. As noted earlier, RFOR set its sights on being awarded such contract and touted as much to various stakeholders.

Unfortunately, the award process for the Phase II Contract took much longer than expected, as the application was much more extensive (being over 1000 pages in length). Around this time, while RFOR was completing the application and related due diligence, and in anticipation of being awarded the Phase II Contract, the Debtors requested that AZIDA issue the 2022 Bonds. The Debtors anticipated using the proceeds of the 2022 Bonds to pay off some of its debt owed to Lateral, as well as fund the completion of the Bellemont Facility. The Debtors hoped that with this additional funding the Bellemont Facility construction would be completed by the time they were awarded the Phase II Contract. Even in the event that the Phase II Contract were to be further delayed, RFOR anticipated other avenues of sourcing forestry acreage.

Although the Company advanced in the award process, USFS ultimately decided to cancel its offering in 2021, stating that the amended RFOR Phase II Contract diverged too greatly from USFS' initial offer.

Accordingly, after a two-year application process and spending significant funds and time, the Debtors were unable to secure the Phase II Contract.

## 2.2     Delays in the Completion of the Bellemont Facility

After the Company completed its obligations under the Phase I Contract, the Company was under pressure to improve its processing and throughput capacity through the building of another sawmill that would be able to meet the anticipated production requirements under the Phase II Contract, with additional capacity for other opportunities  Unfortunately, the Company faced multiple challenges in completing the construction of the Bellemont Facility, which led to an overall delay of 16 months and cost increases of about $30 million.

First, the process of designing, engineering, and building a sawmill facility such as the Bellemont Facility usually takes years. As a result of impounding pressure from USFS and local politicians and related added time constraints, the Debtors were forced to design, engineer, and plan the construction of the Bellemont Facility quickly – much faster than what the industry would usually dictate.

Second, despite hiring who they thought was a highly skilled and recommended engineer to lead the construction of the Bellemont Facility, the engineer RFOR hired was anything but that. Among other things, the engineer failed to put together and organize the necessary cost estimates for the build, meaning that the Debtors had no price certainty on the project or the raw materials needed for construction, no cost certainty on the actual construction and installation, and no certain timeline for completion.

Third, the COVID-19 pandemic put a strain on the project. Initially, the Debtors were forced to halt construction of the Bellemont Facility immediately, due to the nation wide shut down. Once construction was allowed to resume, the cost of forestry equipment and raw materials, such as lumber, skyrocketed. Because of this high-cost environment, producers and suppliers began to prioritize the higher capital producing projects. As a result, the cost of raw materials and labor increased, there were higher than expected wait times in receiving the necessary equipment for construction, and the overall timeline of completing the Bellemont facility was delayed.

11295777v.1

Fourth, extreme weather conditions in the winter of 2022 caused significant delays in the construction of the Bellemont Facility.  With record snowfall in the area, construction was unable to continue, even on the already delayed schedule.

In the end, the funding raised from the issuance of the 2022 Bonds was not enough to cover the, already overbudget, cost of completing the Bellemont Facility, which is now scheduled to be completed in May 2024.

## 2.3    **The COVID-19 Pandemic**

In 2020, the COVID-19 Pandemic unexpectedly halted the Debtors' operations completely as they were forced to shut down the facilities that were operating and halt construction on the Bellemont Facility.  This unexpected halt in the Debtors' business, accordingly, led to revenue reductions.

## 2.4    **Winter of 2022**

The Debtors found it increasingly hard to recover from the forced shut down due to the COVID-19 pandemic.  Although the Debtors' two other facilities were operating, it was at a loss of over $1 million per month.

To make matters worse, Arizona succumbed to a particularly harsh winter in 2022-2023.  That winter brought record snowfall to Arizona, with 21 days of measurable snow – the most the area had seen in years.

In addition to stopping the construction of the Bellemont Facility, the snow in the winter of 2022 and early 2023 significantly impeded the Debtors' ability to maintain continuity of log supply to its sawmills.  Despite the growing demand, and increasing prices for wood products, the Debtors were unable to take advantage of the market.  The snow and wet weather that followed in the spring of 2023 significantly hindered RFOR's supply of logs, making them unable to maintain production at economic levels and forced the Debtors to curtail operations.

## 2.5    **Negotiations with the Consenting Stakeholders**

By April 2023, the Debtors had insufficient capital from operations and still had not finished construction of the Bellemont Facility.  As such, the Debtors requested that Invesco consider making available a delayed draw term loan facility.  Wanting to support the Company and prevent a loss of value for all stakeholders, Invesco agreed to issue the Bridge Loan.

Unable to fulfill their obligations, by September 2023, the Debtors had defaulted under the Bridge Credit Agreement and the Series A Bonds.  As a result of negotiations with key stakeholders, Invesco, as investment manager or sub-adviser to the Series A Bondholders, UMB, as Bond Trustee, and the Company agreed to that certain forbearance agreement, whereby the Series A Bondholders agreed to forbear from exercising any right or remedies they may have.  In addition, UMB, as administrative agent, and the Company agreed to that certain forbearance agreement, whereby the Bridge Loan Lenders agreed to forbear from exercising any right or

11

remedies it may have under the Bridge Credit Agreement. The forbearance period was extended multiple times and the current forbearance period is set to expire on January 31, 2024.

During the forbearance period, as noted above, operations at the Heber and Williams Facilities were curtailed. The Debtors, accordingly, established a list of unnecessary machinery and equipment located at the Heber and Williams Facilities and, on January 11, 2024, held an auction for the sale of those items. The proceeds from that auction are still being recorded by the auctioneer, but the Debtors expect the total net proceeds of the auction to be approximately $550,000.

## 2.6     The Marketing Process

The Debtors first engaged in a process to solicit new out-of-court financing as well as proposals to acquire the Debtors or their assets. The Debtors were unable to obtain new out-of-court financing on acceptable terms.

On July 31, 2023, the Debtors retained Intrepid Investment Bankers, LLC ("Intrepid") to act as the Debtors' investment banker in connection with, among other things, proposals to acquire the Debtors or their assets, and, to the extent necessary, a marketing process for the Debtors' proposed debtor-in-possession financing facility.

Since its engagement, Intrepid has conducted a robust and extensive marketing and sale process for the sale of substantially all of the Debtors' assets. This process included contacting 81 potential third-party purchasers from North and South America, Asia, Europe, and Oceania (including 42 strategic buyers and 39 financial buyers). In addition, Intrepid assisted the Debtors in preparing a Confidential Information Presentation, setting up and populating a detailed data room, and engaging in negotiations and discussions regarding the form of a potential sale. Of these 81 parties, 17 executed non-disclosure agreements and were granted access to the virtual data room.

Despite these robust prepetition marketing efforts, the Debtors received no formal offers and an agreement for the sale of the Debtors' assets with any third-party was not reached.

## 2.7     Development of the Plan

After the thorough market test described above, the only party interested in acquiring the Debtors' assets were their existing lenders. After discussions with key stakeholders and management, consideration of other strategic alternatives, and upon the advice of counsel and other advisors, in their business judgment, the Debtors determined that filing for chapter 11 bankruptcy is the best path forward. The Debtors have determined that this route would be the most expedient path to allow the Company to emerge as a better capitalized enterprise.

Accordingly, the Bridge Loan Lenders, the Bond Trustee, the Series A Bondholders, and the Debtors agreed to the Restructuring Transactions, which are incorporated into the Plan. Effectively, the Bridge Lenders agreed to fund additional expenses through the DIP Facility to get to confirmation of the Plan, with $35 million of the DIP Facility being rolled into the Exit Facility.

11295777v.1

The remainder of the DIP Facility will be converted into New Class A Units in the Reorganized Debtors, along with the balance of the Series A Bond debt, with all of the Series B Bond debt converted into New Class B Units in the Reorganized Debtors. The preferences and priorities of the New Class A and New Class B Units will be set forth in the New Operating Agreement, but the general terms are reflected in the LLC Agreement Term Sheet set forth as **Exhibit B** hereto.

## ARTICLE III:

## THE PLAN

### 3.1    Treatment of Claims and Equity Interests

The Plan provides for the treatment of Claims against and Equity Interests in the Debtors through, among other things, the following:

- Each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim.

- Each Holder of an Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

- Each Holder of an Allowed Other Priority Claim, in exchange for full and final satisfaction, settlement, release, and discharge of and in exchange for each Other Priority Claim, shall (A) be paid in full in Cash the unpaid portion of its Other Priority Claim on or as soon as reasonably practicable after (1) the Effective Date, (2) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (3) such other date as may be ordered by the Bankruptcy Court; or (B) receive such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code.

- On the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of all DIP Claims, subject to the prior written consent of the DIP Lenders (which consent may be given or withheld for any reason or no reason) (i) $35,000,000 of the DIP Claims shall convert on a dollar-for-dollar basis into loans under the Exit Facility pursuant to the Exit Facility Documents and (ii) DIP Converted Claims shall be exchanged for the New Class A Units in the Reorganized Company. The Holders of the DIP Converted Claims shall receive on account of such Claims their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan.

- Each Holder of an Other Secured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

- Each Holder of a Bridge Loan Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Bridge Loan Claim, their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan.

- Each Holder of a Senior Series A Bond Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Senior Series A Bond Claim, their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan.

- Each Holder of a Subordinated Series B Bond Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Subordinated Series B Bond Claim, their ratable share of the New Class B Units, subject to dilution on account of the Management Incentive Plan.

- All Lateral Loan Claims shall be cancelled, released, and discharged, and shall be of no further force or effect.  Therefore, Holders of Lateral Loan Claims shall not receive any distribution on account of such Lateral Loan Claim.

- All General Unsecured Claims shall be discharged and will receive no distribution on account of such Claims.  Notwithstanding the foregoing treatment, each Holder of an Allowed General Unsecured Claim shall be eligible to receive the consideration being provided to Holders of Allowed General Unsecured Claims that timely elect to opt-in to the Releases, as described in Article IV of the Plan.

- Each Intercompany Claim shall, at the option of the Debtors and the Consenting Stakeholders, be (i) Reinstated or (ii) cancelled, released, and discharged without any distribution on account of such Claims.

- All Subordinated Claims shall be cancelled, released, and discharged as of the Effective Date, and shall be of no further force or effect.

- All Equity Interests in RFPG shall be cancelled, released, and discharged without any distribution on account of such Equity Interests; and

- The Intercompany Equity Interests shall be cancelled, released, and discharged without any distribution on account of such Intercompany Equity Interests; *provided, however,* that at the option of the Debtors and the Consenting Stakeholders, the Intercompany Equity Interests may be Reinstated for administrative convenience.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Plan.  Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety.  As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to

14

be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article VI of this Disclosure Statement, entitled "Certain Factors To Be Considered."

**3.2    Compromise and Settlement of Claims, Interests, and Controversies**

The Plan provides that, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Equity Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Equity Interests (as applicable) in any Class are intended to be and shall be final.

**3.3    New Capital Structure**

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, will effectuate the Restructuring Transactions by, among other things, entering into:  (a) the Exit Facility Documents; (b) the New Organizational Documents, which shall be in a form consistent in all respects with the LLC Agreement Term Sheet and (c) the Management Incentive Plan.  All above-listed documents shall become effective in accordance with their terms and the Plan.

**3.4    Issuance of Reorganized Company Equity Interests**

Reorganized Company Equity Interests shall be authorized under the New Organizational Documents, issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. All of the Reorganized Company Equity Interests issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the Reorganized Company Equity Interests is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Equity Interest. Holders of Reorganized Company Equity Interests shall be deemed as a result of having accepted distributions of Reorganized Company Equity Interests pursuant to the Plan to have accepted the terms of the New Operating Agreement (solely in their capacity as members of the Reorganized Company) and to be parties thereto without further action or signature. The New Operating Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Reorganized Company Equity Interests shall be bound thereby in all respects.

All Equity Interests of RFPG outstanding prior to Consummation (including any securities or rights exchangeable or exercisable for Equity Interests) shall be extinguished upon

15

Consummation and holders thereof shall not receive any payment or property on account of any such Equity Interests.

### 3.5    Management Incentive Plan

Following the Effective Date, the Reorganized Debtors may adopt and implement the Management Incentive Plan.

### 3.6    Claims Cash Pool Account

On the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Claims Cash Pool Account with the Claims Cash Pool.

By no later than such date that is 14 days after the General Unsecured Claims Bar Date, or as soon thereafter as is reasonably practicable, the General Unsecured Claims Administrator shall provide the Reorganized Debtors with a register of Consenting GUC Holders, including (i) the identities of Consenting GUC Holders, (ii) the amounts of the General Unsecured Claims held by the Consenting GUC Holders, and (iii) the amounts of General Unsecured Claims held by Holders of General Unsecured Claims that are not Consenting GUC Holders.

As soon as reasonably practicable after the occurrence of the Claims Objection Deadline, the General Unsecured Claims Administrator shall distribute the funds in the Claims Cash Pool Account to Consenting GUC Holders.  Any such Consenting GUC Holders will be eligible to receive their Pro-Rata Share of the Claims Cash Pool (after deducting all fees and expenses incurred by the General Unsecured Claims Administrator) on account of their Allowed General Unsecured Claims.  For the avoidance of doubt the Consenting GUC Holders' Pro-Rata Share of the Claims Cash Pool shall be calculated using the total amount of Allowed General Unsecured Claims as the denominator, regardless of what percentage of Allowed General Unsecured Claims are held by Consenting GUC Holders.

The Claims Cash Pool Account (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors, (ii) shall be held in reserve to fund distributions as provided herein, and (iii) no Liens, Claims, or Interests shall encumber the Claims Cash Pool Account in any way (whether on account of the Exit Facility or other otherwise).  As soon as reasonably practicable after all distributions have been made to the Consenting GUC Holders, any and all Cash remaining in the Claims Cash Pool Account shall be indefeasibly paid to the Reorganized Debtors.

### 3.7    Unclassified Claims

(a)    Unclassified Claims

(1)    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the applicable Debtor(s) or the Reorganized Debtor(s), as applicable, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim shall receive in full and

16

final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the unpaid portion of such Allowed Administrative Claim in Cash: (i) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Administrative Claim is due or as soon as reasonably practicable thereafter); (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; (iii) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable; or (iv) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### (2)    Professional Fee Claims

On the Effective Date, the Reorganized Debtors shall establish (if not already established) and fund the Professional Fee Account with Cash equal to the Professional Fee Reserve Amount; *provided* that any amounts remaining in the Funded Reserve Account shall be used to fund the Professional Fee Account.  The Professional Fee Account shall be maintained solely for the benefit of the Retained Professionals, subject to any remaining amount in the Professional Fee Account being promptly paid to the Reorganized Debtors after all Allowed amounts owing to Retained Professionals have been paid in full.  Subject to the rights of the Reorganized Debtors to such remaining amount in the Professional Fee Account, such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  No Liens, Claims, or Equity Interests shall encumber the Professional Fee Account in any way, subject to any remaining amount in the Professional Fee Account being promptly paid to the Reorganized Debtors after all Allowed amounts owing to Retained Professionals have been paid in full.  The amount of Professional Fee Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals from funds held in the Professional Fee Account when such Professional Fee Claims are Allowed by an Order of the Bankruptcy Court.  In no event shall the Reorganized Debtors be obligated to satisfy Professional Fee Claims to the extent that the Professional Fee Reserve Account is insufficient to satisfy the Professional Fee Claims. Any remaining amount in the Professional Fee Account, following payment of all Allowed Professional Fee Claims shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court or any other Entity.

Except as otherwise specifically provided in the Plan, including without limitation, Section 9.8 hereof, on and after the Effective Date, the Reorganized Debtors shall pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by such Debtor or Reorganized Debtor (as applicable) on or after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  The Reorganized Debtors shall pay, within 10 Business Days after submission of a detailed invoice to the Reorganized Debtors, such reasonable Claims for compensation or reimbursement of expenses incurred by the Retained Professionals of the Debtors.  From and after the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Debtor or Reorganized Debtor (as applicable) may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### (3) DIP Claims

Subject to the DIP Orders, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreement as of the Effective Date, including principal, interest, fees, costs, other charges, and expenses, and all other obligations related to the DIP Facility, if any.

Notwithstanding anything to the contrary in the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of all DIP Claims, on the Effective Date, subject to the prior written consent of the DIP Lenders (which consent may be given or withheld for any reason or no reason), (i) $35,000,000 of the DIP Claims shall convert on a dollar-for-dollar basis into loans under the Exit Facility pursuant to the Exit Facility Documents and (ii) DIP Converted Claims shall be exchanged for the New Class A Units in the Reorganized Company. The Holders of the DIP Converted Claims shall receive on account of such Claims their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan.

### (4) Priority Tax Claims

Except to the extent that each Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim will be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on or before the Effective Date, such Claim will be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or when such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

### (5) Statutory Fees

The Debtors and the Reorganized Debtors, as applicable, will pay all quarterly fees under 28 U.S.C § 1930(a), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' or Reorganized Debtors' business, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

### (b) Classified Claims and Equity Interests Summary

The Plan establishes a comprehensive classification of Claims and Equity Interests. The table below summarizes the classification, treatment, voting rights, and estimated recoveries of the Claims and Equity Interests, by Class, under the Plan. Amounts in the far right column under the heading "Liquidation Recovery" are estimates only and are based on certain assumptions described herein and set forth in greater detail in the Liquidation Analysis (as defined below) attached hereto as **Exhibit C**. Accordingly, recoveries actually received by Holders of Claims and Equity Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

The "Projected Plan Recovery" figures included in the table below are shown prior to any impact of the Management Incentive Plan. The figures reflect the full range of the Debtors' valuation analysis.

| Class | Claim | Treatment | Status | Voting Right | Projected Plan Recovery[12] |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Paid in full in Cash or receive such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code. | Unimpaired | No (conclusively presumed to accept) | 100% |
| 2 | Other Secured Claims | (i) Paid in full in Cash; (ii) Satisfied in full by delivery of the collateral securing the claim; (iii) Reinstated; or (iv) Such other treatment rendering such claims unimpaired. | Unimpaired | No (conclusively presumed to accept) | 100% |
| 3 | Bridge Loan Claims | On or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Bridge Loan Claim, each Holder thereof shall receive their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan. | Impaired | Yes | 20%-35% |
| 4 | Senior Series A Bond Claims | On or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Senior Series A Bond Claim, each Holder thereof shall receive their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan. | Impaired | Yes | 20%-35% |

---

[12]    Projected Recovery for each class is based on the implied valuation more fully described in **Exhibit D**.

19

| Class | Claim | Treatment | Status | Voting Right | Projected Plan Recovery[12] |
|-------|-------|-----------|--------|--------------|-----------------------------|
| 5 | Subordinated Series B Bond Claims | On or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Subordinated Series B Bond Claim, each Holder thereof shall receive their Pro-Rata Share of the New Class B Units, subject to dilution on account of the Management Incentive Plan. | Impaired | Yes | >0% |
| 6 | Lateral Loan Claims | Discharged without any distribution. | Impaired | No (deemed not to accept) | 0% |
| 7 | General Unsecured Claims | Discharged without any distribution. Notwithstanding the above treatment, each Holder of an Allowed General Unsecured Claim shall be eligible to receive the consideration being provided to Holders of Allowed General Unsecured Claims that timely elect to opt-in to the Releases, as described in Article IV of the Plan. | Impaired | No (deemed not to accept) | 0%[13] |
| 8 | Intercompany Claims | On the Effective Date, at the option of the Debtors, and the Consenting Stakeholders, each Intercompany Claim shall be either (A) Reinstated or (B) cancelled, released, and discharged without any distribution. | Unimpaired/ Impaired | No (conclusively presumed to accept / deemed not to accept) | 100% / 0% |
| 9 | Subordinated Claims | Discharged without any distribution. | Impaired | No (deemed not to accept) | 0% |
| 10 | Equity Interests in RFPG | Cancelled without any distribution. | Impaired | No (deemed not to accept) | 0% |

---

[13]    The Plan does provide, however, that Holders of Allowed General Unsecured Claims in Class 7 may receive, in exchange for opting into the Releases set forth in the Plan, their Pro-Rata Share of the Claims Cash Pool.

11295777v.1

| Class | Claim | Treatment | Status | Voting Right | Projected Plan Recovery[12] |
|-------|-------|-----------|--------|--------------|------------------------------|
| 11 | Intercompany Equity Interests | Cancelled without any distribution; *provided, however*, that at the option of the Debtors and the Consenting Stakeholders, the Intercompany Equity Interests may be Reinstated for administrative convenience. | Unimpaired/ Impaired | No (conclusively presumed to accept / deemed not to accept) | 100% / 0% |

**(c)** **Classified Claims and Equity Interests Details**

**(1)** *Class 1—Other Priority Claims.*

A. *Classification*: Class 1 consists of all Other Priority Claims.

B. *Treatment:* Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and discharge of and in exchange for each Other Priority Claim, each Holder of such Allowed Other Priority Claim shall (A) be paid in full in Cash the unpaid portion of its Other Priority Claim on or as soon as reasonably practicable after (1) the Effective Date, (2) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (3) such other date as may be ordered by the Bankruptcy Court; or (B) receive such other recovery as is necessary to satisfy section 1129 of the Bankruptcy Code.

C. *Impairment and Voting:* Class 1 is Unimpaired and Holders of Other Priority Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Priority Claims.

**(2)** *Class 2—Other Secured Claims.*

(i) *Classification*: Class 2 consists of all Other Secured Claims.

(ii) *Treatment:* Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder thereof shall receive: (A) payment in full in Cash; (B) delivery of the collateral securing any such Claim and payment of any interest

required under section 506(b) of the Bankruptcy Code; (C) Reinstatement of such Claim; or (D) other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    *Impairment and Voting*:  Class 2 is Unimpaired and Holders of Other Secured Claims are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Other Secured Claims.

**(3)**    *Class 3—Bridge Loan Claims.*

(i)    *Classification:* Class 3 consists of Bridge Loan Claims.

(ii)    *Treatment:* Except to the extent that a Holder of an Allowed Bridge Loan Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Bridge Loan Claim, each Holder thereof shall receive their ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan.

(iii)    *Impairment and Voting:* Class 3 is Impaired and Holders of Bridge Loan Claims are entitled to vote to accept or reject the Plan.

**(4)**    *Class 4—Senior Series A Bond Claims.*

(i)    *Classification*: Class 4 consists of all Senior Series A Bond Claims.

(ii)    *Treatment:*  On the Effective Date, all Senior Series A Bond Claims shall be cancelled, released, and discharged, and shall be of no further force or effect.  On the Effective Date, each Holder of an Allowed Senior Series A Bond Claim shall receive in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each such Allowed Senior Series A Bond Claim its ratable share of the New Class A Units (measured by reference to the Secured Lender Claim Amount), subject to dilution on account of the Management Incentive Plan.

(iii)    *Impairment and Voting*:  Class 4 is Impaired and Holders of Senior Series A Bond Claims are entitled to vote to accept or reject the Plan.

**(5)**     *Class 5—Subordinated Series B Bond Claims.*

    (i)     *Classification*: Class 5 consists of all Subordinated Series B Bond Claims.

    (ii)     *Treatment*:  On the Effective Date, all Subordinated Series B Bond Claims shall be cancelled, released, and discharged, and shall be of no further force or effect.  On the Effective Date, each Holder of an Allowed Subordinated Series B Bond Claims shall receive in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each such Allowed Subordinated Series B Bond Claims its Pro-Rata Share of the New Class B Units, subject to dilution on account of the Management Incentive Plan.

    (iii)     *Impairment and Voting*:  Class 5 is Impaired and Holders of Subordinated Series B Bond Claim are entitled to vote to accept or reject the Plan.

**(6)**     *Class 6—Lateral Loan Claims.*

    (i)     *Classification*: Class 6 consists of all Intercompany Claims.

    (ii)     *Treatment*:  On the Effective Date, all Lateral Loan Claims shall be cancelled, released, and discharged, and shall be of no further force or effect.  Thereafter, Holders of Lateral Loan Claim shall not receive any distributions on account of such Lateral Loan Claims.

    (iii)     *Impairment and Voting*:  Class 6 is Impaired and Holders of Lateral Loan Claims are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Lateral Loan Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Lateral Loan Claims.

**(7)**     *Class 7—General Unsecured Claims.*

    (i)     *Classification*:  Class 7 consists of all General Unsecured Claims.

    (ii)     *Treatment*:  On the Effective Date, all General Unsecured Claims shall be cancelled, released, and discharged, and shall be of no further force or effect.  Thereafter, Holders of General Unsecured Claims shall not receive any distributions on account of such General Unsecured Claims.

    (iii)     *Impairment and Voting*:  Class 7 is Impaired and Holders of General Unsecured Claims are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore,

Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such General Unsecured Claims.

(iv) *Release Opt-In*:  Notwithstanding the above treatment, each Holder of an Allowed General Unsecured Claim shall be eligible to receive the consideration being provided to Holders of Allowed General Unsecured Claims that timely elect to opt-in to the Releases, as described in Article IV of the Plan.

(v) *Deficiency Claims*: If the Committee (if any) (i) does not object, or assist or support any other party in objecting, to Confirmation of the Plan, (ii) does not assert, or assist or support any other party in asserting, a "Challenge" (as defined in the DIP Order), and (iii) agrees to terminate the Challenge Period (as defined in the DIP Order) effective as of the date that is three (3) calendar days prior to the Confirmation Hearing, each Holder of an Allowed Deficiency Claim will waive the right to receive any distribution from the Claims Cash Pool on account of their Allowed Deficiency Claims.

**(8)** *Class 8—Intercompany Claims.*

(i) *Classification*:  Class 8 consists of all Intercompany Claims.

(ii) *Treatment*:  On the Effective Date, at the option of the Debtors, and the Consenting Stakeholders, each Intercompany Claim shall be either (A) Reinstated or (B) cancelled, released, and discharged without any distribution on account of such Claims.

(iii) *Impairment and Voting*:  Holders of Intercompany Claims that are Reinstated are conclusively presumed to accept the Plan pursuant to section 1126(f) and Holders of Intercompany Claims that are cancelled, released and discharged under the Plan without any distribution are deemed not to accept pursuant to section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Claims.

**(9)** *Class 9—Subordinated Claims.*

(i) *Classification*:  Class 9 consists of all Subordinated Claims, if any.

(ii) *Treatment*:  On the Effective Date, all Subordinated Claims shall be cancelled, released, and discharged as of the Effective Date, and shall be of no further force or effect.  Therefore, Holders of

24

Subordinated Claims shall not receive any distribution on account of such Subordinated Claims.

(iii)    *Impairment and Voting*: Class 9 is Impaired and Holders of Subordinated Claims are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims.

**(10)**    *Class 10—Equity Interests in RFPG.*

(i)    *Classification*:  Class 10 consists of all Equity Interests in RFPG.

(ii)    *Treatment*:  On the Effective Date, all Equity Interests in RFPG shall be cancelled without any distribution on account of such Equity Interests.

(iii)    *Impairment and Voting*:  Class 10 is Impaired and Holders of such Equity Interests are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Equity Interests in RFPG are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Equity Interests in RFPG.

**(11)**    *Class 11—Intercompany Equity Interests.*

(i)    *Classification*:   Class 11 consists of all Intercompany Equity Interests.

(ii)    *Treatment*:   On the Effective Date, the Intercompany Equity Interests shall be cancelled without any distribution on account of such Equity Interests; provided, however, that at the option of the Debtors and the Consenting Stakeholders, the Intercompany Equity Interests may be Reinstated for administrative convenience.

(iii)    *Impairment and Voting*:  Holders of Intercompany Equity Interests that are Reinstated are conclusively presumed to accept the Plan pursuant to section 1126(f) and Holders of Intercompany Equity Interests that are cancelled, released and discharged under the Plan without any distribution are deemed not to accept pursuant to section 1126(g) of the Bankruptcy Code, respectively.  Therefore, Holders of Allowed Intercompany Equity Interests are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Intercompany Equity Interests.

(d)      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, the DIP Orders, or the DIP Facility Documents, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

(e)      **Voting, Presumptions, Solicitation**

> (1)      *Acceptance by Certain Impaired Classes.*  Only Holders of Allowed Claims in Class 3, Class 4, and Class 5 are entitled to vote to accept or reject the applicable Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least 66.6% in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Class 3, Class 4, and Class 5 have received Ballots containing detailed voting instructions.

> (2)      *Conclusively Presumed Acceptance by Unimpaired Classes*.  Holders of Claims in Class 1 and Class 2, and certain Holders of Claims in Class 8 and Equity Interests in Class 11 are conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

> (3)      *Deemed Not To Accept by Certain Impaired Classes*.  Holders of Claims and Equity Interests in Class 6, Class 7, Class 9, Class 10 and certain Holders of Claims in Class 8 and Equity Interests in Class 11 are deemed not to accept the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan and the vote of such Holders shall not be solicited.

> (4)      *Controversy Concerning Impairment*.  If a controversy arises as to whether any Claims or Equity Interests, or any Class thereof, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

> (5)      *Elimination of Vacant Classes.*  Any Class of Claims or Equity Interests that does not have a holder of an Allowed Claim or Allowed Equity Interest or a Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes

of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**(f)**    **Confirmation Pursuant to**
**Section 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Equity Interests that does not accept the Plan, including the Classes of Claims and Equity Interest that are deemed not to accept the Plan.

**(g)**    **Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Equity Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a) or (b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided in the Plan, the Debtors reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.

**(h)**    **Intercompany Equity Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Equity Interests are not being received by Holders of such Intercompany Equity Interests on account of their Intercompany Equity Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure for the ultimate benefit of the Holders that receive Reorganized Common Stock or Reorganized Preferred Stock in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions on account of such Holders' Allowed Claims.

**3.8**    **Liquidation Analysis**

The Debtors, with the assistance of Riveron Management Services, LLC ("Riveron"), have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit C** (the "Liquidation Analysis"), to assist Holders of Claims and Equity Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Equity Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

As set forth in the Liquidation Analysis, the Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims than they would receive in liquidation under chapter 7 of the Bankruptcy Code.  This belief is based on a number of factors, including, but not limited to: (a) the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling in a controlled manner, affecting the business as a going concern; (b) the additional administrative claims involved in the appointment of a chapter 7 trustee; and (c) the additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

Additionally, on December 10, 2020, RFPG issued that certain Unsecured Promissory Note (the "Unsecured Note") in the principal amount of $625,626.94, with interest accruing thereon, to East African Forestry Products, LDA (Mozambique) ("EAFP").  EAFP is an entity owned and operated by the Debtors' former CEO.  The loans issued under the Unsecured Note mature on December 31, 2025.  In the Liquidation Analysis, the Debtors estimate a 0% recovery with respect to this receivable.

## 3.9    Valuation Analysis

The Plan provides for the distribution of Reorganized Company Equity Interests to the Holders of DIP Converted Claims, Bridge Loan Claims, Senior Series A Bond Claims, and Subordinated Series B Bond Claims, as applicable and as provided for in the Plan.  Accordingly, Intrepid, at the request of the Debtors, has performed an analysis, which is attached hereto as **Exhibit D**, of the estimated implied value of the Debtors on a going-concern basis as of **March 31, 2024** (the "Valuation Analysis").  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken described therein, should be read in conjunction with Article VI of this Disclosure Statement, entitled "Certain Factors To Be Considered."  The Valuation Analysis is based on data and information as of **January 17, 2024**. Intrepid makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

THE VALUATION ANALYSIS REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS AND THEIR ASSETS AND BUSINESS.  THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS.    ANY  SUCH  PRICES  MAY  BE  MATERIALLY  DIFFERENT  THAN INDICATED BY THE VALUATION ANALYSIS.

## 3.10    Financial Information and Projections

In connection with planning and developing the Plan, the Debtors, with the assistance of their advisors, prepared projections for the fiscal years 2024 through 2028, which are attached hereto as **Exhibit E** (the "Financial Projections"), including management's assumptions related thereto.  For purposes of the Financial Projections, the Debtors have assumed an Effective Date of March 31, 2024.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of

28

this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, commodity prices, regulatory changes, or a variety of other factors, including the factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein. The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

## ARTICLE IV:

## VOTING PROCEDURES AND REQUIREMENTS[14]

### 4.1   Classes Entitled to Vote on the Plan

The following Classes are entitled to vote to accept or reject the Plan (the "Voting Classes"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3 | Bridge Loan Claims | Impaired |
| 4 | Senior Series A Bond Claims | Impaired |
| 5 | Subordinated Series B Bond Claims | Impaired |

If your Claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package (as defined below). If you are a Holder of a Claim in one of the Voting Classes, you should read your ballot(s) and carefully follow the instructions included in the ballot(s). Please use only the ballot(s) that accompany the applicable Solicitation Package, if any, or the ballot(s) that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provided to you.

### 4.2   Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted. Acceptance by a class of claims requires an affirmative vote of more than one-half in

---

[14]   This Article is qualified in its entirety by the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Conditionally Approving the Solicitation Procedures, (IV) Approving the Combined Hearing Notice, (V) Conditionally Waiving the Requirement to Convene the Section 341 Meeting of Creditors, and (VI) Granting Related Relief* (the "Solicitation Motion") to be filed on the Petition Date.

number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted. Acceptance by a class of interests requires an affirmative vote of at least two-thirds in amount of the total allowed interests that have voted.

## 4.3    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Fee Claims.

While these factors could affect distributions available to Holders of Allowed Claims and Equity Interests under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Class or necessarily require a re-solicitation of the votes of Holders of Claims in the Voting Class pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in Article VI of this Disclosure Statement.

## 4.4    Classes Not Entitled To Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims against and Equity Interests in the Debtors are *not entitled to* vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | No (conclusively presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |

30

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 6 | Lateral Loan Claims | Impaired | No (deemed not to accept) |
| 7 | General Unsecured Claims | Impaired | No (deemed not to accept) |
| 8 | Intercompany Claims | Unimpaired / Impaired | No (conclusively presumed to accept / deemed not to accept) |
| 9 | Subordinated Claims | Impaired | No (deemed not to accept) |
| 10 | Equity Interests in RFPG | Impaired | No (deemed not to accept) |
| 11 | Intercompany Equity Interests | Unimpaired / Impaired | No (conclusively presumed to accept / deemed not to accept) |

**4.5    Solicitation Procedures**

    **(a)    Solicitation Agent**

The Debtors have retained Kroll Restructuring Administration LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

    **(b)    Solicitation Package**

The following materials constitute the solicitation package (collectively, the "<u>Solicitation Package</u>") distributed to Holders of Claims in the Voting Classes:

- the form of the notice of the combined hearing to consider approval of the adequacy of this Disclosure Statement and confirmation the Plan;

- a Ballot and applicable voting instructions; and

- this Disclosure Statement and all exhibits hereto, including the Plan and all exhibits thereto.

    **(c)    Distribution of the Solicitation Package and Plan Supplement**

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on January 22, 2024.

The Solicitation Package (except the Ballots) may also be obtained from the Solicitation Agent by: (i) calling the Solicitation Agent at (844) 272-2766 (US/Canada Toll Free) or +1 (646) 440-4878 (International), or (ii) emailing RFORBallots@ra.kroll.com and referencing "Restoration Forest Products Group Solicitation" in the subject line. After the Debtors file the

Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.ra.kroll.com/RFOR/, or for a fee via PACER at https://www.pacer.gov/.

The Debtors shall file the Plan Supplement with the Bankruptcy Court by no later than fourteen (14) calendar days prior to the Confirmation Hearing, subject to any deadline set forth in an order of the Bankruptcy Court.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will serve copies of the Plan Supplement on certain parties, and parties may obtain a copy of the Plan Supplement from the Solicitation Agent for free by:  (i) calling the Solicitation Agent at the telephone numbers set forth above; or (ii) visiting the Debtors' restructuring website, https://cases.ra.kroll.com/RFOR/.

## 4.6     Voting Procedures

January 10, 2024 (the "Voting Record Date") is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

For the Holder of a Claim in a Voting Class to have its Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and submitted so that such Holder's Ballot is actually received by the Solicitation Agent on or before the Voting Deadline, which is February 5, 2024 at 5:00 p.m. (prevailing Eastern Time).

Holders of Claims in Class 4 or Class 5 may submit pre-validated Beneficial Holder Ballots, or their Nominees may submit Master Ballots, by email to RFORballots@ra.kroll.com.  Holders of Claims in Class 3 (Bridge Loan Claims) may not submit Ballots by email; however, such holders may submit their Ballots via the Solicitation Agent's online E-Balloting Portal by visiting https://cases.ra.kroll.com/RFORBallots/, clicking on the "Submit E-Ballot" section of the website, and following the instructions set forth on the electronic ballot.  Holders of Claims in Classes 3, 4, and 5 may also submit paper Ballots to the Solicitation Agent via first class mail, overnight mail, or personal delivery to Restoration Forest Products Group, LLC, Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232

If a Holder of a Claim in a Voting Class transfers all of such Claim to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim Holder is automatically deemed to have provided a voting proxy to the purchasers of the Holder's Claim, and such purchasers shall be deemed to be the Holders thereof as of the Voting Record Date for purposes of voting on the Plan.

You might receive more than one Ballot if you hold Claims through one or more affiliated funds, in which case the vote cast by each such affiliated fund will be counted separately. Separate Claims held by affiliated funds in a particular Class shall not be aggregated, and the vote of each such affiliated fund related to its Claims shall be treated as a separate vote to accept or reject the Plan, as applicable. If you hold any portion of a single Claim, you and all other Holders of any portion of such Claim will be (a) treated as a single creditor for voting purposes and (b) required to vote every portion of such Claim collectively to either accept or reject the Plan.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM IN CLASS 3, CLASS 4, AND CLASS 5 MUST VOTE ALL OF ITS CLASS 3, CLASS 4, OR CLASS 5 CLAIMS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLAIM AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS. NO BALLOT MAY BE WITHDRAWN OR MODIFIED AFTER THE VOTING DEADLINE WITHOUT THE DEBTORS' PRIOR CONSENT OR PERMISSION OF THE BANKRUPTCY COURT.

**EXCEPT AS OTHERWISE SPECIFIED HEREIN OR AS MAY BE COMMUNICATED BY THE DEBTORS, THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE CLASS 3, CLASS 4, AND CLASS 5 CLAIMS IS BEING MADE PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, INCLUDING PURSUANT TO SECTION 4(A)(2) THEREOF, AND APPLICABLE UNITED STATES STATE SECURITIES LAWS, AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE ACCREDITED INVESTORS OR QIBs.**

**4.7**     **Opt-In Process**

If the Plan is confirmed by the Bankruptcy Court, the Debtors will cause the Solicitation Agent to distribute the Opt-In Form to Holders of Claims in Class 7 (General Unsecured Claims). Such Holders will be provided with the opportunity to opt-in to the Releases set forth in the Plan and receive their Pro-Rata Share of the Claims Cash Pool by timely submitting the Opt-In Form.

**ARTICLE V:**

**OTHER MATERIAL ASPECTS OF THE PLAN**

**5.1**     **Distributions**

Under the Bankruptcy Code only claims and interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an Allowed Claim or Equity Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, that the Claim or Equity Interest, and the amount thereof, is in fact a valid Claim against or Equity Interest in the Debtors.

**5.2**     **Distribution on Account of Claims**
        **and Equity Interests Allowed as of the Effective Date**

Except as otherwise provided in the Plan or a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Equity Interests Allowed on or before the Effective Date shall be made on the Distribution Date; *provided* that (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) in accordance with Article II of the Plan, Allowed Priority Tax Claims, unless otherwise agreed, shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in accordance with the terms of any agreement between the Debtors and the Holder of such Claim, or as may be due and payable under applicable non-bankruptcy Law, or in the ordinary course of business.

**5.3**     **Distribution on Account of Claims**
        **and Equity Interests Allowed After the Effective Date**

**(1)**     **Payments and Distributions on Disputed Claims**

Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the next Distribution Date; *provided* that (i) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of

34

dealing, course of business, or industry practice and (ii) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date shall be treated as Allowed Priority Tax Claims in accordance with Article VI of the Plan and paid.

### (2)     Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision to the contrary in the Plan and except as otherwise agreed to by the relevant parties, no payments or distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or agreement among the relevant parties, or by Final Order.

### 5.4     Timing and Calculation of Amounts to Be Distributed

Except as otherwise provided in the Plan, on the Distribution Date each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  Except as otherwise provided in the Plan, or any order of the Bankruptcy Court, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### (a)     Delivery of Distributions

### (1)     Record Date for Distributions

On the Distribution Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Date.  If a Claim is transferred twenty (20) or fewer days before the Distribution Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### (2)     Delivery of Distributions on Account of Bridge Loan Claims.

UMB, in its capacity as Administrative Agent under the Bridge Loan Credit Agreement shall be deemed to be the holder of all Bridge Loan Claims for purposes of distributions to be made hereunder, and all distributions on account of Claims in Class 3 shall be made to the Administrative Agent.  As soon as practicable following compliance with the requirements set forth in Article VI of the Plan (as applicable), the Administrative Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Bridge Loan Claims in Class 3 in accordance with the terms of the Bridge Loan Credit Agreement and the Plan.  Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Administrative Agent shall not have any liability to any Entity with respect to distributions made or directed to be made by the Administrative Agent.

### (3)     Delivery of Distributions on Account of Senior Series A Bond Claims.

The Bond Trustee shall be deemed to be the holder of all Senior Series A Bond Claims for purposes of distributions to be made hereunder, and all distributions on account of Claims in Class

4 shall be made to the Bond Trustee. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan (as applicable), the Bond Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Senior Series A Bond Claims in Class 4 in accordance with the terms of the Authority Loan Agreement, Indenture and the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Bond Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the Bond Trustee.

### (4)    Delivery of Distributions on Account of Subordinated Series B Bond Claims.

The Bond Trustee shall be deemed to be the holder of all Subordinated Series B Bond Claims for purposes of distributions to be made hereunder, and all distributions on account of Claims in Class 5 shall be made to the Bond Trustee. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan (as applicable), the Bond Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Subordinated Series B Bond Claims in Class 5 in accordance with the terms of the Authority Loan Agreement, Indenture and the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the Bond Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the Bond Trustee.

### (5)    Delivery of Distributions on Account of General Unsecured Claims.

On the applicable Distribution Date, the Distribution Agent shall make distributions to Holders of Allowed General Unsecured Claims in accordance with Article IV of the Plan at the address designated on the respective Opt-In Proof of Claim Forms executed and delivered by Holders of Allowed General Unsecured Claims to the Notice and Claims Agent, or, if no address has been provided, at the address indicated on the Debtors' books and records as of the date of any such distribution, or the address set forth in the Schedules.

### (6)    Distribution by Distribution Agent.

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan. To the extent the Debtors and the Reorganized Debtors, as applicable, determine to utilize a Distribution Agent to facilitate the distributions under the Plan to Holders of Allowed Claims, any such Distribution Agent would first be required to: (i) affirm its obligation to facilitate the prompt distribution of any documents; (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan; (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan to be distributed by such Distribution Agent; and (iv) post a bond, obtain a surety or provide some other form of security for the performance of its duties, the costs and expenses of procuring which shall be borne by the Debtors or the Reorganized Debtors, as applicable.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for

any approvals, authorizations, actions, or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, object to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

(7)    <b>Minimum Distributions</b>

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors and the Distribution Agents shall not be required to make distributions or payments of less than $100 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar or fractional share of applicable equity interests under the Plan would otherwise be called for, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar or share of Reorganized Common Stock (up or down), with half dollars and half shares of Reorganized Common Stock or less being rounded down.

(b)    <u><b>Undeliverable Distributions</b></u>

(1)    <u><b>Holders of Certain Undeliverable Distributions</b></u>

If any distribution to a Holder of an Allowed Claim made in accordance with the Plan is returned to the Reorganized Debtors (or their Distribution Agent) as undeliverable, no further distributions shall be made to such Holder. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Section 6.7 of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends, or other accruals of any kind on account of their distribution being undeliverable.

(2)    <u><b>Failure to Claim Undeliverable Distributions</b></u>

Undeliverable Distributions or unclaimed Distributions shall remain in the possession of the Reorganized Debtors until such time as a Distribution becomes deliverable or the holder accepts Distribution, or such Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind. Such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 90 days from the date of the attempted Distribution. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. The Reorganized

37

Debtors shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

### (3)    Failure to Present Checks

Checks issued by the Reorganized Debtors (or their Distribution Agent) on account of Allowed Claims shall be null and void if not negotiated within 90 days after the issuance of such check.  Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 90 days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be discharged and forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or their property.  Within 90 days after the mailing or other delivery of any such distribution checks, notwithstanding applicable escheatment Laws, all such distributions shall revert to the Reorganized Debtors.  Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

### (c)    Manner of Payment

At the option of the Distribution Agent, any Cash payment to be made under the Plan may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### (d)    No Postpetition or Default Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order and notwithstanding any documents that govern the Debtors' prepetition indebtedness to the contrary, (1) postpetition or default interest shall not accrue or be paid on any Claims, and (2) no Holder of a Claim shall be entitled to (a) interest accruing on or after the Petition Date on any such Claim or (b) interest at the contract default rate, each as applicable.

### (e)    Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions reasonably necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

### (f)    Surrender of Cancelled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Equity Interest that is discharged by the Plan shall

be deemed to have surrendered such certificate or instrument to the Reorganized Debtors. Except as otherwise expressly provided in the Plan, such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors and Reorganized Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Equity Interests, which shall continue in effect. Notwithstanding anything to the contrary in the Plan, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

### (g)   Claims Paid or Payable by Third Parties

#### (1)   Claims Payable by Insurance

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.

#### (2)   Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### 5.5   No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan does not contemplate substantive consolidation of any of the Debtors.

### 5.6   General Settlement of Claims and Equity Interests

As discussed further herein and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classifications, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Equity Interests, Causes of Action, and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019. Distributions made to Holders of Allowed Claims in any Class are intended to be final.

### 5.7   Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be reasonably necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including, but not limited to: (a) the execution and delivery of appropriate agreements or other

documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable Law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates of formation or incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable Law; and (d) all other actions that the Reorganized Debtors reasonably determine are necessary or appropriate.  The Debtors intend to disclose certain steps related to the issuance of Reorganized Company Equity Interests to be taken in relation to the Restructuring Transactions in the Plan Supplement.  For the purposes of effectuating the Plan, none of the Restructuring Transactions contemplated in the Plan shall constitute a change of control under any agreement, contract, or document of the Debtors.

(a)     **Approval of the Exit Facilities and Exit Facility Documents**

On the Effective Date, the Reorganized Debtors shall have access to debt financing in the form of the Exit Facility in an initial aggregate amount equal to $35,000,000.00.  The Reorganized Debtors may use the Exit Facility for any purpose permitted by the Exit Facility Documents, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

Confirmation of the Plan shall be deemed to constitute approval of the Exit Facility and the Exit Facility Documents (including all transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities and expenses provided for therein) and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations under the Exit Facility Documents and such other documents as may be reasonably required or appropriate, in each case, in accordance therewith.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy Law.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents: (i) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents; (ii) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents; and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy Law.  The Reorganized Debtors granting such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and

11295777v.1

consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other Law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

(b)    **Issuance of Reorganized Company Equity Interests**

Reorganized Company Equity Interests shall be authorized and issued under the New Operating Agreement on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. All of the Reorganized Company Equity Interests issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the Reorganized Company Equity Interests is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Equity Interest. Holders of Reorganized Company Equity Interests shall be deemed as a result of having accepted distributions of Reorganized Company Equity Interests pursuant to the Plan to have accepted the terms of the New Operating Agreement (solely in their capacity as members of the Reorganized Company) and to be parties thereto without further action or signature. The New Operating Agreement shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each holder of Reorganized Company Equity Interests shall be bound thereby in all respects.

All Equity Interests of RFPG outstanding prior to Consummation (including any securities or rights exchangeable or exercisable for Equity Interests) shall be extinguished upon Consummation and holders thereof shall not receive any payment or property on account of any such Equity Interests.

On the Effective Date, the Reorganized Debtors and the holders of Reorganized Company Equity Interests shall enter into the New Organizational Documents in substantially the form included in the Plan Supplement. The New Organizational Documents shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of Reorganized Company Equity Interests shall be bound thereby, in each case without the need for execution by any party thereto other than the Reorganized Debtors.

(c)    **Claims Cash Pool and Release Opt-In**

On the Effective Date, the Debtors or Reorganized Debtors shall establish and fund the Claims Cash Pool Account with the Claims Cash Pool.

By no later than such date that is 14 days after the General Unsecured Claims Bar Date, or as soon thereafter as is reasonably practicable, the General Unsecured Claims Administrator shall provide the Reorganized Debtors with a register of Consenting GUC Holders, including (i) the identities of Consenting GUC Holders, (ii) the amounts of the General Unsecured Claims held by the Consenting GUC Holders, and (iii) the amounts of General Unsecured Claims held by Holders of General Unsecured Claims that are not Consenting GUC Holders.

As soon as reasonably practicable after the occurrence of the Claims Objection Deadline, the General Unsecured Claims Administrator shall distribute the funds in the Claims Cash Pool Account to Consenting GUC Holders. Any such Consenting GUC Holders will be eligible to receive their Pro-Rata Share of the Claims Cash Pool (after deducting all fees and expenses incurred by the General Unsecured Claims Administrator) on account of their Allowed General Unsecured Claims. For the avoidance of doubt the Consenting GUC Holders' Pro-Rata Share of the Claims Cash Pool shall be calculated using the total amount of Allowed General Unsecured Claims as the denominator, regardless of what percentage of Allowed General Unsecured Claims are held by Consenting GUC Holders.

The Claims Cash Pool Account (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors, (ii) shall be held in reserve to fund distributions as provided herein, and (iii) no Liens, Claims, or Interests shall encumber the Claims Cash Pool Account in any way (whether on account of the Exit Facility or other otherwise). As soon as reasonably practicable after all distributions have been made to the Consenting GUC Holders, any and all Cash remaining in the Claims Cash Pool Account shall be indefeasibly paid to the Reorganized Debtors.

**(d)** **Management Incentive Plan**

Following the Effective Date, the Reorganized Debtors may adopt and implement the Management Incentive Plan.

## 5.8    Continued Corporate Existence

Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist as of the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable Law and pursuant to the New Organizational Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable Law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, without the need for approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, take such action as permitted by applicable Law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (e) the reincorporation of a Reorganized Debtor under the Law of jurisdictions other than the Law under which the Debtor currently is incorporated.

## 5.9    Vesting of Assets

Except as otherwise provided in the Plan or the Plan Documents, on the Effective Date, all Assets, including all Claims, rights, and Causes of Action, and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the

terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims), Equity Interests, and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

**5.10    Cancellation of Existing Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (i) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest, including the Bridge Loan Credit Agreement, the Indenture, Authority Loan Agreement, Lateral Loan Agreement, and the DIP Credit Agreement and their related security and collateral documents (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) shall be released and discharged.

Notwithstanding such cancellation and discharge:

(1)    Pursuant to section 9.20(c) of the DIP Credit Agreement, all indemnification or other protections provided to any Indemnified Person (as defined therein) pursuant to the provisions in Article VIII, section 9.5, section 9.6, section 9.20, and Article X of the DIP Credit Agreement shall survive. The DIP Facility Documents shall also continue in effect for purposes of allowing the DIP Agent to (a) receive distributions from the Debtors under the Plan and to make further distributions to the Holders of the DIP Claims on account of such DIP Claims; (b) enforce its rights, Claims and interests with respect to the DIP Lenders; and (c) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of DIP Claims, including any rights to priority of payment with respect to the DIP Lenders; and (d) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the DIP Agent or Holders of DIP Claims under the Plan;

(2)    The Bridge Loan Credit Agreement Documents shall continue in effect solely for purposes of allowing the Bridge Loan Agent to: (a) receive distributions from the Debtors under the Plan and to make further distributions to the Holders of the Bridge Loan Claims on account of such Bridge Loan Claims; (b) enforce its rights, Claims and interests with respect to the Bridge Loan Lenders; (c) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or

property distributable to Holders of Bridge Loan Claims, including any rights to priority of payment with respect to the Bridge Loan Lenders; and (d) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the Bridge Loan Agent or Holders of Bridge Loan Claims under the Plan;

(3)    The Authority Loan Agreement and the Indenture shall continue in effect solely for purposes of allowing the Bond Trustee to: (a) receive distributions from the Debtors under the Plan and to make further distributions to the Holders of the Secured Bondholder Claims on account of such Claims; (b) enforce its rights, Claims and interests with respect to the Secured Bondholders; (c) enforce its rights to payment of fees, expenses, and indemnification obligations as against any money or property distributable to Holders of Secured Bondholder Claims, including any rights to priority of payment with respect to the Secured Bondholders; and (d) appear and be heard in the Chapter 11 Cases or in any other proceeding, including to enforce any obligation owed to the Bond Trustee or Holders of Secured Bondholder Claims under the Plan; and

(4)    Except to the extent set forth in or provided for under the Plan, nothing in section 4.8 of the Plan shall affect a cancellation of any Reorganized Company Equity Interests, Intercompany Equity Interests, or Intercompany Claims which shall be effective as of the Effective Date.

## 5.11    Sources of Consideration for Plan Distributions

The Debtors shall fund distributions under the Plan with: (a) Cash on hand, including Cash from operations; (b) the proceeds of the DIP Loans; (c) the Exit Facility; and (d) the Reorganized Company Equity Interests. Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors. The Reorganized Debtors shall be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers shall be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and shall not violate the terms of the Plan.

From and after the Effective Date, subject to any applicable limitations set forth in any post-Effective Date agreement (including, without limitation, the Exit Facility Documents), the Reorganized Debtors shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

## 5.12    Exemption from Registration Requirements

The issuance of the Reorganized Company Equity Interests under the Plan shall be exempt from registration under the Securities Act and any other applicable securities Laws pursuant to section 1145 of the Bankruptcy Code. These Securities may be resold without registration under the Securities Act or other federal securities Laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities,

44

as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such exempt Securities generally may be resold without registration under state securities Laws pursuant to various exemptions provided by the respective Laws of the several states.

### 5.13    Organizational Documents

Subject to Article IV of the Plan, the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and provisions of the Plan. The New Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code.

### 5.14    Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any Stamp or Similar Tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

### 5.15    Directors and Officers of the Reorganized Debtors

The members of the Reorganized Board will be designated in accordance with the Plan Supplement. Except to the extent that a member of the board of directors or board of managers, or the sole manager, as applicable, of a Debtor is designated in the Plan Supplement to serve as a director, manager or sole manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or board of managers, or the sole manager, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date, and each such director, manager, or sole manager shall be deemed to have resigned or shall otherwise cease to be a director, manager or sole manager of the applicable Debtor on the Effective Date. Each of the directors, managers, sole managers and officers of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Reorganized Debtor and may be designated, replaced or removed in accordance with such New Organizational Documents.

**5.16** **Insurance Policies**

All insurance policies pursuant to which any Debtor has any obligations in effect as of the Effective Date shall be deemed and treated as Executory Contracts pursuant to the Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect thereafter in accordance with such policy's respective terms.

**5.17** **Corporate Action**

On the Effective Date, all actions contemplated by the Plan, the Plan Supplement, and the Restructuring Transactions shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by Holders of Claims or Interests, directors, managers, or officers of the Debtors, the Reorganized Debtors, or any other Entity, including: (i) the selection of the directors and officers of each of the Reorganized Debtors; (ii) the adoption and/or filing of the New Organizational Documents; (iii) the distribution of the Reorganized Company Equity Interests as provided herein or in the Plan Supplement; (iv) the execution and entry into the Exit Facility Documents; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) or Restructuring Transactions, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan and the Plan Supplement (or necessary or desirable to effect the transactions contemplated by the Plan and the Plan Supplement) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Company Equity Interests, the Exit Facility Documents, and any and all agreements, documents, securities, and instruments relating to the foregoing.

The authorizations and approvals contemplated by Section 4.5 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

**5.18** **Effectuating Documents; Further Transactions**

Prior to, on, and after the Effective Date, the Debtors and Reorganized Debtors and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the DIP Facility Documents, the Exit Facility Documents, the New Organizational Documents, and any securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan.

## 5.19    Restructuring Expenses

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, but not paid pursuant to the DIP Orders or DIP Facility Documents, shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to the Plan and the DIP Orders, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On or as soon as reasonably practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay pre- and post-Effective Date, when due and payable in the ordinary course, Restructuring Expenses related to implementation, Consummation and defense of the Plan whether incurred before, on, or after the Effective Date.

## 5.20    Retained Causes of Action

Unless any Causes of Action or Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the DIP Orders, or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action or Claims in the ordinary course, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action and Claims shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such retained Causes of Action or Claims, and may exercise any and all rights in connection therewith. For the avoidance of doubt, in no instance will any Cause of Action preserved include any Claim or Cause of Action with respect to, or against, a Released Party.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Schedules, or the Disclosure Statement to any Claim or Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  All rights of the Debtors and Reorganized Debtors to prosecute any and all Claims or Causes of Action against any Entity are expressly preserved, except as otherwise expressly provided herein.**

47

**5.21** **Treatment of Executory Contracts and Unexpired Leases**

**(a)** **Assumption and Rejection of Executory Contracts and Unexpired Leases**

All Executory Contracts and Unexpired Leases of the Debtors that are not otherwise assumed or rejected will be deemed rejected by the applicable Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that (i) are identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (ii) previously expired or terminated pursuant to their own terms, (iii) those that have been previously assumed or rejected pursuant to a Final Order by the Debtors prior to the Effective Date; and (iv) are the subject of a motion seeking assumption or rejection as of the Effective Date or such later date.

The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving the assumption, assumption and assignment, or rejection, as the case may be, of Executory Contracts or Unexpired Leases, as described in the Plan and Plan Supplement, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (ii) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (iii) providing that the requirements for assumption or assumption and assignment of any Executory Contract or Unexpired Lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts or Unexpired Leases pursuant to the Plan are effective as of the Effective Date.

Each Executory Contract and Unexpired Lease assumed pursuant to Article V of the Plan shall be fully enforceable by the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

**(b)**     <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by (i) payment of the Cure Cost in Cash on the Effective Date, subject to the limitation described in the following paragraph, (ii) without acceleration in the ordinary course of business according to the Executory Contract or Unexpired Lease, or (iii) on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.  No later than the Plan Supplement Filing Date, to the extent not previously filed with the Bankruptcy Court and served on affected counterparties, the Debtors shall provide for notices of proposed assumption and proposed Cure Costs to be filed and served upon applicable contract and lease counterparties, together with procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a contract or lease counterparty to a proposed assumption, assumption and assignment, or related Cure Cost must be filed, served, and actually received by the Debtors within 14 days of notice of such assumption or assumption and assignment.

Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure Cost shall be deemed to have assented to such assumption or Cure Cost.  In the event of a dispute regarding (i) the amount of any Cure Cost, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365(b) of the Bankruptcy Code, if applicable, under the Executory Contract or the Unexpired Lease to be assumed or assumed and assigned, and/or (iii) any other matter pertaining to assumption and/or assignment, then the Bankruptcy Court shall hear such dispute prior to the assumption and/or assignment becoming effective, and the applicable Cure Costs associated therewith (if any) shall be paid following entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment and shall not prevent or delay implementation of the Plan or Effective Date; provided that the Debtors may settle any dispute regarding the amount of any Cure Cost without any action, order, or approval of the Bankruptcy Court;  provided, further, that notwithstanding anything to the contrary herein, the Debtors reserve the right to either reject, any Executory Contract or Unexpired Lease within 30 days after the entry of a Final Order resolving an objection to assumption or assumption and assignment, determining the Cure Cost under an Executory Contract or Unexpired Lease that was subject to a dispute, or resolve any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption or assumption and assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, and the payment of the Cure Cost, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assumption and assignment.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**(c)      Indemnification and Reimbursement Obligations**

Any and all Indemnification Obligations of the Debtors, including pursuant to their corporate charters, agreements, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents, or board resolutions, employment contracts or other agreements for the directors, officers, managers, employees, attorneys, other professionals and agents employed by the Debtors to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors based upon any act or omission for or on behalf of the Debtors shall remain in full force and effect to the maximum extent permitted by applicable Law and shall not be discharged, impaired, or otherwise affected by the Plan.  All such obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations in Section 5.3 of the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

**(d)      Claims Based on Rejection of Executory Contracts and Unexpired Leases**

Unless otherwise provided by a Bankruptcy Court order, Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases, if any, pursuant to the Plan or otherwise must be filed with the Notice and Claims Agent by the General Unsecured Claims Bar Date.  Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts and Unexpired Leases, if any, that are not timely filed shall be Disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contract and Unexpired Leases, if any, shall constitute General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

**(e)      Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor including any Executory Contracts and Unexpired Leases assumed by such Debtor, shall be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that are not otherwise assumed or rejected will be deemed assumed by the applicable Debtor or Reorganized Debtor in accordance with the provisions and requirements of section 365 and 1123 of the Bankruptcy Code.

**5.22    Employee Compensation and Benefits**

Except as otherwise provided in the Plan or in the Plan Supplement and except for any equity-based compensation or incentive plans, on and after the Effective Date, the Reorganized Debtors may, but are not required to, honor in the ordinary course of business any employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974) and

any other contracts, agreements, policies, programs, and plans for, among other things, employment, compensation, health care, disability and other welfare benefits, deferred compensation benefits, severance policies and benefits, retirement benefits, workers' compensation insurance and accidental death and dismemberment insurance that as of immediately prior to the Petition Date are, and as of immediately prior to the Effective Date continue to be, sponsored, maintained, or contributed to by any of the Debtors for the directors, officers, employees, and other service providers of any of the Debtors who served in such capacity at any time. Nothing contained herein shall entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such expired benefit plan or alleged entitlement under any such expired benefit plan. Nothing herein or in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, Claims, Causes of Action, or other rights with respect to any benefit plan, whether expired or unexpired.

Except as otherwise provided in the Plan, none of (i) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan or (ii) the consummation of the transactions provided in the Plan (or otherwise contemplated by the Restructuring Transactions and the Plan to occur prior to or on or about the Effective Date), in each case alone or together with any other event, will (A) entitle any current or former director, officer, employee, or other service provider of any of the Debtors to any payment or benefit, (B) accelerate the time of payment or vesting or trigger any payment or funding of compensation or benefits under, or increase the amount payable or trigger any other obligation under, any benefit plan or expired benefit plan, or (C) limit or restrict the right of the Debtors or Reorganized Debtors to merge, amend, or terminate any benefit plan, in each case including as a result of a "change in control" or similar provision or as a result of giving rise to any person to terminate his or her service with the Debtors or Reorganized Debtors for "good reason" or similar provision.

## 5.23    Release, Injunction, and Related Provisions

### (a)    Discharge of Claims and Termination of Equity Interests; Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Equity Interests and Claims of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against the Debtors, the Reorganized Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim or Equity Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest is Allowed; or (iii) the Holder of such Claim or Equity Interest has accepted or rejected, or been deemed to accept or reject, the Plan. Except as otherwise provided herein, any default by the

Debtors or their Affiliates with respect to any Claim or Equity Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and is fair, equitable, and reasonable. Subject to the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

**(b)** **Releases by the Debtors**

**PURSUANT TO SECTION 1123(b) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, PURSUANT TO THE CONFIRMATION ORDER, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, AND ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY SHALL BE DEEMED FOREVER RELEASED AND DISCHARGED BY EACH AND ALL OF THE DEBTORS, THE REORGANIZED DEBTORS, AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, AS APPLICABLE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM AGAINST, OR EQUITY INTEREST IN, A DEBTOR OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF**

THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS (OTHER THAN ANY INTERCOMPANY CLAIMS THAT HAVE BEEN REINSTATED AS CONTEMPLATED ABOVE), THE RESTRUCTURING, THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE PLAN, INCLUDING THE ISSUANCE OR DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, THE PLAN SUPPLEMENT, THE DISCLOSURE STATEMENT, THE DIP FACILITY DOCUMENTS, THE EXIT FACILITY DOCUMENTS, OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; PROVIDED THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTORS' RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT EACH DEBTOR RELEASE IS (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF SUCH CLAIMS; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE, AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR REORGANIZED DEBTORS OR THEIR RESPECTIVE ESTATES ASSERTING ANY CLAIM, CAUSE OF ACTION, OR LIABILITY RELATED THERETO, OF ANY KIND WHATSOEVER, AGAINST ANY OF THE RELEASED PARTIES OR THEIR PROPERTY.

(c)     Releases by Holders of Claims and Equity Interests

AS OF THE EFFECTIVE DATE, TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH OF THE RELEASING PARTIES SHALL BE

**DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH DEBTOR, REORGANIZED DEBTOR AND EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR FIXED, MATURED OR UNMATURED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE BUSINESS OPERATIONS OF THE DEBTORS, ACTIONS TAKEN BY THE DEBTORS' BOARD OF MANAGERS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THE DISCLOSURE STATEMENT, THE PLAN, THE PLAN SUPPLEMENT, THE DIP FACILITY DOCUMENTS, THE EXIT FACILITY DOCUMENTS, OR OTHER DOCUMENTS OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING FROM ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES FRAUD, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; PROVIDED THAT THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN, AND ANY RIGHT TO ENFORCE THE PLAN AND CONFIRMATION ORDER IS NOT SO RELEASED.**

    (d)    <u>Exculpation and Limitation of Liability</u>

**UPON AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE DEBTORS AND THEIR DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, INVESTMENT BANKERS, FINANCIAL ADVISORS, AND OTHER PROFESSIONAL ADVISORS AND AGENTS SHALL BE DEEMED TO HAVE SOLICITED ACCEPTANCES OF THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING SECTION 1125(e) OF THE BANKRUPTCY CODE.**

**THE EXCULPATED PARTIES SHALL NEITHER HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; PROVIDED THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; PROVIDED, FURTHER, THAT TO THE EXTENT PERMITTED BY APPLICABLE LAW EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.**

**THE EXCULPATED PARTIES HAVE, AND UPON CONFIRMATION, SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, INCLUDING WITH REGARD TO THE DISTRIBUTIONS OF REORGANIZED COMPANY EQUITY INTERESTS PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT AND SHALL NOT BE LIABLE AT ANY TIME FOR THE VIOLATIONS OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN.**

(e)    <u>**Injunction**</u>

**THE SATISFACTION, RELEASE AND DISCHARGE PURSUANT TO THIS ARTICLE IX OF THE PLAN SHALL ALSO ACT AS AN INJUNCTION AGAINST ANY ENTITY BOUND BY SUCH PROVISION AGAINST COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET, OR RECOVER ANY CLAIM OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THE PLAN OR THE CONFIRMATION ORDER TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 THEREOF.**

**5.24**    <u>**Setoffs and Recoupment**</u>

Except as otherwise provided herein or in the DIP Orders, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy Law, or as may be agreed to by the Holder of an Allowed Claim, may set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any Claims, rights, and Causes of Action of any nature that the applicable Debtor or Reorganized Debtor may hold against the Holder of such Allowed

11295777v.1

Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan, a Final Order or otherwise); *provided* that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action.

In no event shall any Holder of Claims be entitled to set off or recoup any Claim against any Claim, right, or Cause of Action of a Debtor or a Reorganized Debtor, as applicable, unless such Holder has timely filed a Proof of Claim with the Bankruptcy Court preserving such setoff or recoupment in such Proof of Claim.

### 5.25    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

To the extent that any Holder of a Secured Bondholder Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens or security interests to secure such Holder's Secured Bondholder Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

### 5.26    Plan Modifications

Subject to the limitations contained in the Plan, the Debtors reserve the right, with the consent of the Consenting Stakeholders, in accordance with the Bankruptcy Code and the Bankruptcy Rules: (i) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (ii) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms set forth herein.

### 5.27    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**5.28    Certain Technical Amendments**

Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided* that such technical adjustments and modifications (i) do not adversely affect the treatment of Holders of Claims or Equity Interests under the Plan, and (ii) shall be acceptable to the Consenting Stakeholders.

**5.29    Revocation or Withdrawal of Plan**

The Debtors reserve the right to, with the consent of the Consenting Stakeholders, revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the entry of the Confirmation Order and to file subsequent Chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (a) the Plan with respect to such Debtor or Debtors shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void with respect to such Debtor or Debtors; and (c) nothing contained in the Plan with respect to such Debtor or Debtors shall: (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

**5.30    Reservation of Rights**

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, this Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

**5.31    Conditions Precedent to the Effective Date**

The Effective Date shall not occur unless and until each of the following conditions have occurred or been waived in accordance with the terms of the Plan:

1.    the Bankruptcy Court shall have approved the Disclosure Statement, in a form acceptable to the Debtors and the Consenting Stakeholders, and the order approving this Disclosure Statement shall not have been stayed;

2.    the Confirmation Order shall have become a Final Order (unless otherwise waived by the Consenting Stakeholders), shall have been entered by April 30, 2024 (or such other later date as agreed to by the Consenting Stakeholders), shall be consistent in all material respects with this Plan, and shall otherwise be in a form acceptable to the Debtors and the Consenting Stakeholders (and with respect to those provisions thereof that affect the rights, obligations, liabilities and duties of the DIP Agent or the Bond Trustee, to the DIP Agent or the Bond Trustee, as applicable), and the Confirmation Order shall not have been stayed;

3.      all documents, certificates, and agreements necessary to implement the Plan shall have been executed and tendered for delivery to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable Laws, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date);

4.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors and the Consenting Stakeholders;

5.      all actions necessary to implement the Plan shall have been effected;

6.      the Bankruptcy Court shall have entered the DIP Orders, and the final DIP Order shall have become a Final Order, and the Debtors shall not be in default under the DIP Facility or the DIP Order and there shall not have occurred and be continuing any event, act, or omission that, but for the expiration of time, would permit any DIP Lender to terminate the DIP Facility in accordance with its terms upon the expiration of such time and the DIP Facility and DIP Credit Agreement shall be in full force and effect;

7.      all governmental and material third party approvals and consents necessary in connection with the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Restructuring Transactions;

8.      there shall be no ruling, judgment or order issued by any Governmental Unit making illegal, enjoining or otherwise preventing or prohibiting the consummation of the Restructuring Transactions;

9.      the Professional Fee Account shall have been established and the Professional Fee Reserve Amount shall have been funded in accordance with this Plan;

10.     The Claims Cash Pool Account shall have been established and funded with $400,000; provided, however, that nothing herein shall relieve the Debtors or Reorganized Debtors, as applicable, from any additional funding obligations of the Claims Cash Pool Account under Article IV of the Plan;

11.     the Debtors shall have paid in full in Cash all Restructuring Expenses incurred or estimated to be incurred, through the Effective Date;

12.     the New Organizational Documents, in form and substance acceptable to the Consenting Stakeholders, shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of

organization and shall have become effective in accordance with such jurisdiction's corporation, limited liability company, or alternative comparable laws, as applicable;

13.     except as otherwise agreed by the Exit Agent in its sole discretion, the conditions to effectiveness of the Exit Facility Documents have been satisfied or waived in accordance with the terms thereof, and the Exit Facility Documents are in full force and effect and binding on all parties thereto; and

14.     such other conditions as mutually agreed by the Debtors and the Consenting Stakeholders.

## 5.32    Waiver of Conditions Precedent

The Debtors or the Reorganized Debtors, as applicable, with the consent of the Consenting Stakeholders, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than a proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, to exercise any of the foregoing rights shall not be deemed a waiver of such rights or any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

## 5.33    Effect of Failure of Conditions Precedent

If the Effective Date does not occur prior to or on the Outside Date (as may be extended with the consent of the Consenting Stakeholders), then upon notice by the Debtors to the Bankruptcy Court, that: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Equity Interests, or Causes of Action; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE VI:

## CERTAIN FACTORS TO BE CONSIDERED

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN**

CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

## 6.1   General

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  In considering whether to vote to accept or reject the Plan, Holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement.

## 6.2   Risks Relating to the Plan and Other Bankruptcy Law Considerations

### (a)   A Holder of a Claim or Equity Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created 11 Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  However, a Holder of a Claim or Interest could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that the classifications of Claims and Equity Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan.  Such modification could require re-solicitation of votes on the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Equity Interests is not appropriate.

### (b)   The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from Class 3, Class 4, or Class 5 the Debtors may elect to amend the Plan, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.  There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as the Restructuring Transactions contemplated by the Plan.

(c)      **Parties in Interest May Object to
the Debtors' Classification of Claims and Interests.**

Bankruptcy Code section 1122 provides that a debtor may place a claim or an equity interest in a particular class under a plan of reorganization only if such claim or equity interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Equity Interests in the Plan complies with the Bankruptcy Code requirements because the Debtors classified Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(d)      **The Bankruptcy Court May Not Confirm the Plan
or May Require the Debtors to Re-Solicit Votes with Respect to the Plan.**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. With respect to any impaired Classes of Claims and Equity Interests that do not accept the plan or are deemed not to accept the Plan, section 1129(b) requires that the plan be fair and equitable (including, without limitation, with respect to the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan. If and when the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

The Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes in favor of the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement. This process includes a Bankruptcy Court hearing with respect to the required approval of a disclosure statement, followed (after Bankruptcy Court approval) by solicitation of claim and equity interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the Bankruptcy Court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Equity Interests and the Debtors' analysis thereof are set forth

in the unaudited Liquidation Analysis, attached hereto as **Exhibit C**.  The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors and interest holders than those provided for in the Plan because of:

- the likelihood that the Debtors' assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner, affecting the business as a going concern;

- additional administrative expenses involved in the appointment of a chapter 7 trustee; and

- additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

(e)      **Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan.**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and Consummation of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.  If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not occur.  In the event that the Plan is not Confirmed or is not consummated, the Debtors may seek Confirmation of an alternative plan of reorganization.

(f)      **The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate.**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case.  Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b).

Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures.  Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined by section 1125(a) of the Bankruptcy Code).  While the Debtors believe that the

requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### (g)     There is a Risk of Loss of Support for the Plan.

The Plan is currently supported by its key stakeholders but there is a risk that unforeseen changes in circumstances could result in the loss of support for the Plan by such stakeholders prior to Confirmation and could result in the loss of use of cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### (h)     The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases.

Certain parties in interest may contest the Debtors' authority to commence or prosecute the Chapter 11 Cases. If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the Plan, and any parties providing exit financing may be unwilling to proceed with such funding. If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding or liquidate their business in another forum to the detriment of all parties in interest.

### (i)     Parties May Object to the Plan on Account of the Debtors Releases, Third-Party Releases, Exculpations, or Injunction Provisions.

Any party in interest, including the United States Trustee for the District of Delaware (the "U.S. Trustee"), could object to the Plan on the grounds that, among other things, the (i) debtor release contained Article IX of the Plan is to be given without adequate consideration, (ii) third-party release contained in Article IX of the Plan is not given consensually or in a permissible non-consensual manner, (iii) exculpation contained in Article IX of the Plan extends to non-estate fiduciaries, or (iv) the injunction contained in Article IX of the Plan is overly broad. In response to such an objection, the Bankruptcy Court could determine that any of these provisions are not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the applicable provision. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

### (j)     The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation.

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Equity Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All Holders of Claims and Equity Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient

11295777v.1

acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Equity Interests or is otherwise permitted by the Bankruptcy Code.

### (k) The Plan May Have Material Adverse Effects on the Debtors' Operations.

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective customers, employees, partners, and other parties. While the Debtors expect to continue normal operations during the Chapter 11 Cases, such adverse effects could materially impair the Debtors' operations and adversely affect the Debtors' ability to reorganize and emerge.

### (l) The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and Lengthy Bankruptcy Cases Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan.

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to the Company's business, there can be no assurance to such timing and it could last considerably longer than anticipated if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business. There is a risk, due to uncertainty about the Debtors' futures that, among other things:

- customers could move to the Debtors' competitors;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, or other business partners could terminate their relationships with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' future prospects.

A lengthy bankruptcy case also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time

while they try to develop a different plan of reorganization that can be confirmed.  A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

### (m) Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization That May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan.

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan.  Under the Bankruptcy Code, a debtor in possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from the Petition Date.  However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court.  If such an order were to be entered, parties in interest other than the Debtors would then have the opportunity to propose alternative plans of reorganization.

If another party in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Equity Interests.

### (n) The Debtors May Be Unsuccessful in Obtaining First Day Orders To Permit Them to Pay Certain Critical Vendors or Employees, or Continue Operating in the Ordinary Course of Business.

The Debtors have attempted to address potential concerns of their customers, vendors, employees, and other key parties in interest that might arise from the filing of Chapter 11 Cases through a variety of provisions incorporated into or contemplated by the Plan and relief to be sought at the outset of the Chapter 11 Cases, including the Debtors' intention to seek appropriate Bankruptcy Court orders to permit the Debtors to pay amounts owed to various critical vendors and employee obligations consistent with their ordinary course practices.  However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' business might suffer.

### (o) The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral or the DIP Facility.

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to enter into postpetition financing arrangements and use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to the DIP Lenders under the applicable prepetition debt documents.  Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases.  There can be no assurance that the Bankruptcy Court will approve the DIP Facility or such use of cash collateral on the terms requested.  Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral.  There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' business may be impaired materially.

(p)    **Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise or treatment under the plan of reorganization or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

**6.3    Risks Relating to the Restructuring Transactions**

(a)    **The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Effective Date.**

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors. In addition, the Debtors are highly dependent on the efforts and performance of their management team. If key employees depart because of uncertainty about their future roles and potential complexities of the Restructuring Transactions, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

(b)    **There Is Inherent Uncertainty in the Debtors' Financial Projections Such that the Reorganized Debtors May Not Be Able to Meet the Projections.**

The Financial Projections attached hereto as **Exhibit E** includes projections for the fiscal years ending December 31, 2024 through December 31, 2028. These projections are based on assumptions that are an integral part of the projections, including Confirmation and Consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the Reorganized Company Equity Interests and the ability of the Reorganized Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the

66

Debtors emerge from the Chapter 11 Cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the Reorganized Debtors' boards of directors or managers may make after reevaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation from the Financial Projections, and could result in materially different outcomes from those projected.

### (c)      Failure to Implement the Restructuring Transactions and Confirm and Consummate the Plan Could Negatively Impact the Debtors.

If the Restructuring Transactions are not implemented, the Debtors may consider other restructuring alternatives available at that time, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, commencement of section 363 sales of the Debtors' assets, or any other transaction that would maximize value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against and Equity Interests in the Debtors than the terms of the Plan.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

If the Plan is not confirmed and consummated, the ongoing business of the Debtors may be adversely affected and there may be various consequences, including:

- the adverse impact to the Debtors' business caused by the failure to pursue other beneficial opportunities due to the focus on the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the incurrence of substantial costs by the Debtors in connection with the Restructuring Transactions, without realizing any of the anticipated benefits of the Restructuring Transactions;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing non-prepackaged chapter 11 or chapter 7 proceedings, resulting in recoveries for creditors and interest holders that are less than

contemplated under the Plan, or resulting in no recovery for certain creditors and interest holders.

**(d)    Even if the Restructuring Transactions
are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the amount of the Debtors' cash interest expense and improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth.  Even if the Restructuring Transactions are implemented, the Reorganized Debtors will continue to face a number of risks, including certain risks that are beyond the Reorganized Debtors' control, such as changes in economic conditions, changes in the Reorganized Debtors' industry, and changes in commodity prices.  As a result of these risks and others, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**6.4    Risks Relating to the Reorganized Company Equity Interests**

**(a)    The Value of the Reorganized Company
Equity Interests Cannot Be Stated With Certainty.**

Despite the Debtors' best efforts to value the Reorganized Company Equity Interests, various uncertainties and contingencies, including market conditions, the Reorganized Debtors' potential inability to implement their business plan or lack of a market for the Reorganized Company Equity Interests may cause fluctuations or variations in value of the Reorganized Company Equity Interests not fully accounted for in the Plan.  All of these factors are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets and other factors that generally influence the prices of securities.  Actual market prices of such securities also may be affected by other factors not possible to predict.

**(b)    The Plan Exchanges Senior Indebtedness for Junior Securities.**

If the Plan is confirmed and consummated, certain Holders of Claims will receive the New Class A Units and New Class B Units, as applicable.  Thus, in agreeing to the Plan, certain of such Holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation preference over equity securities, for the Reorganized Company Equity Interests, which will be subordinate to all future creditor claims.

**(c)    A Liquid Trading Market for the
Reorganized Company Equity Interests May Not Develop.**

The Debtors make no assurance that liquid trading markets for the Reorganized Company Equity will develop.  The liquidity of any market for the Reorganized Company Equity Interests will depend, among other things, upon the number of Holders of New Class A Units and New Class B Units, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Therefore, the Debtors cannot assure

that an active trading market will develop or, if a market develops, what the liquidity or pricing characteristics of that market will be.

**6.5     Risks Relating to the Debtors' Business**

**(a)     The Debtors May Not Be Able To Implement the Business Plan.**

The Debtors may not achieve their business plan and financial restructuring strategy.  In such event, the Reorganized Debtors may be unable to restructure their funded debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated in this Disclosure Statement, or become subject to further insolvency proceedings.

**(b)     The Debtors' Financial Projections Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based.**

The Debtors' Financial Projections are based on numerous assumptions including: timely Confirmation and Consummation pursuant to the terms of the Plan; the anticipated future performance of the Reorganized Debtors; industry performance; general business and economic conditions; and other matters, many of which are beyond the control of the Debtors and some or all of which may not materialize.  In addition, unanticipated events and circumstances occurring subsequent to the date that this Disclosure Statement is approved by the Bankruptcy Court may affect the actual financial results of the Reorganized Debtors' operations.  These variations may be material and may adversely affect the ability of the Reorganized Debtors to make payments with respect to indebtedness following Consummation.  Because the actual results achieved throughout the periods covered by the projections may vary from the projected results, the projections should not be relied upon as an assurance of the actual results that will occur.  Except with respect to the projections and except as otherwise specifically and expressly stated, this Disclosure Statement does not reflect any events that may occur subsequent to the date of this Disclosure Statement.  Such events may have a material impact on the information contained in this Disclosure Statement.  The Debtors do not intend to update the Financial Projections and therefore the Financial Projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

**(c)     The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.**

The Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, borrowings in connection with emergence.

(d) **Existing and Increased Competition in the
Industry or Decreasing Demand for the Debtors' Products
.Mav Adverselv Affect the Debtors' Business and Result of Operations**

The Debtors compete with numerous other companies in the industry that offer similar products and provide similar services as those offered by the Debtors.  The Debtors' competitors may be able to adopt more aggressive pricing and promotional policies, adapt to changes in customer preferences or requirements more quickly, devote greater resources to the design, sourcing, distribution, marketing and sale of their products than the Debtors.  In addition, the Debtors' competitors may seek to emulate facets of the Debtors' business strategy, which could result in a reduction of any competitive advantage or special appeal that the Debtors might possess.  An inability to overcome potential competitive disadvantages or effectively market the Debtors' products relative to the Debtors' competitors could have an adverse effect on the Debtors' business and results of operations.

(e) **The Debtors' Reliance on Suppliers
May Impact the Debtors' Operation and Performance.**

The Debtors rely significantly on their suppliers.  Adverse changes in any of the relationships with their suppliers, or the inability to enter into new relationships with suppliers, could negatively impact the Debtors' operations and performance.  The Debtors' current arrangements with suppliers may not remain in effect on current or similar terms, and the impact of changes to those arrangements may adversely impact the Debtors' revenue.

(f) **The Debtors Must Continue to Retain,
Motivate, and Recruit Executives and Other Key Employees,
Which May Be Difficult in Light of Uncertainty Regarding the Plan,
and Failure To Do So Could Negativelv Affect the Debtors' Business.**

The Reorganized Debtors' success will depend, in part, on the efforts of their executive officers, their management team, and other key employees.  These individuals possess sales, marketing, financial, administrative, and technological skills that are critical to the operation of the Reorganized Debtors' business.  If the Reorganized Debtors lose or suffer an extended interruption in the services of one or more of their executive officers, managers, or other key employees, the Reorganized Debtors' business, operational results, and financial condition may be negatively impacted.

(g) **The Reorganized Debtors May Be Adversely Affected by Potential
Litigation, Including Litigation Arising Out of the Chapter 11 Cases.**

In the future, the Reorganized Debtors may become a party to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

**6.6**     **Certain Tax Implications of the Chapter 11 Cases and the Plan**

Holders of Allowed Bridge Loan Claims, Allowed Senior Series A Bondholder Claims, and Allowed Subordinated Series B Bondholder Claims should carefully review Article VI of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors, Reorganized Debtors, and Holders of such Claims.

**6.7**     **Disclosure Statement Disclaimer**

**(a)**     **Information Contained Herein Is Solely for Soliciting Votes.**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Specifically, this Disclosure Statement is not legal advice to any Person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

**(b)**     **Disclosure Statement May Contain Forward-Looking Statements.**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the filing or pendency of the Chapter 11 Cases;
- projected and estimated liability costs;

- financing plans;
- growth opportunities for existing products and services;

- competitive position;
- results of litigation;

- business strategy;
- disruption of operations;

- budgets;
- contractual obligations;

- projected cost reductions;
- projected general market conditions;

- projected dividends;
- plans and objectives of management for future operations;

- projected price increases;
- off-balance sheet arrangements;

- effect of changes in accounting due to recently issued accounting standards;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and

- cash flows; and growth opportunities for existing products and services.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Valuation Analysis, the Liquidation Analysis, the recovery projections, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Equity Interests may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

**(c)      No Legal, Business, or Tax Advice
            Is Provided to You by This Disclosure Statement.**

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

**(d)      No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

**(e)      Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. All Parties, including the Debtors and the Reorganized Debtors, as applicable, reserve the right to continue to investigate Claims and Equity Interests and file and prosecute objections to Claims and Equity Interests.

**(f)      No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a Holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that Holder's Claim, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of

whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

### (g) Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

### (h) The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update.

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

### (i) No Representations Outside of the Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## ARTICLE VII:

## CONFIRMATION PROCEDURES

The following is a brief summary of the Confirmation process. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

### 7.1 The Confirmation Hearing

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors will request, on the Petition Date, that the Bankruptcy Court approve the Plan and Disclosure Statement at a joint hearing. The

Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Plan Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan.  An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 7.2    **Confirmation Standards**

Among the requirements for Confirmation of the Plan pursuant to Bankruptcy Code section 1129 are: (i) the Plan is in the "best interests" of holders of Claims; (ii) the Plan is feasible and (iii) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class or if an Impaired Class is deemed to reject, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of Bankruptcy Code section 1129.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

## 7.3    **Best Interests Test/Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the unaudited Liquidation Analysis attached hereto as **Exhibit C**, the Debtors believe that the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe Holders of Claims and Equity Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

**7.4**     **Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit E**.  Based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan while conducting ongoing business operations.  Therefore, Consummation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**7.5**     **Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan.  These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

**(a)**     **No Unfair Discrimination**

The no "unfair discrimination" test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

**(b)**     **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in the class.  As to the dissenting (or deemed rejecting) class, the test sets different standards depending upon the type of claims or equity interests in the class.  A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all. A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (a) for each holder of an interest included in the rejecting class to receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such interest holder is entitled, (ii) any fixed redemption price to which such interest holder is entitled, or (iii) the value of such interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors submit that Confirmation of the Plan pursuant to the "cramdown" provisions of Bankruptcy Code section 1129(b), if necessary, is proper, as the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**7.6**    **Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtors may seek to (a) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (b) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) liquidate their assets and business under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation of their assets and business in chapter 7, the Debtors would convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis attached hereto as **Exhibit C**.

## ARTICLE VIII:

## IMPORTANT SECURITIES LAW DISCLOSURE

**8.1**    **Reorganized Company Equity Interests**

The Plan provides for the Reorganized Company Equity Interests to be distributed to Holders of certain DIP Claims, and to the Holders of Bridge Loan Claims, Senior Series A Bond Claims, and Subordinated Series B Bond Claims, as applicable and in accordance with Article IV of the Plan.

The Debtors believe that New Class A Units and the New Class B Units will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable Blue Sky Law.

The Debtors are relying on exemptions from the registration requirements of the Securities Act, including section 4(a)(2) thereof, and applicable state securities laws, to exempt the offer of the Reorganized Company Equity Interests that may be deemed to be made pursuant to the prepetition solicitation of votes on the Plan. To ensure that the prepetition solicitation is exempt from the registration requirements of the Securities Act, the ballots include a certification that the voting holder of the related Claims is an "accredited investor" (as defined in rule 501(a) of Regulation D of the Securities Act, an "Accredited Investor"). If a holder voting in the prepetition solicitation fails to make such certification, or if such holder fails to otherwise establish, to the reasonable satisfaction of the Debtors, its status as an Accredited Investor, its vote will not be counted. Following the filing of the Plan with the Bankruptcy Court, the Debtors intend to request the Bankruptcy Court's approval to solicit votes on the Plan from holders of Class 3 Claims, Class 4 Claims, and Class 5 Claims who are not Accredited Investors pursuant to section 1145 of the Bankruptcy Code. If the Bankruptcy Court does not grant the Debtors' request, the Debtors will use reasonable efforts to propose an alternative mechanism to allow holders of Class 3 Claims,

Class 4 Claims, and Class 5 Claims who are not Accredited Investors to participate in the distribution of Reorganized Company Equity Interests.

The Debtors further believe that the issuance of the Reorganized Company Equity Interests pursuant to the Plan is, and subsequent transfers of the Reorganized Company Equity Interests by the Holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be exempt from federal and state securities ("Blue Sky Laws") registration requirements as described in more detail below.

## 8.2    Exemption from Registration Requirements

All New Class A Units and New Class B Units issued pursuant to the Plan on account of Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on section 1145(a) of the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization of a debtor, of an affiliate participating in a joint plan with a debtor, or of a successor to a debtor under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for an administrative expense in a case concerning, the debtor or such affiliate under a plan, and (c) the securities are issued in exchange for such claim against or interest in or claim for an administrative expense in a case concerning a debtor or such affiliate or are issued principally in such exchange and partly for cash and property.  The Debtors believe that the offer and sale of the New Class A Units and New Class B Units in exchange for the Claims described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.  Accordingly, no registration statement will be filed under the Securities Act or any state securities laws.  Recipients of the Reorganized Company Equity Interests are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.  As discussed below, the exemptions provided for in section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

## 8.3    Resales of Reorganized Company Equity Interests

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in a case concerning a debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with a plan, with the consummation of a plan, or with the offer or sale of securities under a plan; or (d) is an "issuer" of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities

Act, includes as "statutory underwriters" all "affiliates," which are all Persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities. "Control," as defined in rule 405 of the Securities Act, means to possess, directly or indirectly, the power to direct or cause to direct management and policies of a Person, whether through owning voting securities, contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor may be deemed to be a "Controlling Person" of the debtor or successor under a plan of reorganization, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.

Resales of the Reorganized Company Equity Interests offered, issued, and distributed pursuant to the Plan in reliance on section 1145 of the Bankruptcy Code by entities deemed to be "underwriters" are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. If section 1145(a) of the Bankruptcy Code is unavailable because the recipient of the Reorganized Company Equity Interests under the Plan or the Plan Supplement is an entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, such securities will be issued in reliance on the exemption from registration set forth in section 4(a)(2) under the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.

Under certain circumstances, Holders of New Class A Units and New Class B Units, issued and distributed pursuant to the Plan in reliance on section 1145 of the Bankruptcy Code who are deemed to be "underwriters" may be entitled to resell their New Class A Units and New Class B Units pursuant to the limited safe harbor resale provisions of rule 144 of the Securities Act.

Generally, rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" with respect to the Reorganized Company Equity Interests would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Reorganized Company Equity Interests and, in turn, whether any Person may freely resell the New Class A Units and the New Class B Units. However, the Debtors do not intend to make publicly available the requisite information regarding the Debtors, and, as a result, after the holding period, rule 144 will not be available for resales of the Reorganized Company Equity Interests by Persons deemed to be underwriters.

**Accordingly, the Debtors recommend that potential recipients of the Reorganized Company Equity Interests consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law. In addition, these securities will not be registered under the Securities Exchange Act or listed on any national securities exchange. The Debtors make no representation concerning the ability of a person to dispose of the Reorganized Company Equity Interests.**

# ARTICLE IX:

## CERTAIN UNITED STATES FEDERAL
## INCOME TAX CONSEQUENCES OF THE PLAN

### 9.1    Tax Background

A summary description of certain United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only the principal United States federal income tax consequences of the Plan to the Debtors and for Holders of Claims who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or any other taxing authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other taxing authorities.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Debtor or any Holder of a Claim.  No assurance can be given that the IRS or another taxing authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address state, local, or non-United States tax consequences of the Plan, nor does it purport to address all the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, real estate investment trusts, regulated investment companies, United States expatriates, Holders of Claims who are, or who hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction).  Furthermore, the following discussion does not address the Medicare contribution tax on net investment income or alternative minimum tax considerations for Holders of Claims or United States federal taxes other than income taxes.  Except as expressly provided below, the following discussion assumes that Holders of Claims hold their Claims as capital assets for United States federal income tax purposes (generally, property held for investment), and that the various debt and other arrangements to which a Debtor is a party will be respected for United States federal income tax purposes in accordance with their forms.

For purposes of the following discussion, a "U.S. Holder" is a beneficial owner of a Claim immediately prior to the Restructuring Transactions that is (i) a citizen or individual resident of the United States; (ii) a corporation (or other entity classified as a corporation for United States

federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to United States federal income taxation regardless of its source; or (iv) a trust that (a) is subject to the primary supervision of a United States court and has one or more United States persons, within the meaning of Internal Revenue Code section 7701(a)(30), who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury regulations to be treated as a United States person.    For purposes of the following discussion, a "Non-U.S. Holder" is a beneficial owner of a Claim that is an individual, corporation, estate or trust for United States federal income tax purposes and is not a U.S. Holder.

If a partnership (including any entity classified as a partnership for United States federal income tax purposes) holds Claims, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners.  A partnership participating in the Plan (and its partners) should consult their tax advisors regarding the consequences of participating in the Plan.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

Each Holder of a Claim is strongly urged to consult its own tax advisor regarding the United States federal, state, local, and non-United States tax consequences of the transactions described herein or contemplated by the Plan.

**9.2    Certain U.S. Federal Income Tax
Consequences to the Debtors and Reorganized Debtors**

**(a)    General**

RFPG is treated as a partnership for U.S. federal income tax purposes and each of the other Debtors (all of whom are subsidiaries of RFPG) are treated as disregarded entities for U.S. federal income tax purposes.  As a partnership or disregarded entity, RFPG and the other Debtors are not themselves subject to U.S. federal income tax.   Instead, each holder of equity interests in RFPG is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction, and credit of such Debtors.  Accordingly, the U.S. federal income tax consequences of the Restructuring Transactions under the Plan generally will not be borne by the Debtors, but instead will be borne by the holders of equity interests in RFPG.

**(b)    Taxable Transfer of Assets**

Although the structure of the Restructuring Transactions and the Reorganized Company has not yet been finalized, it is anticipated that, pursuant to the Restructuring Transactions, either a successor partnership (for U.S. federal income tax partnership) to RFPG will be treated for U.S. federal income tax purposes as having transferred its assets to the Reorganized Company, or the holders of equity interests in RFPG will be treated for U.S. federal income tax purposes as having disposed of equity in RFPG, and the rest of the discussion assumes that the Restructuring Transactions will include such a transfer or disposition.  In either case, the Debtors and the Reorganized Company generally expect such transfer or disposition to be treated for U.S. federal

income tax purposes as a taxable sale by RFPG of the assets of RFPG to the Reorganized Company or a taxable sale by RFPG equity holders of their equity interests, and the following discussion assumes such treatment. As described above, because RFPG (and any successor partnership) is a partnership for U.S. federal income tax purposes, even if the Restructuring Transactions included a sale of partnership assets, any gain or loss recognized by RFPG in the Restructuring Transactions would generally be allocated to holders of equity interests in RFPG. Some or all equity holders' ability to recognize losses for U.S. federal income tax purposes may be limited due to "loss limitation" rules, or they may otherwise be limited in using any losses recognized to offset other taxable income or gain, including as a result of limitations on the ability to use capital losses. RFPG equity holders are urged to consult with their tax advisers in this regard.

        **(c)**        **Cancellation of Indebtedness Income and Tufts Gain**

        Absent an exception, under general U.S. federal income tax principles, a taxpayer will generally realize cancellation of indebtedness income ("COD Income") to the extent that its outstanding indebtedness is satisfied for an amount less than the adjusted issue price of such indebtedness. For this purpose, the amount paid to a Holder of such indebtedness would be equal the fair market value of cash and other property given to such Holder in satisfaction of such indebtedness.

        Notwithstanding the foregoing, under certain circumstances the cancellation of indebtedness will not give rise to COD Income. In particular, if property that is subject to "nonrecourse debt" (within the meaning of Treasury regulations promulgated under section 1001 of the Tax Code) is transferred to the creditors in a foreclosure transaction (or is sold for less than the amount of the outstanding debt), the transaction is treated as though the property subject to such nonrecourse debt was sold for an amount equal to that of the outstanding nonrecourse debt (where such gain is referred to as "Tufts Gain"). *See Tufts v. Comm'r*, 461 U.S. 300 (1983). Accordingly, a taxpayer who engages in such a transaction will realize taxable Tufts Gain equal to the difference of the amount of the outstanding nonrecourse debt (if such amount is greater than the amount that would otherwise be realized for federal income tax principles) and its adjusted tax basis in the property sold under section 1001 of the Tax Code, rather than COD Income. Similarly, if a partner in a partnership sells equity interests therein, the amount realized on the disposition generally includes such partner's share of the liabilities of the partnership.

        The Debtors expect that RFPG may realize a substantial amount of COD Income and/or Tufts Gain (or gain recognized in respect of the Debtors' debt in connection with the sale of partnership interests) in connection with the Plan. As described above, because RFPG is a partnership for U.S. federal income tax purposes, any such COD Income and/or Tufts Gain (or such other realized gain) realized by RFPG will be allocated to the holders of equity interests in RFPG. The exact amount of any COD Income and/or Tufts Gain (or such other realized gain) that will be realized pursuant to the Plan will not be determinable until the consummation of the Plan.

**9.3**    **Certain U.S. Federal Income Tax**
        **Consequences to U.S. Holders of Secured Bondholder Claims**

        The following summary discusses certain United States federal income tax consequences of the transactions contemplated by the Plan to Holders of Secured Bondholder Claims that are U.S. Holders. These consequences (including the character, timing and amount of income, gain

or loss recognized) will depend upon, among other things: (i) the manner in which a U.S. Holder of a Secured Bondholder Claim acquired a Secured Bondholder Claim; (ii) the length of time the Secured Bondholder Claim has been held; (iii) the U.S. Holder of a Secured Bondholder Claim's method of tax accounting; (iv) whether the U.S. Holder of a Secured Bondholder Claim has taken a bad debt deduction with respect to the Secured Bondholder Claim (or any portion of the Secured Bondholder Claim) in the current or prior taxable years; (v) whether the Secured Bondholder Claim was acquired at a discount; and (vi) whether the U.S. Holder of a Secured Bondholder Claim has previously included in its taxable income accrued but unpaid interest with respect to the Secured Bondholder Claim.    The tax consequences described below are not exclusive and some of the conclusions expressed are uncertain.  U.S. Holders may be treated for United States federal income tax purposes in certain respects other than as set forth herein.  Therefore, each U.S. Holder of a Secured Bondholder Claim is strongly urged to consult its own tax advisor regarding information that may be relevant to its particular situation and circumstances and the tax consequences to it of the transactions contemplated by the Plan.

### (a)    General

Although the structure of the Restructuring Transactions and the Reorganized Company has not yet been finalized, it is anticipated that, pursuant to the Restructuring Transactions, (i) substantially all operating assets of the Reorganized Company will be wholly-owned (directly or indirectly) by an entity of the Reorganized Company that is treated as a domestic corporation for U.S. federal income tax purposes (the "Corporate Reorganized Company"), (ii) Holders of Secured Bondholder Claims may directly own equity in the Corporate Reorganized Company, or it may own equity in an entity of the Reorganized Company that is treated as a partnership for U.S. federal income tax purposes (the "Partnership Reorganized Company"), which Partnership Reorganized Company will directly or indirectly own equity in the Corporate Reorganized Company, (iii) the Holders of Secured Bondholder Claims would be treated as forming the Reorganized Company and contributing the Secured Bondholder Claims to the Reorganized Company in exchange for Reorganized Company Equity Interests (the "Loan Contributions"), and (iv) the Reorganized Company will obtain direct or indirect ownership of assets currently held by RFPG in satisfaction and discharge of the Secured Bondholder Claims (the "Acquisition"), and the following discussion assumes such treatment.

### (b)    Loan Contributions and Acquisition

### (1)    Treatment of the Reorganized Company

It is anticipated that the Loan Contributions will be effected by one or more tax-deferred transactions – in particular, transactions governed by section 351 and/or section 721 of the Tax Code, and the following discussion assumes such treatment.  The Reorganized Company generally is expected to take an adjusted basis in a Secured Bondholder Claim equal to the Holder's previous adjusted basis in such Secured Bondholder Claim, increased by the amount of any accrued market discount taken into income by the Holder upon the deemed contribution of the Secured Bondholder Claim to the Reorganized Company, as discussed below.  However, to the extent that such basis is greater than the fair market value of a Secured Bondholder Claim, the Reorganized Company's basis therein may be "stepped down" to its then fair market value under section 362(e) of the Tax Code.  Alternatively, certain U.S. Holders may be eligible to elect under section 362(e)(2)(C) of the Tax Code (the "Tax Basis Election") to step down the Holder's basis in Reorganized Company

Equity Interests in lieu of the step down in the Reorganized Company's basis in the Secured Bondholder Claim transferred to the Reorganized Company by such U.S. Holder. The Tax Basis Election is not expected to be available with respect to Secured Bondholder Claims contributed by a Non-U.S. Holder.

After the Loan Contribution, it is expected that the Reorganized Company should be treated as acquiring the assets of RFPG in exchange for its Secured Bondholder Claims in a taxable exchange under section 1001 of the Tax Code (even if RFPG equity holders are treated as selling equity of RFPG in the Acquisition). Accordingly, subject to the "market discount" rules discussed below, the Reorganized Company generally is expected to recognize gain or loss with respect to a Secured Bondholder Claim in an amount equal to the difference between (i) the fair market value of the assets received in respect of the Secured Bondholder Claims for U.S. federal income tax purposes (other than any consideration attributable to a Secured Bondholder Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Secured Bondholder Claim exchanged therefor (other than any tax basis attributable to accrued but unpaid interest previously included in taxable income). The proportion of any gain or loss recognized by the Reorganized Company allocated to principal is expected to be capital in character.

The Reorganized Company's tax basis in the assets received for U.S. federal income tax purposes pursuant to the Plan is expected to equal the fair market value of such assets as of the Effective Date. The Reorganized Company's holding period in the assets received for U.S. federal income tax purposes pursuant to the Plan is expected to begin on the day following the Effective Date.

### (2)    Certain U.S. Federal Income Tax Consequences to U.S. Holders

It is anticipated that the Loan Contributions will be effected by one or more tax-deferred transactions – in particular, transactions governed by section 351 and/or section 721 of the Tax Code, and the following discussion assumes such treatment. Subject to the "market discount" and "accrued interest" rules discussed below, Holders of Secured Bondholder Claims generally are expected to recognize no gain or loss on such exchange for U.S. federal income tax purposes. A U.S. Holder's holding period for its Reorganized Company Equity Interests generally is expected to include its holding period for the Secured Bondholder Claims exchanged therefor. Absent the effect of any Tax Basis Election, a U.S. Holder's adjusted basis in the Reorganized Company Equity Interests is expected to equal its previous adjusted basis in the Secured Bondholder Claims. However, certain U.S. Holders may be eligible to make a Tax Basis Election to step down the Holder's basis in Reorganized Company Equity Interests in lieu of the step down in the Reorganized Company's basis in the Secured Bondholder Claim transferred to the Reorganized Company by such U.S. Holder. It is possible that the Reorganized Company may make such Tax Basis Election without the consent of such U.S. Holder; for example, if the Reorganized Company includes a Partnership Reorganized Company, then the Partnership Reorganized Company and the Corporate Reorganized Company may together make such Tax Basis Election with respect to the Secured Bondholder Claims contributed to the Partnership Reorganized Company by such U.S. Holder. This may cause such U.S. Holder to recognize more gain or less loss for U.S. federal income tax purposes upon a sale or disposition of the U.S. Holder's interests in the Partnership Reorganized Company or upon a sale or disposition by the Partnership Reorganized Company of equity in the

Corporate Reorganized Company acquired in respect of the Secured Bondholder Claims contributed by such U.S. Holder.

### A.   Market Discount

If a U.S. Holder of a Secured Bondholder Claim had purchased its interest in the Series A Bond or Indenture at a price less than such debt instrument's "revised issue price" (generally, the issue price increased by all previous holders' inclusions of original issue discount), the difference would constitute "market discount" for U.S. federal income tax purposes.  Under the market discount rules (subject to a de minimis rule), any gain realized by a U.S. Holder upon the disposition of a Secured Bondholder Claim (i.e., the excess of the fair market value of the Reorganized Company Equity Interests received by the U.S. Holder over the adjusted basis of the Secured Bondholder Claim exchanged therefor) that was acquired with market discount should generally be treated as ordinary interest income to such U.S. Holder to the extent of accrued market discount on such Secured Bondholder Claim as of the Effective Date (unless the U.S. Holder elected to include market discount in income as it accrued).  A U.S. Holder's tax basis in Reorganized Company Equity Interests, discussed above, should generally be increased by the amount of any such accrued market discount taken into account by the U.S. Holder upon the Restructuring Transactions.  U.S. Holders should consult their tax advisors regarding the potential application of the market discount rules.

Gain recognized by the Reorganized Company in the exchange of a Secured Bondholder Claim bearing market discount pursuant to the Plan should generally be treated as ordinary interest income to the extent of the market discount accrued on such Secured Bondholder Claim during the prior Holder's period of ownership, unless such Holder had previously included such accrued market discount in taxable income, including upon the deemed contribution of Secured Bondholder Claims to the Reorganized Company in exchange for Reorganized Company Equity Interests, as discussed above.

### B.   Accrued Interest

To the extent that any Secured Bondholder Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, the Debtors generally expect that they will take the position that such distribution shall, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes to the principal amount of the Secured Bondholder Claim first and then, to the extent the consideration exceeds the principal amount of the Secured Bondholder Claim, to the portion of such Secured Bondholder Claim representing accrued but unpaid interest.  However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

If any distribution under the Plan is treated as being allocated first to accrued but unpaid interest, the Reorganized Company would realize ordinary income with respect to the distribution in an amount equal to the lesser of (i) such distribution and (ii) the accrued but unpaid interest on the Secured Bondholder Claim not already taken into income by the prior Holder, regardless of whether the Reorganized Company otherwise realizes a loss as a result of the Plan.

Conversely, if any distribution under the Plan is treated as being allocated first to principal, the Reorganized Company may be able to recognize a deductible loss in an amount equal to the excess of (i) the amount of accrued but unpaid interest on such Claim already taken into income by the prior Holders over (ii) the amount by which such distribution exceeds the amount of principal on the Secured Bondholder Claim.   Such loss may be ordinary; however, the tax law is unclear on this point.

### (3)    Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders

The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  The tax consequences described below are not exclusive,  and some of the conclusions expressed are uncertain.  Non-U.S. Holders may be treated for United States federal income tax purposes in certain respects other than as set forth herein.   This discussion does not include any non-U.S. tax considerations. Each Non-U.S. Holder is urged to consult its tax advisor regarding the effects of U.S. federal, state, local, and non-U.S. income tax laws, as well as treaties, on the consummation of the Plan to such Non-U.S. Holder.

### A.    Gain Recognition

It is anticipated that the Loan Contributions will be effected by one or more tax-deferred transactions – in particular, transactions governed by section 351 and/or section 721 of the Tax Code, and the following discussion assumes such treatment.

In general, any gain realized by a Non-U.S. Holder on the exchange of its Secured Bondholder Claim generally is not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) (such income, "ECI").  Because of the general tax-deferred treatment of the Loan Contribution, it is generally expected that even Non-U.S. Holders that fall within such categories would recognize no gain or loss on such exchange for U.S. federal income tax purposes, subject to the rules below regarding "market discount" and "accrued interest".  A Non-U.S. Holder's holding period for its Reorganized Company equity interests generally is expected to include its holding period for the Secured Bondholder Claims exchanged therefor.  A Non-U.S. Holder's adjusted basis in the Reorganized Company equity interests is expected to equal its previous adjusted basis in the Secured Bondholder Claims.  Unlike with respect to a U.S. Holder, the Tax Basis Election is not expected to be available with respect to Secured Bondholder Claims contributed by a Non-U.S. Holder.

If a Non-U.S. Holder would have recognized income in respect of "market discount" or "accrued interest" as described above in sections 9.3(b)(2)(A)-(B) if it were a U.S. Holder, and either (i) such Non-U.S. Holder is subject to tax under the conditions described in clause (a) of the previous paragraph, or (ii) such income in respect of "market discount" is ECI, then such Non-U.S. Holder may be subject to tax on such amounts of market discount.  In addition, the income in respect of "market discount" is ECI and such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its

effectively connected earnings and profits for the taxable year, subject to certain adjustments. Non-U.S. Holders should consult with their tax advisers in this regard.

If any distribution from the Plan is allocated to accrued and unpaid interest as described above in section 9.3(b)(2)(B), then a Non-U.S. Holder may be treated as realizing interest income as described above. In that case, if the applicable Non-U.S. Holder does not meet the conditions described in clause (a) of the first paragraph, and such interest income is not ECI, then such interest income is expected to qualify for the so-called "portfolio interest exemption" and would not be subject to U.S. federal income tax or withholding, provided that:

- the Non-U.S. Holder does not own, actually or constructively, a 10% or greater interest in Debtors within the meaning of section 871(h)(3) of the Tax Code and Treasury Regulations thereunder;

- the Non-U.S. Holder is not a controlled foreign corporation related to Debtors, actually or constructively through the ownership rules under section 864(d)(4) of the Tax Code;

- the Non-U.S. Holder is not a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business; and

- the beneficial owner gives Debtors or Debtors' paying agent an appropriate IRS Form W-8 (or suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed establishing its status as a Non-U.S. Holder.

If not all of these conditions are met, interest treated as realized by a Non-U.S. Holder in respect of accrued and unpaid interest that is not effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder may be subject to U.S. federal income tax and may be subject to withholding at a 30% rate, unless an applicable income tax treaty reduces or eliminates such withholding and the Non-U.S. Holder claims the benefit of that treaty by providing an appropriate IRS Form W-8 (or a suitable substitute or successor form or such other form as the IRS may prescribe) that has been properly completed and duly executed.

## 9.4    Certain U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Reorganized Company Equity Interests

The following discussion assumes that Holders will receive equity in a Corporate Reorganized Company entity. The following is a summary of certain United States federal income tax consequences of the ownership and disposition of shares of equity interests in a Corporate Reorganized Company as of the date hereof. Except where noted, this summary deals only with common stock that is held as a capital asset by a Holder. The tax consequences described below are not exclusive, and some of the conclusions expressed are uncertain. Holders may be treated for United States federal income tax purposes in certain respects other than as set forth herein. This discussion does not include any non-U.S. tax considerations. Each Holder is urged to consult

its tax advisor regarding the effects of U.S. federal, state, local, and non-U.S. income tax laws, as well as treaties, on the consummation of the Plan to such Holder.

**(a)    Tax Consequences to U.S. Holders**

**(1)    Distributions on Equity Interests of the Corporate Reorganized Company**

Any distributions made on account of the equity of the Corporate Reorganized Company will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Corporate Reorganized Company as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. However, "qualified dividend income" treatment is only available if certain holding period and other requirements are satisfied. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its equity in the Corporate Reorganized Company. Any such distributions in excess of the U.S. Holder's basis in its Corporate Reorganized Company equity interests generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction. However, the dividends-received deduction is only available if certain holding period and other requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(2)    Disposition of Equity Interests of the Corporate Reorganized Company**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of equity interests in the Corporate Reorganized Company. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held such equity interests for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

**(b)    Tax Consequences to Non-U.S. Holders**

**(1)    Distributions on Equity Interests of the Corporate Reorganized Company**

In the event that the Corporate Reorganized Company make a distribution of cash or other property (other than certain pro rata distributions of its equity interests) in respect of its equity interests, the distribution generally will be treated as a dividend for United States federal income

87

tax purposes to the extent it is paid from its current or accumulated earnings and profits, as determined under United States federal income tax principles.  Any portion of a distribution that exceeds the Corporate Reorganized Company's current and accumulated earnings and profits generally will be treated first as a tax-free return of capital, causing a reduction in the adjusted tax basis of a Non-U.S. Holder's equity interests in the Corporate Reorganized Company, and to the extent the amount of the distribution exceeds a Non-U.S. Holder's adjusted tax basis of its Corporate Reorganized Company equity interests, the excess will be treated as gain from the disposition of Corporate Reorganized Company equity interests (the tax treatment of which is discussed below in section 9.4(b)(2)).  In addition, if the Corporate Reorganized Company determines that it is classified as a "United States real property holding corporation" (see section 9.4(b)(2) below), it may be required to withhold 15% of any distribution that exceeds its current and accumulated earnings and profits.

Subject to the discussion below regarding effectively connected income, dividends paid to a Non-U.S. Holder generally will be subject to withholding of United States federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty, as discussed further below.  Even if the Corporate Reorganized Company's current or accumulated earnings and profits are less than the amount of the distribution, the applicable withholding agent may elect to treat the entire distribution as a dividend for U.S. federal withholding tax purposes. If U.S. federal income tax is withheld on the amount of a distribution in excess of the amount constituting a dividend, the Non-U.S. Holder may obtain a refund of all or a portion of the excess amount withheld by timely filing a claim for refund with the IRS.  Dividends that are effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States (and, if required by an applicable income tax treaty, are attributable to a United States permanent establishment, or, in certain cases involving individual holders, a fixed base) are not subject to the withholding tax, provided certain certification and disclosure requirements are satisfied.  Instead, such dividends are subject to United States federal income tax on a net income basis in the same manner as if the Non-U.S. Holder were a United States person as defined under the Code.  To obtain this exemption, a non-U.S. holder must provide a valid IRS Form W-8ECI properly certifying such exemption.  Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A Non-U.S. Holder who wishes to claim the benefit of an applicable treaty rate and avoid backup withholding, as discussed below, for dividends will be required (a) to provide the applicable withholding agent with a properly executed, valid IRS Form W-8BEN or Form W-8BEN-E (or other applicable form) certifying under penalty of perjury that such holder is not a United States person as defined under the Code and is eligible for treaty benefits or (b) if equity interests of the Corporate Reorganized Entity is held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable United States Treasury regulations. Special certification and other requirements apply to certain Non-U.S. Holders that are pass-through entities rather than corporations or individuals. Non-U.S. Holders are urged to consult their own tax advisors regarding their entitlement to benefits under a relevant income tax treaty.

A Non-U.S. Holder eligible for a reduced rate of United States federal withholding tax pursuant to an income tax treaty may be entitled to a refund of any excess amounts withheld if the Non-U.S. Holder timely files an appropriate claim for refund with the IRS.

The foregoing discussion is subject to the discussion below in sections 9.6 and 9.7.

> **(2)   Disposition of Equity Interests of
> the Corporate Reorganized Company**

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of equity interests in the Corporate Reorganized Company unless: (i) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (ii) such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or (iii) the Corporate Reorganized Company is or has been during a specified testing period a "U.S. real property holding corporation" (a "USRPHC") under the FIRPTA rules (as defined and discussed below).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Equity Interests.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), gain on the disposition of certain investments in U.S. real property is subject to U.S. federal income tax in the hands of Non-U.S. Holders and treated as income effectively connected with a U.S. trade or business carried on by the Non-U.S. Holder ("ECI") that is subject to U.S. federal net income tax even if a Non-U.S. Holder is not otherwise engaged in a U.S. trade or business.

With respect to Corporate Reorganized Company equity interests, rules with respect to "U.S. real property holding corporations" ("USRPHCs") may apply.  In general, a corporation is a USRPHC if the fair market value of the corporation's U.S. real property interests (as defined in the Internal Revenue Code and applicable Treasury Regulations) equals or exceeds 50% of the aggregate fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business (applying certain look-through rules to evaluate the assets of subsidiaries) at any time within the shorter of the 5-year period ending on the effective time of the applicable disposition or the period of time the Non-U.S. Holder held such interest.  Taxable gain from the disposition of an interest in a USRPHC (generally equal to the difference between the amount realized and such Non-U.S. Holder's adjusted tax basis in such interest) will be treated in a manner similar to ECI, and the Non-U.S. Holder would generally need to file a U.S. federal income tax return reporting such gain.  Furthermore, a buyer of the Corporate Reorganized Company equity interests may be required to withhold an amount equal to 15% of the amount realized on the sale.  The amount of any such withholding would be allowed as a credit against the

Non-U.S. Holder's U.S. federal income tax liability and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS. However, in the event the Corporate Reorganized Company equity interests are "regularly traded on an established securities market" within the meaning of FIRPTA, the withholding obligation described above would not apply, even if a Non-U.S. Holder is subject to the substantive FIRPTA tax.

Under the FIRPTA rules, if the stock of a USRPHC is regularly traded on an established securities market, a person that holds 5% or less of such stock will not be subject to substantive FIRPTA taxation or FIRPTA withholding upon a disposition of its shares, and FIRPTA withholding upon dispositions will generally be inapplicable other than in the case of certain distributions and redemptions by the issuer.  Although the Debtors do not expect the Corporate Reorganized Company equity interests to be considered regularly traded on an established securities market, whether and when the Corporate Reorganized Company equity interests will be considered regularly traded on an established securities market will depend, in part, on whether a market develops in such equity, and cannot currently be determined.

A corporation will not be a USRPHC if, at the time of a disposition, it does not directly or indirectly hold any United States real property interests ("USRPIs") and it had directly or indirectly disposed of all of the USRPIs it directly or indirectly owned in one or more fully taxable transactions.

After preliminary analysis of RFPG's assets, the Debtors believe it is unclear whether the Corporate Reorganized Company will be a USRPHC over time.  Non-U.S. Holders that are sensitive to ECI are encouraged to consult with their tax advisors about, among other things, the possibility of investing through a non-U.S. entity that is classified as a corporation for U.S. federal income tax purposes.  The determination of whether the Corporate Reorganized Company will be a USRPHC is factual in nature and subject to change, and no assurance can be provided regarding whether the Reorganized Company will be treated as a USRPHC for U.S. federal income tax purpose at any point, and no assurance can be provided that the Corporate Reorganized Company will be able to certify that withholding or tax under FIRPTA does not apply to an actual or deemed disposition of equity interest in the Corporate Reorganized Company.

**9.5     Certain U.S. Federal Income Tax Consequences to
          <u>Holders of Owning and Disposing of Partnership Reorganized Company</u>**

**(a)     <u>General Discussion and Tax Consequences to U.S. Holders</u>**

The following discussion assumes that Holders of Secured Bondholder Claims will own interests in a Partnership Reorganized Company.  As a partnership, the Partnership Reorganized Company itself will not be subject to U.S. federal income tax.  Instead, the Partnership Reorganized Company will file an annual partnership information return with the IRS which will report the results of the Partnership Reorganized Company's operations. Each holder of the Partnership Reorganized Company partnership interests (an "<u>Equityholder</u>") will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of the Partnership Reorganized Company's income, gain, loss, deduction and credit for each taxable year of the Partnership Reorganized Company ending with or within the

Equityholder's taxable year. Each item generally will have the same character as if the Equityholder had recognized the item directly. Equityholders will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from the Partnership Reorganized Company for such taxable year, and thus may incur income tax liabilities in excess of any cash distributions from the Partnership Reorganized Company.

An Equityholder is allowed to deduct its allocable share of the Partnership Reorganized Company's losses (if any) only to the extent of such Equityholder's adjusted tax basis (discussed below) in its Partnership Reorganized Company partnership interests at the end of the taxable year in which the losses occur. In addition, various other limitations in the Tax Code may significantly limit an Equityholder's ability to deduct its allocable share of deductions and losses of the Partnership Reorganized Company against other income.

The Partnership Reorganized Company will provide each Equityholder with the necessary information to report its allocable share of the Partnership Reorganized Company's tax items for U.S. federal income tax purposes. However, no assurance can be given that the Partnership Reorganized Company will be able to provide such information prior to the initial due date of the Equityholder's U.S. federal income tax return and Equityholders may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The Partnership Reorganized Company's general partner will decide how items will be reported on The Partnership Reorganized Company's U.S. federal income tax returns, and all Equityholders will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency (and may, under the New Organizational Documents, be required to treat the items consistently on their own returns, irrespective of the ability under the Tax Code to file a statement disclosing inconsistencies). In the event that the Partnership Reorganized Company's income tax returns are audited by the Internal Revenue Service, the tax treatment of The Partnership Reorganized Company's income and deductions generally will be determined at the Partnership Reorganized Company level in a single proceeding, rather than in individual audits of the Equityholders. The Partnership Reorganized Company's "tax matters partner" or "partnership representative" (as those terms are used in the Tax Code) will have considerable authority under the Tax Code and the New Organizational Documents to make decisions affecting the tax treatment and procedural rights of the Equityholders.

An Equityholder generally will not recognize gain or loss on the receipt of a distribution of cash or property from the Partnership Reorganized Company (provided that the Equityholder is not treated as exchanging such Equityholder's share of the Partnership Reorganized Company's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the Tax Code, and together "ordinary income items") for other partnership property). An Equityholder that is a U.S. Holder, however, will recognize gain on the receipt of a distribution of cash and, in some cases, marketable securities, from The Partnership Reorganized Company (including any constructive distribution of money resulting from a reduction of the Equityholder's share of the Partnership Reorganized Company's indebtedness) to the extent such distribution or the fair market value of such marketable securities distributed exceeds such Equityholder's adjusted tax basis in its the Partnership Reorganized Company partnership interests. Such distribution would

be treated as gain from the sale or exchange of the Partnership Reorganized Company partnership interests, which is described below.

An Equityholder's adjusted tax basis in its Partnership Reorganized Company partnership interests generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such Equityholder makes to the Partnership Reorganized Company, (ii) the Equityholder's allocable share of the income of the Partnership Reorganized Company, and (iii) increases in the Equityholder's allocable share of the Partnership Reorganized Company's indebtedness, and reduced, but not below zero, by the sum of (i) the Equityholder's allocable share of the Partnership Reorganized Company's losses, and (ii) the amount of money or the adjusted tax basis of property distributed to such Equityholder, including constructive distributions of Cash resulting from reductions in such Equityholder's allocable share of the Partnership Reorganized Company's indebtedness.

A sale of all or part of the Partnership Reorganized Company partnership interests will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the Partnership Reorganized Company Partnership Interests disposed of.  Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the Partnership Reorganized Company Partnership Interests has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain of The Partnership Reorganized Company's ordinary income items and such proceeds exceed the Equityholder's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions.  An Equityholder's ability to deduct any loss recognized on the sale of its Partnership Reorganized Company Partnership Interests will depend on the Equityholder's own circumstances and may be restricted under the Tax Code. In addition, to avoid U.S. federal tax withholding imposed in connection with a partnership interest, an Equityholder may be required to certify that it is a U.S. person, or that another exception to such withholding regime applies.

### (b)     Tax Consequences to Non-U.S. Holders

The U.S. federal income tax treatment of a Non-U.S. Holder that holds interests in the Partnership Reorganized Company is complex and will vary depending upon the circumstances of the Non-U.S. Holder and the activities of the Reorganized Company.  In general, the tax treatment of a Non-U.S. Holder will depend on whether the Fund is deemed to be engaged in a U.S. trade or business.  If the Partnership Reorganized Company were deemed to be engaged in a U.S. trade or business, the income allocated to a Non-U.S. Holder that is ECI would be subject to U.S. taxation at graduated rates (and certain corporate Non-U.S. Holder could be subject to an additional 30% "branch profits" tax).  In that case, each Non-U.S. Holder would be obligated to file a U.S. federal income tax return reporting such income and each Non-U.S. Holder's distributive share of such income would be subject to withholding tax.  In addition, any gain from the disposition of a "United States real property interest" held directly or indirectly by the Fund generally would be taxable as ECI.  The Tax Code defines "United States real property interests" broadly, and it includes interests in real property located in the U.S. as well as the stock of any corporation that holds sufficient interests in U.S. real property to be considered a "United States real property

holding corporation" under the Code. Accordingly, it is possible that the Fund will own interests in a United States real property interest. Gain realized from the disposition of such interests would be subject to U.S. taxation and withholding, and each Non-U.S. Holder would be required to file a U.S. federal income tax return reporting such income.

It is currently anticipated that Partnership Reorganized Company will not own any operating assets directly or through entities treated as flow-through for U.S. federal income tax purposes, but will rather own all operating assets through the Corporate Reorganized Company. Therefore, it is generally expected that a Non-U.S. Holder that owns equity interests in the Partnership Reorganized Company will not be treated as engaged in a U.S. trade or business for U.S. federal income tax purposes.

However, Debtors believe it is unclear whether the Corporate Reorganized Company will be a USRPHC over time. If the Corporate Reorganized Company is a USRPHC, and if the Partnership Reorganized Company sells or disposes of interests in the Corporate Reorganized Company, Non-U.S. Holders may be required to pay tax on the gain realized from such disposition and file a U.S. federal income tax return reporting such gain. In addition, if a Non-U.S. Holder sells or disposes of direct interests in the Partnership Reorganized Company, taxable gain realized on such disposition would be treated in a manner similar to ECI, and the Non-U.S. Holder would generally need to file a U.S. federal income tax return reporting such gain. Further, a buyer of equity interests in the Partnership Reorganized Company may be required to withhold an amount equal to 15% of the amount realized on the sale. Non-U.S. Holders that are sensitive to ECI are encouraged to consult with their tax advisors about, among other things, the possibility of investing through a non-U.S. entity that is classified as a corporation for U.S. federal income tax purposes, so that such non-U.S. entity can serve as a "filings blocker" that makes any applicable U.S. federal income tax filings (rather than the Non-U.S. Holder being required to directly make such filings). The determination of whether the Corporate Reorganized Company will be a USRPHC is factual in nature and subject to change, and no assurance can be provided regarding whether the Reorganized Company will be treated as a USRPHC for U.S. federal income tax purpose at any point, and no assurance can be provided that the Corporate Reorganized Company will be able to certify that withholding or tax under FIRPTA does not apply to an actual or deemed disposition of equity interest in the Partnership Reorganized Company.

## 9.6    FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of

property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder is urged to consult its tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

## 9.7    **Information Reporting and Backup Withholding**

Certain payments, including the distributions or payments in respect of Secured Bondholder Claims pursuant to the Plan, generally are subject to information reporting by the payor to the IRS. Moreover, such reportable payments may be subject to backup withholding (currently at a rate of twenty-four percent (24%)) under certain circumstances. Under the Tax Code's backup withholding rules, a Holder of a Secured Bondholder Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder of a Secured Bondholder Claim (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates such exemption or (ii) timely provides a correct United States taxpayer identification number and makes certain certifications under penalties of perjury.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a Holder of a Secured Bondholder Claims' United States federal income tax liability, and such Holder of an Secured Bondholder Claim may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury regulations and whether the transactions contemplated by the Plan would be subject to these Treasury regulations and require disclosure on the Holder's tax returns.

## 9.8    **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES TO THE DEBTORS AND HOLDERS ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE UNITED STATES FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN OR CONTEMPLATED BY THE PLAN.**

## ARTICLE X:

## CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and Consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received by the Solicitation Agent no later than 5:00 p.m. (prevailing Eastern Time) on February 5, 2024.

Dated: January 29, 2024

Respectfully submitted,

Restoration Forest Products Group, LLC
on behalf of itself and each of its Debtor affiliates

By: _/s/ Kenneth Latz_
Name:   Kenneth Latz
Title:    Chief Restructuring Officer

Prepared by:

M. Blake Cleary, Esq. (No. 3614)
Brett M. Haywood, Esq. (No. 6166)
Gregory J. Flasser, Esq. (No. 6154)
Katelin A. Morales, Esq. (No. 6683)
Shannon Forshay, Esq. (No. 7293)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000

_Proposed Counsel for the Debtors and Debtors in Possession_

## EXHIBIT A

**Joint Prepackaged Chapter 11 Plan of Reorganization**

## EXHIBIT B

## LLC Agreement Term Sheet

**Restoration Forest Products Group, LLC**

**Term Sheet Relating to LLC Agreement**

This term sheet (this "Term Sheet") presents certain preliminary material terms of the limited liability company operating agreement (the "LLC Agreement") and other governing agreements (together with the LLC Agreement, the "Organizational Documents") of Restoration Forest Products Group, LLC, a Delaware limited liability company (the "Company") that would be reflected in the Organizational Documents of the Company to be adopted upon the consummation of the proposed restructuring transactions pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended (the "Restructuring Transactions").

*THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT ANY SUCH OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. THE TERMS SET FORTH HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION AND DELIVERY BY ALL RELEVANT PARTIES OF LEGALLY BINDING DEFINITIVE DOCUMENTATION AND CONSUMMATION OF THE RESTRUCTURING TRANSACTIONS. THIS TERM SHEET DOES NOT INCLUDE ALL THE TERMS TO BE INCLUDED IN SUCH DEFINITIVE DOCUMENTATION, AND SHALL NOT BE BINDING ON ANY PARTY.*

| | |
|---|---|
| **Structure:** | The Company will be organized as a Delaware limited liability company and will elect to be taxed as a corporation.[1] |
| **Units:** | The membership interests of the Company shall be divided into three (3) classes: "Class A Units"; "Class B Units"; and "Class C Units" (collectively, the "Units" and the holder of a Unit, a "Unitholder"). Each Class A Unit and each Class B Unit shall be entitled to one (1) vote. The Class C Units shall be non-voting and issued in accordance with any management incentive plan. |
| **Managers:** | *Managers* <br><br> The board of managers of the Company (the "Board") shall initially have seven (7) managers (which number may be increased or decreased as described in this "Managers" section and the "Designation Rights" section below) (each, a "Manager"), which shall consist of: |

---

[1] For tax efficiency and other reasons, Invesco and Lateral (each as defined herein) may receive interests in a limited partnership and the limited partnership would own 100% of the equity of the Company (which, for the avoidance of doubt, would be a Delaware limited liability company taxed as a corporation). In such case, the limited partnership would have governance rights, economics, and other terms substantially the same as those set forth herein.

- the Chief Executive Officer (the "CEO") of the Company;

- two (2) independent Managers designated by Invesco Senior Secured Management Inc., on behalf of its respective funds, managed accounts, or investment vehicles and/or any of its affiliates that are Unitholders (collectively, "Invesco"); and

- four (4) Managers designated by Invesco.

Following the initial appointment of the Managers, the Board shall consist of such number of Managers to give effect to the appointment rights set forth below; *provided*, that, the Board shall consist of a minimum of seven (7) Managers; *provided*, *further*, the Board may increase or decrease the number of Managers on the Board, but not below the minimum number.

Following the initial appointment of the Managers, the following appointment requirements shall apply:

- The CEO shall be a Manager;

- Invesco shall be entitled to appoint two (2) independent Managers; and

- Invesco shall be entitled to appoint the remaining Managers.

*Term*

Managers will serve an initial one-year term and will thereafter be designated by the relevant party or parties for one-year terms.

*Designation Rights*

For so long as any Unitholder, together with its affiliates, is entitled to designate a Manager pursuant to this section entitled "Managers" (any such designation right, a "Designation Right", and any such Unitholder                a                "Designating Investor"):

- A Designating Investor may at any time cause its designee to be replaced by designating a replacement designee;

- Neither the Board nor any other Unitholder may remove or replace any Designating Investor's designee(s) without such Designating Investor's consent, other than for "cause;"

2

|  | • All Unitholders will agree to vote their Units to elect or remove a Designating Investor's designee at the direction of such Designating Investor; and |
|---|---|
|  | • Any vacancy on the Board due to the resignation or removal of a Designating Investor's designee shall remain open until such Designating Investor has designated a replacement. |
|  | If at any time a Designation Right is terminated, the Manager(s) serving on the Board as a result of such terminated Designation Right shall be removed from the Board and the vacancy created thereby shall be filled by Invesco. |
|  | For so long as Lateral Investment Management, LLC, on behalf of its respective funds, managed accounts, or investment vehicles and/or any of its affiliates that are Unitholders (collectively, "Lateral"), holds at least a majority of the issued and outstanding Class B Units and is not in material breach of the Cooperation Agreement, it shall be entitled to one (1) board observer, subject to customary terms (which will include right to receive board packages and similar information). |
|  | For so long as Invesco holds Class A Units, in addition to the Designation Rights contained herein, it shall be entitled to two (2) board observers, subject to customary terms. |
| **Quorum; Action:** | Any quorum of the Board must include the Managers then-in-office constituting a majority in voting power of the Managers; *provided*, that at least one Manager designated by Invesco is present, subject to customary provisions related to repeated absences. Each Manager, who is not an independent Manager, designated by Invesco will get two (2) votes with respect to any action or item that requires approval of the Board and all other Managers will have one (1) vote. All approvals of the Board will be by majority vote of those Managers present at a quorate meeting. |
| **Waterfall Economics:** | Any distributions to Unitholders, whether pursuant to a sale of the Company, liquidity event, or otherwise, shall be distributed in the following priority (the "Waterfall"):[2]<br><br>• First, 100% of the distributions to the Class A Unitholders, ratably among such Unitholders based on the aggregate number of Class A Units then held by each such Unitholder, |

---

[2] Waterfall will be amended by action of the Board in connection with the establishment of the Company's management incentive plan to insert Class C Units in the Waterfall.

3

until the Class A Minimum Return[3] of each Class A Unit has been paid in full (the "<u>Tier 1 Participation Threshold</u>").

- <u>Second</u>, with respect to distributions in excess of the Tier 1 Participation Threshold, (i) 95% to the Class A Unitholders ratably among such Unitholders based on the aggregate number of Class A Units then held by each such Unitholder and (ii) 5% to the Class B Unitholders ratably among such Unitholders based on the aggregate number of Class B Units then held by each such Unitholder, in each case, until the Class A Unitholders have received distributions equal to the product of 1.5 multiplied by the Class A Minimum Return (the "<u>Tier 2 Participation Threshold</u>").

- <u>Third</u>, with respect to distributions in excess of the Tier 2 Participation Threshold, (i) 90% to the Class A Unitholders ratably among such Unitholders based on the aggregate number of Class A Units then held by each such Unitholder and (ii) 10% to the Class B Unitholders ratably among such Unitholders based on the aggregate number of Class B Units then held by each such Unitholder, in each case, until the Class A Unitholders have received distributions equal to the product of 2.0 multiplied by the Class A Minimum Return (the "<u>Tier 3 Participation Threshold</u>").

- <u>Fourth</u>, with respect to distributions in excess of the Tier 3 Participation Threshold, (i) 80% to the Class A Unitholders ratably among such Unitholders based on the aggregate number of Class A Units then held by each such Unitholder and (ii) 20% to the Class B Unitholders ratably among such Unitholders based on the aggregate number of Class B Units then held by each such Unitholders, in each case, until the Class A Unitholders have received distributions equal to the product of 2.5 multiplied by the Class A Minimum Return (the "<u>Tier 4 Participation Threshold</u>").

- <u>Fifth</u>, with respect to distributions in excess of the Tier 4 Participation Threshold, (i) 50% to the Class A Unitholders ratably among such Unitholders based on the aggregate number of Class A Units then held by each such Unitholder and (ii) 50% to the Class B Unitholders ratably among such

---

[3] "<u>Class A Minimum Return</u>" means, with respect to any Class A Unit as of any determination date, an amount equal to $[amount per share equal to total equity value of at least $161,100,000], subject to adjustment as determined by the Board in good faith for any stock splits, reverse stock splits, recapitalizations, recombinations, and any future issuances or redemptions.

| | Unitholders based on the aggregate number of Class B Units then held by each such Unitholder. |
| --- | --- |
| | Notwithstanding the foregoing, the Class B Unitholders will not be entitled to any distributions set forth above if Lateral is in material breach of the Cooperation Agreement and such material breach has not been cured (to the extent such breach is curable). |
| **Information Rights:** | The Company will provide, subject to customary limitations (*e.g.*, confidentiality obligations), each such Unitholder with:<br><br>• Annual audited financial statements within one hundred an twenty (120) days following the end of the fiscal year; and<br><br>• Quarterly unaudited financial statements within sixty (60) days following the end of each of the Company's first three fiscal quarters; and<br><br>• If provided to the Board or lenders, monthly financial statements.<br><br>The Company will also provide each Unitholder with all tax information required to be provided to Unitholders and as may be reasonably requested for purposes of allowing Unitholders (or their direct and indirect owners) to prepare and file their own tax and information returns. |
| **Transfer Restrictions:** | Transfers of Units, other than Permitted Transfers (as defined herein) will be subject to Board consent.<br><br>Notwithstanding anything to the contrary, each Unitholder will be permitted to transfer (each a "Permitted Transfer") its Units to any of its affiliates (excluding portfolio companies affiliated with any Unitholder) without the consent of the Board; *provided*, *however*, such transfer shall be prohibited and voided if such transfer would: (i) if effected, require the Company to register any security under the Securities Exchange Act of 1934, as amended (the "Exchange Act") (as a result of the number of Unitholders or otherwise), unless, in any such case, at the time of such transfer, the Company is already subject to the reporting obligations under Sections 13 or 15(d) of the Exchange Act; (ii) violate applicable securities laws; (iii) cause the Company to be considered a publicly traded partnership under applicable tax laws; or (iv) otherwise violate the terms of the Organizational Documents (provided, however, that such Organizational Documents will not impose greater restrictions on Permitted Transfers then described above). |

5

| | In addition to the restrictions described above, no Units may be transferred unless the transferee thereof executes a joinder to the LLC Agreement, in a form to be provided for therein or as otherwise approved by the Board. |
|---|---|
| **Drag-Along Rights:** | Customary drag-along rights providing that any Unitholder holding, or group of Unitholders collectively holding, more than 50% of the issued and outstanding Class A Units shall have the right to effect a sale of the Company to an unaffiliated third party by merger, consolidation, sale of all or substantially all of the assets, or sale of the Units of the Company without the approval of the other Unitholders and with no appraisal rights, subject to customary protections for such other Unitholders. |
| **Affiliate Transactions:** | All transactions between the Company (or any of its subsidiaries), on the one hand, and any Unitholder (or any controlled affiliate of such Unitholder) (including transactions with controlled portfolio companies), on the other hand, will require approval of a majority of disinterested Managers (subject to customary exceptions, including but not limited to indemnification and compensation agreements for Managers affiliated with such Unitholder, and any transaction in which all Company equity holders are given *pro rata* participation rights). |
| **Registration Rights** | The LLC Agreement will provide for a customary reorganization in connection with an IPO.  Each holder of at least 10% of the issued and outstanding Class A Units (a "10% Investor") will be granted customary demand, piggyback and shelf registration rights.  All other Unitholders of at least 5% of the issued and outstanding Class A Units and Class B Units, calculated on an aggregate basis, will be entitled to participate (*i.e.*, piggyback) on a *pro rata* basis (based on shares held) with any 10% Investor(s) in any registered public offering of Company stock at the Company's expense, subject to customary cutbacks and certain restrictions in an IPO.  All Unitholders will be subject to customary lockups in connection with an IPO or subsequent registrations.  Customary expenses and indemnification provisions will be included as part of the registration rights. |
| **Corporate Opportunities / Fiduciary Duties:** | The LLC Agreement will provide, to the fullest extent permitted by applicable law, for the renunciation of the Company's interest in business opportunities that are presented to Managers or Unitholders, in each case, other than opportunities presented to Managers (who are an employee, consultant or officer of the Company), employees, consultants or officers of the Company.

The LLC Agreement will provide that the fiduciary duties of the Unitholders and the Managers that are employed by or designated by any of the Unitholders (except any Managers employed by the |

6

| | |
|---|---|
| | Company) shall be eliminated or limited to the fullest extent permitted by applicable law. |
| **Exculpation and Indemnification:** | The Managers will be exculpated and indemnified to the fullest extent permitted by law and the Company will enter into separate indemnification agreements with each Manager providing, among other things, for customary advancement of expenses and that the Company is the indemnitor of first resort. |
| **D&O Insurance:** | The Company will obtain and retain D&O insurance in an amount and on terms otherwise acceptable to the Board. |
| **Amendments:** | The Organizational Documents may be amended by holders, together with their affiliates, of 50% of the issued and outstanding Class A Units; *provided*, that amendment, modification, supplement, or waiver of the Waterfall or any of the specific rights of the Class B Units or Lateral, will require the consent of holders of a majority of the issued and outstanding Class A Units and Class B Units, each voting as a separate class; *provided*, *however*, modifications to the Waterfall by action of the Board (which action shall be in good faith) to (i) insert or issue Class C Units pursuant to any management incentive plan and (ii) adjust the Class A Minimum Return for any stock splits, reverse stock splits, recapitalizations, recombinations, and any future issuances or redemptions of Class A Units shall not require Unitholder consent. |
| **Confidentiality and Continuing Obligations** | The LLC Agreement will contain customary confidentiality provisions requiring each Unitholder and any affiliate thereof to maintain, and to cause their respective employees, directors, officers, managers, agents, representatives and advisors who have access to confidential information to maintain such information confidential. |

7

## EXHIBIT C

**Liquidation Analysis**

**Restoration Forest Products Group, LLC**
**Hypothetical Liquidation Analysis**

| $ in 000s | Unaudited 11/30/23 [1] | Pro Forma 3/31/24 [2] | Recovery % Low | Recovery % High | Proceeds $ Low | Proceeds $ High |
|---|---|---|---|---|---|---|
| Cash | $ 5,110 | $ 10,331 | 100.0% | 100.0% | $ 10,331 | $ 10,331 |
| Accounts Receivable | 301 | 321 | 85.0% | 90.0% | 273 | 289 |
| Other Receivables | 851 | 851 | 0.0% | 0.0% | 0 | 0 |
| Inventory | 1,577 | 3,914 | 35.8% | 42.9% | 1,402 | 1,679 |
| Prepaids and Other Assets | 13,341 | 13,341 | 0.0% | 0.0% | 0 | 0 |
| Property and Equipment: | | | | | | |
| Real Estate | 9,697 | 9,697 | 135.6% | 173.3% | 13,150 | 16,800 |
| Machinery and Equipment | 102,674 | 116,614 | 7.4% | 7.5% | 8,629 | 8,695 |
| Net Property and Equipment | 112,371 | 126,310 | 17.2% | 20.2% | 21,779 | 25,495 |
| **Total Assets** | **$ 133,550** | **$ 155,067** | **21.8%** | **24.4%** | **$ 33,786** | **$ 37,794** |
| **Chapter 7 Liquidation Costs:** | | | | | | |
| Operating Expenses | | | n/a | n/a | $ (745) | $ (1,387) |
| Real Estate Commission and Liquidator Fees | | | n/a | n/a | (726) | (872) |
| Chapter 7 Professional Fees | | | n/a | n/a | (500) | (700) |
| Chapter 7 Trustee Fees | | | n/a | n/a | (704) | (824) |
| Total Chapter 7 Liquidation Costs | | | | | $ (2,674) | $ (3,783) |
| **Net Proceeds Available to Creditors** | | | **20.1%** | **21.9%** | **$ 31,111** | **$ 34,011** |

**Hypothetical Chapter 7 Scenario:**

| | Estimated Allowed Claim | Low % | High % | Low $ | High $ |
|---|---|---|---|---|---|
| Pre-Conversion Expenses and Professionals Carve-Out | $ 1,550 | 100.0% | 100.0% | $ 1,550 | $ 1,550 |
| Other Secured Claims [3] | 825 | 70.3% | 78.2% | 579 | 645 |
| DIP Claims [4] | 98,115 | 29.5% | 32.4% | 28,982 | 31,816 |
| Senior Series A Bond Claims | 138,868 | 0.0% | 0.0% | 0 | 0 |
| Subordinated Series B Bond Claims | 107,374 | 0.0% | 0.0% | 0 | 0 |
| Priority Tax Claims | 0 | 0.0% | 0.0% | 0 | 0 |
| Statutory Fees | 0 | 0.0% | 0.0% | 0 | 0 |
| Other Priority Claims | 0 | 0.0% | 0.0% | 0 | 0 |
| Lateral Unsecured Loan Claims | 56,704 | 0.0% | 0.0% | 0 | 0 |
| General Unsecured Claims | 4,000 | 0.0% | 0.0% | 0 | 0 |
| Intercompany Claims | 0 | 0.0% | 0.0% | 0 | 0 |
| Subordinated Claims | 0 | 0.0% | 0.0% | 0 | 0 |
| Equity Interests in RFPG | 0 | 0.0% | 0.0% | 0 | 0 |
| Intercompany Equity Interests | 0 | 0.0% | 0.0% | 0 | 0 |
| **Total Creditor Recovery** | **$ 407,436** | **7.6%** | **8.3%** | **$ 31,111** | **$ 34,011** |

**Notes**

(1) Reflects values obtained from the Debtors' unaudited consolidated statement of financial position as of November 30, 2023.
(2) Reflects Debtors' estimated assets as of the Conversion Date of March 31, 2024.
(3) Represents estimated value for secured claims related to purchase money security interests and claims owing to the Arizona Industrial Development Authority under the bond indenture for fees, expenses and indemnification claims that are assumed to be priming in nature.
(4) The amount of DIP Claims includes approximately $64,306,000 of prepetition Bridge Loan Claims that the Liquidation Analysis assumes will be "rolled up" into DIP Claims as contemplated under the DIP Facility.

**LIQUIDATION ANALYSIS**

## I.    Best Interests Test

Under the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a chapter 11 plan unless each holder of a Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. *See* 11 U.S.C. §1129(a)(7). Accordingly, to demonstrate that the Plan satisfies the "best interests of creditors" test, the Debtors have prepared the following hypothetical liquidation analysis (the "**Liquidation Analysis**") based on certain assumptions discussed in the Disclosure Statement and the accompanying notes to the Liquidation Analysis.

The Liquidation Analysis estimates potential cash distributions to holders of Allowed Claims and Interests in a hypothetical chapter 7 liquidation of the Debtors' assets. Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtors prepared the Liquidation Analysis with the assistance of their financial and legal advisors.

THIS LIQUIDATION ANALYSIS HAS NOT BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. ALTHOUGH THE DEBTORS CONSIDER THE ESTIMATES AND ASSUMPTIONS SET FORTH HEREIN TO BE REASONABLE UNDER THE CIRCUMSTANCES, SUCH ESTIMATES AND ASSUMPTIONS ARE BASED ON INFORMATION AVAILABLE TO THE DEBTORS AND ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RESULTS SET FORTH BY THIS LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE ACTUALLY LIQUIDATED PURSUANT TO CHAPTER 7 OF THE BANKRUPTCY CODE. ACTUAL RESULTS IN SUCH A CASE COULD VARY MATERIALLY FROM THOSE PRESENTED HEREIN, AND DISTRIBUTIONS AVAILABLE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS COULD DIFFER MATERIALLY FROM THE PROJECTED RECOVERIES SET FORTH IN THE LIQUIDATION ANALYSIS.

THE LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE, GOOD-FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE CONVERSION DATE (AS DEFINED BELOW). THE LIQUIDATION ANALYSIS IS NOT INTENDED AND SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THE LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THE VALUES AND RECOVERIES REPRESENTED IN THE LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS

IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THE LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.

**Conclusion:**

The Debtors have determined, as summarized in the Liquidation Analysis, that the Plan will provide holders of Claims and Interests with a recovery that is not less than what they would otherwise receive if the Debtors' estates were liquidated under chapter 7 of the Bankruptcy Code.

## II.    Global Assumptions

The Liquidation Analysis should be read in conjunction with the following global notes and assumptions:

### A. Basis of presentation

The Liquidation Analysis reflects estimated asset and liability values as of March 31, 2024, except as otherwise indicated where it was based on the Debtors' books and records as of November 30, 2023. The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered proceeding as shown on a consolidated basis.

### B. Chapter 7 Process

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code on or about the anticipated Effective Date of March 31, 2024 (the "**Conversion Date**").

On the Conversion Date, it is assumed that the Office of the United States Trustee would appoint a chapter 7 trustee (the "**Trustee**") to liquidate the Debtors' estates (the "**Estates**"), during which time all of the Debtors' assets would be sold or surrendered to the respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be used and distributed to creditors in accordance with the priority scheme under section 726 of the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a chapter 7 trustee must, among other things, collect and convert the property of a debtor's estate as expeditiously as is compatible with the best interests of relevant stakeholders, which could result in potentially distressed recoveries. To maximize the value of the Estates, the Trustee is assumed to maintain the staff required to support the liquidation of the Debtors' assets over a three (3) month period and a six (6) month period, respectively, in the High Case and Low Case scenarios (as defined and described in Section II.D hereto).

The Liquidation Analysis assumes the DIP Lenders will consent to the Debtors' limited use of cash collateral and that the Debtors would not have funds to support any process other than an expedited wind down of the Debtors' business by the Trustee to convert the Debtors' assets to cash and limit the amount of administrative expenses incurred subsequent to the Conversion Date. There can be no assurance, however, that the liquidation would be completed in the indicated timeframes, nor is

there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized. If the Debtors were not allowed the use of cash collateral, recoveries in a liquidation would likely be materially less than shown in the Liquidation Analysis.

## C.  Chapter 7 Process

The cessation of business in a chapter 7 liquidation is likely to cause additional claims to be asserted against the Estates that otherwise would not exist absent such a liquidation. Examples of these kinds of claims include, but are not limited to, employee-related claims (such as severance, WARN Act, or similar claims), tax liabilities, and claims related to the rejection of unexpired leases and executory contracts. These additional claims could be significant and, in certain circumstances, may be entitled to priority under the Bankruptcy Code. The Debtors cannot be certain of the sufficiency of any adjustments made for these potential additional claims in the Liquidation Analysis. While the Debtors have made a good faith estimate of Claims in a hypothetical chapter 7, the Claims assumed in the Liquidation Analysis may vary from actual asserted Claims.

## D.  Liquidation Scenarios and Timeframes

The Liquidation Analysis reflects two liquidation scenarios, which give rise to a range of estimated liquidation recoveries.  The scenario representing the high end of the range of estimated recoveries (the "**High Case**") is predicated upon an assumed period of six (6) months to monetize the Debtors' assets and make liquidating distributions to claimants in order of legal priority.  The scenario that represents the low end of the range of estimated recoveries (the "**Low Case**") is predicated upon a three (3) month horizon for the liquidation.

## E.  Litigation

The Liquidation Analysis does not consider any potential proceeds or cash outflows resulting from the outcome of potential litigation asserted by or against the Debtors, including but not limited to avoidance actions under the Bankruptcy Code.

## III.   Notes to the Liquidation Analysis

### A. Total Proceeds Available for Distribution

*Note 1: Cash Balance on Conversion Date*

The Debtors' estimated cash balance as of the Conversion Date is approximately $10.3 million, which amount is the collateral of the DIP Lenders. The liquidation proceeds for cash is estimated at 100% for both the Low Case and the High Case.

*Note 2: Accounts Receivable*

The Debtors' estimated accounts receivable balance as of the Conversion Date is approximately $0.3 million. Accounts receivable balances are expected to be primarily comprised of customer receivables. The Liquidation Analysis assumes

between an 85% and 90% recovery on accounts receivable in the Low Case and High Case, respectively.

*Note 3: Other Receivables*

The Debtors have two long-term notes receivable with outstanding balances of approximately $0.8 million. The Debtors believe a low likelihood of recoverability exists for these notes, and they are not expected to have significant economic value in a liquidation scenario. A recovery of 0% has been estimated for these assets in both the High Case and Low Case.

*Note 4: Inventory*

The Debtors' estimated value of inventory on the Conversion Date is approximately $3.9 million, consisting of $2.3 million of raw materials, $0.7 million of work-in-process inventory, and $0.9 million of finished lumber inventory. The Liquidation Analysis assumes between 36% and 43% of blended recoveries on inventory balances in the Low Case and High Case, respectively.

Given the limited scale of the forest products industry in Arizona, the Debtors believe the raw materials would be sold substantially below cost, with a recovery of approximately 20% to 30% of estimated book value. Work-in process inventory and finished lumber inventory were estimated to result in gross recoveries of 47% and 67% of book value in the Low Case and High Case, respectively.

*Note 5: Prepaids and Other Assets*

The Debtors' estimated value of Prepaid Accounts and Other Assets at the Conversion Date is approximately $13.3 million. A recovery of 0% has been estimated for these assets in both the Low Case and High Case.

The various prepaid expenses and deposits are primarily related to construction deposits, prepaid insurance, and prepaid rent and are not expected to have significant economic value in a liquidation scenario.

Other Assets include capitalized bond issuance costs and capitalized costs in connection with the Debtors' forestry contracts, neither of which are expected to have recoverable value in a liquidation scenario.

*Note 6: Property and Equipment*

The Debtors estimate that the net book value of property and equipment at the Conversion Date is approximately $126.3 million. The blended recovery on net property and equipment is estimated to be between 17% and 20% in the Low Case and High Case, respectively.

The estimated recovery values for the Bellemont and Williams real property was based on broker price opinions obtained by an industrial real estate broker in December 2023. The estimated value of the Heber real property was based on

recommendations provided by the listing agent for that property.  A significant majority of the estimated recovery value of the real property relates to the Debtors' owned real property in Bellemont, Arizona.

Machinery and equipment assets include mill equipment, rolling stock, and assets under construction. The estimated liquidation value for the Bellemont machinery and equipment was based on an appraisal performed by an industrial equipment appraiser, with consideration of certain additional equipment that is expected to arrive onsite prior to the Conversion Date. The liquidation value of rolling stock was estimated based on conversations with management and market prices. The machinery and equipment located at the Williams and Heber sites were monetized in an auction that took place on January 11, 2024. The proceeds from this auction are expected to be received by the Debtors prior to the Conversion Date.

### B. Liquidation Costs

*Note 7: Operating Expenses*

This Liquidation Analysis assumes that there will be various labor and non-labor related operating expenses and other costs incurred in connection with the liquidation of the Debtors' assets and the administration of the liquidation proceeding after the conversion of the Chapter 11 Cases to chapter 7 cases. This Liquidation Analysis assumes the cessation of the Debtors' ordinary course operations, and, as a result, assumes no cash flows from operations following the Conversion Date. This Liquidation Analysis assumes the Trustee will employ a substantially reduced employee base in order to facilitate the orderly liquidation of the Debtors' Estates, plus a retention bonus pool equal to $50,000. These individuals will primarily be responsible for overseeing and maintaining certain of the Debtors' operations, providing historical knowledge and insight to the Trustee regarding the Debtors' businesses, and concluding the administrative liquidation of the business after the sale of substantially all of the Debtors' assets.  Following the Conversion Date, operating costs are assumed to be $0.7 million and $1.4 million in the Low Case and High Case, respectively. The difference between the two cases is driven by the length of the liquidation process, with the High Case estimated to take three (3) months longer than the Low Case.

*Note 8: Real Estate Commission and Liquidator Fees*

The Liquidation Analysis assumes there will be additional costs associated with real estate commissions and liquidator fees for the marketing and sale of property and equipment. The Liquidation Analysis reflects estimated real estate broker commissions of approximately 4% of the total liquidation proceeds realized from the sale of real property. Additionally, an estimated $200 thousand of liquidator marketing costs have been included in the liquidation costs in both the Low Case and High Case.

*Note 9: Chapter 7 Professional Fees*

This Liquidation Analysis assumes that the chapter 7 trustee will hire financial and legal advisors to assist in the administration of the chapter 7 liquidation. Pursuant to section 726 of the Bankruptcy Code, the allowed administrative expenses incurred by the Trustee, including expenses affiliated with selling the Debtors' and non-debtor subsidiaries' assets and winding down operations, would be entitled to payment in full prior to any distribution to Administrative Expense Claims and Other Priority Claims.

The Liquidation Analysis estimates professional fees to be between $0.5 million and $0.7 million in the Low Case and High Case, respectively.  This estimate is based on legal, financial, and other professionals' expected fees and expenses and the complexity of the Debtors' liquidation and wind down.

*Note 10: Chapter 7 Trustee Fees*

Pursuant to sections 326 and 330 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for the Trustee's services, not to exceed 25% on the first $5,000 or less distributed to creditors, 10% on any distributable amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over by the Trustee to parties-in-interest. For purposes of the Liquidation Analysis, these fees are assumed to be 3% of gross liquidation proceeds realized, excluding cash.

## C. Claims

*Note 11: Pre-Conversion Expenses and Professional Carve-Out*

The DIP financing provides for certain unpaid pre-conversion expenses and accrued and unpaid professional fees and expenses (Carve-out Claims). These shall be entitled to legal priority above DIP Claims and all other Claims under the Plan. This Liquidation Analysis assumes a Claim of $1.5 million for Pre-Conversion Expenses and Professional Carve-Out. This Claim is comprised of $1.0 million accrued employee expenses and $0.5 million of accrued but unpaid fees and expenses incurred by professionals retained by the Debtors. This excludes additional fees payable to the U.S. Trustee.

*Note 12:* Other Secured Claims

Represents the estimated secured Claims for Purchase Money Security Interests (PMSI) along with estimated Claims owing to the Arizona Industrial Development Authority (AZIDA) under the bond indenture for fees, expenses, and indemnification Claims that are assumed to be priming in nature. This Liquidation Analysis assumes estimated recoveries on Other Secured Claims are approximately 70% to 78%, including a full recovery for the AZIDA Claim. For purposes hereof, it has been

assumed that any additional Other Secured Claims are either inapplicable or are insignificant.

*Note 13: DIP Claims*

Represents the estimated Claims for the DIP Lender, assuming that the prepetition secured debt held by the DIP Lenders is fully rolled-up into the DIP Facility prior to the Conversion Date. Based on the foregoing analysis of proceeds available in a liquidation, estimated recoveries on the DIP Claims in a liquidation are approximately 30% to 32%.

*Note 14: Senior Series A Bond Claims*

Represents the estimated secured Claims for the Senior Series A Bondholders. Based on the foregoing analysis, no recovery has been estimated for the Senior Series A Bond Claims.

*Note 15: Subordinated Series B Bond Claims*

Represents the estimated secured Claims for the Subordinated Series B Bondholders. Based on the foregoing analysis, no recovery has been estimated for the Subordinated Series B Claims.

*Note 16: Priority Tax and Statutory Fees Claims*

The Debtors estimate that there will be no Priority Tax and Statutory Fees Claims on the Conversion Date. For purposes hereof, it has been assumed that any such Claims are either inapplicable, settled prior to conversion or are insignificant.

*Note 17: Other Priority Claims*

The Debtors estimate that there will be no Other Priority Claims on the Conversion Date. For purposes hereof, it has been assumed that any such Claims are either inapplicable, settled prior to conversion or are insignificant.

The Debtors estimate that no other classes of Claims or Interests would be entitled to recovery in a chapter 7 liquidation.

**EXHIBIT D**

**Valuation Analysis**

**Valuation Analysis**

THE VALUATION INFORMATION CONTAINED HEREIN DOES NOT PURPORT TO BE OR CONSTITUTE (I) A RECOMMENDATION TO ANY HOLDER OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS AS TO HOW TO VOTE ON, OR OTHERWISE ACT WITH RESPECT TO, THE PLAN, (II) AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN OR OF THE TERMS AND PROVISIONS OF THE PLAN OR OF ANY TRANSACTION OFFERED PURSUANT TO THE PLAN OR OTHERWISE DESCRIBED THEREIN, INCLUDING WITHOUT LIMITATION, THE OFFERING OF NEW COMPANY INTERESTS, OR (III) AN APPRAISAL OF THE ASSETS OF THE REORGANIZED DEBTORS. FURTHERMORE, THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE REGARDING, AND INTREPID INVESTMENT BANKERS LLC ("**INTREPID**") DOES NOT EXPRESS ANY VIEW OR OPINION AS TO, THE PRICE OR RANGE OF PRICES AT WHICH THE NEW COMPANY INTERESTS OR OTHER SECURITIES OF THE DEBTORS OR THE REORGANIZED DEBTORS MAY TRADE, BE SALEABLE, OR OTHERWISE BE TRANSFERABLE AT ANY TIME, INCLUDING, WITHOUT LIMITATION, SUBSEQUENT TO CONSUMMATION OF THE PLAN.

SUCH VALUATION INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN, AND, OTHER THAN WITH RESPECT TO THE FOREGOING, WAS NOT PREPARED FOR THE PURPOSE OF PROVIDING THE BASIS FOR AN INVESTMENT DECISION BY ANY HOLDER OR ANY OTHER PERSON OR ENTITY WITH RESPECT TO ANY TRANSACTION OFFERED PURSUANT TO THE PLAN OR OTHERWISE DESCRIBED THEREIN (INCLUDING, WITHOUT LIMITATION, THE OFFERING OF NEW COMPANY INTERESTS). SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF ESTIMATED RELATIVE RECOVERIES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS THEREUNDER AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS OR ANY OF THEIR AFFILIATES OR, OTHER THAN TO THE EXTENT EXPRESSLY SET FORTH IN THIS VALUATION ANALYSIS, IN ANY WAY OR MANNER IN CONNECTION WITH ANY OF THE TRANSACTIONS DESCRIBED IN THE PLAN, INCLUDING WITHOUT LIMITATION THE OFFERING OF NEW COMPANY INTERESTS. THE VALUATION INFORMATION CONTAINED HEREIN SHOULD ALSO BE CONSIDERED IN CONJUNCTION WITH THE RISK FACTORS DESCRIBED IN ARTICLE VIII OF THE DISCLOSURE STATEMENT AND THE FINANCIAL PROJECTIONS ATTACHED THERETO AS EXHIBIT E.

THE ESTIMATED VALUE SET FORTH IN THE VALUATION ANALYSIS DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE DEBTORS OR THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH MAY BE MATERIALLY DIFFERENT THAN THE ESTIMATES SET FORTH IN THE VALUATION ANALYSIS. ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH ANY SECURITIES OF THE REORGANIZED DEBTORS MAY TRADE AFTER GIVING EFFECT TO THE

TRANSACTIONS CONTEMPLATED TO BE EFFECTED BY THE PLAN AS OF OR FOLLOWING CONSUMMATION THEREOF. ANY SUCH PRICES MAY BE MATERIALLY DIFFERENT THAN INDICATED BY THE VALUATION ANALYSIS.

IN THE EVENT THAT THE PLAN IS NOT CONSUMMATED AS OF THE EXPECTED EFFECTIVE DATE AS ASSUMED IN THE FINANCIAL PROJECTIONS, IT IS HIGHLY LIKELY THAT THE VALUATION ANALYSIS CONTAINED HEREIN WILL CHANGE, POSSIBLY MATERIALLY.

Subject to authorization from the Bankruptcy Court, the Debtors expect to retain Intrepid as their investment banker in connection with the Chapter 11 Cases. Solely for purposes of the Plan and the Disclosure Statement, Intrepid estimated the total enterprise value (the "**Total Enterprise Value**")[1] and the implied estimated equity value (the "**Equity Value**") of the Reorganized Debtors on a consolidated going-concern basis and *pro forma* for the transactions contemplated by the Plan (the "**Valuation Analysis**"), all as set forth below. The Valuation Analysis was based on financial information provided by the Debtors' senior management, including the Financial Projections (defined below) attached to the Disclosure Statement as Exhibit E, and information provided by other sources.

In assessing and utilizing the Financial Projections for purposes of performing the Valuation Analysis, Intrepid took into account its discussions with the Debtors' senior management and financial advisors regarding the risks and uncertainties of realizing the Financial Projections in light of (i) the current and prospective industry conditions and competitive dynamics facing the Debtors (and, as of the Effective Date, the Reorganized Debtors), (ii) the Debtors' recent financial performance, (iii) the key commercial, operational, and financial drivers underlying the Financial Projections, (iv) the impact and economic effects of the post COVID-19 environment and other global macroeconomic factors on any of the foregoing, and (v) various other facts and circumstances relevant to the Financial Projections.

The Valuation Analysis was conducted as of January 17, 2024 and assumes the effective date of the Plan occurs on March 31, 2024 (the "**Effective Date**").  For purposes of this Valuation Analysis, Intrepid has assumed that no material changes that would affect value will occur between January 17, 2024 and the contemplated Effective Date.

### Estimated Total Enterprise Value and Equity Value

Based on the Financial Projections and other information and the financial analyses described herein, Intrepid estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $70 to $90 million, with a midpoint of $80 million. After deducting *pro forma* net debt of $25 million[2] as contemplated by the Plan as of the Effective Date, Intrepid's estimated Total Enterprise Value implies an estimated Equity Value for the Reorganized Debtors of approximately $45 to $65 million, with a midpoint of $55 million.

THE FINANCIAL PROJECTIONS FOR, AND THE ESTIMATED TOTAL ENTERPRISE VALUE AND THE ESTIMATED EQUITY VALUE OF, THE REORGANIZED DEBTORS ARE SUBJECT TO VARIOUS UNCERTAINTIES AND CONTINGENCIES THAT ARE INHERENTLY DIFFICULT TO PREDICT. AMONG OTHER THINGS, SUCH ESTIMATED VALUES WILL FLUCTUATE BASED ON (I) GENERAL ECONOMIC AND BUSINESS CONDITIONS, CAPITAL MARKETS CONDITIONS, AND INDUSTRY-SPECIFIC AND

---

[1]   Total Enterprise Value is a financial term that generally means (a) the subject company's equity value (i.e., the value of the subject company's equity and equity-linked securities (i) inclusive of the value of (y) any minority investments held by the subject company and (z) any non-operating assets of the subject company and (ii) exclusive of the value of any non-controlling interests in the subject company's businesses that are held by third parties) plus (b) the subject company's funded debt less (c) the subject company's excess cash, cash equivalents, and short- and long-term marketable securities.

[2]   Represents the principal amount of the Exit Facility minus estimated *pro forma* cash of $10 million.

COMPANY-SPECIFIC FACTORS, AND (II) THE FINANCIAL CONDITION, FINANCIAL PERFORMANCE, AND FINANCIAL PROSPECTS OF THE REORGANIZED DEBTORS. MANY OF THE FOREGOING FACTORS AND/OR DRIVERS ARE BEYOND THE CONTROL OF THE DEBTORS, THE REORGANIZED DEBTORS, AND INTREPID. ACCORDINGLY, THE ESTIMATED VALUES SET FORTH HEREIN ARE NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE THE ESTIMATED TOTAL ENTERPRISE VALUE AND THE IMPLIED ESTIMATED EQUITY VALUE OF THE REORGANIZED DEBTORS AS SET FORTH HEREIN ARE INHERENTLY SUBJECT TO SUCH UNCERTAINTIES AND CONTINGENCIES, NONE OF THE DEBTORS, THE REORGANIZED DEBTORS, INTREPID, OR ANY OTHER PERSON ASSUMES ANY RESPONSIBILITY FOR THEIR ACCURACY, ACHIEVABILITY, OR REALIZATION. ANY VARIANCE IN ACTUAL RESULTS FROM THE ESTIMATES SET FORTH IN THE FINANCIAL PROJECTIONS COULD HAVE A MATERIAL IMPACT ON INTREPID'S VALUATION ANALYSIS.

UNLESS OTHERWISE INDICATED HEREIN, INTREPID'S VALUATION ANALYSIS WAS BASED ON THE FINANCIAL PROJECTIONS FOR THE REORGANIZED DEBTORS AND ON CAPITAL MARKETS DATA AS OF JANUARY 17, 2024, REFLECTS INFORMATION MADE AVAILABLE TO INTREPID AS OF OR PRIOR TO SUCH DATE, AND IS BASED ON ECONOMIC, CAPITAL MARKETS, AND OTHER CONDITIONS AS OF SUCH DATE. INTREPID IS NOT MAKING ANY ASSESSMENT REGARDING THE IMPACT OR THE ECONOMIC EFFECTS OF THE POST COVID-19 ENVIRONMENT AND OTHER GLOBAL MACROECONOMIC FACTORS, INCLUDING WITH RESPECT TO THE POTENTIAL IMPACT OR EFFECTS ON THE FUTURE FINANCIAL PERFORMANCE OF THE REORGANIZED DEBTORS. ALTHOUGH THE VALUATION ANALYSIS MAY BE AFFECTED BY SUBSEQUENT DEVELOPMENTS INCLUDING, WITHOUT LIMITATION, DEVELOPMENTS RELATING TO THE POST COVID-19 ENVIRONMENT AND OTHER GLOBAL MACROECONOMIC FACTORS, INTREPID ASSUMES NO RESPONSIBILITY FOR UPDATING OR REVISING THE ESTIMATED TOTAL ENTERPRISE VALUE OR THE IMPLIED ESTIMATED EQUITY VALUE OF THE REORGANIZED DEBTORS FOR ANY REASON, WHETHER DUE TO FACTS, CIRCUMSTANCES, OR EVENTS OCCURRING AFTER SUCH DATE OR OTHERWISE.

### *Summary of Reviews, Financial Analyses and Valuation Methodologies*

In the course of estimating the Total Enterprise Value of the Reorganized Debtors, Intrepid:

- reviewed drafts of the Plan and the Disclosure Statement, each dated as of January 16, 2024;

- reviewed the *pro forma* capitalization of the Reorganized Debtors as contemplated by the Plan as of the Effective Date;

- reviewed certain historical and forward-looking business and financial information regarding the business and prospects of the Debtors and the Reorganized Debtors (including certain financial projections for the Reorganized Debtors for the fiscal years ending December 31, 2024 through December 31, 2028 (the "**Financial Projections**")), all as prepared and approved for Intrepid's use by the Debtors' senior management and financial advisors;

- discussed with the Debtors' senior management and the Debtors' other advisors (as applicable) their respective views regarding the (i) business, operations, historical and projected financial results, and future prospects of the Debtors and the Reorganized Debtors, (ii) key assumptions related to the Financial Projections, and (iii) commercial, competitive, and regulatory dynamics in the forestry, lumber, and engineered wood products sectors;

- reviewed and discussed with the Debtors' senior management and the Debtors' other advisors (as applicable) the Debtors' tax attributes;

- compared the financial performance of the Debtors with corresponding data for certain publicly traded companies that Intrepid deemed relevant in evaluating the Reorganized Debtors and reviewed the trading multiples for such publicly traded companies;

- performed discounted cash flow analyses based on the Financial Projections; and

- conducted such other studies, analyses, inquiries, and investigations as Intrepid deemed appropriate.

In connection with performing its Valuation Analysis, Intrepid:

- based its Valuation Analysis on various assumptions, including assumptions concerning general economic, business, and capital markets conditions and industry-specific and company-specific factors, all of which are beyond the control of the Debtors, the Reorganized Debtors, and Intrepid;

- performed a variety of financial analyses and considered a variety of factors in assessing the estimated Total Enterprise Value of the Reorganized Debtors;

- did not form a view or opinion as to whether any individual analysis or factor, whether positive or negative, considered in isolation, supported or failed to support its estimate of the Total Enterprise Value of the Reorganized Debtors; and

- relied primarily on the Discounted Cash Flow Analysis to ultimately arrive at its estimate of the Total Enterprise Value of the Reorganized Debtors.

In preparing its valuation, Intrepid performed a variety of financial analyses and considered a variety of factors. Several generally accepted valuation techniques for estimating the Debtors' enterprise value were considered. Intrepid largely relied on a Discounted Cash Flow ("**DCF**") analysis, after considering a Comparable Public Company Analysis and a Precedent Transactions Analysis; however, the lack of publicly-traded comparable companies and M&A transactions involving companies that have similar business, financial, and operating characteristics to the Reorganized Debtors make the results of these analyses inapplicable. Intrepid also took into consideration and relied upon the results of the Sale Process undertaken by the Company prior to filing for bankruptcy.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE FINANCIAL ANALYSES PERFORMED BY INTREPID. INTREPID'S PREPARATION OF ITS VALUATION ANALYSIS INVOLVED VARIOUS COMPLEX DETERMINATIONS AND JUDGMENTS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF VALUATION ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ANALYSES ARE NOT READILY SUSCEPTIBLE TO SUMMARY DESCRIPTION.

### *Certain Caveats, Limitations, and Considerations*

With respect to the information used in performing its Valuation Analysis described herein:

- Intrepid relied upon and assumed the accuracy, completeness, and reasonableness of all industry, business, financial, legal, regulatory, tax, accounting, actuarial, and other information (including, without limitation, the Financial Projections, any other estimates, and any other forward-looking information) provided by or discussed with the Debtors and their other advisors or obtained from public sources, data suppliers, and other third parties;

- Intrepid did not assume any responsibility, obligation, or liability for the accuracy, completeness, reasonableness, achievability, or independent verification of, and Intrepid did not independently verify, any of the above-referenced information (including, without limitation, the Financial Projections, any other estimates and any other forward-looking information);

- Intrepid expressed no view, opinion, representation, guaranty, or warranty (in each case, express or implied) regarding the reasonableness or achievability of the Financial Projections, any other estimates, and any other forward-looking information or the assumptions upon which they are based; and

- Specifically, with respect to (i) the Financial Projections, any other estimates and any other forward-looking information provided by or discussed with the Debtors, (a) Intrepid was advised by the Debtors' senior management and other advisors, and Intrepid assumed, that the Financial Projections, such other estimates and such other forward-looking information utilized in its analyses had been reasonably prepared on bases reflecting the best then-currently available estimates and judgments of the Debtors' senior management as to the expected future performance of the Reorganized Debtors, (b) Intrepid assumed that the Financial Projections would be realized substantially as projected/forecasted, and (c) Intrepid assumed that the Financial Projections, such other estimates, and such other forward-looking information had been reviewed by the Debtors' Board of Managers with the understanding that such information would be used and relied upon by Intrepid in connection with its Valuation Analysis and (ii) any financial projections, other estimates, and/or other forward-looking information obtained by Intrepid from public sources, data suppliers, and other third parties, Intrepid assumed that such information was reasonable and reliable.

Intrepid further assumed that (i) in all respects meaningful to its analyses, (a) the final version of the Plan, as confirmed, and the related Disclosure Statement will not differ materially from earlier drafts or versions thereof that Intrepid reviewed in order to prepare its Valuation Analysis and (b) the Debtors will comply with all terms and conditions of the Plan and the Disclosure Statement; (ii) the Plan will be consummated in a timely manner in accordance with its terms and in compliance with all applicable laws, documents, and other requirements, without any delays, limitations, restrictions, conditions, waivers, amendments, or modifications (regulatory, tax-related or otherwise) that would have an effect on the Reorganized Debtors in any way meaningful to Intrepid's analyses; and (iii) no material changes that would affect the estimated Total Enterprise Value of the Reorganized Debtors will occur between January 17, 2024 and the contemplated Effective Date.

Intrepid's financial advice to the Debtors and its Valuation Analysis (and any materials provided in connection therewith):

- were provided to the Debtors' Board of Managers (in its capacity as such) solely for its information and assistance in connection with its evaluation of the Plan;

- did not constitute a recommendation to the Debtors' Board of Managers with respect to proposing the Plan or pursuing any of the transactions described in or contemplated by the Plan;

- do not constitute advice or a recommendation to any holder of any Claim against or Equity Interest in any of the Debtors, any creditors of any of the Debtors, or any other stakeholders in any of the Debtors (all of the foregoing, "**Interested Parties**") as to how to vote or act in connection with the Plan;

- do not address the (i) Debtors' or Interested Parties' underlying business or financial decision to, respectively, propose or accept or reject the Plan (and any transactions contemplated thereby), (ii) relative merits of the Plan (and any transactions contemplated thereby) as compared to any alternative business or financial strategies that might exist for the Debtors or such Interested Parties, or (iii) effects of any other transaction in which the Debtors or such Interested Parties might

engage;

- do not constitute a view or opinion as to (i) any term, aspect or implication of the Plan (including, without limitation, the form or structure of any transactions contemplated thereby) or the Disclosure Statement or (ii) any other agreement, transaction document or instrument contemplated by the Plan or to be entered into or amended in connection with the Plan;

- do not constitute a view or opinion as to fairness, financial or otherwise, of the Plan to, or of any consideration to be paid to or received by, any of the Interested Parties;

- do not constitute a view or opinion as to the fairness, financial or otherwise, of the amount or nature of any compensation payable to or to be received by any of the Debtors' or the Reorganized Debtors' directors, managers, officers, or employees, or any class of such persons, in connection with the Plan relative to the consideration to be distributed to or received by the Interested Parties;

- do not constitute a view or opinion regarding the solvency/liquidity of the Reorganized Debtors or any other entity under any relevant laws relating to bankruptcy, insolvency, or similar matters; and

- do not constitute a solvency/liquidity opinion or a liquidation analysis.

Intrepid's professionals are not legal, regulatory, tax, consulting, turn-around, accounting, appraisal, or actuarial experts and Intrepid's financial analyses described herein should not be construed as constituting advice with respect to such matters; accordingly, Intrepid relied on the assessments of the Debtors' senior management and the Debtor's other advisors with respect to such matters.

Intrepid did not perform or obtain any independent appraisal of the assets or liabilities (including any contingent, derivative, or off-balance sheet assets and liabilities) of the Debtors, the Reorganized Debtors, or any other entity or of the solvency/liquidity of the Debtors, the Reorganized Debtors, or any other entity, nor was Intrepid furnished with any such appraisals (other than the Liquidation Analysis, prepared by the Debtors, with the assistance of their financial advisor, attached to the Disclosure Statement as Exhibit C).

## **EXHIBIT E**

**Financial Projections**

In connection with planning and developing the Plan, the Debtors, with the assistance of their advisors, prepared projections for the fiscal years ending December 31, 2024 through December 31, 2028, which are attached hereto as **Exhibit E** (the "Financial Projections"), including management's assumptions related thereto.  For purposes of the Financial Projections, the Debtors have assumed an Effective Date of March 31, 2024.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Financial Projections due to a material change in the Debtors' prospects.

The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, commodity prices, regulatory changes, or a variety of other factors, including the factors listed in this Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.  Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement.

| USD in 000's | As of and for Fiscal Years Ending December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2024[1] | 2025 | 2026 | 2027 | 2028 |
| **Gross Revenue** | $ 55,519 | $ 93,217 | $ 97,724 | $ 100,656 | $ 103,675 |
| *Growth* | *N/A* | *68%* | *5%* | *3%* | *3%* |
| COGS | (40,941) | (58,755) | (59,416) | (61,199) | (63,035) |
| **Gross Profit** | **14,577** | **34,462** | **38,308** | **39,457** | **40,641** |
| *Gross Margin* | *26%* | *37%* | *39%* | *39%* | *39%* |
| SG&A | (17,973) | (11,065) | (10,769) | (11,092) | (11,424) |
| **EBITDA** | **$ (3,396)** | **$ 23,397** | **$ 27,539** | **$ 28,365** | **$ 29,216** |
| Add: Restructuring Fees and Expenses | 6,771 | - | - | - | - |
| **Adjusted EBITDA** | **$ 3,375** | **$ 23,397** | **$ 27,539** | **$ 28,365** | **$ 29,216** |
| *% Margin* | *6%* | *25%* | *28%* | *28%* | *28%* |
| Working Capital | $ 4,652 | $ 6,203 | $ 8,062 | $ 8,304 | $ 8,553 |
| *Change in Working Capital* | *(10,776)* | *(1,550)* | *(1,859)* | *(242)* | *(249)* |
| Capital Expenditures | $ 18,766 | $ 5,467 | $ 5,167 | $ 5,322 | $ 5,481 |
| Depreciation and Amortization | $ 15,628 | $ 14,529 | $ 13,937 | $ 14,355 | $ 14,786 |

**Notes:**

(1) 2024 projections reflect results of operations and balances as of and for the period from January 1, 2024 through December 31, 2024.

**EXHIBIT F**

**Corporate Organizational Chart**



**Restoration Forest Products Group, LLC**

- Restoration Forest Products, LLC
- Just Right, LLC
- Good Earth Power AZ, LLC
- Seymour International Group, LLC
- Seymour Forest Products, LLC
- Lumberjack Timber, LLC

*Restoration Forest Products Group, LLC, Restoration Forest Products, LLC, Just Right, LLC, and Good Earth Power AZ, LLC are the Debtors and are represented in green.*

**Seymour International Group, LLC, Seymour Forest Products, LLC, and Lumberjack Timber, LLC are non-Debtor affiliates. Each of these non-Debtor affiliates is non-operational and in the process of being wound down.*

1116038 7v.2